ORAL ARGUMENT NOT YET SCHEDULED

**Nos. 25-5152, 25-5233, 25-5247**
―――――――――――――――――――――――――――

# In the United States Court of Appeals
# for the District of Columbia
―――――――――――――――――――――――――――

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,
*Plaintiffs - Appellants*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Defendants – Appellees*,
―――――――――――――――――――――――――――

On Appeal from the United States District Court for the District of Columbia
Case No. 1:25-cv-00943-TNM, Honorable Trevor N. McFadden, District Judge
―――――――――――――――――――――――――――

### OPENING BRIEF OF PLAINTIFFS-APPELLANTS
―――――――――――――――――――

Lynn Damiano Pearson
Cassandra Charles
Joanna Cuevas Ingram
National Immigration Law Center
P.O. Box 34573
Washington, D.C.  20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Emma Winger
Michelle Lapointe
Leslie K. Dellon
Chris Opila
American Immigration Council
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

*Counsel for Plaintiffs – Appellants*
(Additional counsel listed on signature block)

## <u>CERTIFICATE OF PARTIES, RULINGS, RELATED CASES,<br>AND RULE 26.1</u>

Pursuant to Circuit Rules 26.1 and 28(a)(1), and Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants certify the following:

A.    <u>Parties and Amici</u>. The following parties appeared before the district court or this Court:

1.    Coalition for Humane Immigrant Rights, *Plaintiff-Appellant*

2.    United Farm Workers of America, *Plaintiff-Appellant*

3.    CASA, Inc., *Plaintiff-Appellant*

4.    Make the Road New York, *Plaintiff-Appellant*

5.    U.S. Department of Homeland Security, *Defendant-Appellee*

6.    Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security, *Defendant-Appellee*

7.    U.S. Citizenship and Immigration Services, *Defendant-Appellee*

8.    Kika Scott, in her official capacity as Senior Official Performing the Duties of the Director, *Defendant-Appellee*

9.    U.S. Immigration and Customs Enforcement, *Defendant-Appellee*

10.    Todd Lyons, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement, *Defendant-Appellee*

11.    U.S. Customs and Border Protection, *Defendant-Appellee*

12. Pete R. Flores, in his official capacity as Acting Commissioner, U.S. Customs and Border Protection, *Defendant-Appellee*

13. U.S. Department of Justice, *Defendant-Appellee*

14. Pamela Bondi, in her official capacity as Attorney General, *Defendant-Appellee*

Immigration Reform Law Institute appeared as amici before the district court or this Court.

B.    Rulings Under Review.

1. Memorandum Order Denying Stay and Preliminary Injunction, dated April 10, 2025 (ECF 27), issued by the Honorable Trevor N. McFadden in Case No. 1:25-cv-00943 (D.D.C.)

2. Memorandum Order Denying Stay or Injunction Pending Appeal, dated June 12, 2025 (ECF 53), issued by the Honorable Trevor N. McFadden in Case No. 1:25-cv-00943 (D.D.C.)

3. The constructive denial of Plaintiffs' Renewed Motion for a Stay or Preliminary Injunction, dated June 18, 2025 (ECF 54), by the Honorable Trevor N. McFadden in Case No. 1:25-cv-00943 (D.D.C.)

C.      <u>Statement of Related Cases</u>. This case has not previously been before this Court or any other court other than the district court from which these appeals were taken. Undersigned counsel is unaware of any other case that is related to this case.

D.      <u>Rule 26.1 Disclosure</u>. Plaintiffs-Appellants certify that none of the aforementioned Plaintiffs has any parent companies, subsidiaries, or affiliates owning outstanding securities in the hands of the public.

Dated: September 16, 2025                    */s/ Emma Winger*
                                             Emma Winger
                                             American Immigration Council

                                             *Attorney for Plaintiffs-Appellants*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION .............................................................2

STATEMENT OF ISSUE PRESENTED .....................................................3

STATUTES AND REGULATIONS ............................................................3

STATEMENT OF THE CASE......................................................................3

    I.      History of Noncitizen Registration .....................................................3

        A.     The Alien Registration Act of 1940.................................................4

        B.     The Narrowing of Noncitizen Registration Over the Decades ......6

        C.     Defendants' New Registration Scheme.......................................11

    II.     Procedural History .......................................................................15

STANDARD OF REVIEW .......................................................................17

SUMMARY OF THE ARGUMENT ......................................................18

ARGUMENT ..............................................................................................20

    I.      PLAINTIFFS' APPEALS ARE PROPER. ......................................20

    II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.....22

        A.     Plaintiffs Have Standing.............................................................22

        B.     The IFR Violated Notice and Comment Requirements ..............23

        C.     The IFR is Arbitrary and Capricious ...........................................32

III.   PLAINTIFFS HAVE ESTABLISHED LIKELIHOOD OF

      IRREPARABLE HARM .................................................................41

    A.    Arrest and Prosecution ................................................................41

    B.    First and Fifth Amendment Injuries ...........................................44

    C.    Removal and Inability to Pursue Immigration Relief ................48

    D.    Injury to CHIRLA's Core Programmatic Work...........................49

IV.   THE BALANCE OF THE EQUITIES AND THE PUBLIC

      INTEREST FAVOR PLAINTIFFS.....................................................52

  V.    AN APA STAY IS THE APPROPRIATE REMEDY .......................54

CONCLUSION ......................................................................................56

CERTIFICATE OF COMPLIANCE ......................................................58

CERTIFICATE OF SERVICE ...............................................................59

ADDENDUM ..............................................................................Add. 1

## TABLE OF AUTHORITIES

**CASES**

*A. A. R. P. v. Trump*, 145 S. Ct. 1364 (2025)...............................................21

*AFL-CIO v. NLRB*, 57 F.4th 1023 (D.C. Cir. 2023)..................................23

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,

   988 F.2d 146 (D.C. Cir. 1993).................................................................32

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,

   946 F.3d 615 (D.C. Cir. 2020).................................................................50

*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) ...................33

*Am. Wild Horse Pres. Campaign v. Perdue*,

   873 F.3d 914 (D.C. Cir. 2017)........................................................ 34, 36

*Arizona v. EPA*, 77 F.4th 1126 (D.C. Cir. 2023) ......................................22

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ...................... 23, 33

*Bryan v. United States*, 524 U.S. 184 (1998)...........................................25

*Cabrera v. U.S. Dep't of Labor*, --- F. Supp. 3d ---, No. 25-cv-1909 (DLF),

   2025 WL 2092026 (D.D.C. July 25, 2025)...................................... 54, 55

*Career Colls. & Schools of Texas v. U.S. Dep't of Educ.*,

   98 F.4th 220 (5th Cir. 2024)....................................................................54

*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981) .....................................21

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,

   513 F. Supp. 3d 154 (D.D.C. 2021) ....................................................51

*Chamber of Com. of U.S. v. U.S. Dep't of Lab.*,

   174 F.3d 206 (D.C. Cir. 1999)....................................................... 28, 31

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ...............18

*City of Clarksville v. FERC*, 888 F.3d 477 (D.C. Cir. 2018) ...................22

*Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024)..............56

*Dep't of Com. v. New York,* 588 U.S. 752 (2019) ....................................39

*Edgar v. Haines*, 2 F.4th 298 (4th Cir. 2021) ...........................................45

*Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1 (D.C. Cir. 2011) ......................... 24, 28, 31

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1 (D.D.C. 2014) .........50

*Ethical Treatment of Animals v. U.S. Dep't of Agric.*,

    797 F.3d 1087 (D.C. Cir. 2015) ...........................................................51

*Fla. Immigrant Coal. v. Uthmeier*, 778 F. Supp. 3d 1315 (S.D. Fla. 2025) ............42

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)........ 22, 50

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ....................50

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,

    691 F.3d 1250 (11th Cir. 2012) ....................................................... 41, 44

*Grace v. Barr,* 965 F.3d 883 (D.C. Cir. 2020).........................................35

*Great Lakes Gas Transmission Ltd. P'ship v. FERC,*

    984 F.2d 426 (D.C. Cir. 1993)................................................................33

*Grosso v. United States*, 390 U.S. 62 (1968) ..........................................47

*Guardian Fed. Sav. & Loan Ins. Corp.,* 589 F.2d 658 (D.C. Cir. 1978).................33

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .................................. 50, 51

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) ...................................49

*Idaho Org. of Res. Councils v. Labrador*,

    780 F. Supp. 3d 1013 (D. Idaho 2025)................................................41

*IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524 (7th Cir. 1996) .....................21

*Int'l Ladies' Garment Workers' Union v. Donovan,*

    722 F.2d 795 (D.C. Cir. 1983)................................................................36

*League of Women Voters of the U.S. v. Newby*,

    838 F.3d 1 (D.C. Cir. 2016)............................................... 18, 43, 52

*Leary v. United States*, 395 U.S. 6 (1969) ..............................................47

*Lindell v. United States*, 82 F.4th 614 (8th Cir. 2023) ............................................43

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................22

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012) ..........................................53

*Make the Road New York v. Noem*, No. 25-cv-190 (JMC),

    2025 WL 2494908 (D.D.C. Aug. 29, 2025)..........................................................54

*Mann Constr., Inc. v. United States*, 27 F.4th 1138 (6th Cir. 2022).........................26

*Marchetti v. United States*, 390 U.S. 39 (1968) ........................................................47

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ...................................... 23, 28, 29

*Michigan v. EPA*, 576 U.S. 743 (2015) ............................................................... 33, 40

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ................................42

*Mock v. Garland*, 697 F. Supp. 3d 564 (N.D. Tex. 2023)..........................................42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983)....................................................................................... 33, 36

*Nat'l Ass'n of Home Health Agencies v. Schweiker*,

    690 F.2d 932 (D.C. Cir. 1982).......................................................................... 28, 29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,

    145 F.3d 1399 (D.C. Cir. 1998) ............................................................................54

*Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428 (D.C. Cir. 1995).........50

*Nken v. Holder*, 556 U.S. 418 (2009)........................................................................52

*Noem v. Vasquez Perdomo,* No. 25A169 (U.S. Sept. 8, 2025) ................................30

*Nw. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*,

    496 F. Supp. 3d 31 (D.D.C. 2020) .......................................................................51

*Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1 (D.D.C. 1997) ....53

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020)....................34

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................53

*Ramirez v. U.S. Immigr. & Customs Enf't*,

    310 F. Supp. 3d 7 (D.D.C. 2018) ................................................................. 42, 44

*Ramsden v. United States*, 2 F.3d 322 (9th Cir. 1993) .............................................43

ix

*Sepulveda Ayala v. Noem*, No. 3:25-CV-5185-JNW,

    2025 WL 1207655 (W.D. Wash. Apr. 26, 2025)....................................................49

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) .......................................52

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*,

    985 F.3d 1032 (D.C. Cir. 2021) ............................................................32

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966) ...........................................20

*Sw. Airlines Co. v. FERC,* 926 F.3d 851 (D.C. Cir. 2019) .......................................33

*Texas Child.'s Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) .......................53

*Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022) ...........................................55

*TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020).......................................53

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)..................................................15

Trump v. CASA, 606 U.S. 831 (2025)....................................................................55

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021)..................................................18

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333 (D.D.C. 2020).........45

*UFW v. Solis*, 697 F. Supp. 2d 5 (D.D.C. 2010) .....................................................36

*United States v. Cain*, 583 F.3d 408 (6th Cir. 2009) ..............................................26

*United States v. Claudio-Becerra*, No. PO 08-2305,

    2008 WL 11451346 (D.N.M. Aug. 28, 2008)....................................................25

*United States v. Mendez-Lopez,* 528 F. Supp. 972 (N.D. Okla. 1981)....................25

*United States v. Picciotto*, 875 F.2d 345 (D.C. Cir. 1989)......................................26

*United States v. Spingola*, 464 F.2d 909 (7th Cir. 1972).........................................25

*VanDerStok v. Garland*, 633 F. Supp. 3d 847 (N.D. Tex. 2022)...................... 42, 43

*Winter v. NRDC*, 555 U.S. 7 (2008) .......................................................................18

*Younger v. Harris*, 401 U.S. 37 (1971) ..................................................................43

**STATUTES**

6 U.S.C. § 557 ..................................................................................9

8 U.S.C. § 451 ..................................................................................4

8 U.S.C. § 1101(a)(27)(J)(i) ...........................................................49

8 U.S.C. § 1158(a)(1) .....................................................................49

8 U.S.C. § 1182(a)(9)(B) ................................................................49

8 U.S.C. § 1201(b) ...........................................................................9

8 U.S.C. § 1227(a)(3)(A) ...............................................................10

8 U.S.C. § 1292(a)(1) .......................................................................2

8 U.S.C. § 1301 ............................................................................3, 9

8 U.S.C. § 1302 ............................................................................3, 9

8 U.S.C. § 1302(a) .....................................................................9, 24

8 U.S.C. § 1303 ............................................................................3, 9

8 U.S.C. § 1304 ...................................................... 3, 9, 12, 24, 27, 30

8 U.S.C. § 1305 ............................................................................3, 9

8 U.S.C. § 1305(a) .........................................................................10

8 U.S.C. § 1306 ....................................................................... 3, 9, 12

8 U.S.C. § 1306(a) ........................................................ 10, 14, 25, 42

8 U.S.C. § 1306(b) .........................................................................10

Act of Sept. 11, 1957, Pub. L. No. 85-316, 71 Stat. 639 (1957) ..............8

Alien Registration Act. Pub. L. No. 76-670, 54 Stat. 670 ...................4, 5

Farm Labor Supply Appropriations Act of 1944, § 5(g),
    Pub. L. No. 78-229, 58 Stat. 11 (1944) ..................................6

Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952) .............7

## REGULATIONS

12 Fed. Reg. 5061 (July 31, 1947).................................................................6

15 Fed. Reg. 567 (Feb. 2, 1950) ..................................................................7

17 Fed. Reg. 11465 (Dec. 19, 1952) ............................................................7

22 Fed. Reg. 9739 (Dec. 6, 1957) ................................................................8

25 Fed. Reg. 7175 (July 29, 1960) ...............................................................8

81 Fed. Reg. 94231 (Dec. 23, 2016) ............................................................9

90 Fed. Reg. 11793 (Mar. 12, 2025)..1, 3, 13, 14, 24, 27, 28, 29, 30, 35, 37, 38, 39,
40, 48, 51

8 C.F.R. § 204.11(h)...................................................................................49

8 C.F.R. § 214.14(c)...................................................................................49

8 C.F.R. § 264.1(a) ............................................................................. 10, 37

8 C.F.R. § 264.1(b)....................................................................................10

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025)...................11

## OTHER AUTHORITIES

Adrian Florido, *'Antagonized for Being Hispanic': Growing Claims of Racial
Profiling in LA Raids*, NPR (July 4, 2025, 1:00 PM EST),
https://tinyurl.com/yyz7as33.................................................................30

*Alien Registration (AR-2) Forms*, National Archives (last updated Sept. 6, 2024),
https://tinyurl.com/5efpyb89.................................................................4

*Alien Registration to Justice Unit*, N.Y. Times (Jan. 2, 1943)...................6

An Open Letter to the Conference Committee on Intelligence Reform: Remove
National ID Provisions from the Conference Report (Nov. 15, 2004),
https://tinyurl.com/yakkm342.................................................................31

Austen Erblat, *Who Is Jeanette Vizguerra, Immigrant Rights Activist Fighting Deportation in Denver?*, CBS News (June 5, 2025, 6:55 PM), https://tinyurl.com/3dk5xekm .................................................................45

Billal Rahman, *Kristi Noem Breaks Down How Federal Migrants Register Works*, Newsweek (Feb. 26, 2025, 9:45 AM), https://tinyurl.com/bdz9prye ........... 12, 27

*CIS Ombudsman Annual Report 2024* 28 (June 28, 2024), https://tinyurl.com/ybpreeka ................................................................39

Comment from CHILRA to USCIS (Apr. 11, 2025) https://tinyurl.com/yc64npuu ................................................................32

Comment from MRNY to USCIS (Apr. 11, 2025) https://tinyurl.com/4ssch4tn .................................................................32

David Morgan, *Republican US Senator Murkowski on Threat of Trump Retaliation: 'We Are All Afraid'*, Reuters (Apr. 17, 2025, 11:06 PM), https://tinyurl.com/2v4hu4hn ................................................................46

Dep't of Justice, Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense, 49 Op. O.L.C. ___, 2025 WL 1837418 (June 21, 2025)....47

*Flexoline Index (Flex)*, National Archives (last updated May 20, 2024), https://tinyurl.com/mv436xs2 ................................................................6

Form G-325R Biographic Information (Registration), OMB: 1615-0166 https://tinyurl.com/3txjv5an..................................................... 13, 27, 28, 45, 46

Immigrant Legal Resource Center, Discussing Registration with Clients (May 14, 2025), https://tinyurl.com/4kf6rnru ...................................................37

Jeremy Roebuck & Marianne LeVine, *Migrants Criminally Charged after Failing to Register with U.S. Government*, Wash. Post (May 31, 2025), https://tinyurl.com/4da4xehh ................................................................14

Jonathan Weinberg, *Demanding Identity Papers*, 55 Washburn L.J. 197 (2015)......7

Karina Tsui, *What We Know about the Federal Detention of Activists, Students and Scholars Connected to Universities*, CNN (Apr. 2, 2025, 8:48 PM), https://tinyurl.com/y7z8dysv ..............................................................46

Mae M. Ngai, *The Strange Career of the Illegal Alien: Immigration Restriction and Deportation Policy in the United States, 1921–1965*, 21 L. & Hist. Rev. 69 (2003) ..........................................................5

Matthew Feeney, *If You Value Privacy, Resist Any Form of National ID Cards*, Cato Institute (Nov. 28, 2018), https://tinyurl.com/4y86nmxu ..........................31

Melissa Quinn, *Trump's Crusade Against Big Law Firms Sparks Fears of Long-Lasting Damage*, CBS News (Apr. 2, 2025, 3:20 PM), https://tinyurl.com/5c766bej ..............................................................46

Memorandum from the Attorney Gen. re: General Policy Regarding Charging, Plea Negotiations, and Sentencing 3 (Feb. 5, 2025), https://tinyurl.com/25wr8sd5 ..............................................................12

Nancy Morawetz & Natasha Fernández-Silber*, Immigration Law and the Myth of Comprehensive Registration*, 48 U.C. Davis L. Rev. 141 (2014)....................8, 25

Offs. of the U.S. Att'ys, U.S. Dep't of Just., Prosecuting Immigration Crimes Report - 8 U.S.C. § 1325 Defendants Charged (July 10, 2025), https://tinyurl.com/37uharxz ..............................................................47

*Policy Manual*, U.S. Citizenship and Immigration Services (last updated Aug. 29, 2025), https://tinyurl.com/5b5ta5sk ..............................................................5

Press Release, DHS, Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally (Feb. 25, 2025), https://tinyurl.com/mrex6hhy................................................... 12, 27

Press Release, U.S. Att'y Off., Mexican National Pleads Guilty to Willful Failure to Register Charge in Waco (July 2, 2025), https://tinyurl.com/3wcp3erc .........14

xiv

Robert H. Jackson, U.S. Attorney Gen., Speech: Alien Registration and Democracy (Dec. 21, 1940), *available at* https://tinyurl.com/5eyhcb4j............................5, 27

Supporting Statement for Biographic Information (Registration), OMB Control No.: 1615-NEW, 6 (Feb. 25, 2025) https://tinyurl.com/2cs24kmp ....................40

United States v. Ayala-Melendez, 1:25-cr-00154-JEB (D.D.C., complaint filed May 12, 2025)............................................................14

U.S. Citizenship & Immigr. Servs., *USCIS to Consider Anti-Americanism in Immigrant Benefit Requests* (Aug. 19, 2025), https://tinyurl.com/4kb6bcxk......45

U.S. Citizenship & Immigr. Servs., Alien Registration Requirement, How to Determine if You are Already Registered (May 6, 2025), https://www.uscis.gov/alienregistration................................................................37

U.S. Citizenship & Immigr. Servs., G-325R, Biographic Information (Registration) (last updated April 11, 2025), https://www.uscis.gov/forms/all-forms/g-325r....13

# **GLOSSARY**

CASA, Inc. ("CASA")

Coalition for Humane Immigrant Rights ("CHIRLA")

Immigration and Nationality Act ("INA")

Immigration and Nationality Service ("INS")

Interim Final Rule, Alien Registration Form and Evidence of Registration, 90 Fed. Reg. 11793 (Mar. 12, 2025) ("IFR")

Joint Appendix ("JA")

Make the Road New York ("MRNY")

National Security Entry-Exit Registration System ("NSEERS")

United Farm Workers of America ("UFW")

# INTRODUCTION

This case challenges Defendants' rushed and arbitrary implementation of a universal noncitizen registration scheme by executive action for the first time since the end of World War II. Defendants imposed this scheme through an Interim Final Rule, 90 Fed. Reg. 11793 (Mar. 12, 2025) ("IFR") without prior notice and consideration of public comment and without any meaningful explanation for the significant shift in policy, in violation of the Administrative Procedure Act ("APA"). As soon as the IFR took effect on April 11, Defendants began prosecuting noncitizens newly required to apply for registration.

The district court recognized that the IFR marks a dramatic change in course without the APA's procedural protections. As the court observed: "[T]his is a pretty big switcheroo from what's been happening, and [] the case law and the APA would require something more than what [Defendants have] done to implement this rule."  JA143; *see* JA102–04.

Nevertheless, the district court denied Plaintiffs' motion for an APA stay or preliminary injunction. While the court initially doubted Plaintiffs' standing, it later concluded Plaintiffs do have standing but denied their request for preliminary relief on a finding of no irreparable harm. That is wrong. The members of Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), United Farm Workers of America ("UFW"), CASA, Inc. ("CASA") and Make the Road New York

1

("MRNY") are at imminent risk of irreparable injury. Their members are unable to access the new registration system, exposing them to the very real risk of prosecution and detention. Their members are *currently* experiencing a chilling of their protected speech and a burden to their right against self-incrimination. Their members face removal and barriers to pursuing congressionally-approved immigration relief because the IFR registration scheme is an integral part of Defendants' plans for mass detention and deportation. And CHIRLA itself faces ongoing, irreparable injury to its core programmatic work.

Where all four factors weigh in favor of both an APA stay and a preliminary injunction, the Court should reverse the district court and enter a stay or preliminary injunction of the IFR.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. JA24. The promulgation of the IFR was a "final agency action" and, therefore, subject to judicial review by the district court. This Court has jurisdiction to review the interlocutory orders denying a stay or injunction pending appeal under 8 U.S.C. § 1292(a)(1). *See* Doc. No. 2129682.

## STATEMENT OF ISSUE PRESENTED

Whether the district court erred in denying Plaintiffs-Appellants a stay pursuant to 5 U.S.C. § 705, or in the alternative a preliminary injunction of the IFR on noncitizen registration, 90 Fed. Reg. 11793 (Mar. 12, 2025).

## STATUTES AND REGULATIONS

Applicable statutes and regulations are contained in the attached addendum.

## STATEMENT OF THE CASE

### I.    History of Noncitizen Registration

This case addresses a dramatic change in policy regarding the registration of noncitizens in the United States. While the Immigration and Nationality Act ("INA") contains registration provisions at 8 U.S.C. §§ 1301–1306, before the IFR, "[noncitizens] who had entered the country illegally were effectively exempt from the statutory registration requirements, since there existed no process by which they could register." JA102 Indeed, the United States has never previously adopted a universal noncitizen registration scheme for the purpose of facilitating mass deportation. Instead, during World War II, the federal government briefly attempted a national registry with the goal of creating an inventory of noncitizens. Since the end of World War II, the federal government progressively narrowed the registration requirement. Outside the exigencies of wartime or a terrorist attack, the government chose to register people through established statutory and regulatory

3

mechanisms for granting immigration status and other immigration benefits, consistently exempting the undocumented population from the registration process. Then, in March 2025, Defendants issued the IFR, newly imposing a universal registration and fingerprint requirement with the obligation to carry proof of registration at all times or face arrest and federal prosecution. Defendants' stated purpose for the IFR is not to recreate a national inventory but to facilitate mass detention and deportation.

## A.  The Alien Registration Act of 1940

In wartime 1940, reflecting national concern over foreign-born agents, Congress passed the Smith Act, also known as the Alien Registration Act. Pub. L. No. 76-670, 54 Stat. 670 (codified at 8 U.S.C. § 451) (repealed 1952). The Act required noncitizens who were present in the United States, 14 years or older, and who remained for 30 days or longer to register and be fingerprinted at a local post office. *See id.* §§ 31(b), 32(b), 33(a) 54 Stat. at 673–674. The newly created Alien Registration Division of the Immigration and Nationality Service ("INS") issued and centralized registration records. *See Alien Registration (AR-2) Forms*, National Archives (last updated Sept. 6, 2024), https://tinyurl.com/5efpyb89 (describing the role of Alien Registration Division). Upon registration using form AR-2, the universal registration form, the noncitizen was issued form AR-3, a dedicated registration receipt that neither recorded nor conferred any immigration status or

4

benefit. *See Policy Manual*, U.S. Citizenship and Immigration Services (last

updated Aug. 29, 2025), https://tinyurl.com/5b5ta5sk (showing a copy of AR-3).

Then-Attorney General Robert H. Jackson described the purpose of the

Alien Registration Act as "an inventory of those persons within [U.S.] borders who

are . . . not American citizens but . . . are American assets—precious human

assets." Robert H. Jackson, U.S. Attorney Gen., Speech: Alien Registration and

Democracy 1 (Dec. 21, 1940) [hereinafter *Jackson Speech*], *available*

*at* https://tinyurl.com/5eyhcb4j; *see also id.* (analogizing registration to a "year-end

inventory of assets [that] is a customary procedure of sound business"). Rather

than working as a tool for mass deportation, the law incentivized registration by

authorizing the Attorney General to suspend deportation for unlawful entrants.

*See* § 20(c), 54 Stat. at 672. The federal government encouraged noncitizens to

register over radio broadcasts, promising that there was "no desire to break up

families or homes needlessly" and that those who registered would "receive all

consideration" for suspension of deportation. *Jackson Speech* at 4. Ultimately,

from 1941 through the late 1950s, the federal government suspended the

deportation of thousands of noncitizens each year. Mae M. Ngai, *The Strange*

*Career of the Illegal Alien: Immigration Restriction and Deportation Policy in the*

*United States, 1921–1965*, 21 L. & Hist. Rev. 69, 105 (2003) (calculating 34,632

suspensions of deportations reflected in INS reports from 1941 through 1960).

B.  The Narrowing of Noncitizen Registration Over the Decades

Almost immediately after the initial registration drive, the government began a decades-long project of progressively narrowing the universal registration requirement. In 1944, the INS eliminated the bureaucracy needed to maintain universal registration by disbanding the Alien Registration Division, ending post office registration, and absorbing registration into its immigration processes by conducting registration at ports of entry and INS offices. *See Flexoline Index (Flex)*, National Archives (last updated May 20, 2024), https://tinyurl.com/mv436xs2 (describing disbandment of Alien Registration Division near the end of World War II and transfer of registration functions to INS and its "alien files" created in relation to new arrivals, adjustments of status, or applications by non-citizens); *Alien Registration to Justice Unit*, N.Y. Times (Jan. 2, 1943) (describing transfer of registration functions from post offices to INS).

Further reductions to the scope of the registration requirement occurred throughout the 1940s and 1950s to meet the need for streamlined labor and tourism—exempting Mexican agricultural workers and certain Canadian visitors. *See* Farm Labor Supply Appropriations Act of 1944, § 5(g), Pub. L. No. 78-229, 58 Stat. 11, 15–16 (1944) (exempting Mexican "braceros" from registration); 12 Fed. Reg. 5061, 5131 (July 31, 1947) (exempting short-term Canadian visitors). In 1950, the INS ceased using the AR-3, the universal proof of registration form

6

applicable to all noncitizens regardless of immigration status. 15 Fed. Reg. 567, 579 (Feb. 2, 1950). In its place, the INS designated certain forms accessible only to noncitizens with immigration status, including the Form I-151 for lawful permanent residents and Form I-94 for nonimmigrants with a record of lawful entry. *Id.* at 579–580. Noncitizens without a record of lawful entry thus became functionally exempt from registration requirements because there existed no process by which to register. *See* Jonathan Weinberg, *Demanding Identity Papers*, 55 Washburn L.J. 197, 208 (2015) (stating that, beginning in 1950, "a noncitizen in the United States would not receive any evidence of registration absent a finding by the INS that he was legally entitled to be present in this country").

After significant immigration reform in the 1950s, the INS had the opportunity to establish a universal registration and fingerprint process for noncitizens. It declined to do so. The passage of the Immigration and Nationality Act ("INA") of 1952 incorporated the registration requirements from the Smith Act and added a requirement to carry any proof of registration. *See* INA, Pub. L. No. 82-414, §§ 261–64, 66 Stat. 163, 223–25 (1952). But the implementing regulations provided that, except for lawful permanent residents, the only available registration form was the record of lawful admission and departure (Form I-94). *See* 17 Fed. Reg. 11465, 11533 (Dec. 19, 1952).

7

In the decades that followed, Congress and the INS together dismantled most of the remaining registration and carry requirements. In 1957, Congress granted the Attorney General the discretion to waive the fingerprint requirement for any nonimmigrant. *See* Act of Sept. 11, 1957, Pub. L. No. 85-316, § 8, 71 Stat. 639, 641. In 1960, following the repeal of universal fingerprint requirements, the INS removed the carry requirement from the Code of Federal Regulations. *Compare* 25 Fed. Reg. 7175, 7181 (July 29, 1960) (no carry requirement), *with* 22 Fed. Reg. 9739, 9806 (Dec. 6, 1957) (requiring *"Carrying and possession of proof of alien registration*."). Over the years, as Congress created additional forms of immigration status, the INS continued its policy of accomplishing registration through immigration processes by adding some new immigration forms as proxies for a registration document. *See* Nancy Morawetz & Natasha Fernández-Silber, *Immigration Law and the Myth of Comprehensive Registration*, 48 U.C. Davis L. Rev. 141, 170 (2014). The agency never reauthorized a universal registration document accessible outside of immigration forms, despite multiple revisions to the regulations defining registration documents.

Since the World War II registration effort, the only time the federal government has instituted even a limited registration requirement separate from the immigration process was in response to the September 11, 2001, attacks. The INS used notice-and-comment rulemaking to implement National Security Entry-Exit

8

Registration System ("NSEERS"), a controversial program that required nationals from 25 predominantly Muslim and Middle Eastern countries to register. *See* 81 Fed. Reg. 94231 (Dec. 23, 2016). In 2011, the federal government ceased using NSEERS after finding the program unnecessary and that it provided no increase to national security. *See id.* at 94232. In 2016, the Department of Homeland Security ("DHS") rescinded the regulations authorizing NSEERS, because it was ineffective and "rendered obsolete" in light of more universally applicable, established security measures. *See id.* at 94232–33.

The INA still contains the registration provisions from the Smith Act of 1940, as amended by the INA in 1952 and 1957. *See* 8 U.S.C. §§1201(b), 1301–1306 . Visa applicants are registered through the visa process. *See id.* §§ 1301, 1201(b). For those not registered through the visa process, the INA obligates noncitizens over the age of 14 who remain at least 30 days "to apply for registration and to be fingerprinted" through "forms" prepared by the Secretary of Homeland Security[1] and similarly requires parents and legal guardians to "apply for the registration" of their children through the same. *See id.* §§ 1302(a)–(b), 1304(a). It further states that noncitizens 18 years of age or older must "at all times carry . . . any certificate of alien registration or alien registration receipt card issued

---

[1] Pursuant to the Homeland Security Act of 2002, references to the Attorney General that refer to functions transferred to DHS are deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557.

to [them]." *Id.* § 1304(e). Failure to carry is a crime punishable by a fine or up to 30 days in jail. *Id.* Finally, the INA makes it a crime to "willfully fail[]" to "apply for registration and be fingerprinted" (or, for a parent or legal guardian, to fail to do the same for their child), punishable by a fine or up to six months of imprisonment. *Id.* § 1306(a). Any noncitizen who is "required to be registered" must also notify DHS within ten days of any change of address. *Id.* § 1305(a). Failure to do so is a crime punishable by a fine and up to 30 days in jail, *id.* § 1306(b), and is a ground of deportation, *id.* § 1227(a)(3)(A).

Notwithstanding these provisions, the regulations in place prior to April 11, 2025, demonstrated the immigration agencies' longstanding determination that registration was effectively handled through the immigration process, while exempting the many noncitizens who had no means to apply for registration. As the agencies recognized for nearly a century, the regulations provided that registration and proof of registration should be sought through existing forms for gaining admission and establishing immigration status. *See* 8 C.F.R. § 264.1(a), (b). The regulations contain two lists: acceptable registration forms, *id.* § 264.1(a), and evidence of registration, *id.* § 264.1(b). Many existing forms used to screen immigration benefits applicants are not included on these lists.

As had been the case since the 1940s, prior to April 2025, the regulations did not include a registration form or evidence of registration for a noncitizen who entered without inspection and was ineligible for any immigration benefit.

### C. Defendants' New Registration Scheme

Defendants have now suddenly reversed the federal government's eighty-year-old approach to registration, imposing universal registration with the attendant civil and criminal penalties for failure to apply for registration or carry proof of registration. They did so for a newly adopted purpose of facilitating mass deportation and criminalizing the undocumented population—a far cry from the universal inventory of noncitizens implemented by the Attorney General in 1940.

On January 20, 2025, by executive order President Trump instructed the Secretary of Homeland Security, in coordination with the Attorney General and the Secretary of State, to "(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of [the registration statutes]; (b) Ensure that all previously unregistered aliens in the United States comply with the requirements of [these statutes]; and (c) Ensure that failure to comply with the legal obligations of [these statutes] is treated as a civil and criminal enforcement priority." Exec. Order No. 14159, 90 Fed. Reg. 8443, 8444 (Jan. 20, 2025).

11

On February 5, 2025, the Attorney General mandated that the Department of Justice (DOJ) "shall use all available criminal statutes . . . to support the Department of Homeland Security's immigration and removal initiatives," including the criminal penalties for willful failure to apply for registration and to carry registration documents. Memorandum from the Attorney Gen. re: General Policy Regarding Charging, Plea Negotiations, and Sentencing 3 (Feb. 5, 2025), https://tinyurl.com/25wr8sd5 (referencing 8 U.S.C. § 1304 and § 1306).

On February 25, 2025, DHS issued a press release announcing the new registration requirement under the heading "DHS Will Use Every Available Tool to Compel Illegal Aliens to Self-Deport." Press Release, DHS, Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally (Feb. 25, 2025), https://tinyurl.com/mrex6hhy (hereinafter *"Press Release"*). Defendant Noem gave a televised interview explaining that a noncitizen's registration would permit the government to "help them relocate right back to their home country." *See* Billal Rahman, *Kristi Noem Breaks Down How Federal Migrants Register Works*, Newsweek (Feb. 26, 2025, 9:45 AM), https://tinyurl.com/bdz9prye (hereinafter "*Newsweek Article"*) (quoting Secretary Noem interview).

On March 12, 2025, Defendants published the IFR in the Federal Register creating a new online-only, English-only general application for registration, Form

12

G-325R. *See* 90 Fed. Reg. at 11793, 11796. The form requires registrants to report on their past and intended future "activities" without limitation. Form G-325R Biographic Information (Registration), OMB: 1615-0166, 6 https://tinyurl.com/3txjv5an [hereinafter Form G-325R][2] ("Since entry, in what activities have you been engaged? In what activities do you intend to engage between now and your expected date of departure?"). The form mandates collection of information beyond what is specifically enumerated in the Alien Registration Act, including, "Have you EVER committed a crime of any kind (even if you were not arrested, cited, charged with, or tried for that crime, or convicted)?" *Id.* at 7.

The IFR estimates that between 2.2 million and 3.2 million people will have a means to apply for registration (and thus a duty to do so), where none existed before. 90 Fed. Reg. at 11797. It also reiterates the executive order's mandate that failure to comply with the registration requirements of the statute should be treated as "a civil and criminal enforcement priority." *Id* at 11795. The IFR acknowledges that universal registration results in a universal requirement to carry proof of

---

[2] After the IFR went into effect, USCIS made a PDF version of the registration form available on its website but maintained the online-only registration process. USCIS, G-325R, Biographic Information (Registration) (last updated April 11, 2025), https://www.uscis.gov/forms/all-forms/g-325r.

registration at all times at all times. *See id.* at 11797 (noting the new scheme will "also result in more [noncitizens] needing to maintain evidence of registration").

The IFR claims that it is exempt from notice and comment rulemaking because it is merely a "rule of agency organization, procedure, or practice" that does not "alter the rights or interests of parties." *Id.* at 11796. Yet at the hearing below, counsel for Defendants conceded that prior to the IFR, there was no "universal form that would apply across the board" for all undocumented immigrants to register. JA164; *see also* 90 Fed. Reg. at 11795 (observing that "[noncitizens] who entered without inspection and have not otherwise been encountered by DHS lack a designated registration form"). And Defendants have kept their promise to enforce the new obligation—prosecutions for failure to register under this new scheme have begun across the country, including in this district. *See United States v. Ayala-Melendez*, 1:25-cr-00154-JEB (D.D.C., complaint filed May 12, 2025); JA169–185 (multiple federal criminal complaints under 8 U.S.C. § 1306(a) filed since April 17, 2025); JA243–44; Press Release, U.S. Att'y Off., Mexican National Pleads Guilty to Willful Failure to Register Charge in Waco (July 2, 2025), https://tinyurl.com/3wcp3erc; Jeremy Roebuck & Marianne LeVine, *Migrants Criminally Charged after Failing to Register with U.S. Government*, Wash. Post (May 31, 2025), https://tinyurl.com/4da4xehh.

## II.     Procedural History

On March 31, Plaintiffs filed a complaint challenging the IFR's promulgation and moved for a stay of the IFR's effective date under 5 U.S.C. § 705, or in the alternative a preliminary injunction pending final adjudication on the claims. *See* JA9. On April 10, the district court denied Plaintiffs' motion, opining that Plaintiffs "failed to show that they have a substantial likelihood of standing." JA101. Plaintiffs appealed the denial of the preliminary injunction. *See* JA167.

On April 24, Plaintiffs filed a motion for an injunction pending appeal at the district court. *See* JA13. In an order dated April 29, the district court declined to "take off in another sprint" to resolve Plaintiffs' motion and set a hearing for six weeks after the motion was filed. *See* JA245–46. On May 2, Plaintiffs filed a motion for a stay or injunction pending appeal with this Court. Doc. No. 2114110.

On June 12, before this Court ruled on Plaintiffs' pending motion, the district court denied Plaintiffs' motion for an injunction pending appeal. *See* June JA247. This time, however, the court found that Plaintiffs had "remedied the Court's concerns about associational standing." JA251. In particular, the district court acknowledged that its core legal conclusion—that persons required to register under the new rule lack standing under *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)—was erroneous and foreclosed by precedent. JA252–53. However, the district court concluded that Plaintiffs had not established irreparable harm.

15

JA253–58. While the court relied on the purportedly heightened standard for an injunction pending appeal, it made clear that its conclusion about irreparable harm would warrant denial of a preliminary injunction itself. JA258 (finding that "Plaintiffs could not have met their burden to show irreparable harm even if this were a motion for preliminary injunction").

Because of this shift in reasoning, and because the briefing on appeal had focused on *standing* rather than *irreparable harm,* Plaintiffs promptly filed a motion with this Court to hold their May 2 motion in abeyance. *See* Doc. No. 2120804. On June 18, Plaintiffs filed a motion in the district court for an expedited summary judgment briefing schedule and a renewed motion for a stay or preliminary injunction in order to obtain a formal denial order incorporating the district court's new reasoning and to facilitate appellate review. *See* JA263; JA259.

On June 25, Plaintiffs appealed the district court's denial of the motion for a stay or injunction pending appeal. *See* JA268. This Court consolidated the two pending appeals and ordered that they both be held in abeyance. Doc. No. 2122386; Doc. No. 2122431.

The district court did not respond to Plaintiffs' renewed motion for a stay or injunction. So, on July 8, Plaintiffs filed a notice of appeal of the district court's constructive denial. *See* JA270. The next day, Plaintiffs requested this Court lift the abeyance and expedite consideration of the consolidated appeals. *See* Doc. No.

16

2124610. Doc. No. 2124591. Defendants moved the Court to dismiss Plaintiffs' June 25 appeal (Second Appeal) and Plaintiffs' July 8 appeal (Third Appeal). Doc. No. 2126374.

On July 10, the district court denied Plaintiffs' motion to expedite summary judgment briefing and, sua sponte, stayed district court proceedings pending resolution of the three pending appeals. *See* JA272.

On August 12, this Court entered an order denying the stay or injunction pending appeal because Plaintiffs had not met "the stringent requirements for an injunction [or stay] pending appeal," but granted Plaintiffs' motion to expedite their appeals. *See* Doc. No. 2129682. The Court referred Defendants' motion to dismiss to the merits panel. *Id.*

At the district court, on August 21, Plaintiffs moved to lift the stay and proceed directly to summary judgment to promptly resolve Plaintiffs' claims without reconsidering the decisions denying preliminary relief. JA274–758–59. At the time of filing, this motion remains pending.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Changji Esquel Textile Co. v. Raimondo*, 40

17

F.4th 716, 721 (D.C. Cir. 2022) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

This Court reviews "the district court's denial of a preliminary injunction for an

abuse of discretion, its legal conclusions *de novo*, and its factual findings for clear

error." *Trump v. Thompson*, 20 F.4th 10, 23 (D.C. Cir. 2021). Where the record is

clear and compels the conclusion that each factor weighs in Plaintiffs' favor, the

Court may grant a stay or injunction without remanding to the district court.

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

## SUMMARY OF THE ARGUMENT

I.      The Court should deny Defendants' formalistic motion to dismiss.

There is no doubt that the district court has denied preliminary relief, and the

relevant legal questions are before the court in the three consolidated appeals.

Plaintiffs' second appeal challenges the district court's June 12 order, which

effectively modified its April 10 denial of stay or preliminary injunction by altering

the basis of its reasoning. Plaintiffs' third appeal properly challenges the district

court's constructive denial of Plaintiffs' renewed motion for a stay or preliminary

injunction.

II.     Plaintiffs are likely to succeed on the merits.

A.      As the district court held, Plaintiffs have established standing, both

because of the injuries that amount to irreparable harm, but also because Plaintiffs'

members are directly regulated parties.

18

B.    The IFR violates the APA's notice and comment requirements. It is not a procedural rule, but rather a legislative rule because it imposes new criminal liability, represents a substantive value judgment regarding the criteria and purpose for registration that imposes new burdens on the millions newly obligated to register, burdens the First and Fifth Amendment rights of registrants, and has such a broad public impact that notice and comment is necessary.

C.    The IFR is arbitrary and capricious because it fails to explain the change in policy that existed since the end of World War II and failed to consider important aspects of the problem.

III.    The district court erred in concluding that Plaintiffs have not established irreparable harm. Their members are currently at risk of prosecution under the IFR's unlawful regulatory regime, infringement of their First and Fifth Amendment rights, and detention and deportation without the ability to pursue congressionally authorized relief. Plaintiff CHIRLA is experiencing harm to its core business functions.

IV.    The balance of the equities and the public interest weigh in favor of a stay and an injunction because the public always has an interest in the government following the law and preserving the status quo ante.

V.    An APA § 705 stay is the appropriate remedy under longstanding circuit precedent.

## ARGUMENT

### I.    PLAINTIFFS' APPEALS ARE PROPER

The Court should deny Defendants' motion to dismiss, because Plaintiffs' Second and Third Appeals are properly before this Court.

Formalism aside, it is clear that the district court has rejected preliminary relief three times now, and that its basis for doing so is a purported lack of irreparable injury. Defendants make no argument that the Court cannot reach the fundamental question whether that decision should be reversed. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 373 (1966) (federal rules were "written to further, not defeat the ends of justice").

Even on a more granular level, there is no problem with Plaintiffs' consolidated appeals. Plaintiffs' Second Appeal sought review of the district court's June 12 order denying a stay or injunction pending appeal, an order which for practical purposes amended the April 10 denial of a stay or preliminary injunction. *See* JA253 (finding "Plaintiffs have remedied the Court's concerns about associational standing [in the April 10 order, but] they still fail to show irreparable harm"); *id*. at 12 JA258 (holding that "Plaintiffs could not have met their burden to show irreparable harm even if this were a motion for preliminary injunction"). As such, the June 12 order was effectively an interlocutory order "refusing" an

20

injunction, resulting in irreparable harm, and thus appealable under 28 U.S.C. § 1292(a)(1). *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).

The Third Appeal, which Plaintiffs filed to preserve their rights given the urgent need to address their ongoing harm, seeks review of the constructive denial of the renewed motion for stay or preliminary injunction. *See IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 526 (7th Cir. 1996) (noting "[a] showing of unjustifiable delay coupled with irreparable injury if an immediate appeal is not allowed is enough to make a constructive denial appealable, if a formal denial would be" and collecting cases); *see also A. A. R. P. v. Trump*, 145 S. Ct. 1364, 1367 (2025) (per curiam) (finding court of appeals jurisdiction over constructive denial of injunctive relief). That renewed motion sought nothing more than a pro forma denial of relief (a denial preordained by the June 12 order), but the district court did not rule on it. The district court has since denied Plaintiffs' request for expedited summary judgment briefing and, sua sponte, stayed district court proceedings pending the resolution of Plaintiffs' appeals. JA272. Therefore, to the extent there was any ambiguity, it is now crystal clear that the district court has functionally denied preliminary relief again—and will not grant any such relief absent intervention from this Court. Under Defendants' theory, that ruling would be insulated from review, giving the district court "the judicial . . . equivalent of a pocket veto." *IDS Life Ins.*, 103 F.3d at 527.

21

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Plaintiffs Have Standing

The district court correctly concluded that Plaintiffs "successfully assert associational standing." JA252. As discussed at length below, Plaintiffs' members and CHIRLA itself suffer multiple concrete and irreparable injuries sufficient to establish not only standing but also irreparable harm. *See supra* Part III. But as the district court found, Plaintiffs have associational standing simply because their members are directly regulated by the IFR. JA252–53; *see, e.g., Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (where a person is "an object of the [government] action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it"); *Arizona v. EPA*, 77 F.4th 1126, 1131 (D.C. Cir. 2023) (holding that in "cases involv[ing] rules that constrain[] what regulated parties may lawfully do" "standing is 'usually' self-evident"); *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018) ("This imposition of new regulatory obligations, in and of itself, is sufficient to establish standing.").

### B.    The IFR Violated Notice and Comment Requirements of the APA

As the district court indicated, the IFR marks a significant change in policy and practice that required more process under the APA. JA143. It is a legislative rule subject to the APA's notice and comment procedure, not a procedural one exempt from this democratic process. The APA's "exception for procedural rules is narrowly construed." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). It applies only to "internal house-keeping measures organizing agency activities," *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023), to afford agencies "latitude in organizing their internal operations," *Batterton v. Marshall*, 648 F.2d 694, 702 n.34, 707 (D.C. Cir. 1980). The "critical feature" of a procedural rule is "that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which parties present themselves or their viewpoints to the agency." *AFL-CIO*, 57 F.4th at 1034.

By contrast, a rule is legislative (and subject to notice and comment) when: (i) it "imposes substantive burdens," *id.*; (ii) it "encodes a substantive value judgment," *id.*; (iii) it "trenches on substantial private rights or interests," *id.* at 1034–35; (iv) it "otherwise alters the rights or interests of parties," *id.* at 1035; or (v) it "affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking," namely "public participation in agency decisionmaking" and "ensur[ing] the agency has all pertinent information

23

before it when making a decision." *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 6 (D.C. Cir. 2011).

The IFR implicates at least four of these scenarios. First, it exposes additional individuals to criminal liability, altering their rights and interests. Second, it makes substantive value judgments about the purpose of registration and the criteria to do so. Third, it trenches upon individuals' First and Fifth Amendment rights. And fourth, and finally, it impacts the public to such a degree that public input through notice-and-comment rulemaking is required.

### 1. The IFR Imposes New Criminal Liability

First, the IFR exposes additional noncitizens to criminal liability for not applying for registration, thus imposing substantive burdens upon them and altering their rights and interests. The IFR—not the underlying registration statutes—obligates noncitizens who previously lacked a duty to apply for registration to do so under pain of criminal liability. 90 Fed. Reg. at 11795 (listing six different groups lacking a means to apply for registration but for the IFR); *see also id.* at 11796 ("This IFR fills the gaps in the regulatory regime by prescribing a registration form available to all aliens regardless of their status").

The statutes themselves create only a "duty ... to apply for registration" through "forms" prepared by the Secretary of Homeland Security, 8 U.S.C. §§ 1302(a), 1304(a), not a freewheeling duty to register even absent a means for doing

24

so. "In this way, the statute authorizes a registration scheme that is as broad as the registration apparatus developed by the Executive" such that "[i]f there is no application mechanism, there can be no duty to apply." Nancy Morawetz & Natasha Fernández-Silber, *Immigration Law & the Myth of Comprehensive Registration*, 48 U.C. Davis L. Rev. 141, 174 (2014) *see also United States v. Spingola*, 464 F.2d 909, 911 (7th Cir. 1972) ("Genuine impossibility is a proper defense to a crime of omission."); *cf. United States v. Mendez-Lopez,* 528 F. Supp. 972, 973 (N.D. Okla. 1981) (dismissing criminal failure to carry proof of registration card for unregistered noncitizen after concluding the statute only punishes failing to carry proof if it is actually issued).

Moreover, prior to the IFR, noncitizens without a means to register lacked the mens rea to commit the registration crime. Failure to apply for registration under 8 U.S.C. § 1306(a) must be "willful."  In other words, a defendant "must have deliberately failed or refused to apply for registration and be fingerprinted before he can be convicted of this crime." *United States v. Claudio-Becerra*, No. PO 08-2305, 2008 WL 11451346, at *3 (D.N.M. Aug. 28, 2008) (dismissing complaint under § 1306(a) for failure to allege willfulness); *see also Bryan v. United States*, 524 U.S. 184, 191–92 (1998) ("As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, in order to establish a 'willful' violation of a statute, the Government must

25

prove that the defendant acted with knowledge that his conduct was unlawful.")
(cleaned up)). A noncitizen could not willfully fail to apply to register when no
application exists for them.

Rules like the IFR that impose criminal sanctions are "held to the strict letter
of the APA." *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989). The
IFR "puts new criminal liability on the acts or omissions of regulated persons" and
so "is quintessentially legislative." *United States v. Cain*, 583 F.3d 408, 420 (6th
Cir. 2009); *see also Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th
Cir. 2022) (deeming an IRS submission requirement a legislative rule where
taxpayers "had no obligation to provide information" before the requirement,
"have such a duty after[wards]" and "failure to comply comes with the risk of
penalties and criminal sanctions, all characteristics of legislative rules"). Therefore,
notice-and-comment rulemaking was required.

### 2. The IFR Poses Substantive Value Judgments

Second, the IFR also embodies burdensome, substantive value judgments
about the goal of registration and what information noncitizens must provide to
apply. The rule abandons a decades-old narrow registration policy that—outside
the exigencies of war or a terrorist threat—limited registration to noncitizens
admitted to the United States or eligible for certain immigration benefits and
accomplished registration through the statutory and regulatory processes of

26

applying for admission and such benefits. Moreover, instead of merely "inventory[ing] . . . persons within [U.S.] borders" and disclaiming any intent to leverage registration for deportation, *Jackson Speech* at 1, 4–5, the IFR transforms registration into a mechanism for immigration enforcement, 90 Fed. Reg. at 11797 (emphasizing that registration data "will make it easier and safer for DHS to enforce the law" and "execut[e] arrest warrants"); *id.* (identifying "law enforcement efficacy" and "improved enforcement" as the rule's "direct … and indirect benefits"); *see also Press Release* (describing registration as cudgel to "compel [noncitizens] to leave the country voluntarily"); *Newsweek Article* (quoting Defendant Noem forecasting that registration would allow the government to "help [noncitizens] relocate right back to their home country").

To accomplish the new goals of mass deportations and coerced departures, the IFR demands that the millions of noncitizens now required to apply for registration disclose far more information than the statute mandates *Cf.* 8 U.S.C. § 1304(a) (requiring only "(1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the police and criminal record, if any, of such alien"). Beyond these four items, Form G-325R gathers information regarding uncharged criminal activity; aliases; date and place of birth; country of citizenship or nationality; telephone numbers and email addresses; five

27

years of physical address history; sex, ethnicity, and race; height, weight, eye color, and hair color; marital status, date of marriage, and place of marriage; legal name, citizenship, date of birth, and place of birth of any spouse or past spouse; and parents' names, citizenships, dates of birth, places of birth, and places of residence. *See* Form G-325R. As for the biometric interview, it gathers a noncitizen's photograph and signature in addition to the statutorily required fingerprints. 90 Fed. Reg. at 11795.

Advancing a new policy agenda by subjecting noncitizens to the burdens of submitting detailed personal information and biometrics to the federal government "that in some respects exceed those required by law" renders the IFR legislative. *Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 174 F.3d 206, 208, 211–12 (D.C. Cir. 1999); *see also Mendoza*, 754 F.3d at 1024 (deeming rules for obtaining an immigration benefit legislative because "they set the bar for" the minimum wage that employers "must offer . . . to obtain approval"); *Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C. Cir. 1982) (finding a rule changing a sixteen-year old policy that imposes new burdens not to be procedural). So does the infringement on the "personal privacy" of applicants and their family members concomitant with submitting their personal information to the government. *See Elec. Priv. Info. Ctr.*, 653 F.3d at 6 (finding a security screening method that resulted in greater invasion of "personal privacy" constituted a "new substantive

28

burden"). The estimated loss of over $118 million in applicants' wages and 2.5 million hours of their time does too. *See* 90 Fed. Reg. at 11799 (combining cost estimates for completing the Form G-325R and collecting biometrics); *cf. Nat'l Ass'n of Home Health Agencies*, 690 F.2d at 949 (deeming a policy change legislative for imposing $10 million to $30 million in transfer costs). The IFR must undergo public comment before imposing these burdens to further new value judgments about the purpose of registration and the criteria for doing so.

3.  The IFR Impinges on Parties' First and Fifth Amendment Rights

Third, as discussed at length below, the IFR trenches upon the First and Fifth Amendment rights of those it obligates to apply for registration. *See infra* Part III.B. Such infringement "on substantial private rights" makes the IFR a legislative rule. *Mendoza,* 754 F.3d at 1023.

4.  The IFR's Impact on the Public Is So Substantial That Notice and Comment is Necessary

Fourth and finally, by Defendants' own estimates, the IFR affects an enormous segment of the public: "between 2.2 million and 3.2 million" noncitizens now have a duty to apply for registration, submit to fingerprinting and other biometrics, and always carry proof of registration or application. 90 Fed. Reg. at 11797. But these estimates understate the IFR's impact. The IFR also burdens parents and legal guardians who must register for their children; attorneys who

29

must help clients navigate this new, confusing regime; and businesses that benefit from international tourism.

Perhaps most significantly, the IFR creates a historic, show-me-your-papers regime for noncitizens that will inevitably sweep up U.S. citizens too. It obligates all noncitizens over 18 to carry proof of registration under threat of criminal liability. 90 Fed. Reg. at 11794 (citing 8 U.S.C. § 1304(e)'s requirement to do so); *id.* at 11795 (announcing noncompliance with this requirement "as a civil and criminal enforcement priority"). No such regime has ever existed previously: universal registration (last used in the 1940s) has never been paired with a universal obligation to carry proof of registration (added to the statute in the 1950s). *See supra* at 3–11. This novel regime increases the risk to everyone in the country (not just noncitizens) of being stopped (potentially unlawfully) and asked to provide proof of registration, *cf.* Adrian Florido, *'Antagonized for Being Hispanic': Growing Claims of Racial Profiling in LA Raids*, NPR (July 4, 2025, 1:00 PM EST), https://tinyurl.com/yyz7as33 (describing immigration stops of U.S. citizens)—a risk particularly acute in light of Defendants' immigration enforcement practices that the Supreme Court recently permitted to continue pending litigation. S*ee Noem v. Vasquez Perdomo,* No. 25A169 (U.S. Sept. 8, 2025) (order staying district court's order that had enjoined the use of race, employment, language or accent, and presence at a particular location to support

reasonable suspicion for immigration stops). This show-me-your-papers regime

implicates concerns expressed across the political spectrum in the contentious

debates about creating a national ID. *See* Matthew Feeney, *If You Value Privacy,*

*Resist Any Form of National ID Cards*, Cato Institute (Nov. 28, 2018),

https://tinyurl.com/4y86nmxu; An Open Letter to the Conference Committee on

Intelligence Reform: Remove National ID Provisions from the Conference Report

(Nov. 15, 2004), https://tinyurl.com/yakkm342 (signed by ACLU, Gun Owners of

America, Republican Liberty Caucus, and Unitarian Universalist Association of

Congregations, among others).

Plaintiffs and other members of the public were entitled to raise these and

other concerns—and have them considered—before the IFR took effect and to

propose alternatives to the rule. *See Elec. Priv. Info. Ctr.*, 653 F.3d at 6 (finding a

rule legislative when it "affects the public to a degree sufficient to implicate the

policy interests animating notice-and-comment rulemaking"); *Chamber of Com.*,

174 F.3d at 212 (holding rule to be legislative where it involved "the safety

practices of thousands of employers" such that "[t]he value of ensuring that the

[agency] is well-informed and responsive to public comments before it adopts a

policy is therefore considerable"). But Defendants denied them this opportunity. *See* JA99; JA83; JA68; JA57.[3]

***

The IFR is a legislative rule promulgated in violation of the APA's notice-and-comment requirements. This procedural error alone is sufficient to justify staying the IFR and injunctive relief. *See Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that normally requires vacatur of the rule.") (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 199 (D.C. Cir. 1993)).

## C.     The IFR is Arbitrary and Capricious

In addition to its procedural flaws, the IFR is arbitrary and capricious. The problems are, of course, linked: Notice and comment guarantees not only "public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies" but also that agencies "will have before [them] the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d

---

[3] CHIRLA and MRNY commented on the IFR after its promulgation, *see* Comment from CHILRA to USCIS (Apr. 11, 2025), https://tinyurl.com/yc64npuu; Comment from MRNY to USCIS (Apr. 11, 2025), https://tinyurl.com/4ssch4tn, and would have submitted more robust commentary if the agency had been required to consider it before the IFR took effect, *see* JA57.

1037, 1044 (D.C. Cir. 1987) (quoting *Batterton*, 648 F.2d at 703 and *Guardian Fed. Sav. & Loan Ins. Corp.,* 589 F.2d 658, 662 (D.C. Cir. 1978)). The problems below should have been obvious to the agency, yet it is no surprise that flawed procedure yielded a flawed rule.

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is arbitrary and capricious where it "entirely fail[s] to consider an important aspect of the problem," *id.*, such as "the advantages *and* the disadvantages of [its] decisions," *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (emphasis in original), or their "shift in … policy" and "departure from its typical manner of" administering a program, *Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426, 433 (D.C. Cir. 1993). Where an agency changes policy, it must provide "[a] full and rational explanation" for the change. *Sw. Airlines Co. v. FERC,* 926 F.3d 851, 856 (D.C. Cir. 2019) (quoting *Great Lakes Gas*, 984 F.2d at 433). The IFR did not do so here when breaking from historical tradition and creating a universal registration and carry regime for the first time. Nor did it consider other important aspects of this new regime.

33

1. The IFR Does Not Acknowledge or Explain the Significant Change in Registration Policy

As observed by the lower court, the IFR "is a pretty big switcheroo" in the registration scheme and "case law and the APA … require something more than what [Defendants have] done to implement this rule." JA143; *see* JA102–04. "A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017); *see also Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) ("Reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach.") (citation omitted).

Until April 2025, noncitizens had never been subject to a universal registration and carry scheme. As detailed above, universal registration died in the mid-1940s nearly a decade before Congress obligated registered noncitizens to carry proof of registration. *See supra* at 3–11. Even when universal registration existed, it prioritized accounting, not law enforcement. Defendants' glib assertions in the IFR that the rule does not depart from the past blinkers reality—millions of people have incurred a duty to apply for registration and for the first time, the

34

government intends to prioritize criminal enforcement for failure to do so and carry registration papers.

The government also explicitly seeks to use information gleaned from registration as a direct deportation tool, a departure from prior practice. *See* 90 Fed. Reg. at 11797. Defendants' failure to acknowledge and explain these departures from past practice alone renders the IFR arbitrary and capricious. *See Grace v. Barr,* 965 F.3d 883, 903 (D.C. Cir. 2020) (holding that change to U.S. Citizenship and Immigration Services (USCIS) policy on legal standard applicable to credible fear interviews was arbitrary and capricious where it was unacknowledged and unexplained, and affirming district court order "on that basis alone.").

### 2. Defendants Failed to Adequately Consider Important Aspects of the Problem

The IFR fails to consider the wide-ranging implications of the ahistorical universal registration and carry requirement it creates. Defendants' estimate of the affected population—between 2.2 and 3.2 million individuals—underscores the wide-ranging impact of the rule. *See* 90 Fed. Reg. at 11797. Despite this, nowhere does it consider important aspects of the problem, including: the ability of the impacted population to access the new online, English-only registration system; the needless burden placed on those who have pending or even granted applications for congressionally-authorized immigration relief; and the IFR's serious First and

Fifth Amendment implications, *see supra* Part III.B. The IFR's lack of

consideration of these important problems render it arbitrary and capricious. *See*

*Am. Wild Horse Pres. Campaign*, 873 F.3d at 923.

The IFR also does not consider the new requirement's impact on particularly

vulnerable groups, especially teenagers aged 14 and older, individuals without

access to the Internet, the elderly, those with limited literacy, and limited English

proficient individuals. *See* JA68–70 (describing UFW members with limited

formal education, limited access to and familiarity with the Internet, and language

barriers); JA60–JA61 (describing an eighteen-year-old member who arrived in the

United States as an unaccompanied minor required to register under the IFR).

Defendants did not discuss any alternatives to the online-only, English-only

registration system through the USCIS website that might accommodate the

special needs of some of these affected populations. Their failure to consider the

adequacy of the system to operationalize a policy of this scale—which carries

criminal consequences for noncompliance—is arbitrary and capricious. *See State*

*Farm*, 463 U.S. at 43; *see also UFW v. Solis*, 697 F. Supp. 2d 5, 10 (D.D.C. 2010)

("[A]n agency's failure to consider alternatives or to provide an explanation for

rejecting those alternatives can render its ultimate decision arbitrary and

capricious.") (citing *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d

795, 815 (D.C. Cir. 1983)).

36

The IFR also fails to grapple with the consequences of the new registration system for large categories of noncitizens who have already submitted extensive immigration paperwork to the government—including applicants for asylum, U visas (for victims of certain crimes), T visas (for survivors of trafficking), protection under the Violence Against Women Act ("VAWA"), Special Immigrant Juvenile ("SIJS") status, temporary protected status ("TPS"), and Deferred Action for Childhood Arrivals ("DACA")—but are nonetheless not considered "registered."[4] *See* 90 Fed. Reg. at 11794–95 (listing categories of registration documents under 8 C.F.R. §§ 264.1(a) and (b); JA92, JA94–5 (describing members who have applied for U nonimmigrant status and DACA); JA61 (describing member who is the process of self-petitioning under VAWA). Indeed, even those who have been *granted* asylum, DACA, or TPS (but have not received an

_____

[4] Defendants' failure to consider and address registration's intersection with these benefit applications is sowing confusion—seemingly within USCIS as well as with registration applicants. USCIS's website directs U-visa applicants to complete a Form G-325R since 8 C.F.R. § 264.1(a) does not include the I-918 U-visa petition. *See* USCIS, Alien Registration Requirement, How to Determine if You are Already Registered (May 6, 2025), https://www.uscis.gov/alienregistration. But the agency has rejected registration applications submitted by U-visa applicants who have completed biometrics during the U-visa process for "already compl[ying] with [their] duty to register." Immigrant Legal Resource Center, Discussing Registration with Clients, 5-6, App'x D (May 14, 2025), https://tinyurl.com/4kf6rnru. More careful consideration would clarify who does and does not need to register.[5] A stay remains available pursuant to § 705 even though the IFR took effect on April 11, 2025. "Courts . . . routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (collecting cases).

employment authorization document) are not considered "registered" under the regulations. *See* 90 Fed. Reg. at 11794–95.

The IFR does not address what considerations Defendants weighed—if any—when declining to add commonly submitted immigration forms like the applications outlined above to the list of registration documents while simultaneously mandating an entirely new registration system through Form G-325R. Noncitizens who have already submitted extensive immigration-related paperwork to the government through these forms must now navigate the Form G-325R process—a process meant to facilitate deportation, not provide immigration benefits—to be considered "registered," otherwise they risk prosecution for failure to register. Moreover, because none of the forms for the immigration benefits listed above (asylum, T and U visas, VAWA, SIJS, DACA, TPS) count as "evidence of registration," noncitizens who submitted such forms can be prosecuted criminally for failure to carry registration documents. Defendants articulate no explanation for not crediting these forms as a means for registration, much less a rational one.

3.  Defendants Provide No Reasonable Explanation for the
    Purpose of the IFR

Furthermore, the IFR is misleading as to its purpose. The IFR's benign characterization of the purpose of the new universal registration process to "improve registration outcomes" and to "fill a gap in registration," 90 Fed. Reg. at

11795, belies its true rationale: immigration enforcement, self-deportation, and criminal prosecution, *see supra* at 11–12. "[L]aw enforcement efficacy" and "improved enforcement" are the only benefits from improved registration outcomes that the IFR identifies. *Id.* at 11797; *see also id.* (noting that registration data "will make it easier and safer for DHS to enforce the law" and "execut[e] arrest warrants"). But nowhere does the IFR expressly discuss its underlying law enforcement rationale for why these outcomes are desirable and worth the considerable burdens that the IFR imposes. "[A]gencies must offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public," not hide the ball behind bureaucratic doublespeak. *Dep't of Com. v. New York,* 588 U.S. 752, 785 (2019); *id.* (A court is "not required to exhibit a naiveté from which ordinary citizens are free.") (quotation omitted).

### 4. The IFR Fails to Adequately Consider Costs

IFR does not adequately consider the costs to the public and USCIS of imposing this new universal registration requirement. The IFR contains virtually no analysis of the economic impact of the new registration requirement, including the cost to USCIS of absorbing new biometrics appointments or how those new appointments will affect a notoriously backlogged agency. *See CIS Ombudsman Annual Report 2024* 28 (June 28, 2024), https://tinyurl.com/ybpreeka (noting "limited resources and significant existing and new workloads," that require

USCIS to "continuously grapple[ ] with difficult decisions regarding which immigration benefits adjudications to prioritize"). The IFR notes only that "DHS will incur additional costs due to the added activities from the collection of biometrics given the impacted population of [noncitizens] do not pay fees for registration or biometrics." 90 Fed. Reg. at 11797. Defendants' own analysis finds an annualized cost to the government of nearly $72 million to administer biometrics pursuant to the IFR and an annualized cost to the public of more than $118 million in complying with its requirements. *See* Supporting Statement for Biographic Information (Registration), OMB Control No.: 1615-NEW, 6, 8 (Feb. 25, 2025) https://tinyurl.com/2cs24kmp (click on Statement A, G-325R-001_NEW_EMGCY_SPTSTMT.v2.docx). A reasoned explanation would weigh the costs of the new universal registration process against the benefits, including the likely impact on other USCIS functions. *See Michigan*, 576 U.S. at 753 ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions. It also reflects the reality that too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems." (citation and quotation marks omitted)). Defendants fail to provide that explanation here.

* * *

40

Because Defendants failed to consider multiple important aspects of the problem and to adequately explain their choices for this shift in policy, the IFR is arbitrary and capricious in violation of the APA.

### III.    PLAINTIFFS HAVE ESTABLISHED LIKELIHOOD OF IRREPARABLE HARM

The district court erred when it concluded that Plaintiffs have not established irreparable harm sufficient to warrant preliminary relief. With the IFR already in effect, Plaintiffs and their members are currently suffering or imminently at risk of a range of irreparable injuries: prosecution as a result of the IFR's unlawful new regulatory regime, chilling of protected speech and a burden to their Fifth Amendment rights, detention and deportation and an inability to pursue congressionally-authorized immigration relief, and harm to CHIRLA's core business practices. Any one of these injuries would be sufficient to warrant an injunction pending appeal. Taken together, they show the wide-ranging harms inflicted by the IFR's radical reimagining of noncitizen registration without review or input from the public or careful consideration by the agencies.

### A.    Arrest and Prosecution

Courts across the country have repeatedly found that the threat of prosecution under an unlawful statutory or regulatory scheme is irreparable harm. *See, e.g., Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012) (preempted statute); *Idaho Org. of Res. Councils v. Labrador*, 780

41

F. Supp. 3d 1013, 1045 (D. Idaho 2025) (same); *Fla. Immigrant Coal. v. Uthmeier*, 778 F. Supp. 3d 1315, 1325 (S.D. Fla. 2025) (same); *Mock v. Garland*, 697 F. Supp. 3d 564, 578–79 (N.D. Tex. 2023) (unlawfully promulgated agency rule); *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 856–58 (N.D. Tex. 2022) (same). And "deprivations of physical liberty" like arrests "are the sort of actual and imminent injuries that constitute irreparable harm." *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018); *see also N.S. v. Hughes*, 335 F.R.D. 337, 351 (D.D.C. 2020) (same).

Prosecution of Plaintiffs' members as a result of the IFR is impending here. *See, e.g.*, JA187–88; JA194–95 (detailing how members of Plaintiff organizations do not speak English and have difficulty accessing the Internet, preventing them from accessing the IFR's new registration system and putting them at imminent risk of prosecution and detention for failure to register). Defendants have not only promised to enforce immigration crimes vigorously but also, consistent with this promise, begun to prosecute 8 U.S.C. § 1306(a) throughout the country, including in the District of Columbia where some Plaintiff CASA's members reside. *See supra* at 14.

That risk of prosecution is enough standing alone for irreparable harm. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (finding sufficient risk of irreparable harm where the police were "not currently imposing"

42

an unlawful checkpoint, "but it ha[d] done so more than once, and the police chief

ha[d] expressed her intent to continue to use the program until a judge stop[ed]

her"). After all, "a preliminary injunction requires only a likelihood of irreparable

injury," such that "Damocles's sword does not have to actually fall" to warrant an

injunction. *League of Women Voters*, 838 F.3d at 8–9.

The district court opined that "the mere threat of potential future prosecution

is insufficient to establish irreparable harm." JA254 (quoting *Lindell v. United

States*, 82 F.4th 614, 620 (8th Cir. 2023)). But the cases it cited involved *existing*

criminal investigations and prosecutions whose procedures provided adequate

means to redress purported illegalities. They enforced limits that are meant to

ensure that equity does not circumvent the criminal process. *See Lindell*, 82 F.4th

at 618–21 (action under Fed. R. Crim. Pro. 41(g) to return seized property during

criminal investigation); *Ramsden v. United States*, 2 F.3d 322, 324–26 (9th Cir.

1993) (same); *cf. Younger v. Harris*, 401 U.S. 37, 43–44 (1971). But Plaintiffs are

not asking the court to enjoin an ongoing criminal case. *See VanDerStok*, 633 F.

Supp. at 857–58 (distinguishing *Younger* when finding irreparable harm arising

from threat of criminal and civil liability under unlawfully promulgated agency

rule). "Plaintiffs are under the threat of . . . prosecution for crimes" under a

registration scheme that violates the APA; enforcement of that unlawful regulatory

43

scheme "is neither benign nor equitable." *Ga. Latino All. for Hum. Rts.*, 691 F.3d at 1269.

### B.    First and Fifth Amendment Injuries

Plaintiffs' members are currently suffering violations of their First and Fifth Amendment rights because the IFR chills their protected speech and burdens their right against self-incrimination.

The district court relied entirely on the fact that Plaintiffs have not pled a standalone cause of action under the First Amendment to find no irreparable injury based on that harm. *See* JA256–57. But the fact that plaintiffs do not assert a constitutional *cause of action* is no indication that they lack a cognizable *injury*. *See Ramirez*, 310 F. Supp. 3d at 31 (finding deprivation of liberty to be irreparable harm in case raising only statutory causes of action); *N.S.*, 335 F.R.D. at 351 (same).

The district court cited a series of cases for the unremarkable proposition that when a plaintiff *does* allege a First Amendment claim, irreparable harm requires an analysis of the likelihood of success of that claim. JA256–57. But that in no way shows that one *cannot* establish irreparable harm from chilled speech unless one seeks relief under the First Amendment. That would be illogical: Why should plaintiffs have to assert a constitutional claim even where, as here, they are clearly likely to succeed on a statutory one?

The IFR burdens Plaintiffs' members' First Amendment protected speech by requiring them to report on their protected advocacy "activities," *see* Form G-325R at 6, not for a discretionary benefit but instead through a mandatory universal registration process on the threat of federal prosecution. This in turn exposes these members—who advocate for issues, including immigrant rights, that are strongly disfavored by Defendants and the current presidential administration—to imminent, unlawful retaliatory enforcement *for their speech* (given Defendants' express promises to use registration as a tool for enforcement). *See* JA201–02; JA216–17; JA222; JA226; JA231; JA234–35; JA239–40.

Plaintiffs can establish a First Amendment injury if the government action would cause a person of "ordinary firmness" to feel a chilling effect. *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021); *see Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020). Here, against the backdrop of extraordinary recent enforcement in retaliation for speech, a person of "ordinary firmness" would experience chilling of speech and associational activities by having to disclose to the government First Amendment protected activity on a form whose stated purpose is to aid in deportation efforts. *See* U.S. Citizenship & Immigr. Servs., *USCIS to Consider Anti-Americanism in Immigrant Benefit Requests* (Aug. 19, 2025), https://tinyurl.com/4kb6bcxk; Austen Erblat*, Who Is Jeanette Vizguerra, Immigrant Rights Activist Fighting Deportation in Denver?*,

45

CBS News (June 5, 2025, 6:55 PM), https://tinyurl.com/3dk5xekm; Karina Tsui,

*What We Know about the Federal Detention of Activists, Students and Scholars*

*Connected to Universities*, CNN (Apr. 2, 2025, 8:48 PM),

https://tinyurl.com/y7z8dysv; David Morgan, *Republican US Senator Murkowski*

*on Threat of Trump Retaliation: 'We Are All Afraid'*, Reuters (Apr. 17, 2025, 11:06

PM), https://tinyurl.com/2v4hu4hn; Melissa Quinn, *Trump's Crusade Against Big*

*Law Firms Sparks Fears of Long-Lasting Damage*, CBS News (Apr. 2, 2025, 3:20

PM), https://tinyurl.com/5c766bej; *see also* JA97–98.

      In addition, Plaintiffs members' Fifth Amendment rights are burdened right

now by a registration process that requires them to admit to criminal conduct—

illegal entry under 8 U.S.C. § 1325—on threat of federal prosecution, without

providing any evident mechanism to assert a privilege. *See* Form G-325R at 7

("Have you EVER committed a crime of any kind (even if you were not arrested,

cited, charged with, or tried for that crime, or convicted)?" with only response

options "Yes" or "No"). In fact, the current version of the form instructs

registrants: "[Y]ou must answer 'Yes' to any question that applies to you, even if

your records were sealed or otherwise cleared, or even if anyone, including a

judge, law enforcement officer, or attorney, told you that you no longer have a

record." *Id.* 7 Thus, registrants must report any uncharged criminal conduct in

Form G-325R and, by simply applying for registration using a form targeting those

who entered the country in violation of 8 U.S.C. § 1325, are providing "a significant link in a chain of evidence tending to establish [their] guilt." *Marchetti v. United States*, 390 U.S. 39, 48 (1968) (cleaned up); *accord Grosso v. United States*, 390 U.S. 62, 66–68 (1968).

Contrary to the district court's claim, this harm is not speculative. *See* JA257. There is "ample reason to fear" that such a link would lead to prosecution. *Leary v. United States*, 395 U.S. 6, 16 (1969). Defendants have promised to vigorously enforce this particular offense and indeed, have begun doing so across the country. *See* Offs. of the U.S. Att'ys, U.S. Dep't of Just., Prosecuting Immigration Crimes Report - 8 U.S.C. § 1325 Defendants Charged (July 10, 2025), https://tinyurl.com/37uharxz (reporting 2,190 prosecutions in June 2025, a 365% increase since the change of administration in January 2025 and a 45% increase since the IFR's promulgation in March 2025). And DOJ has made clear that, rejecting past practice, it will prosecute these offenses far from the border. *See* Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense, 49 Op. O.L.C. ___, 2025 WL 1837418 (June 21, 2025) (withdrawing "prior prudential advice that section 1325(a)(2) should be charged only in the district of entry").

While a standalone Fifth Amendment claim might not become ripe until the privilege is asserted, JA257, members are cognizably *harmed* by being forced to

choose between exposure to criminal prosecution for disclosing self-incriminating information on the G-325R, or exposure to immigration or criminal consequences for failing to disclose information on the G-325R in an attempt to invoke their Fifth Amendment rights.

### C.    Removal and Inability to Pursue Immigration Relief

The district court misconstrued the harm that arises when members with pending relief—including relief where information is otherwise subject to strict confidentiality provisions—apply to register. The injury is not merely "informational harm," JA255; instead, the IFR's mandatory registration process places members at risk of detention and removal from the United States despite their eligibility to pursue congressionally immigration authorized relief. Individuals like CHIRLA member Ursela, who is in the process of applying for Special Immigrant Juvenile (SIJS) status and has applied for asylum, and MRNY member Guvelia, who has a pending application for a U visa as a victim of crime, must now apply to register because those applications do not count as registration documents or evidence of registration. *See* 90 Fed. Reg. at 11794–95; JA205; JA212. Congress has set strict limits on the use of information submitted in support of applications for U visas, *see* 8 U.S.C. § 1367, but the IFR sets no such limits and instead explicitly anticipates that it will be used for immigration enforcement. *See* 90 Fed. Reg. at 11797. Thus, applying for registration will place these individuals

in the direct crosshairs of immigration enforcement authorities and interfere with their ability to pursue immigration relief for which they are eligible. SIJS and U visa applications cannot be pursued through removal proceedings. *See* 8 C.F.R. § 204.11(h) (USCIS has sole jurisdiction over SIJS applications); 8 C.F.R. § 214.14(c) (same for U visa petitions). And individuals cannot pursue SIJS or asylum once they are removed, *see* 8 U.S.C. §§ 1101(a)(27)(J)(i), 1158(a)(1), while U visa applicants face additional grounds of inadmissibility once they have been removed, *see id.* § 1182(a)(9)(B). These harms are irreparable. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–34 (D.C. Cir. 2022) (removal to a country where an individual will be persecuted or tortured is irreparable harm); *Sepulveda Ayala v. Noem*, No. 3:25-CV-5185-JNW, 2025 WL 1207655, at *3 (W.D. Wash. Apr. 26, 2025) (finding removal, family separation, and additional hurdles to pursuing U visa is irreparable harm); *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 656–57, 675, 680–81 (E.D. Va. 2020) (finding removal of young person abandoned by his parents is irreparable harm because it would result in loss of SIJ status and danger in native country).

### D.    Injury to CHIRLA's Core Programmatic Work

Finally, the district court was wrong to reaffirm its previous finding that CHIRLA has not shown injury under the rule.  JA253. CHIRLA has established that the IFR impacts its core programmatic work of providing legal services

sufficient for both standing and irreparable harm. It has shown a "concrete and demonstrable injury to [its] activities that is more than 'simply a setback to [its] abstract social interests.'" *See Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Here, unlike the cases relied upon by the district court, CHIRLA is not simply an advocacy and public education organization. *See* JA107–11 (citing *All. for Hippocratic Med.*, 602 U.S. at 394 (advocacy regarding abortion drug); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919–21 (D.C. Cir. 2015)) (education and advocacy regarding poultry inspection);; *Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1434 (D.C. Cir. 1995) (taxpayer education and advocacy)); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 23–24 (D.D.C. 2014) (advocacy organization asserting lobbying related expenditures).

Instead, CHIRLA has identified the following concrete harms to its core programmatic work: 1) it has already identified at least 100 current clients who appear required to seek registration under the IFR, including 60 U visa applicants (those applying for immigration relief as victims of certain serious crimes), JA58; 2) the need for legal staff to spend additional time to review client files to determine the need to register, which will require filing a FOIA request for some cases, and the need to engage in separate consultations with clients about

registering, JA58–59; 3) an increase in the volume of inquiries about registration through its hotline, evidenced in part by numerous calls inquiring about registration in anticipation of the IFR taking effect, JA57–58; 4) a strain on its personnel and financial resources as a result of this increased volume of work arising from the IFR, JA58–60 and 5) interference with existing grant deliverables that fund legal services for immigration benefits and removal proceedings on a per case basis, JA56, 58–59. Underscoring that such harm is not speculative, the government's own numbers in the IFR indicate that it will impact 2.2-3.2 million people. 90 Fed. Reg. at 11797.

Within this circuit, courts have held that similar injuries are sufficiently concrete and nonspeculative for both standing and irreparable harm. *See Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 169–71, 176 (D.D.C. 2021); *Nw. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46–50, 79–80 (D.D.C. 2020). Notably, an organization need not be entirely hamstrung—its activities need only be "perceptibly impaired." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1100 (D.C. Cir. 2015) ("*PETA*") (quoting *Havens*, 455 U.S. at 379).

It is not the case that because CHIRLA describes its mission as ensuring the integration of immigrant communities into our society "with full rights and access to resources," JA52, the IFR in some ways furthers its mission. *See* Ex. A (Mem.

51

Order) 11; JA111. As discussed, the IFR is harming CHIRLA's core functions by, *inter alia*, *reducing* the number of immigration cases CHIRLA can take on and threatening its grant funding, ultimately leading to a *reduction* in its funding and services. Plainly, a regulation that puts millions of noncitizens in the crosshairs for immigration enforcement under pain of criminal prosecution and damages CHIRLA's ability to do its work does not further the mission of immigrant integration.

## IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR PLAINTIFFS

The balance of equities tips in Plaintiffs' favor and the public interest favors a stay or an injunction. "'Where, as here, 'the Government is the opposing party,' the last two factors 'merge . . . .'" *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). That makes sense, as the government can have no legitimate interest in unlawful agency action. Thus, Plaintiffs' "likelihood of success on the merits 'is a strong indicator that a preliminary injunction would serve the public interest' because '[t]here is generally no public interest in the perpetuation of unlawful agency action.'" *Shawnee Tribe*, 984 F.3d at 102 (quoting *League of Women Voters*, 838 F.3d at 12).

That principle fully applies to the agency's action in issuing the IFR, which violates both the APA notice-and-comment procedures and is arbitrary and capricious. "[I]t has been well established in this Circuit that '[t]he public interest

52

is served when administrative agencies comply with their obligations under the APA.'" *Ramirez*, 568 F. Supp. 3d at 35 (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)) (collecting cases); *see, e.g.*, *Ramirez*, 568 F. Supp. 3d at 34 (arbitrary and capricious); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (same); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.") (notice and comment); *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997) ("the public interest is best served by having federal agencies comply with the requirements of federal law, particularly the notice and comment requirements of the APA . . ."). After all, the APA's requirements of advance notice and opportunity for public input, and of reasoned decision making, are "generally presumed to serve the public interest." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012).

A stay or injunction would particularly serve the public interest here given the longstanding agency policy disrupted by the agency's abrupt IFR. Plaintiffs "seek to preserve the status quo" that until the IFR took effect on April 11, 2025, had prevailed in this country since the end of World War II. *Texas Child.'s Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014). As discussed *infra*, § 705 of the APA includes the authority to stay a rule that has already taken effect.

53

## V.     AN APA STAY IS THE APPROPRIATE REMEDY

Universal relief is proper and needed. Under 5 U.S.C. § 705, courts may "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." Stays under 5 U.S.C. § 705 are universal, just like vacaturs under 5 U.S.C. § 706. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (holding that the APA calls for universal vacatur); *Make the Road New York v. Noem*, No. 25-cv-190 (JMC), 2025 WL 2494908, at *11 (D.D.C. Aug. 29, 2025) (observing that "the D.C. Circuit has repeatedly held, [that] vacatur of the agency action—not merely exempting plaintiffs from the agency action— is the normal remedy under APA section 706" and "courts in this and other circuits have applied that same rule to section 705 stays"); *Cabrera v. U.S. Dep't of Labor*, --- F. Supp. 3d ---, No. 25-cv-1909 (DLF), 2025 WL 2092026, at *8 (D.D.C. July 25, 2025) (same, collecting cases); *see also Career Colls. & Schools of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("[W]e conclude that the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."), *dismissed per S. Ct. R. 46 after cert. granted in part*, No. 24-413 (S. Ct. Aug. 11, 2025).

Both vacatur under § 706 and a stay under § 705 are not party-specific remedies: they "specify what courts are authorized to do with respect to *agency*

54

*actions*, not parties." *Cabrera*, 2025 WL 2092026, at *8 (emphasis in original). In *Cabrera,* an analogous case, the court entered a universal stay of a directive which closed Jobs Corps centers without complying with the APA's procedural requirements, including prior notice and comment. *Id*. at *6, 9.[5]

The Supreme Court's decision in *Trump v. CASA, Inc.* does not limit the availability of relief under the APA. 606 U.S. 831, 847(2025); *see Cabrera* 2025 WL 2092026, at *8. In *CASA*, the Court decided that federal courts lacked the authority to enter universal injunctions pursuant to the Judiciary Act of 1789 because Congress had not provided such authority in that statute. *Id*. The majority distinguished this conclusion from vacatur of agency action pursuant to the APA— a different statute that authorizes categorical remedies. *Id*. at 847 n.10. As Justice Kavanaugh reiterated in concurring: "And in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule. 5 U.S.C. § 706(2) . . ." *Id*. at 869 (Kavanaugh, J. concurring). As Justice Kavanaugh previously discussed in *Corner Post*, Congress authorized vacatur by expressly authorizing courts to "set aside" agency action in 5 U.S.C. § 706(2)—a rare authorization for courts to "act directly" on an agency like an appellate court

---

[5] A stay remains available pursuant to § 705 even though the IFR took effect on April 11, 2025. "Courts . . . routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (collecting cases).

vacates a trial court judgment, and unlike non-APA equitable principles. *Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J. concurring).

## <u>CONCLUSION</u>

The Court should reverse the district court and enter a stay or, in the alternative, a preliminary injunction.

Dated: September 16, 2025

Respectfully submitted,

/s/ Emma Winger

Lynn Damiano Pearson (Circuit Bar No. 66236)
Cassandra Charles (Circuit Bar No. 66162)
Joanna Cuevas Ingram (Circuit Bar No. 66164)
National Immigration Law Center
P.O. Box 34573
Washington, D.C.  20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Jennifer R. Coberly (Circuit Bar No. 63914)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692

Emma Winger (Circuit Bar No. 66184)
Michelle Lapointe (Circuit Bar No. 54940)
Leslie K. Dellon (Circuit Bar No. 27795)
Chris Opila (Circuit Bar No. 66175)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

Cody Wofsy (Circuit Bar No. 61550)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104

Jcoberly@AILA.org

Tel: (415) 343-0770
cwofsy@aclu.org

Anthony Enriquez (Circuit Bar No.
66138)
Sarah T. Gillman (Circuit Bar No.
61974)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (Circuit Bar No.
66245)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanights.org

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32 and Circuit Rule 32,

Plaintiffs-Appellants certify:

1.    This document complies with the type-volume limit of Federal Rule of

Appellate Procedure 32(a)(7)(B) because it contains 12,761 words, excluding

those portions pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit

Rule32(e)(1), according to Microsoft Word.

2.    This document complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of

Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced

typeface in Microsoft Word utilizing 14-point Times New Roman font.


Dated: September 16, 2025                          */s/ Emma Winger*
                                                  Emma Winger
                                                  American Immigration Council

                                                  *Attorney for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

Plaintiffs-Appellants certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on September 16, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


Dated: September 16, 2025              */s/ Emma Winger*
                                      Emma Winger
                                      American Immigration Council

                                      *Attorney for Plaintiffs-Appellants*

## ADDENDUM: STATUTES AND REGULATIONS

5 U.S.C. § 705……...………………………………………………Add. 2

5 U.S.C. § 706(2)(A)……………………………………………Add. 2

8 U.S.C. § 1201(b)………………………………………………Add. 3

8 U.S.C. § 1301………………………………………………Add. 3

8 U.S.C. § 1302………………………………………………Add. 3

8 U.S.C. § 1303………………………………………………Add. 4

8 U.S.C. § 1304………………………………………………Add. 4

8 U.S.C. § 1305………………………………………………Add. 6

8 U.S.C. § 1306………………………………………………Add. 6

Alien Registration Act…………………………………………….. Add. 8

8 C.F.R. § 264.1………………………………………………….. Add. 13

90 Fed. Reg. 11793 (Mar. 12, 2025)…………………………………...Add. 17

## 5 U.S.C. § 705

**Relief pending review**

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

## 5 U.S.C. § 706(2)(A)

**Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

. . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**8 U.S.C. § 1201(b)**

**(b) Registration; photographs; waiver of requirement**

Each alien who applies for a visa shall be registered in connection with his application, and shall furnish copies of his photograph signed by him for such use as may be by regulations required. The requirements of this subsection may be waived in the discretion of the Secretary of State in the case of any alien who is within that class of nonimmigrants enumerated in sections 1101(a)(15)(A), and 1101(a)(15)(G) of this title, or in the case of any alien who is granted a diplomatic visa on a diplomatic passport or on the equivalent thereof.

**8 U.S.C. § 1301**

**Alien seeking entry; contents**

No visa shall be issued to any alien seeking to enter the United States until such alien has been registered in accordance with section 1201(b) of this title.

**8 U.S.C.A. § 1302**

**Registration of aliens**

**(a)** It shall be the duty of every alien now or hereafter in the United States, who (1) is fourteen years of age or older, (2) has not been registered and fingerprinted under section 1201(b) of this title or section 30 or 31 of the Alien Registration Act, 1940, and (3) remains in the United States for thirty days or longer, to apply for registration and to be fingerprinted before the expiration of such thirty days.

**(b)** It shall be the duty of every parent or legal guardian of any alien now or hereafter in the United States, who (1) is less than fourteen years of age, (2) has not been registered under section 1201(b) of this title or section 30 or 31 of the Alien Registration Act, 1940, and (3) remains in the United States for thirty days or longer, to apply for the registration of such alien before the expiration of such thirty days. Whenever any alien attains his fourteenth birthday in the United States he shall, within thirty days thereafter, apply in person for registration and to be fingerprinted.

**(c)** The Attorney General may, in his discretion and on the basis of reciprocity pursuant to such regulations as he may prescribe, waive the requirement of fingerprinting specified in subsections (a) and (b) in the case of any nonimmigrant.

## 8 U.S.C. § 1303

### Registration of special groups

**(a)** Notwithstanding the provisions of sections 1301 and 1302 of this title, the Attorney General is authorized to prescribe special regulations and forms for the registration and fingerprinting of (1) alien crewmen, (2) holders of border-crossing identification cards, (3) aliens confined in institutions within the United States, (4) aliens under order of removal, (5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6) aliens of any other class not lawfully admitted to the United States for permanent residence.

**(b)** The provisions of section 1302 of this title and of this section shall not be applicable to any alien who is in the United States as a nonimmigrant under section 1101(a)(15)(A) or (a)(15)(G) of this title until the alien ceases to be entitled to such a nonimmigrant status.

## 8 U.S.C. § 1304

### Forms for registration and fingerprinting

### (a) Preparation; contents

The Attorney General and the Secretary of State jointly are authorized and directed to prepare forms for the registration of aliens under section 1301 of this title, and the Attorney General is authorized and directed to prepare forms for the registration and fingerprinting of aliens under section 1302 of this title. Such forms shall contain inquiries with respect to (1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the police and criminal record, if any, of such alien; and (5) such additional matters as may be prescribed.

Add. 4

**(b) Confidential nature**

All registration and fingerprint records made under the provisions of this subchapter shall be confidential, and shall be made available only (1) pursuant to section 1357(f)(2) of this title, and (2) to such persons or agencies as may be designated by the Attorney General.

**(c) Information under oath**

Every person required to apply for the registration of himself or another under this subchapter shall submit under oath the information required for such registration. Any person authorized under regulations issued by the Attorney General to register aliens under this subchapter shall be authorized to administer oaths for such purpose.

**(d) Certificate of alien registration or alien receipt card**

Every alien in the United States who has been registered and fingerprinted under the provisions of the Alien Registration Act, 1940, or under the provisions of this chapter shall be issued a certificate of alien registration or an alien registration receipt card in such form and manner and at such time as shall be prescribed under regulations issued by the Attorney General.

**(e) Personal possession of registration or receipt card; penalties**

Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him pursuant to subsection (d). Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both.

**(f) Alien's social security account number**

Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.

Add. 5

**8 U.S.C. § 1305**

**Notices of change of address**

**(a) Notification of change**

Each alien required to be registered under this subchapter who is within the United States shall notify the Attorney General in writing of each change of address and new address within ten days from the date of such change and furnish with such notice such additional information as the Attorney General may require by regulation.

**(b) Current address of natives of any one or more foreign states**

The Attorney General may in his discretion, upon ten days notice, require the natives of any one or more foreign states, or any class or group thereof, who are within the United States and who are required to be registered under this subchapter, to notify the Attorney General of their current addresses and furnish such additional information as the Attorney General may require.

**(c) Notice to parent or legal guardian**

In the case of an alien for whom a parent or legal guardian is required to apply for registration, the notice required by this section shall be given to such parent or legal guardian.

**8 U.S.C. § 1306**

**Penalties**

**(a) Willful failure to register**

Any alien required to apply for registration and to be fingerprinted in the United States who willfully fails or refuses to make such application or to be fingerprinted, and any parent or legal guardian required to apply for the registration of any alien who willfully fails or refuses to file application for the registration of such alien shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000 or be imprisoned not more than six months, or both.

**(b) Failure to notify change of address**

Any alien or any parent or legal guardian in the United States of any alien who fails to give written notice to the Attorney General, as required by section 1305 of this title, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $200 or be imprisoned not more than thirty days, or both. Irrespective of whether an alien is convicted and punished as herein provided, any alien who fails to give written notice to the Attorney General, as required by section 1305 of this title, shall be taken into custody and removed in the manner provided by part IV of this subchapter, unless such alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

**(c) Fraudulent statements**

Any alien or any parent or legal guardian of any alien, who files an application for registration containing statements known by him to be false, or who procures or attempts to procure registration of himself or another person through fraud, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000, or be imprisoned not more than six months, or both; and any alien so convicted shall, upon the warrant of the Attorney General, be taken into custody and be removed in the manner provided in part IV of this subchapter.

**(d) Counterfeiting**

Any person who with unlawful intent photographs, prints, or in any other manner makes, or executes, any engraving, photograph, print, or impression in the likeness of any certificate of alien registration or an alien registration receipt card or any colorable imitation thereof, except when and as authorized under such rules and regulations as may be prescribed by the Attorney General, shall upon conviction be fined not to exceed $5,000 or be imprisoned not more than five years, or both.

**Alien Registration Act of 1940**

U.S. Statutes at Large (76th Cong., 3rd Sess., 670-676)

AN ACT

To prohibit certain subversive activities; to amend certain provisions of law with respect to the admission and deportation of aliens; to require the fingerprinting and registration of aliens; and for other purposes.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

TITLE I

Section 1. (a) It shall be unlawful for any person, with intent to interfere with, impair, or influence the loyalty, morale, or discipline of the military or naval forces of the United States—
(1) to advise, counsel, urge, or in any manner cause insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States; or
(2) to distribute any written or printed matter which advises, counsels, or urges insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States.
(b) For the purposes of this section, the term "military or naval forces of the United States" includes the Army of the United States, as defined in section 1 of the National Defense Act of June 3, 1916, as amended (48 Stat. 153; U.S.C., title 10, sec. 2), the Navy, Marine Corps, Coast Guard, Naval Reserve, and Marine Corps Reserve of the United States; and, when any merchant vessel is commissioned in the Navy or is in the service of the Army or the Navy, includes the master, officers, and crew of such vessel.

Sec. 2. (a) It shall be unlawful for any person—
(1) to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or by the assassination of any officer of any such government;
(2) with the intent to cause the overthrow or destruction of any government in the United States, to print, publish, edit, issue, circulate, sell, distribute, or publicly display any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence.
(3) to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof.
(b) For the purposes of this section, the term "government in the United States" means the Government of the United States, the government of any State, Territory, or possession of the United States, the government of the District of Columbia, or the government of any political subdivision of any of them.

Sec. 3. It shall be unlawful for any person to attempt to commit, or to conspire to commit, any of the acts prohibited by the provisions of this title.

Sec. 4. Any written or printed matter of the character described in section 1 or section 2 of this Act, which is intended for use in violation of this Act, may be taken from any house or other place in which it may be found, or from any person in whose possession it may be, under a search warrant issued pursuant to the provisions of title XI of the Act entitled "An Act to punish acts of interference with the foreign relations, the neutrality and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes", approved June 15, 1917 (40 Stat. 228; U.S.C., title 18, ch. 18).

Sec. 5. (a) Any person who violates any of the provisions of this title shall, upon conviction thereof, be fined not more than $10,000 or imprisoned for not more than ten years, or both.
(b) No person convicted of violating any of the provisions of this title shall, during the five years next following his conviction, be eligible for employment by the United States, or by any department or agency thereof (including any corporation the Stock of which is wholly owned by the United States).

TITLE II

Sec. 20. Section 19 of the Immigration Act of February 5, 1917 (39 Stat. 889; U.S.C., title 8, sec. 155), as amended, is amended by inserting, after "Sec. 19.", the letter "(a)", and by adding at the end of such section the following new subsections:
"(b) Any alien of any of the classes specified in this subsection, in addition to aliens who are deportable under other provisions of law, shall, upon warrant of the Attorney General, be taken into custody and deported:
"(1) Any alien who, at any time within five years after entry, shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law.
"(2) Any alien who, at any time after entry, shall have on more than one occasion, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien or aliens to enter or to try to enter the United States in violation of law.
"(3) Any alien who, at any time after entry, shall have been convicted of possessing or carrying in violation of any law any weapon which shoots or is designed to shoot automatically or semi-automatically more than one shot without manual reloading, by a single function of the trigger, or a weapon commonly called a sawed-off shotgun.
"(4) Any alien who, at any time within five years after entry, shall have been convicted of violating the provisions of title I of the Alien Registration Act, 1940.
"(5) Any alien who, at any time after entry, shall have been convicted more than once of violating the provisions of title I of the Alien Registration Act, 1940.
"No alien who is deportable under the provisions of paragraph (3), (4), or (5) of this subsection shall be deported until the termination of his imprisonment or the entry of an order releasing him on probation or parole.
"(c) In the same of any alien (other than one to whom subsection (d) is applicable) who is deportable under any law of the United States and who has proved good moral character for the preceding five years, the Attorney General may (1) permit such alien to depart the United States to any country of his choice at his own expense, in lieu of deportation, or (2) suspend deportation of such alien if not racially inadmissible or ineligible to naturalization in the United States if he finds that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien. If the deportation of any alien is suspended under the provisions of this subsection for more than six months, all of the facts and pertinent provisions of law in the case shall be reported to the Congress within ten days after the beginning of its next regular session, with the reasons for such suspension. The Clerk of the House shall have such report printed as a public document. If during that session the two Houses pass a concurrent resolution stating in substance that the Congress does not favor the suspension of such deportation, the Attorney General shall thereupon deport such alien in the manner provided by law. If during the session the two Houses do not pass such a resolution, the Attorney General shall cancel deportation proceedings upon the termination of such session, except that such proceedings shall not be canceled in the case of any alien who was not legally admitted for permanent residence at the time of his last entry into the United States, unless such alien pays to the Commissioner of Immigration and Naturalization a fee of $18 (which fee shall be deposited in the Treasury of the United States as miscellaneous receipts). Upon the cancelation of such proceedings in any case in which such fee has been paid, the Commissioner shall record the alien's admission for permanent residence as of the date of his last entry into the United States and the Secretary of State shall, if the alien was a quota immigrant at the time of entry and was not charged to the appropriate quota, reduce by one the immigration quota of the country of the alien's nationality as defined in section 12 of the Act of May 26, 1924 (U. S. C., title 8, sec.

Add. 9

212), for the fiscal year then current or next following.

"(d) The provisions of subsection (c) shall not be applicable in the case of any alien who is deportable under (1) the Act of October 16, 1918 (40 Stat. 1008; U. S. C., title 8, sec. 137), entitled 'An Act to exclude and expel from the United States aliens who are members of the anarchist and similar classes', as amended; (2) the act of May 26, 1922, entitled 'An Act to amend the Act entitled "An Act to prohibit the importation and use of opium for other than medicinal purposes", approved February 9, 1909, as amended' (42 Stat. 596; U. S. C., title 21, sec. 175); (3) the Act of February 18, 1931, entitled 'An Act to provide for the deportation of aliens convicted and sentenced for violation of any law regulating traffic in narcotics', as amended (46 Stat. 1171; U. S. C., title 8, sec. 156a); (4) any of the provisions of so much of subsection (a) of this section as relates to criminals, prostitutes, procurers, or other immoral persons, the mentally and physically deficient, anarchists, and similar classes; or (5) subsection (b) of this section."

Sec. 21. The Act entitled "An Act to provide for the deportation of aliens convicted and sentenced for violation of any law regulating traffic in narcotics", approved February 18, 1931, is amended—
(1) By striking out the words "and sentenced";
(2) By inserting after the words "any statute of the United States" the following: "or of any State, Territory, possession, or of the District of Columbia,"; and
(3) By inserting after the word "heroin" a comma and the word "marihuana".

Sec. 22. No alien shall be deportable by reason of the amendments made by section 20 or 21 on account of any act committed prior to the date of enactment of this Act.

Sec. 23. (a) The first paragraph of section 1 of the Act entitled "An Act to exclude and expel from the United States aliens who are members of the anarchistic and similar classes", approved October 16, 1918, as amended, is amended to read as follows:
"That any alien who, at any time, shall be or shall have been a member of any one of the following classes shall be excluded from admission into the United States:".
(b) Section 2 of such Act of October 16, 1918, as amended, is amended to read as follows:

"Sec. 2. Any alien who was at the time of entering the United States, or has been at any time thereafter, a member of any one of the classes of aliens enumerated in section 1 of this Act, shall, upon the warrant of the Attorney General, be taken into custody and deported in the manner provided in the Immigration Act of February 5, 1917. The provisions of this section shall be applicable to the classes of aliens mentioned in this Act, irrespective of the time of their entry into the United States."

TITLE III

Sec. 30. No visa shall hereafter be issued to any alien seeking to enter the United States unless said alien has been registered and fingerprinted in duplicate. One copy of the registration and fingerprint record shall be retained by the consul. The second copy shall be attached to the alien's visa and shall be taken up by the examining immigrant inspector at the port of arrival of the alien in the United States and forwarded to the Department of Justice, at Washington, District of Columbia.
Any alien seeking to enter the United States who does not present a visa (except in emergency cases defined by the Secretary of State), a reentry permit, or a border-crossing identification card shall be excluded from admission to the United States.

Sec. 31. (a) It shall be the duty of every alien now or hereafter in the United States, who (1) is fourteen years of age or older, (2) has not been registered and fingerprinted under section 30, and (3) remains in the United States for thirty days or longer, to apply for registration and to be fingerprinted before the expiration of such thirty days.
(b) It shall be the duty of every parent or legal guardian of any alien now or hereafter in the United States, who (1) is less than fourteen years of age, (2) has not been registered under section 30, and (3) remains in the United States for thirty days or longer, to apply for the registration of such

alien before the expiration of such thirty days. Whenever any alien attains his fourteenth birthday in the United States he shall, within thirty days thereafter, apply in person for registration and to be fingerprinted.

Sec. 32. Notwithstanding the provisions of sections 30 and 31—
(a) The application for the registration and fingerprinting, or for the registration, of any alien who is in the United States on the effective date of such sections may be made at any time within four months after such date.
(b) No foreign government official, or member of his family, shall be required to be registered or fingerprinted under this title.
(c) The Commissioner is authorized to prescribe, with the approval of the Attorney General, special regulations for the registration and fingerprinting of (1) alien seamen, (2) holders of border-crossing identification cards, (3) aliens confined in institutions within the United States, (4) aliens under order or deportation, and (5) aliens of any other class not lawfully admitted to the United States for permanent residence.

Sec. 33. (a) All applications for registration and fingerprinting under section 31 shall be made at post offices or such other places as may be designated by the Commissioner.
(b) It shall be the duty of every postmaster, with such assistance as shall be provided by the Commissioner, to register and fingerprint any applicant for registration and fingerprinting under such section, and for such purposes to designate appropriate space in the local post office for such registration and fingerprinting. Every postmaster shall forward promptly to the Department of Justice, at Washington, District of Columbia, the registration and fingerprint record of every alien registered and fingerprinted by him. The Commissioner may designate such other places for registration and fingerprinting as may be necessary for carrying out the provisions of this Act, and provide for registration and fingerprinting of aliens at such places by officers or employees of the Immigration and Naturalization Service designated by the Commissioner. The duties imposed upon any postmaster under this Act shall also be performed by any employees at the post office of such postmaster who are designated by the postmaster for such purpose.

Sec. 34. (a) The Commissioner is authorized and directed to prepare forms for the registration and fingerprinting of aliens under this title. Such forms shall contain inquiries with respect to (1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the criminal record, if any, of such alien; and (5) such additional matters as may be prescribed by the Commissioner, with the approval of the Attorney General.
(b) All registration and fingerprint records made under the provisions of this title shall be secret and confidential, and shall be made available only to such persons or agencies as may be designated by the Commissioner, with the approval of the Attorney General.
(c) Every person required to apply for the registration of himself or another under this title shall submit under oath the information required for such registration. Any person authorized to register aliens under this title shall be authorized to administer oaths for such purpose.

Sec. 35. Any alien required to be registered under this title who is a resident of the United States shall notify the Commissioner in writing of each change of residence and new address within five days from the date of such change. Any other alien required to be registered under this title shall notify the Commissioner in writing of his address at the expiration of each three months' period of residence in the United States. In the case of an alien for whom a parent or legal guardian is required to apply for registration, the notices required by this section shall be given by such parent or legal guardian.

Sec. 36. (a) Any alien required to apply for registration and to be fingerprinted who willfully fails to refuses to make such application or to be fingerprinted, and any parent or legal guardian required to apply for the registration of any alien who willfully fails or refuses to file application for the registration of such alien shall, upon conviction thereof be fined not to exceed $1,000 or be imprisoned not more than six months, or both.

(b) Any alien, or any parent or legal guardian of any alien, who fails to give written notice to the Commissioner of change of address as required by section 35 of this Act shall, upon conviction thereof, be fined not to exceed $100, or be imprisoned not more than thirty days, or both.
(c) Any alien or any parent or legal guardian of any alien, who files an application for registration containing statements known by him to be false, or who procures or attempts to procure registration of himself or another person through fraud, shall, upon conviction thereof, be fined not to exceed $1,000, or be imprisoned not more than six months, or both; and any alien so convicted within five years after entry into the United States shall, upon the warrant of the Attorney General, be taken into custody and be deported in the manner provided in sections 19 and 20 of the Immigration Act of February 5, 1917, as amended.

Sec. 37. (a) The Commissioner, with the approval of the Attorney General, is authorized and empowered to make the prescribe, and from time to time to change and amend, such rules and regulations not in conflict with this Act as he may deem necessary and proper in aid of the administration and enforcement of this title (including provisions for the identification of aliens registered under this title); except that all such rules and regulations, insofar as they relate to the performance of functions by consular officers or officers or employees in the Postal Service, shall be prescribed by the Secretary of State and the Postmaster General, respectively, upon recommendation of the Attorney General. The powers conferred upon the Attorney General by this Act and all other powers of the Attorney General relating to the administration of the Immigration and Naturalization Service may be exercised by the Attorney General through such officers of the Department of Justice, including officers of the Immigration and Naturalization Service, attorneys, special attorneys, and special assistants to the Attorney General, as he may designate specifically for such purposes.
(b) The Commissioner is authorized to make such expenditures, to employ such additional temporary and permanent employees, and to rent such quarters outside the District of Columbia as may be necessary for carrying out the provisions of this title.

Sec. 38. (a) For the purposes of this title—
(1) the term ''United States'', when used in a geographical sense, means the States, the Territories of Alaska and Hawaii, the District of Columbia, Puerto Rico, and the Virgin Islands;
(2) the term ''Commissioner'' means the Commissioner of Immigration and Naturalization.
(b) The provisions of this title shall take effect upon the date of enactment of this Act; except that sections 30 and 31 shall take effect sixty days after the date of its enactment.

Sec. 39. The President is authorized to provide, by Executive order, for the registration and fingerprinting, in a manner as nearly similar to that provided in this title as he deems practicable, of aliens in the Panama Canal Zone.


TITLE IV

Sec. 40. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

Sec. 41. This Act may be cited as the ''Alien Registration Act, 1940''.

Approved, June 28, 1940.

Add. 12

## 8 C.F.R. § 264.1

**Registration and fingerprinting.**

**(a)** Prescribed registration forms. The following forms are prescribed as registration forms:

Form No. and Class

G–325R, Biographic Information (Registration), or its successor form.

I–67, Inspection Record—Hungarian refugees (Act of July 25, 1958).

I–94, Arrival–Departure Record—Aliens admitted as nonimmigrants; aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act; aliens whose claimed entry prior to July 1, 1924, cannot be verified, they having satisfactorily established residence in the United States since prior to July 1, 1924; aliens lawfully admitted to the United States for permanent residence who have not been registered previously; aliens who are granted permission to depart without the institution of deportation proceedings or against whom deportation proceedings are being instituted.

I–95, Crewmen's Landing Permit—Crewmen arriving by vessel or aircraft.

I–181, Memorandum of Creation of Record of Lawful Permanent Residence—Aliens presumed to be lawfully admitted to the United States under 8 CFR 101.1.

I–485, Application for Status as Permanent Resident—Applicants under sections 245 and 249 of the Immigration and Nationality Act as amended, and section 13 of the Act of September 11, 1957.

I–590, Registration for Classification as Refugee—Escapee—Refugee-escapees paroled pursuant to section 1 of the Act of July 14, 1960.

I–687, Application for Status as a Temporary Resident—Applicants under section 245A of the Immigration and Nationality Act, as amended.

I–691, Notice of Approval for Status as a Temporary Resident—Aliens adjusted to lawful temporary residence under 8 CFR 210.2 and 245A.2.

I–698, Application to Adjust Status from Temporary to Permanent Resident—Applicants under section 245A of the Immigration and Nationality Act, as amended.

I–700, Application for Status as a Temporary Resident—Applicants under section 210 of the Immigration and Nationality Act, as amended.

I–817, Application for Voluntary Departure under the Family Unity Program.

**(b)** Evidence of registration. The following forms constitute evidence of registration:

Form No. and Class

I–94, Arrival–Departure Record—Aliens admitted as nonimmigrants; aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act; aliens whose claimed entry prior to July 1, 1924, cannot be verified, they having satisfactorily established residence in the United States since prior to July 1, 1924; and aliens granted permission to depart without the institution of deportation proceedings.

I–95, Crewmen's Landing Permit—Crewmen arriving by vessel or aircraft.

I–184, Alien Crewman Landing Permit and Identification Card—Crewmen arriving by vessel.

I–185, Nonresident Alien Canadian Border Crossing Card—Citizens of Canada or British subjects residing in Canada.

I–186, Nonresident Alien Mexican Border Crossing Card—Citizens of Mexico residing in Mexico.

I–221, Order to Show Cause and Notice of Hearing—Aliens against whom deportation proceedings are being instituted.

I–221S, Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien—Aliens against whom deportation proceedings are being instituted.

I–551, Permanent Resident Card—Lawful permanent resident of the United States.

I–766, Employment Authorization Document.

Add. 14

Form I–862, Notice to Appear—Aliens against whom removal proceedings are being instituted.

Form I–863, Notice of Referral to Immigration Judge—Aliens against whom removal proceedings are being instituted.

USCIS Proof of Alien G–325R Registration, or its successor form.

Note to paragraph (b): In addition to the forms noted in this paragraph (b), a valid, unexpired nonimmigrant DHS admission or parole stamp in a foreign passport constitutes evidence of registration.

(c) Replacement of alien registration. Any alien whose registration document is not available for any reason must immediately apply for a replacement document in the manner prescribed by USCIS.

(d) Surrender of registration. If an alien is naturalized, dies, permanently departs, or is deported from the United States, or evidence of registration is found by a person other than the one to whom such evidence was issued, the person in possession of the document shall forward it to a USCIS office.

(e) Fingerprinting waiver.

(1) Fingerprinting is waived for nonimmigrant aliens admitted as foreign government officials and employees; international organization representatives, officers and employees; NATO representatives, officers and employees, and holders of diplomatic visas while they maintain such nonimmigrant status. Fingerprinting is also waived for other nonimmigrant aliens, while they maintain nonimmigrant status, who are nationals of countries which do not require fingerprinting of United States citizens temporarily residing therein.

(2) Fingerprinting is waived for every nonimmigrant alien not included in paragraph (e)(1) of this section who departs from the United States within one year of his admission, provided he maintains his nonimmigrant status during that time; each such alien not previously fingerprinted shall apply therefor at once if he remains in the United States in excess of one year.

(3) Every nonimmigrant alien not previously fingerprinted shall apply therefor at once upon his failure to maintain his nonimmigrant status.

Add. 15

(f) [Reserved by 81 FR 94234]

(g) Registration and fingerprinting of children who reach age 14. Within 30 days after reaching the age of 14, any alien in the United States not exempt from alien registration under the Act and this chapter must apply for registration and fingerprinting, unless fingerprinting is waived under paragraph (e) of this section, in accordance with applicable form instructions.

(1) Permanent residents. If such alien is a lawful permanent resident of the United States and is temporarily absent from the United States when he reaches the age of 14, he must apply for registration and provide a photograph within 30 days of his or her return to the United States in accordance with applicable form instructions. The alien, if a lawful permanent resident of the United States, must surrender any prior evidence of alien registration. USCIS will issue the alien new evidence of alien registration.

(2) Others. In the case of an alien who is not a lawful permanent resident, the alien's previously issued registration document will be noted to show that he or she has been registered and the date of registration.

(h), (i) [Reserved by 76 FR 53795]

# Rules and Regulations

**Federal Register**

Vol. 90, No. 47

Wednesday, March 12, 2025

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 264**

**[CIS No. 2810–25; DHS Docket No. USCIS–2025–0004]**

**RIN 1615–AC96**

### Alien Registration Form and Evidence of Registration

**AGENCY:** U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS").

**ACTION:** Interim final rule ("IFR") with request for comments.

**SUMMARY:** This IFR amends DHS regulations to designate a new registration form for aliens to comply with statutory alien registration and fingerprinting provisions. Aliens who are subject to the registration requirements of the Immigration and Nationality Act, as amended ("INA") who have not yet registered may use this registration form to satisfy their statutory obligations. This IFR also amends DHS regulations to designate additional documentation that may serve as evidence of alien registration.

**DATES:**

*Effective date:* This IFR is effective April 11, 2025.

*Registration:* Aliens may register using the revised form G–325R, Biographic Information (Registration) immediately.

*IFR comment period:* Comments on the rule must be received by April 11, 2025.

*Information collection comment period:* Comments on the information collection described in the *Paperwork Reduction Act* section below must be received by May 12, 2025.

**ADDRESSES:**

*Comments on the IFR:* You may submit comments on this IFR, identified by DHS Docket No. USCIS–2025–0004, through the Federal eRulemaking Portal at *https://www.regulations.gov.* Follow the website instructions for submitting comments.

*Comments on the Information Collection:* Submit comments on the information collection to the same docket as the IFR. In addition, all comments on the information collection must include the OMB Control Number 1615—NEW in the body of the comments.

Comments submitted in a manner other than the ones listed above, including emails or letters sent to the Department's officials, will not be considered comments on the proposed rule and may not receive a response from the Department. Please note that the Department cannot accept any comments that are hand-delivered or couriered. In addition, the Department cannot accept comments contained on any form of digital media storage devices, such as CDs, DVDs, or USB drives. The Department is not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Jerry Rigdon, Acting Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**
Mark Phillips, Residence and Naturalization Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Instructions for providing comments are in the **ADDRESSES** caption above.

*Privacy:* You may wish to consider limiting the amount of personal information that you provide in any public comment submission you make to the Department. The Department may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing DHS Docket No. USCIS–2025–0004. You may also sign up for email alerts on the online docket to be notified when comments are posted or when the final rule is published.

## II. Background

### A. Alien Registration Requirements of the INA

The Alien Registration Act of 1940, also known as the Smith Act, was enacted into law on June 28, 1940. *See* Public Law 76–670, 54 Stat. 670. The Act generally required all aliens in the country beyond 30 days to apply to register and to be fingerprinted. Congress later incorporated these requirements, as amended, in the Immigration and Nationality Act of 1952, Public Law 82–414, 66 Stat. 163. The registration and fingerprinting requirements currently appear, as amended, in part VII of subchapter II of chapter 12 of title 8, United States Code (8 U.S.C. 1301–1306). Throughout this preamble, we refer to such requirements as the alien registration requirements, or the alien registration requirements of the INA.

Under the alien registration requirements of the INA, with limited exceptions (*e.g.,* for visa holders who have already been registered and fingerprinted (through their application for a visa) and A and G visa holders, *see* 8 U.S.C. 1201(b)), all aliens above the age of 14 who remain in the United States for 30 days or longer must apply for registration and to be fingerprinted before the expiration of 30 days. *See* 8 U.S.C. 1302(a). Similarly, parents and legal guardians must ensure that their children below the age of 14 are registered. Within 30 days of reaching his or her 14th birthday, the alien child must "apply in person for registration and to be fingerprinted." 8 U.S.C. 1302(b). The Secretary of Homeland Security ("Secretary") may, in her discretion and on the basis of reciprocity pursuant to such regulations as she may prescribe, waive the requirement of fingerprinting specified in 8 U.S.C. 1302(a) and (b) in the case of any nonimmigrant. 8 U.S.C. 1302(c). As discussed in the next section, the Secretary has exercised this authority with respect to certain nonimmigrants.

Add. 17

An alien's willful failure or refusal to apply to register or to be fingerprinted is punishable by a fine of up to $5,000 or imprisonment for up to six months, or both. 8 U.S.C. 1306(a).[1] The same applies to an alien's parent or legal guardian's willful failure or refusal to register. *Id.* Any alien or any parent or legal guardian of an alien who files a registration application ''containing statements known by him to be false, or who procures or attempts to procure registration of himself or through another person by fraud'' is subject to criminal prosecution. 8 U.S.C. 1306(c); *see, e.g.,* 18 U.S.C. 1001, 1546. A conviction for fraudulent registration constitutes a ground of deportability under 8 U.S.C. 1227(a)(3)(B)(i).

The Secretary has authority to ''prepare forms for the registration and fingerprinting of aliens,'' which ''shall contain inquiries with respect to (1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the police and criminal record, if any, of such alien; and (5) such additional matters as may be prescribed.'' 8 U.S.C. 1304(a). The Secretary also has authority to prescribe ''special regulations and forms for the registration and fingerprinting of'' certain classes of aliens, including ''aliens of any other class not lawfully admitted to the United States for permanent residence,'' ''[n]otwithstanding the provisions of'' 8 U.S.C. 1301 and 1302. 8 U.S.C. 1303(a). Although this rule is fully consistent with 8 U.S.C. 1301 and 1302 and related authority, the Secretary also invokes 8 U.S.C. 1303(a) to the extent necessary to support this rulemaking.

Every alien in the United States who has been registered and fingerprinted under the alien registration requirements of the INA must ''be issued a certificate of alien registration or an alien registration receipt card in such form and manner and at such time as shall be prescribed under regulations issued by the [Secretary].'' 8 U.S.C. 1304(d).[2] Every registered alien 18 years

of age and over must at all times carry and have in their personal possession any certificate of alien registration or alien registration receipt card. Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1304(e); 18 U.S.C. 3559(a)(8), 3571(b)(6).

Finally, each alien required to be registered under the alien registration requirements of the INA who is within the United States must notify DHS in writing of each change of address and new address within ten days from the date of such change and provide such additional information as the Secretary may require by regulation. 8 U.S.C. 1305(a). Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1306(b); 18 U.S.C. 3559(a)(8), 3571(b)(6). In addition, any alien who has failed to comply with the change-of-address notification requirements of 8 U.S.C. 1305 is deportable unless the alien establishes that such failure was reasonably excusable or was not willful. *See* 8 U.S.C. 1227(a)(3)(A).

*B. Current Regulations*

Longstanding regulations provide that within 30 days after reaching the age of 14, any alien in the United States who is not exempt from alien registration must apply for registration and fingerprinting, unless fingerprinting is waived under 8 CFR 264.1(e) (which waives fingerprinting for certain nonimmigrants[3]), in accordance with applicable form instructions. 8 CFR 264.1(g).

If such alien is a lawful permanent resident of the United States and is temporarily absent from the United States when he reaches the age of 14, the alien must apply for registration and provide a photograph within 30 days of his or her return to the United States in accordance with applicable form

instructions. 8 CFR 264.1(g)(1). The alien, if a lawful permanent resident of the United States, must surrender any prior evidence of alien registration. *Id.* USCIS will issue the alien new evidence of alien registration. *Id.* In the case of an alien who is not a lawful permanent resident, the alien's previously issued registration document will be noted to show that he or she has been registered and the date of registration. 8 CFR 264.1(g)(2).

DHS has by regulation prescribed forms that satisfy registration requirements. *See* 8 CFR 264.1(a). The regulations also designate certain forms as constituting evidence of registration. 8 CFR 264.1(b).

DHS regulations identify the following forms as registration forms:
• I–67, Inspection Record—Hungarian refugees (Act of July 25, 1958).
• I–94, Arrival-Departure Record—Aliens admitted as nonimmigrants;[4] aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act; aliens whose claimed entry prior to July 1, 1924, cannot be verified, they having satisfactorily established residence in the United States since prior to July 1, 1924; aliens lawfully admitted to the United States for permanent residence who have not been registered previously; aliens who are granted permission to depart without the institution of deportation proceedings or against whom deportation proceedings are being instituted.
• I–95, Crewmen's Landing Permit—Crewmen arriving by vessel or aircraft.
• I–181, Memorandum of Creation of Record of Lawful Permanent Residence—Aliens presumed to be lawfully admitted to the United States under 8 CFR 101.1.
• I–485, Application for Status as Permanent Resident—Applicants under sections 245 and 249 of the Immigration and Nationality Act as amended, and section 13 of the Act of September 11, 1957.
• I–590, Registration for Classification as Refugee—Escapee—Refugee-escapees paroled pursuant to section 1 of the Act of July 14, 1960.
• I–687, Application for Status as a Temporary Resident—Applicants under section 245A of the Immigration and Nationality Act, as amended.
• I–691, Notice of Approval for Status as a Temporary Resident—Aliens adjusted to lawful temporary residence under 8 CFR 210.2 and 245A.2.

---

[1] Section 1306(a) refers to a fine of up to $1,000, but the general fine provisions of 18 U.S.C. 3571 supersede that language. As a class B misdemeanor, the applicable fine is not more than $5,000. *Id.*; 18 U.S.C. 3559(a)(7).

[2] As of March 1, 2003, in accordance with section 1517 of Title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Immigration and Nationality Act describing functions which were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA ''shall be deemed to refer to the Secretary'' of

Homeland Security. 6 U.S.C. 557 (2003) (codifying HSA, Title XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

[3] The Secretary may waive fingerprinting requirements for some nonimmigrants. Such waivers are in the Secretary's discretion, on the basis of reciprocity, and pursuant to such regulations as the Secretary may prescribe. 8 U.S.C. 1302(c). Applicable regulations waive fingerprinting requirements for some nonimmigrants. *See* 8 CFR 264.1(e)(1) and (2). The waiver covers various diplomatic and similar categories; other nonimmigrant aliens, while they maintain nonimmigrant status, who are nationals of countries which do not require fingerprinting of U.S. citizens temporarily residing therein; and nonimmigrants who depart from the United States within one year of admission. *Id.* A nonimmigrant who fails to maintain status must apply to be fingerprinted at once upon failing to maintain nonimmigrant status. 8 CFR 264.1(e)(3).

[4] This includes aliens admitted as B–1/B–2 nonimmigrants through the Visa Waiver Program who were issued Form I–94W.

Add. 18

• I–698, Application to Adjust Status from Temporary to Permanent Resident—Applicants under section 245A of the Immigration and Nationality Act, as amended.

• I–700, Application for Status as a Temporary Resident—Applicants under section 210 of the Immigration and Nationality Act, as amended.

• I–817, Application for Voluntary Departure under the Family Unity Program.

*See* 8 CFR 264.1(a).

The regulations identify the following forms as constituting evidence of registration:

• I–94, Arrival-Departure Record—Aliens admitted as nonimmigrants; aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act; aliens whose claimed entry prior to July 1, 1924, cannot be verified, they having satisfactorily established residence in the United States since prior to July 1, 1924; and aliens granted permission to depart without the institution of deportation proceedings.

• I–95, Crewmen's Landing Permit—Crewmen arriving by vessel or aircraft.

• I–184, Alien Crewman Landing Permit and Identification Card—Crewmen arriving by vessel.

• I–185, Nonresident Alien Canadian Border Crossing Card—Citizens of Canada or British subjects residing in Canada.

• I–186, Nonresident Alien Mexican Border Crossing Card—Citizens of Mexico residing in Mexico.

• I–221, Order to Show Cause and Notice of Hearing—Aliens against whom deportation proceedings are being instituted.

• I–221S, Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien—Aliens against whom deportation proceedings are being instituted.

• I–551, Permanent Resident Card—Lawful permanent resident of the United States.

• I–766, Employment Authorization Document (''EAD'').

• Form I–862, Notice to Appear—Aliens against whom removal proceedings are being instituted.

• Form I–863, Notice of Referral to Immigration Judge—Aliens against whom removal proceedings are being instituted.

*See* 8 CFR 264.1(b). In addition, under a note to section 264.1(b), a valid, unexpired nonimmigrant DHS admission or parole stamp in a foreign passport constitutes evidence of registration.

## III. Basis and Purpose of the IFR

This rule would partially implement section 7 of Executive Order 14159, Protecting the American People Against Invasion (Jan. 20, 2025), 90 FR 8443 (Jan. 29, 2025). Section 7 directs the Secretary, in coordination with the Secretary of State and the Attorney General, to take all appropriate action to:

• Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, U.S. Code (8 U.S.C. 1301–1306);

• Ensure that all previously unregistered aliens in the United States comply with 8 U.S.C. 1301–1306; and

• Ensure that failure to comply with the legal obligations of 8 U.S.C. 1301–1306 is treated as a civil and criminal enforcement priority.
90 FR 8444.

Following issuance of this Executive Order, DHS reviewed the registration regulations at 8 CFR part 264 and determined that it would be appropriate to designate a general registration form in addition to those already identified in the regulations. DHS believes that a general registration option may improve registration outcomes for certain groups of aliens. For instance, under current regulations, in general:

• Aliens who entered without inspection and have not otherwise been encountered by DHS lack a designated registration form.

• Even an alien who entered without inspection and who is later encountered by DHS, such as by applying for (or being granted) asylum or Temporary Protected Status (TPS), would not typically use the registration forms identified in § 264.1(a) when applying for asylum or TPS.[5]

• Many Canadian nonimmigrants for business or pleasure are not issued a Form I–94 even though they have not been registered through the visa process. *See* 8 CFR 212.1(a)(1), 235.1(f)(1)(ii).

• Some forms designated for registration in 8 CFR 264.1(a) (such as the Form I–485) are not normally used within 30 days of entry into the United States (the relevant time period for registration under 8 U.S.C. 1302 and 8 CFR 264.1(g)).

• In some cases, the acceptable evidence of registration at 8 CFR 264.1(b) is the result of an approved application only, which may leave denied or pending applicants without any acceptable evidence that they have complied with the requirement to register.

• The regulatory registration structure does not use any of the petitions filed on behalf of children or other derivative beneficiaries who may be in the United States.

Consistent with the Executive Order and the alien registration requirements of the INA, this rule designates a general registration option available to all unregistered aliens regardless of their status. To use this option, aliens must create their own unique account, or an account for their child, in myUSCIS at *https://my.uscis.gov/* and then complete G–325R Biographic Information (Registration), which is currently free of charge.

Submission of the registration in myUSCIS initiates the process for the alien's Biometrics Services Appointment at a USCIS Application Support Center (ASC). USCIS contacts the registrant regarding the biometrics services appointment and the collection of biometrics, including fingerprints, photograph and signature. USCIS uses this information for purposes of identity verification, and background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI).[6] USCIS sends an appointment notice with the date, time and location of the registrant's biometric services appointment.

Once an alien successfully completes his or her biometrics appointment at an ASC, the ELIS case management systems will trigger the creation of ''Proof of Alien Registration'' with a unique identifier printed on the document. For those aliens, such as Canadian nonimmigrants and aliens under the age of 14, required to register but for whom the fingerprint requirement is waived, the ELIS case management system will trigger the creation of the ''Proof of Alien Registration'' upon receipt of Form G–325R. This Proof of Alien Registration document will then be posted to the alien's myUSCIS account. In the myUSCIS account, the alien will be allowed to download a .PDF version of the document, and can print it. This document serves as evidence of the

---

[5] Such aliens may receive an EAD, which is designated as evidence of registration in § 264.1(b), but such aliens frequently are not required to apply for an EAD and may not be entitled to one. In addition, the application for an EAD (Form I–765, Application for Employment Authorization) is not designated as a registration form in § 264.1(a), which could result in confusion.

[6] *See* 8 CFR 103.16.

Add. 19

alien's registration for purposes of 8 U.S.C. 1304(d).[7]

This IFR fills the gaps in the regulatory regime by prescribing a registration form available to all aliens regardless of their status, in addition to the other forms already listed. Specifically, this IFR lists the new form at 8 CFR 264.1(a) and lists the corresponding evidence of registration at 8 CFR 264.1(b).

Consistent with 8 U.S.C. 1359, DHS interprets the registration and fingerprinting requirements of 8 U.S.C. 1302 to exclude from "all aliens" American Indians born in Canada who possess at least 50 per centum of blood of the American Indian race who are present in the United States under the authority of 8 U.S.C. 1359, as 8 U.S.C. 1302 and other provisions of subchapter II of Chapter 12, title 8 of the U.S. Code are construed consistent with their right to pass the borders of the United States.[8] Therefore, the registration form added in this IFR would not be used by section 1359 entrants because such entrants do not have to register, although they may do so if they wish.

The rule does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the Act. An alien who has previously registered consistent with 8 CFR 264.1(a), or an alien who has evidence of registration consistent with 8 CFR 264.1(b), need not register again, although such an alien is subject to ongoing change of address reporting requirements under 8 U.S.C. 1305(a) and 8 CFR 265.1.

## IV. Request for Comment on Potential Fee

While DHS is not incorporating a fee for filing Form G–325R at this time, DHS welcomes comment on the option of adding a biometric services fee per registrant of $30, for the collection, use, and storage of biometric information, pursuant to 8 CFR 103.16 and 17.

DHS has broad statutory authority to collect biometric information when

such information is necessary or relevant to the administration of the INA, including 8 U.S.C. 1304(a). Pursuant to 8 CFR 103.2(b)(9), 8 CFR 103.16 and 17, DHS may collect, use, and store biometrics for purposes of conducting background and security checks, adjudicating benefits and performing other functions related to administering and enforcing the immigration laws. *See* 8 CFR 103.2(b)(9). USCIS may require the payment of any biometric services fee identified in 8 CFR 106.2, or also charge a fee that is required by law, regulation, form instructions, or **Federal Register** notice applicable to the request type. *See* 8 U.S.C. 1356(m); 8 CFR 103.2(b)(9), 103.7, 103.17; 8 CFR part 106.

In previous rules, USCIS has evaluated the cost to USCIS of conducting biometric activities, including FBI Name checks and fingerprints, ASC contractual support, and biometric service management overall, including the cost of federal employees at the ASC locations.[9] USCIS currently pays approximately $10.00 to the FBI for fingerprinting results.[10] As part of USCIS' recent Fee Schedule rule, and for purposes of the creation of a separate biometric fee for certain programs, USCIS calculated that the biometric collection, storage and use at an ASC costs approximately $19.50.[11] The sum of these costs is approximately $29.50, which USCIS rounded up to the nearest $5 increment, similar to other Immigration Examinations Fee Account (IEFA) fees, making the fee $30.[12] Therefore, DHS welcomes comment on whether to cover these costs via a $30 biometric services fee for this population. DHS welcomes comments on this potential fee, including the calculation of the fee.

## V. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

DHS has issued this IFR without prior notice and opportunity for comment because this is a rule of agency organization, procedure, or practice ("procedural rule"). *See* 5 U.S.C. 553(b)(A). The procedural-rule exception "covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *JEM Broad. Co., Inc.* v. *FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (quoting *Batterton* v. *Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980)); *see also Mendoza* v. *Perez*, 754 F.3d 1002, 1023–24 (D.C. Cir. 2014); *Am. Hosp. Ass'n* v. *Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987) (holding that procedural rules are those that do not "encode a substantive value judgment or put a stamp of approval or disapproval on a given type of behavior").

The IFR merely adds another method (the myUSCIS registration process) for compliance with existing statutory registration requirements. It does not alter the rights or interests of any party, or encode a substantive value judgment on a given type of private behavior. Accordingly, DHS has proceeded without advance notice and opportunity for comment. DHS nonetheless welcomes post-promulgation comment on all aspects of this IFR consistent with the instructions provided in section I of this preamble.

### B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review), direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. Executive Order 13563 emphasizes the importance of quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. The Office of Management and Budget has determined that this rule is significant under Executive Order 12866 and has reviewed this regulation.

#### Summary

DHS is amending existing regulations to make available another method for aliens to comply with the alien registration requirements of the INA. The rule seeks to better ensure that all

---

[7] As noted above, every registered alien 18 years of age and over must at all times carry and have in their personal possession any certificate of alien registration or alien registration receipt card. Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1304(e); 18 U.S.C. 3559(a)(8), 3571(b)(6).

[8] *See Akins* v. *Saxbe*, 380 F. Supp. 1210 (D. Me. 1974); *Matter of Yellowquill*, 16 I&N Dec. 576 (BIA 1978). Certain members of the Texas Band of Kickapoo Indians similarly are not required to register. *See* Texas Band of Kickapoo Act, Public Law 97–429, sec. 4(d) (1983) ("Notwithstanding the Immigration and Nationality Act, 8 U.S.C. 1101, all members of the Band shall be entitled to freely pass and repass the borders of the United States and to live and work in the United States.").

[9] *See* DHS, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Immigration Benefit Requests.* 88 FR 402, 484–485 (Jan. 4, 2023). DHS finalized the proposed rule and published a final rule in January 2024, with an effective date of April 1, 2024. *See* 89 FR 6194 (Jan. 31, 2024).

[10] *See* 88 FR at 485 (Jan. 4, 2023) (reflecting $11.25 for fingerprint-based Centralized Billing Service Provider (CBSP) checks). Since the publication of the NPRM, the Federal Bureau of Investigation (FBI), U.S. Department of Justice, has revised its fee scheduled, effective January 1, 2025, and lowered the fee for CBSPs to $10.00. *See* 89 FR 68930 (Aug. 28, 2024).

[11] *See* 88 FR at 485 (addressing the calculation of biometric services fee for purposes of applicants for Temporary Protected Status (TPS) under proposed 106.2(a)[48](iii), now included at 8 CFR 106.2(a)(50)(iii), and DHS–EOIR biometric services fee under 8 CFR 103.7(a)(2)).

[12] *See* 88 FR at 485.

Add. 20

aliens in the United States comply with such requirements. The rule does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the INA.

DHS has assessed both the costs and benefits of this rule as required by Executive Orders 12866 and 13563. The rule will result in costs to aliens not currently complying with the requirements of the Act, which include the cost of time to complete and file a registration form as well as time spent submitting biometrics. DHS will incur additional costs due to the added activities from the collection of biometrics given the impacted population of aliens do not pay fees for registration or biometrics. However, the rule also offers benefits by providing a general registration option to allow all unregistered aliens to comply with their registration requirements, which will have direct benefits via improved DHS law enforcement efficacy and indirect benefits as a result of improved enforcement.

Affected Population

The most recent DHS population estimate for aliens without lawful status residing in the United States was 11 million as of January 1, 2022.[13] Most of these aliens either entered the United States without inspection or were admitted past the date they were required to depart. This population comprises aliens who may have filed one of the forms as discussed in the preamble as designated registration forms under 8 CFR 264.1(a), and may have evidence of registration under 8 CFR 264.1(b).

The population impacted by this rule are those who are currently unregistered and who would use the general registration form designated under this rule. DHS estimates the affected population to be between 2.2 million and 3.2 million, after accounting for groups who have engaged with DHS and have previously filed one of the designated registration forms discussed in the preamble (requirements under 8 CFR 264.1(a) or 8 CFR 264.1(b)).[14] The

affected population includes, for instance:

• Aliens who are present in the United States without inspection and admission or inspection and parole and have not yet registered (*i.e.,* have not yet filed a registration form designated under 8 CFR 264.1(a), and do not have evidence of registration under 8 CFR 264.1(b)).

• Canadian visitors who entered the United States at land ports of entry and were not issued evidence of registration (*e.g.,* Form I–94).

• An alien, whether previously registered or not, who turns 14 years old in the United States and therefore must register within 30 days after their 14th birthday.

DHS recognizes there could be additional aliens subject to this rule in the future. Relying on this estimate may somewhat overstate those who need to fully comply as aliens under 14 years of age are required to be registered but do not need to provide fingerprinting.

Costs

DHS recognizes that there are costs to aliens to comply with registration requirements in the Executive Order and the INA's alien registration provisions. Because this rule does not impose any new alien registration or biometric obligations separate from those already contained in the Act, the costs described in this section are inherent in compliance with the statute and are not a result of this rule. DHS nonetheless assesses the effects of the increased compliance that may result from this rule. DHS similarly assesses the benefits in the following section.

Costs to aliens may include the time to complete and file a registration form, as well as time spent traveling to an ASC, submitting fingerprints, and record retention. There is currently no fee for applicants to file the prescribed form or to submit biometrics, but applicants take on the burden of time to complete the form.[15] While travel times and distances vary, applicants would need to travel to an ASC in order to submit biometrics and spend an additional amount of time to complete the collection.[16] The total filing burden

for new registrations will include the cost of time to submit biometrics and the time burden of registration using the prescribed forms in the regulation.

Additional compliance with registration obligations would also result in more aliens needing to maintain evidence of registration in the mode prescribed by DHS. Aliens may also spend some marginal amount of time to become familiar with the process and specific steps they should take to be compliant.

This IFR has the potential impact of increasing the biometric activities for DHS, such as additional FBI Name checks, fingerprinting, and support from ASC locations, estimated to cost $30 per applicant. The additional costs of the registration activities will be taken on by DHS given the population subject to this IFR currently does not pay fees for registration or biometric services, increasing costs to DHS. Earlier in this preamble, DHS has sought comment on a potential fee.

Benefits

The benefit of this IFR is the designation of a general registration form option that will improve registration outcomes for aliens identified in the Affected Population section above, consistent with the requirements of the alien registration provisions of the INA. This IFR provides a registration form available to all unregistered aliens regardless of their status. This rule fills a gap in registration by adding an online option to comply with existing statutory registration requirements.

The IFR is also expected to improve DHS law enforcement efficacy, because law enforcement personnel would have access to more comprehensive registration data. To the extent that the rule results in DHS receiving more comprehensive information about the location of aliens in the United States, the rule will make it easier and safer for DHS to enforce the law. In addition, increased compliance with fingerprinting requirements would provide DHS with additional information about an alien's criminal record, including whether the alien is a known or suspected terrorist. Such information provides greater situational awareness to law enforcement, including when executing arrest warrants. When DHS has more information about potential targets of

---

[13] *See* DHS Office of Homeland Security Statistics (OHSS), Estimates of the Unauthorized Population Residing in the United States: January 2018–January 2022 (Apr. 2024), *https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf.*

[14] Estimate calculated by the Office of Homeland Security Statistics. This estimate does not include aliens who have already met one or more conditions for registration, and accounts for changes to the alien population from 2022 through 2024 as well as emigration and mortality rates.

Other groups already considered registered for purposes of this analysis and not part of the affected population include those who have been issued an I–94 form, were paroled into the United States, were issued an EAD, or were issued a notice to appear in section 240 removal proceedings.

[15] The respondent burden to file Form G–325R is discussed below in the Paperwork Reduction Act section.

[16] *See Employment Authorization for Certain H–4 Dependent Spouses,* 80 FR 10284 (Feb. 25, 2015); and *Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives,* 78

FR 536, 572 (Jan. 3, 2013); *see also* USCIS, DHS, "Instructions for Application to Register Permanent Residence or Adjust Status (Form I–485)," OMB No. 1615–0023 (expires Oct. 31, 2027), *https://www.uscis.gov/sites/default/files/document/forms/i-485instr.pdf.*

Add. 21

law enforcement, it can make more efficient use of law enforcement resources and better protect public safety and officer safety.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 et seq.), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (i.e., small businesses, small organizations, and small governmental jurisdictions). The RFA's regulatory flexibility analysis requirements apply only to those rules for which an agency is required to publish a general notice of proposed rulemaking pursuant to 5 U.S.C. 553 or any other law. See 5 U.S.C. 604(a). DHS did not issue a notice of proposed rulemaking for this action. Therefore, a regulatory flexibility analysis is not required for this rule. Nonetheless, DHS has determined that this rule will not have a significant economic impact on a substantial number of small entities. This rule directly regulates individual aliens. However, the RFA's regulatory flexibility analysis requirements apply only to small entities subject to the requirements of the rule.[17] The individual aliens subject to the requirements of this rule are not small entities as defined in 5 U.S.C. 601(6). Accordingly, DHS certifies that this rule does not have a significant economic impact to a substantial number of small entities.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, which includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector.[18] The inflation adjusted value of $100 million in 1995 is approximately $200 million in 2023

based on the Consumer Price Index for All Urban Consumers (CPI–U).[19] This rule is exempt from the written statement requirement, because DHS did not publish a notice of proposed rulemaking for this rule. In addition, this final rule does not contain a Federal mandate as the term is defined under UMRA.[20] The requirements of title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

## E. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

This IFR is not a "rule" as defined by the Congressional Review Act (CRA), enacted as part of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121. See 5 U.S.C. 804(3)(C) (defining the term "rule" to exclude "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties"). DHS will nonetheless submit this IFR to both houses of Congress and the Comptroller General before the rule takes effect.

## F. Executive Order 14192 (Unleashing Prosperity Through Deregulation)

This rule is exempt from Executive Order 14192 as it is a regulation issued with respect to national security, homeland security and the immigration-related function of the United States.

## G. Executive Order 13132 (Federalism)

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, Federalism, 64 FR 43255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the

preparation of a federalism summary impact statement.

## H. Executive Order 12988 (Civil Justice Reform)

This rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this rule meets the applicable standards provided in section 3 of E.O. 12988.

## I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This rule does not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

## J. National Environmental Policy Act

DHS and its components analyze final actions to determine whether the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq., applies to them and, if so, what degree of analysis is required. DHS Directive 023–01 Rev. 01 and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual)[21] establish the policies and procedures that DHS and its components use to comply with NEPA, 42 U.S.C. 4321 et seq.[22]

NEPA allows Federal agencies to establish categories of actions ("categorical exclusions") that experience has shown do not, individually or cumulatively, have a significant effect on the human

---

[17] Small Business Administration, A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act at 22 (Aug. 2017), https://advocacy.sba.gov/wp-content/uploads/2019/07/How-to-Comply-with-the-RFA-WEB.pdf.

[18] See 2 U.S.C. 1532(a).

[19] See BLS, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202406.pdf (last visited Aug. 6, 2024). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2023); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2023–Average monthly CPI–U for 1995) ÷ (Average monthly CPI–U for 1995)] × 100 = [(304.702    152.383) ÷ 152.383] = (152.319/ 152.383) = 0.99958001 × 100 = 99.96 percent = 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

[20] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. See 2 U.S.C. 1502(1), 658(6).

[21] The Instruction Manual contains DHS's procedures for implementing NEPA and was issued November 6, 2014, available at https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex.

[22] The Council on Environmental Quality (CEQ) regulations, 40 CFR parts 1500 through 1508. also discuss NEPA implementing procedures. DHS is aware of the November 12, 2024 decision in Marin Audubon Society v. FAA, 121 F.4th 902 (D.C. Cir. 2024), reh'g en banc denied, No. 23–1067, 2025 WL 374897 (D.C. Cir. Jan. 31, 2025). To the extent that a court may conclude that the CEQ regulations implementing NEPA are not judicially enforceable or binding on this agency action, DHS notes that its NEPA procedures and approach here are fully consistent with the NEPA statute in addition to being consistent with the CEQ regulations. Even in the absence of the CEQ regulations, DHS would proceed as it has here.

Add. 22

environment and, therefore, do not require an environmental assessment (EA) or environmental impact statement (EIS).[23] *See* 42 U.S.C. 4336(a)(2), 4336e(1). The Instruction Manual, Appendix A lists the DHS Categorical Exclusions.[24]

Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[25]

This rule amends DHS's existing regulations at 8 CFR 264.1(a) to identify another method for aliens to apply to register and be fingerprinted under the alien registration requirements of the INA. DHS has reviewed the rule and finds that the rule is of a strictly administrative or procedural nature, and that no significant impact on the environment, or any change in environmental effect will result from the rule.

Accordingly, DHS finds that the promulgation of this final rule's amendments clearly fits within categorical exclusion A3 established in DHS's NEPA implementing procedures as an administrative change with no change in environmental effect, is not part of a larger federal action, and does not present extraordinary circumstances that create the potential for a significant environmental effect.

*K. Family Assessment*

DHS has reviewed this rule in line with the requirements of section 654 of the Treasury General Appropriations Act, 1999.[26] DHS has systematically reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and

personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this regulation will not negatively affect family well-being and will not have any impact on the autonomy and integrity of the family as an institution.

*L. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995 (PRA), 44 U.S.C. 3501 *et seq.,* DHS is required to submit to the Office of Management and Budget (OMB) for review and approval any new collections of information. This rule requires the use of Form G–325R, Biographic Information (Registration). Consistent with 5 CFR 1320.13, USCIS has submitted and OMB has approved a request for emergency authorization of the required changes for a period of 6 months, as a new collection of information.

In this final rule, USCIS is requesting comments on this information collection. Comments are due by May 12, 2025. When submitting comments on the information collection, your comments should include OMB Control Number 1615—NEW and address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, such as permitting electronic submission of responses.

A summary of the information collection follows.

USCIS Form G–325R (OMB Control Number 1615—NEW)

(1) *Type of Information Collection:* New collection.

(2) *Title of Form/Collection:* Biographic Information (Registration).

(3) *Agency form number, if any, and the applicable component of DHS*

*sponsoring the collection:* Form G–325R; USCIS.

(4) *Affected public who will be asked or required to respond:* Aliens, Individuals or Households. Aliens who are subject to alien registration requirements of the Immigration and Nationality Act, as amended, who have not yet registered.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection is 1,400,000 annually over a three-year period.[27] The estimated hour burden per response is 0.67 hours. The estimated total number of respondents for the information collection of biometrics is 1,400,000 annually over a three-year period and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The estimated total annual hour burden associated with this collection is 2,576,000 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden (*e.g.,* filing fees and postage) associated with this collection of information is $0

In addition, for PRA purposes, the estimated total annual opportunity cost of responding to this collection is $43,110,480 for completing the Form G–325R online and $75,282,480 for obtaining biometrics. This burden cost is prepared for PRA purposes and does not include travel time.

For further information on the approved collection of information, including the estimated burden and the expiration date, please refer to the OMB Control Number 1615—NEW at *www.reginfo.gov.*

**List of Subjects in 8 CFR Part 264**

Aliens, Reporting and recordkeeping requirements.

Accordingly, for the reasons set forth in the preamble, DHS amends 8 CFR part 264 as follows:

---

[23] *See also* 40 CFR 1507.3(e)(ii) and 1501.4.
[24] *See* Appendix A, Table 1.
[25] *Instruction Manual 023–01* at V.B(2)(a)–(c).
[26] Public Law 105–277, 112 Stat. 2681 (1998).

[27] DHS notes that the estimate of annual filing volume in the PRA section is different from the average of the estimated population discussed in the Affected Population section above. DHS uses a different method for estimating the average annual number of respondents for the information collection over the 3-year OMB approval of the control number generally assuming more registrations may be expected to occur in year one than in later years. When the information collection request is nearing expiration USCIS will update the estimates of annual respondents based on actual results in the submission to OMB. The PRA burden estimates are generally updated at least every 3 years. Thus, the PRA estimated annual respondents would be updated to reflect the actual effects of this rule within a relatively short period after a final rule takes effect.

Add. 23

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 1. The authority citation for part 264 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1302–1305; 8 CFR part 2.

■ 2. Amend § 264.1 by:
■ a. In the table in paragraph (a), adding an entry, in alphabetical order, for ''G–325R, Biographic Information (Registration), or its successor form''; and
■ b. In the table in paragraph (b), adding an entry, in alphabetical order, for ''USCIS Proof of Alien G–325R Registration, or its successor form''.

The additions read as follows:

### § 264.1 Registration and fingerprinting
(a) * * *

Form No. and Class

\* \* \* \* \*

G–325R, Biographic Information (Registration), or its successor form.

\* \* \* \* \*

(b) * * *

Form No. and Class

\* \* \* \* \*

USCIS Proof of Alien G–325R Registration, or its successor form.

\* \* \* \* \*

**Kristi Noem,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2025–03944 Filed 3–7–25; 4:35 pm]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 39

[Docket No. FAA–2024–2420; Project Identifier MCAI–2024–00143–T; Amendment 39–22978; AD 2025–05–06]

### RIN 2120–AA64

### Airworthiness Directives; De Havilland Aircraft of Canada Limited (Type Certificate Previously Held by Bombardier, Inc.) Airplanes

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** The FAA is superseding Airworthiness Directive (AD) 2022–01–02, which applied to certain De Havilland Aircraft of Canada Limited Model DHC–8–400, –401, and –402 airplanes. AD 2022–01–02 required

inspecting for corrosion of the nacelle to wing rear spar attachment pins, and the nacelle to landing gear attachment pins, and doing all applicable corrective actions. This AD was prompted by a determination that some operators were unable to identify the airplanes subject to each requirement. This AD continues to require the actions specified in AD 2022–01–02, clarifies the affected airplanes for each required action, and revises the applicability by removing Model DHC–8–400 airplanes; as specified in Transport Canada AD, which is incorporated by reference. The FAA is issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective April 18, 3036.

The Director of the Federal Register approved the incorporation by reference of a certain publication listed in this AD as of April 18, 3036.

**ADDRESSES:**

*AD Docket:* You may examine the AD docket at *regulations.gov* under Docket No. FAA–2024–2420; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, the mandatory continuing airworthiness information (MCAI), any comments received, and other information. The address for Docket Operations is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

*Material Incorporated by Reference:*
• For Transport Canada material identified in this AD, contact Transport Canada, Transport Canada National Aircraft Certification, 159 Cleopatra Drive, Nepean, Ontario K1A 0N5, Canada; telephone 888–663–3639; email *TC.AirworthinessDirectives-Consignesdenavigabilite.TC@tc.gc.ca.* You may find this material on the Transport Canada website at *tc.canada.ca/en/aviation.*
• You may view this material at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available at *regulations.gov* under Docket No. FAA–2024–2420.

**FOR FURTHER INFORMATION CONTACT:**
Fatin Saumik, Aviation Safety Engineer, FAA, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7300; email *9-avs-nyaco-cos@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

The FAA issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 to supersede AD 2022–01–02, Amendment 39–21890 (87 FR 4145, January 27, 2022) (AD 2022–01–02). AD 2022–01–02 applied to certain De Havilland Aircraft of Canada Limited Model DHC–8–400, –401, and –402 airplanes. AD 2022–01–02 required doing a detailed visual inspection for corrosion of the nacelle to wing rear spar attachment pins, and the nacelle to landing gear attachment pins, and doing all applicable corrective actions. The FAA issued AD 2022–01–02 to address premature corrosion and subsequent failure of the nacelle to landing gear and nacelle to rear wing spar attachment pins, which, if undetected, could lead to a single or dual collapse of the main landing gear.

The NPRM published in the **Federal Register** on November 12, 2024 (89 FR 88910). The NPRM was prompted by AD CF–2020–51R2, dated February 27, 2024, issued by Transport Canada, which is the aviation authority for Canada (Transport Canada AD CF–2020–51R2) (also referred to as the MCAI). The MCAI provides clarification of the applicability for each of its parts (Parts I through V) and otherwise maintains the requirements of Transport Canada AD CF–2020–51R1. It also revises the applicability section to remove Model DHC–8–400 airplanes since no Model DHC–8–400 airplanes have been delivered.

In the NPRM, the FAA proposed to continue to require the actions specified in AD 2022–01–02, clarify the affected airplanes for each required action, and revise the applicability by removing Model DHC–8–400 airplanes, as specified in Transport Canada AD CF–2020–51R2. The NPRM also proposed to correct an error in AD 2022–01–02, which included a compliance time that incorrectly used the number of flight cycles on the airplane instead of on the pins. The FAA is issuing this AD to address premature corrosion and subsequent failure of the nacelle to landing gear and nacelle to rear wing spar attachment pins. The unsafe condition, if not addressed, could result a single or dual collapse of the main landing gear.

You may examine the MCAI in the AD docket at *regulations.gov* under Docket No. FAA–2024–2420.

## Discussion of Final Airworthiness Directive

### Comments

The FAA received a comment from Air Line Pilots Association,

Add. 24