ORAL ARGUMENT NOT SCHEDULED

**Nos. 25-5152, 25-5233, 25-5247**

_____

# In the United States Court of Appeals
# for the District of Columbia

_____

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,

*Plaintiffs - Appellants*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants – Appellees*,

_____

On Appeal from the United States District Court for the District of Columbia
Case No. 1:25-cv-00943-TNM, Honorable Trevor N. McFadden, District Judge

_____

## JOINT APPENDIX

_____

Lynn Damiano Pearson
Cassandra Charles
Joanna Cuevas Ingram
National Immigration Law Center
P.O. Box 34573
Washington, D.C.  20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Emma Winger
Michelle Lapointe
Leslie K. Dellon
Chris Opila
American Immigration Council
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

*Counsel for Plaintiffs – Appellants*

# TABLE OF CONTENTS

**Page**

District Court Docket ...........................................................................JA1

Complaint
ECF 1 (March 31, 2025) ...................................................................JA17

Declaration of Angelica Salas, Coalition for Humane Immigrant Rights (CHIRLA)
ECF 4-2 (March 31, 2025) ................................................................JA51

Declaration of Elizabeth Strater, United Farm Workers (UFW)
ECF 4-3 (March 31, 2025) ................................................................JA63

Declaration of George Escobar, CASA Inc.
ECF 4-4 (March 31, 2025) ................................................................JA71

Declaration of Sienna Fontaine, Make the Road NY (MRNY)
ECF 4-5 (March 31, 2025) ................................................................JA85

Memorandum Order Denying Stay and Preliminary Injunction
ECF 27 (April 10, 2025) .................................................................JA101

April 8, 2025 Hearing Transcript
ECF 28 (April 15, 2025) .................................................................JA122

Notice of Appeal
ECF 41 (April 24, 2025) .................................................................JA167

Criminal Complaints Under 8 U.S.C. § 1306(a)
ECF 42-2 (April 24, 2025)...............................................................JA169

Declaration of UFW Member "Ana"
ECF 42-3 (April 24, 2025)...............................................................JA186

Declaration of UFW Member "Gloria"
ECF 42-4 (April 24, 2025)...............................................................JA193

Declaration of CHIRLA Member "Luisa"
ECF 42-5 (April 24, 2025)...........................................................................JA200

Declaration of CHIRLA Member "Ursela"
ECF 42-6 (April 24, 2025)...........................................................................JA204

Declaration of CHIRLA Member "Tiana"
ECF 42-7 (April 24, 2025)...........................................................................JA207

Declaration of MRNY Member "Guvelia"
ECF 42-8 (April 24, 2025)...........................................................................JA210

Declaration of CASA Member YL
ECF 42-9 (April 24, 2025)...........................................................................JA215

Declaration of CASA Member ME
ECF 42-10 (April 24, 2025).........................................................................JA220

Declaration of CASA Member JC
ECF 42-11 (April 24, 2025).........................................................................JA224

Declaration of CASA Member ALDC
ECF 42-12 (April 24, 2025).........................................................................JA229

Declaration of CASA Member NC
ECF 42-13 (April 24, 2025).........................................................................JA233

Declaration of CASA Member PH
ECF 42-14 (April 24, 2025).........................................................................JA238

Declaration of Milagros Cisneros
ECF 42-15 (April 24, 2025).........................................................................JA242

Order Setting Briefing Schedule on Motion for Stay or Injunction Pending Appeal
ECF 44 (April 29, 2025) ..............................................................................JA245

Memorandum Order Denying Stay or Injunction Pending Appeal
  ECF 53 (June 12, 2025) ................................................................... JA247

Renewed Motion for a Stay or Preliminary Injunction
  ECF 54 (June 18, 2025) ................................................................... JA259

Motion for Expedited Summary Judgment Briefing
  ECF 55 (June 18, 2025) ................................................................... JA263

Notice of Appeal
  ECF 56 (June 25, 2025) ................................................................... JA268

Notice of Appeal
  ECF 62 (July 8, 2025) ...................................................................... JA270

Order Denying Expedited Summary Judgment Briefing and Staying Case
  ECF 64 (July 10, 2025) ................................................................... JA272

Motion to Lift Stay
  ECF 65 (August 21, 2025) .............................................................. JA274

APPEAL,STAYED,TYPE-D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00943-TNM

COALITION FOR HUMANE IMMIGRANT RIGHTS et al v.
U.S. DEPARTMENT OF HOMELAND SECURITY et al
Assigned to: Judge Trevor N. McFadden
Case in other court:  USCA, 25-05152
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀USCA, 25-05233
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀USCA, 25-05247
Cause: 05:551 Administrative Procedure Act

Date Filed: 03/31/2025
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of Agency
Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**COALITION FOR HUMANE**
**IMMIGRANT RIGHTS**

represented by **Anthony Enriquez**
ROBERT F. KENNEDY HUMAN RIGHTS
80 Pine Street
Suite 801
New York, NY 10005
917-941-9141
Email: enriquez@rfkhumanrights.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emma Curtis Winger**
AMERICAN IMMIGRATION COUNCIL
Pmb2026
2001 L Street N.W.
Suite 500
Washington, DC 20036
202-507-7512
Email: ewinger@immcouncil.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle Lapointe**
AMERICAN IMMIGRATION COUNCIL
Pmb2026
2001 L Street N.W.
Suite 500
Washington, DC 20036
202-507-7645
Email: mlapointe@immcouncil.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cassandra Charles**
NATIONAL IMMIGRATION LAW
CENTER

JA1

P.O. Box 34573
Washington, DC 20043
213-639-3900
Fax: 213-639-3911
Email: charles@nilc.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chris Opila**
AMERICAN IMMIGRATION COUNCIL
Pmb2026
2001 L Street N.W.,
Suite 500
Washington, DC 20036
202-507-7699
Email: copila@immcouncil.org
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Suite 7th Floor
San Francisco, CA 94104
415-343-0785
Email: cwofsy@aclu.org
*ATTORNEY TO BE NOTICED*

**Jennifer Coberly**
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1331 G Street
Suite 300
20005
Washington, DC 20005
202-507-7692
Email: jcoberly@aila.org
*ATTORNEY TO BE NOTICED*

**Joanna Cuevas Ingram**
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, DC 20043
213-377-5258
Fax: 213-639-3911
Email: cuevasingram@nilc.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leslie Karen Dellon**
AMERICAN IMMIGRATION COUNCIL
Pmb2026
2001 L Street N.W.

JA2

Suite 500
Washington, DC 20036
(202) 507-7530
Fax: (202) 742-5619
Email: ldellon@immcouncil.org
*ATTORNEY TO BE NOTICED*

**Lynn Damiano Pearson**
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, DC 20043
213-639-3900
Fax: 213-639-3911
Email: damianopearson@nilc.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Decker**
ROBERT F. KENNEDY HUMAN RIGHTS
Washington
1300 19th Street NW
Suite #750
20036
Washington, DC 20036
908-967-3245
Email: decker@rfkhumanrights.org
*ATTORNEY TO BE NOTICED*

**Sarah Telo Gillman**
ROBERT F. KENNEDY HUMAN RIGHTS
(RFK HUMAN RIGHTS)
88 Pine Street
Suite 801
New York, NY 10005
646-289-5593
Email: gillman@rfkhumanrights.org
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**UNITED FARM WORKERS OF
AMERICA**

represented by **Anthony Enriquez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emma Curtis Winger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle Lapointe**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

JA3

*ATTORNEY TO BE NOTICED*

**Cassandra Charles**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chris Opila**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Coberly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joanna Cuevas Ingram**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leslie Karen Dellon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lynn Damiano Pearson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Decker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Telo Gillman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**CASA, INC.**                represented by **Anthony Enriquez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emma Curtis Winger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle Lapointe**
(See above for address)

JA4

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cassandra Charles**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chris Opila**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Coberly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joanna Cuevas Ingram**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leslie Karen Dellon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lynn Damiano Pearson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Decker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Telo Gillman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MAKE THE ROAD NEW YORK**                    represented by **Anthony Enriquez**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Michelle Lapointe**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

JA5

**Cassandra Charles**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chris Opila**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Coberly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joanna Cuevas Ingram**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leslie Karen Dellon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lynn Damiano Pearson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Decker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Telo Gillman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emma Curtis Winger**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. DEPARTMENT OF HOMELAND
SECURITY**

represented by **Kartik Narayan Venguswamy**
DOJ-USAO
601 D Street NW
Washington, DC 20579
(202) 252-1790
Email: kartik.venguswamy@usdoj.gov

JA6

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
U.S. DEPARTMENT OF JUSTICE
PO BOX 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9344
Email: ernesto.h.molina@usdoj.gov
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**KRISTI NOEM**                            represented by   **Kartik Narayan Venguswamy**
*in her official capacity as Secretary of the*              (See above for address)
*Department of Homeland Security*                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Ernesto Horacio Molina , Jr.**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**U.S. CITIZENSHIP AND**                   represented by   **Kartik Narayan Venguswamy**
**IMMIGRATION SERVICES**                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Ernesto Horacio Molina , Jr.**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**KIKA SCOTT**                             represented by   **Kartik Narayan Venguswamy**
*in her official capacity as Senior Official*              (See above for address)
*Performing the Duties of the Director,*                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Ernesto Horacio Molina , Jr.**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**U.S. IMMIGRATION AND CUSTOMS**           represented by   **Kartik Narayan Venguswamy**
**ENFORCEMENT**                                            (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Ernesto Horacio Molina , Jr.**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

<u>Defendant</u>

JA7

**TODD M. LYONS**
*in his official capacity as Acting Director,*
*U.S. Immigration and Customs Enforcement*

represented by **Kartik Narayan Venguswamy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. CUSTOMS AND BORDER
PROTECTION**

represented by **Kartik Narayan Venguswamy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETE R. FLORES**
*in his official capacity as Acting*
*Commissioner, U.S. Customs and Border*
*Protection*

represented by **Kartik Narayan Venguswamy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF JUSTICE**

represented by **Kartik Narayan Venguswamy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA J. BONDI**
*in her official capacity as Attorney General*

represented by **Kartik Narayan Venguswamy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**IMMIGRATION REFORM LAW
INSTITUTE**

represented by **Christopher Joseph Hajec**
IMMIGRATION REFORM LAW
INSTITUTE

JA8

25 Massachusetts Avenue, NW
Suite 335
Washington, DC 20001
(202) 232-5590
Fax: (202) 464-3590
Email: chajec@irli.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matt A. Crapo**
IMMIGRATION REFORM LAW
INSTITUTE
25 Massachusetts Avenue, NW
Suite 335
Washington, DC 20001
571-435-3582
Email: mcrapo@irli.org
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/31/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC-11578932) filed by CASA, INC., UNITED FARM WORKERS OF AMERICA, COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK. (Attachments: # 1 Civil Cover Sheet, # 2 Summons DHS, # 3 Summons Secretary of DHS, # 4 Summons USCIS, # 5 Summons Director of USCIS, # 6 Summons ICE, # 7 Summons Director of ICE, # 8 Summons CBP, # 9 Summons Commissioner of CBP, # 10 Summons DOJ, # 11 Summons Attorney General, # 12 Summons USAO)(Winger, Emma) (Entered: 03/31/2025) |
| 03/31/2025 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by COALITION FOR HUMANE IMMIGRANT RIGHTS, UNITED FARM WORKERS OF AMERICA, CASA, INC., MAKE THE ROAD NEW YORK (Winger, Emma) (Entered: 03/31/2025) |
| 03/31/2025 | 3 | NOTICE of Appearance by Emma Curtis Winger on behalf of All Plaintiffs (Winger, Emma) (Entered: 03/31/2025) |
| 03/31/2025 | 4 | MOTION to Stay *Effective Date*, MOTION for Preliminary Injunction , MOTION to Expedite *Consideration* by COALITION FOR HUMANE IMMIGRANT RIGHTS, UNITED FARM WORKERS OF AMERICA, CASA, INC., MAKE THE ROAD NEW YORK. (Attachments: # 1 Memorandum in Support, # 2 Declaration Angelica Salas, # 3 Declaration Elizabeth Strater, # 4 Declaration George Escobar, # 5 Declaration Sienna Fontaine, # 6 Text of Proposed Order)(Winger, Emma) (Entered: 03/31/2025) |
| 04/01/2025 | | Case Assigned to Judge Trevor N. McFadden. (znmw) (Entered: 04/01/2025) |
| 04/01/2025 | 5 | SUMMONS (11) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 04/01/2025) |

| | | |
|---|---|---|
| 04/01/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jennifer Rae Coberly, Filing fee $ 100, receipt number ADCDC-11581163. Fee Status: Fee Paid. by COALITION FOR HUMANE IMMIGRANT RIGHTS, UNITED FARM WORKERS OF AMERICA, CASA, INC., MAKE THE ROAD NEW YORK. (Attachments: # 1 Exhibit Coberly Declaration, # 2 Good Standing Cert., # 3 Text of Proposed Order Proposed Order)(Dellon, Leslie) (Entered: 04/01/2025) |
| 04/01/2025 | 7 | NOTICE of Appearance by Chris Opila on behalf of All Plaintiffs (Opila, Chris) (Entered: 04/01/2025) |
| 04/01/2025 | 8 | NOTICE of Appearance by Cody H. Wofsy on behalf of All Plaintiffs (Wofsy, Cody) (Main Document 8 replaced on 4/3/2025) (mg). (Entered: 04/01/2025) |
| 04/01/2025 | 9 | NOTICE of Appearance by Ernesto Horacio Molina, Jr on behalf of All Defendants (Molina, Ernesto) (Entered: 04/01/2025) |
| 04/01/2025 | | MINUTE ORDER: It is ORDERED that a telephonic scheduling conference shall be held today, April 1, 2025, at 4:30 p.m.. Dial-in information has been provided to the parties. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/1/2025. (lctnm3). (Entered: 04/01/2025) |
| 04/01/2025 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Telephonic Scheduling Conference held on 4/1/2025. Defendant's Opposition due by noon on 4/4/2025. Plaintiff's Reply due by noon on 4/7/2025. Motion Hearing set for 4/8/2025 at 10:00 AM in Courtroom 2 before Judge Trevor N. McFadden. (Court Reporter: Lisa Edwards.) (hmc) (Entered: 04/01/2025) |
| 04/02/2025 | 10 | NOTICE of Appearance- Pro Bono by Sarah Telo Gillman on behalf of All Plaintiffs (Gillman, Sarah) (Entered: 04/02/2025) |
| 04/02/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Michelle Lapointe, Filing fee $ 100, receipt number ADCDC-11586002. Fee Status: Fee Paid. by COALITION FOR HUMANE IMMIGRANT RIGHTS, UNITED FARM WORKERS OF AMERICA, CASA, INC., MAKE THE ROAD NEW YORK. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Opila, Chris) (Entered: 04/02/2025) |
| 04/03/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Anthony Enriquez, Fee Status: No Fee Paid. by COALITION FOR HUMANE IMMIGRANT RIGHTS, UNITED FARM WORKERS OF AMERICA, CASA, INC., MAKE THE ROAD NEW YORK. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Gillman, Sarah) (Entered: 04/03/2025) |
| 04/04/2025 | 13 | MOTION for Order *To Provide Remote Public Telephonic Access to Courtroom for April 8, 2025 Hearing* by COALITION FOR HUMANE IMMIGRANT RIGHTS, UNITED FARM WORKERS OF AMERICA, CASA, INC., MAKE THE ROAD NEW YORK. (Attachments: # 1 Text of Proposed Order Proposed Order)(Dellon, Leslie) (Entered: 04/04/2025) |
| 04/04/2025 | | MINUTE ORDER: The 12 Motion for Leave to Appear Pro Hac Vice is GRANTED. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Trevor N. McFadden on 4/4/2025. (lctnm3). (Entered: 04/04/2025) |
| 04/04/2025 | | MINUTE ORDER granting 11 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Trevor N. McFadden on 4/4/2025. (lctnm3). (Entered: 04/04/2025) |

JA10

| 04/04/2025 | | MINUTE ORDER granting 6 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Trevor N. McFadden on 4/4/2025. (lctnm3). (Entered: 04/04/2025) |
| --- | --- | --- |
| 04/04/2025 | 14 | NOTICE of Appearance by Michelle Lapointe on behalf of All Plaintiffs (Lapointe, Michelle) (Entered: 04/04/2025) |
| 04/04/2025 | 15 | Memorandum in opposition to re 4 Motion to Stay,, Motion for Preliminary Injunction,, Motion to Expedite, filed by TODD M. LYONS, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, U.S. DEPARTMENT OF JUSTICE, PAMELA J. BONDI, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Venguswamy, Kartik) (Entered: 04/04/2025) |
| 04/04/2025 | 16 | NOTICE of Appearance by Kartik Narayan Venguswamy on behalf of All Defendants (Venguswamy, Kartik) (Entered: 04/04/2025) |
| 04/04/2025 | 17 | NOTICE of Appearance by Jennifer Coberly on behalf of All Plaintiffs (Coberly, Jennifer) (Entered: 04/04/2025) |
| 04/04/2025 | 18 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Joanna Elise Cuevas Ingram, Filing fee $ 100, receipt number ADCDC-11592935. Fee Status: Fee Paid. by COALITION FOR HUMANE IMMIGRANT RIGHTS, UNITED FARM WORKERS OF AMERICA, CASA, INC., MAKE THE ROAD NEW YORK. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Opila, Chris) (Entered: 04/04/2025) |
| 04/04/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lynn Damiano Pearson, Filing fee $ 100, receipt number ADCDC-11593021. Fee Status: Fee Paid. by COALITION FOR HUMANE IMMIGRANT RIGHTS, UNITED FARM WORKERS OF AMERICA, CASA, INC., MAKE THE ROAD NEW YORK. (Attachments: # 1 Declaration, # 2 Exhibit Letter of Good Standing, # 3 Text of Proposed Order)(Opila, Chris) (Entered: 04/04/2025) |
| 04/05/2025 | | MINUTE ORDER granting 18 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Trevor N. McFadden on 4/5/2025. (lctnm3). (Entered: 04/05/2025) |
| 04/05/2025 | | MINUTE ORDER granting 19 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Trevor N. McFadden on 4/5/2025. (lctnm3). (Entered: 04/05/2025) |
| 04/07/2025 | 20 | REPLY to opposition to motion re 4 Motion to Stay,, Motion for Preliminary Injunction,, Motion to Expedite, filed by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. (Lapointe, Michelle) (Entered: 04/07/2025) |
| 04/07/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Cassandra Charles, Filing fee $ 100, receipt number ADCDC-11596063. Fee Status: Fee Paid. by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Opila, Chris) (Entered: 04/07/2025) |

JA11

| 04/07/2025 | | MINUTE ORDER: The 13 Motion for Order for Remote Access is DENIED. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/7/2025. (lctnm3). (Entered: 04/07/2025) |
|---|---|---|
| 04/07/2025 | | MINUTE ORDER granting 21 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Trevor N. McFadden on 4/7/2025. (lctnm3). (Entered: 04/07/2025) |
| 04/07/2025 | 22 | NOTICE of Appearance by Sarah Decker on behalf of All Plaintiffs (Decker, Sarah) (Main Document 22 replaced on 4/8/2025 (mg). (Entered: 04/07/2025) |
| 04/08/2025 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Motion Hearing held on 4/8/2025 re 4 MOTION to Stay *Effective Date,* MOTION for Preliminary Injunction, MOTION to Expedite *Consideration* filed by CASA, INC., UNITED FARM WORKERS OF AMERICA, COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK. Matter held under advisement. (Court Reporter: Lisa Edwards.) (hmc) (Entered: 04/08/2025) |
| 04/08/2025 | 23 | NOTICE of Appearance by Joanna Cuevas Ingram on behalf of All Plaintiffs (Cuevas Ingram, Joanna) (Entered: 04/08/2025) |
| 04/08/2025 | 24 | NOTICE of Appearance by Cassandra Charles on behalf of All Plaintiffs (Charles, Cassandra) (Entered: 04/08/2025) |
| 04/08/2025 | 25 | NOTICE of Appearance by Lynn Damiano Pearson on behalf of All Plaintiffs (Damiano Pearson, Lynn) (Entered: 04/08/2025) |
| 04/08/2025 | 26 | NOTICE OF SUPPLEMENTAL AUTHORITY by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA (Winger, Emma) (Entered: 04/08/2025) |
| 04/10/2025 | 27 | MEMORANDUM ORDER denying Plaintiffs' 4 Motion to Stay Effective Date or Motion for Preliminary Injunction in the Alternative. See attached Order for details. Signed by Judge Trevor N. McFadden on 4/10/2025. (lctnm3). (Entered: 04/10/2025) |
| 04/15/2025 | 28 | TRANSCRIPT OF MOTION HEARING before Judge Trevor N. McFadden held on April 8, 2025; Page Numbers: 1-45. Date of Issuance:April 15, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/6/2025. Redacted Transcript Deadline set for 5/16/2025. Release of Transcript Restriction set for 7/14/2025.(Edwards, Lisa) (Entered: 04/15/2025) |
| 04/23/2025 | 29 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/1/2025. Answer |

JA12

| | | |
|---|---|---|
| | | due for ALL FEDERAL DEFENDANTS by 5/31/2025. (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 30 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/8/2025. (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 31 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PAMELA J. BONDI served on 4/8/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 32 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. DEPARTMENT OF HOMELAND SECURITY served on 4/11/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 33 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KRISTI NOEM served on 4/9/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 34 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. DEPARTMENT OF JUSTICE served on 4/8/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 35 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TODD M. LYONS served on 4/7/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 36 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT served on 4/10/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 37 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PETE R. FLORES served on 4/7/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 38 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. CUSTOMS AND BORDER PROTECTION served on 4/7/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 39 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. CITIZENSHIP AND IMMIGRATION SERVICES served on 4/10/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/23/2025 | 40 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KIKA SCOTT served on 4/7/2025 (Attachments: # 1 Exhibit Proof of Service)(Dellon, Leslie) (Entered: 04/23/2025) |
| 04/24/2025 | 41 | NOTICE OF APPEAL TO DC CIRCUIT COURT by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. Filing fee $ 605, receipt number ADCDC-11643221. Fee Status: Fee Paid. Parties have been notified. (Lapointe, Michelle) (Entered: 04/24/2025) |
| 04/24/2025 | 42 | MOTION for Injunction *Pending Appeal* by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. (Attachments: # 1 Exhibit A - Hearing Transcript, # 2 Exhibit B - Criminal Complaints Under 8 U.S.C. § 1306(a), # 3 Declaration Ex. C - Declaration of UFW Member Ana, # 4 Declaration Ex. D - Declaration of UFW Member Gloria, # 5 Declaration Ex. E - Declaration of CHIRLA Member Luisa, # 6 Declaration Ex. F - Declaration of CHIRLA Member Ursela, # 7 Declaration Ex. G - Declaration of CHIRLA |

| | | |
|---|---|---|
| | | Member Tiana, # 8 Declaration Ex. H - Declaration of MRNY Member Guvelia, # 9 Declaration Ex. I -Declaration of CASA Member YL, # 10 Declaration Ex. J - Declaration of CASA Member ME, # 11 Declaration Ex. K - Declaration of CASA Member JC, # 12 Declaration Ex. L - Declaration of CASA Member ALDC, # 13 Declaration Ex. M - Declaration of CASA Member NC, # 14 Declaration Ex. N - Declaration of CASA Member PH, # 15 Declaration Ex. O - Declaration of Milagros Cisneros, # 16 Text of Proposed Order)(Lapointe, Michelle) (Entered: 04/24/2025) |
| 04/25/2025 | 43 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 41 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 04/25/2025) |
| 04/28/2025 | | USCA Case Number 25-5152 for 41 Notice of Appeal to DC Circuit Court, filed by CASA, INC., UNITED FARM WORKERS OF AMERICA, COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK. (mg) (Entered: 04/28/2025) |
| 04/29/2025 | 44 | ORDER setting briefing schedule on Plaintiffs' 42 Motion for Injunction Pending Appeal. Response due May 19, 2025. Reply due May 27, 2025. The parties are further ORDERED to appear for a motions hearing on June 6, 2025, at 11:00 a.m. in Courtroom 2 before Judge Trevor N. McFadden. See attached Order for details. Signed by Judge Trevor N. McFadden on 4/29/2025. (lctnm3). (Entered: 04/29/2025) |
| 05/19/2025 | 45 | Memorandum in opposition to re 42 MOTION for Injunction *Pending Appeal* filed by PAMELA J. BONDI, PETE R. FLORES, TODD M. LYONS, KRISTI NOEM, KIKA SCOTT, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Venguswamy, Kartik) (Entered: 05/19/2025) |
| 05/21/2025 | 46 | NOTICE of Appearance by Christopher Joseph Hajec on behalf of IMMIGRATION REFORM LAW INSTITUTE (Hajec, Christopher) (Entered: 05/21/2025) |
| 05/21/2025 | 47 | NOTICE of Appearance by Matt A. Crapo on behalf of IMMIGRATION REFORM LAW INSTITUTE (Crapo, Matt) (Entered: 05/21/2025) |
| 05/21/2025 | 48 | Unopposed MOTION for Leave to File Amicus Brief by IMMIGRATION REFORM LAW INSTITUTE. (Attachments: # 1 Amicus Brief, # 2 Proposed Order)(Hajec, Christopher) (Entered: 05/21/2025) |
| 05/22/2025 | | MINUTE ORDER: The 48 Motion for Leave to File Amicus Brief is DENIED WITHOUT PREJUDICE. The Brief fails to comply with FRAP 29(a)(4), as required by LCvR 7(o). SO ORDERED. Signed by Judge Trevor N. McFadden on 5/22/2025. (lctnm3). (Entered: 05/22/2025) |
| 05/23/2025 | 49 | MOTION for Leave to File Amicus Brief*(Corrected)* by IMMIGRATION REFORM LAW INSTITUTE. (Attachments: # 1 Corrected Amicus Brief, # 2 Proposed Order)(Hajec, Christopher) (Entered: 05/23/2025) |
| 05/23/2025 | 50 | REPLY to opposition to motion re 42 Motion for Injunction,,,, filed by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. (Lapointe, Michelle) (Entered: 05/23/2025) |
| 05/27/2025 | | MINUTE ORDER: The 49 Motion for Leave to File Amicus Brief by Immigration Reform Law Institute is GRANTED. The Clerk of Court is directed to docket the [49-1] amicus curiae brief. SO ORDERED. Signed by Judge Trevor N. McFadden on 5/27/2025. (lctnm3). (Entered: 05/27/2025) |

| 05/27/2025 | 51 | AMICUS BRIEF by IMMIGRATION REFORM LAW INSTITUTE. (mg) (Entered: 05/27/2025) |
| 05/27/2025 | 52 | NOTICE of Appearance by Anthony Enriquez on behalf of CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA (Enriquez, Anthony) (Entered: 05/27/2025) |
| 06/02/2025 | | MINUTE ORDER: In light of the briefing submitted by the parties, the hearing on the 42 Motion for Injunction Pending Appeal scheduled for 6/6/2025 is VACATED as unnecessary. The Court will take the matter under advisement and issue a memorandum order in due course. SO ORDERED. Signed by Judge Trevor N. McFadden on 6/2/2025. (lctnm3). (Entered: 06/02/2025) |
| 06/12/2025 | 53 | MEMORANDUM ORDER denying Plaintiffs' 42 Motion for Injunction Pending Appeal. See attached Order for details. Signed by Judge Trevor N. McFadden on 6/12/2025. (lctnm3). (Entered: 06/12/2025) |
| 06/18/2025 | 54 | MOTION for Preliminary Injunction , MOTION to Stay by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. (Winger, Emma) (Entered: 06/18/2025) |
| 06/18/2025 | 55 | MOTION to Expedite *Summary Judgment Briefing Schedule* by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. (Attachments: # 1 Proposed Order) (Winger, Emma) (Entered: 06/18/2025) |
| 06/20/2025 | | NOTICE OF ERROR regarding 55 MOTION to Expedite *Summary Judgment Briefing Schedule*. Please note for future filings: Attorney signature- signature on document must match PACER login. (mg) (Entered: 06/20/2025) |
| 06/25/2025 | 56 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 53 Memorandum & Opinion by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. Filing fee $ 605, receipt number ADCDC-11776560. Fee Status: Fee Paid. Parties have been notified. (Winger, Emma) (Entered: 06/25/2025) |
| 06/25/2025 | 57 | Unopposed MOTION for Extension of Time to File Response/Reply as to 54 MOTION for Preliminary Injunction MOTION to Stay by PAMELA J. BONDI, PETE R. FLORES, TODD M. LYONS, KRISTI NOEM, KIKA SCOTT, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Venguswamy, Kartik) (Entered: 06/25/2025) |
| 06/26/2025 | 58 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 56 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 06/26/2025) |
| 06/26/2025 | 59 | STANDING ORDER Establishing Procedures for Cases Before Judge Trevor N. McFadden. The parties are hereby ORDERED to read and comply with the directives in the attached standing order. Signed by Judge Trevor N. McFadden on 6/26/2025. (lctnm3). (Entered: 06/26/2025) |
| 06/26/2025 | | MINUTE ORDER: The 57 Motion for Extension of Time is GRANTED. Counsel is advised that future extensions of time must be made prior to four days before the filing deadline. The Response to Plaintiffs 54 Motion for Preliminary Injunction is now due June 27, 2025. Any Reply by Plaintiffs shall be filed by July 7, 2025. SO ORDERED. Signed by Judge Trevor N. McFadden on 6/26/2025. (lctnm3). (Entered: 06/26/2025) |

JA15

| | | |
|---|---|---|
| 06/26/2025 | | USCA Case Number 25-5233 for 56 Notice of Appeal to DC Circuit Court, filed by CASA, INC., UNITED FARM WORKERS OF AMERICA, COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK. (mg) (Entered: 06/27/2025) |
| 06/27/2025 | 60 | Memorandum in opposition to re 54 MOTION for Preliminary Injunction MOTION to Stay filed by PAMELA J. BONDI, PETE R. FLORES, TODD M. LYONS, KRISTI NOEM, KIKA SCOTT, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Venguswamy, Kartik) (Entered: 06/27/2025) |
| 06/30/2025 | 61 | REPLY to opposition to motion re 54 Motion for Preliminary Injunction, Motion to Stay filed by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. (Winger, Emma) (Entered: 06/30/2025) |
| 07/08/2025 | 62 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 54 MOTION for Preliminary Injunction MOTION to Stay by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. Filing fee $ 605, receipt number ADCDC-11801571. Fee Status: Fee Paid. Parties have been notified. (Winger, Emma) (Entered: 07/08/2025) |
| 07/08/2025 | 63 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 62 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 07/08/2025) |
| 07/09/2025 | | USCA Case Number 25-5247 for 62 Notice of Appeal to DC Circuit Court, filed by CASA, INC., UNITED FARM WORKERS OF AMERICA, COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK. (mg) (Entered: 07/10/2025) |
| 07/10/2025 | 64 | ORDER denying Plaintiffs' 55 Motion to Expedite Summary Judgment Briefing Schedule and staying case pending outcome of appeals. Signed by Judge Trevor N. McFadden on 7/10/2025. (lctnm3). (Entered: 07/10/2025) |
| 08/21/2025 | 65 | MOTION to Lift Stay re 64 Order on Motion to Expedite by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, MAKE THE ROAD NEW YORK, UNITED FARM WORKERS OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Winger, Emma) (Entered: 08/21/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/13/2025 09:08:21 | | |
| **PACER Login:** | ecwinger | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00943-TNM |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

JA16

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS
2533 West 3rd Street, Suite 101
Los Angeles, California 90057

Case No.

UNITED FARM WORKERS OF AMERICA
29700 Woodford-Tehachapi Road
P.O. Box 62
Keene, CA 93531

**COMPLAINT**

CASA, INC.
8151 15th Avenue Hyattsville, MD 20528

MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY
245 Murray Lane, SW Washington, DC
20528

KRISTI NOEM, in her official capacity as
Secretary of the Department of Homeland
Security, 245 Murray Lane, SW Washington,
DC 20528

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES, 5900 Capital Gateway Dr.
Camp Springs, MD 20588-0009

KIKA SCOTT, in her official capacity as
Senior Official Performing the Duties of the
Director, U.S. Citizenship and Immigration
Services, 5900 Capital Gateway Dr.
Camp Springs, MD 20588-0009

JA17

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, 500 12th St., SW,
Washington, DC 20536

TODD M. LYONS, in his official capacity
as Acting Director, U.S. Immigration and
Customs Enforcement, 500 12th St., SW,
Washington, DC 20536

U.S. CUSTOMS AND BORDER
PROTECTION, 1300 Pennsylvania Avenue,
NW, Washington, D.C. 20229

PETE R. FLORES, in his official capacity as
Acting Commissioner, U.S. Customs and
Border Protection, 1300 Pennsylvania
Avenue, NW, Washington, DC 20229

U.S. DEPARTMENT OF JUSTICE, 950
Pennsylvania Ave., NW,
Washington, DC 20530

PAMELA BONDI, in her official capacity as
Attorney General, 950 Pennsylvania Ave.,
NW, Washington, DC 20530

*Defendants.*

## INTRODUCTION

1.    This case challenges an interim final rule (IFR) through which Defendants purport

to impose a new, universal immigration registration regime. Under this new rule, millions of

noncitizens—including many who have already been screened by the federal government—must

register with the federal government within 30 days, submit fingerprints and other biometric

information, and carry proof of this registration at all times or face arrest and federal prosecution.

The IFR reverses the government's long-standing approach to registration—a limited registration

policy that has been in place since the end of World War II—in a manner that will cause

confusion, fear, and significant economic disruption. Defendants attempt to rush through these sweeping changes without any meaningful explanation for the change in policy and without the notice, public comment, and careful consideration that Congress requires to avoid exactly these types of harms.

2.     On March 12, 2025, Defendants issued the IFR to go into effect in 30 days, on April 11, 2025. The IFR creates new requirements for all noncitizens 14 years of age or older who remain in the United States for at least 30 days and not currently registered and fingerprinted under the existing scheme. The IFR indicates that *all* noncitizen children must re-register and be fingerprinted using this new process when they turn 14. The IFR likewise requires parents and legal guardians to register all unregistered children under the age of 14. *See* U.S. Citizenship & Immigration Servs., Alien Registration Form and Evidence of Registration, 90 Fed. Reg. 11793 (Mar. 12, 2025). Without the benefit of notice and comment, the IFR creates an incoherent, inconsistent, and confusing registration scheme that Defendants have not explained.

3.     This is a dramatic change in policy. For eighty years, the federal government has chosen not to impose a universal registration requirement. Instead, it has relied on existing immigration processes—visa and benefits applications, admission procedures, and removal proceedings—to screen noncitizens. The government has never before required registration as part of a campaign to prioritize the prosecution of misdemeanor immigration offenses and to encourage "self-deportation."  The current regulations reflect the federal government's longstanding determination that, outside the exigencies of wartime or an armed attack, any registration requirement is appropriately accomplished through established statutory and regulatory mechanisms for granting immigration status and other immigration benefits.

4.      Defendants seek to implement this scheme in just 11 days without providing adequate notice to those impacted or the public, without considering comments, and without engaging in reasoned decision-making.

5.      The IFR violates the procedural and substantive requirements of the Administrative Procedure Act ("APA"). Absent intervention by this Court, all noncitizens—as well as U.S. citizens wrongly suspected of being noncitizens—will be exposed to a new criminal enforcement regime and a "show me your papers" country, and without regard to the statutorily-mandated guardrails of the APA.

## PARTIES

6.      Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization headquartered in Los Angeles, California, with eight offices throughout California and a national policy office in Washington, D.C. Its mission is to ensure immigrant communities are fully integrated in society with full rights and access to resources. It is a member-based organization with approximately 50,000 active members. It provides education and legal services to members and non-members alike and engages in policy advocacy to further its mission.

7.      In 2012, CHIRLA launched its legal services program in response to community members seeking assistance applying for Deferred Action for Childhood Arrivals ("DACA"). It has since assisted thousands of individuals with family and humanitarian immigration benefits as well as removal defense cases. CHIRLA's programming also includes a hotline where individuals—including members, clients, and community members—can call with questions. CHIRLA's legal programs are funded through specific grants for affirmative legal services work, removal defense cases, and its Student Legal Services program.

8.     CHIRLA's membership includes U.S. citizens and noncitizens alike, many of whom belong to mixed-status families. CHIRLA educates its membership as well as its broader community through know-your-rights trainings, workshops, social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

9.     Plaintiff United Farmworkers of America ("UFW") was founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other leaders. UFW was created from the merger of workers' rights organizations to form one union. UFW's mission is to improve the lives, wages, and working conditions of agricultural workers and their families.

10.    To fulfill its mission, UFW engages in collective bargaining, worker education, advocacy, state and federal legislation, and public campaigns. UFW's values are integrity, "Sí se puede" attitude, dignity, and innovation. As a result of UFW's work, thousands of agricultural workers are protected under UFW contracts. UFW has also sponsored and advocated for legal reforms to protect all farm workers at the state and federal level, including related to overtime pay, heat safety, pesticides safety, COVID-19 protections, and other policies to protect farmworkers and advance their rights.

11.    As of March 2025, UFW has approximately 7,000 members. UFW members play an important role in deciding what activities UFW engages in as an organization. UFW membership comes with a variety of benefits. Dues-paying members receive protections obtained through collective bargaining in which UFW engages on their behalf. Members reach out to UFW seeking assistance, advocacy, advice, and information and to raise concerns that their communities are facing.

12.     Plaintiff Make the Road New York ("MRNY") is a nonprofit, membership-based community organization with over 28,000 members residing in New York City, Westchester County, and Long Island, and primarily in the boroughs of Queens, Brooklyn and Staten Island, that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY's membership includes U.S. citizens and noncitizens alike, many of whom belong to mixed-status families. MRNY's mission is to build the power of immigrant and working class communities to achieve dignity and justice. To fulfill its mission, MRNY engages in four core strategies: the provision of legal and survival services, transformative education, community organizing, and policy innovation. MRNY has five community centers in New York, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

13.     Plaintiff CASA, Inc. ("CASA") is a nonprofit membership organization headquartered in Langley Park, Maryland, with additional offices in Virginia, Pennsylvania, and Georgia. Its mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. It is a member-based organization with more than 173,000 lifetime members from across the United States. CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities. CASA's members are predominantly noncitizens in a variety of immigration statuses.

14.     Defendant Department of Homeland Security ("DHS") is a cabinet-level department of the U.S. federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

15.     Defendant Kristi Noem is Secretary of DHS. She is sued in her official capacity. Defendant Noem directs each of the component agencies within the DHS. In her official capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and she issued the IFR.

16.     Defendant USCIS is the sub-agency of DHS that administers registration forms and the collection of biometrics, including fingerprints.

17.     Defendant Kika Scott is the Senior Official Performing the Duties of USCIS Director. She is sued in her official capacity.

18.     Defendant ICE is a sub-agency of DHS responsible for enforcing immigration laws.

19.     Defendant Todd M. Lyons is the Acting Director of ICE. He is sued in his official capacity.

20.     Defendant CBP is a sub-agency of DHS responsible for enforcing immigration laws.

21.     Defendant Pete R. Flores is the Acting Commission of CBP. He is sued in his official capacity.

22.     Defendant Department of Justice ("DOJ") is a cabinet-level department of the U.S. federal government.

23.     Defendant Pamela Bondi is the Attorney General. She is sued in her official capacity. In her official capacity, she is tasked with enforcing federal criminal laws, including 8 U.S.C. §§ 1304(e) and 1306.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the laws of the United States, including but not limited to the APA, 5 U.S.C. § 551, *et seq*.

25.    The promulgation of the IFR is a "final agency action" and, therefore, subject to judicial review by this Court. 5 U.S.C. §§ 702, 704, 706.

26.    Venue is proper under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States sued in their official capacity, the action does not involve real property, and/or the majority of Defendants reside in this district, and/or a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### A. Background on Noncitizen Registration

27.    Except for a brief period during World War II, the United States has never operated a universal noncitizen registration system as applicable to all noncitizens. In response to wartime fears of a "fifth column," the Smith Act of 1940, also known as the Alien Registration Act, set forth a scheme where all noncitizens seeking to enter the United States on a visa were required to register and be fingerprinted, and all other noncitizens 14 years of age or older were required to register and be fingerprinted at a local post office if they remained in the United States beyond 30 days. *See* Pub. L. 76-670, §§ 30, 31(a), 33(a), 36, 54 Stat. 670, 673-75. Parents and legal guardians were similarly required to register children under the age of 14. *See id.* § 31(b).

28.    The point of registration was not to catch those out of compliance with immigration law; instead, it was intended as an internal security measure during wartime to

better understand who was present in the country. Thus, to implement this system, federal officials went to great lengths to advise the public of this new obligation. Then-Attorney General Robert H. Jackson reassured noncitizens over national radio broadcast that those with "irregularity connected with their entrance" would "receive all consideration" for immigration relief if they registered.[1] The former Immigration and Naturalization Service ("INS") established the Alien Registration Division to administer the system and noncitizens could register for free at any one of 45,000 local post offices.[2] By January 1941, nearly 5 million noncitizens had registered and the Attorney General, as promised, exercised his discretion to suspend the deportation of thousands of unlawful entrants.[3]

29.    Almost immediately after the end of World War II, the INS began to dismantle the universal registration system. It eliminated the Alien Registration Division, canceled registration through post offices, and began shifting registration into its immigration functions.[4] The INS moved registration out of post offices to ports of entry and INS offices, and registration documents increasingly took the form of proof of immigration status instead of dedicated registration forms.[5] Early on, the INS exempted entire classes of noncitizens, including Canadians visiting for less than six months and certain laborers, from these registration

---

[1] *See* Nancy Morawetz & Natasha Fernández-Silber, *Immigration Law and the Myth of Comprehensive Registration*, 48 U.C. Davis L. Rev. 141, 157-58 (2014) [hereinafter *Myth of Comprehensive Registration*] (quoting Robert H. Jackson, U.S. Attorney Gen., Speech Over the Broadcasting Facilities of the Columbia Broadcasting System Station WJSV: Alien Registration and Democracy 3-4 (Dec. 21, 1940), https://tinyurl.com/e8y7w5c8).
[2] *Id.* at 158-59.
[3] *Id.* at 160 & n.98.
[4] *Id.* at 161-62; Nat'l Archives, *Alien Registration (AR-2) Forms*, https://tinyurl.com/5efpyb89 (last reviewed Sept. 6, 2024); U.S. Customs & Immigr. Servs., *Alien Registration Forms on Microfilm, 1940-1944* https://tinyurl.com/ckf3cyr9 (last reviewed/updated Jan. 24, 2025). For a period in the 1950s, post offices resumed providing change of address forms.
[5] *Id.* at 162 & n.109 (citing 11 Fed. Reg. 9982, 9982-83 (Sept. 11, 1946)).

requirements.[6] Without the wartime impetus to identify "disloyal" noncitizens, the INS

abandoned attempts to register immigrants without status.[7]

30.     Even after the passage of the Immigration and Nationality Act ("INA") of 1952,

which incorporated the registration requirements from the Smith Act and added a requirement to

carry any proof of registration, *see* Immigration and Nationality Act, Pub. L. No. 82-414, §§ 261-

64, 66 Stat. 163, 223-25 (1952), the INS did not establish a registration process for all

noncitizens.[8] The implementing regulations provided that, except for lawful permanent residents,

the only registration form would be the record of lawful admission and departure (Form I-94). 17

Fed. Reg. 11532, 11533 (Dec. 19, 1952). Moreover, over the next few years the INS expressly

exempted certain British and Canadian nonimmigrants and agricultural workers from

registration. 18 Fed. Reg. 3531, 3531 (June 19, 1953); 22 Fed. Reg. 4188, 4188-89 (June 14,

1957).

31.     Congress took no action to indicate any disagreement with INS's tailored

approach. To the contrary, in 1957 Congress granted the Attorney General the discretion to waive

the fingerprint requirement for any nonimmigrant. *See* Act of Sept. 11, 1957, Pub. L. No. 85-316,

§ 8, 71 Stat. 639, 641. By 1960, the INS had eliminated any reference to the old generic

registration form and post office system from the regulations.[9] Moreover, as the types of possible

---

[6] *Id.* at 162-63 & n.115-17 (citing 12 Fed. Reg. 5130, 5131 (July 31, 1947)).

[7] *Id.* at 162-64; *see also* Jonathan Weinberg, *Demanding Identity Papers*, 55 Washburn L.J. 197, 208 (2015) [hereinafter *Demanding Identity Papers*] (stating that beginning in 1950, "a noncitizen in the United States would not receive any evidence of registration absent a finding by the INS that he was legally entitled to be present in this country").

[8] *Myth of Comprehensive Registration* at 164-172; *Demanding Papers* at 210-11.

[9] *Demanding Identity Papers* at 208 n.80.

immigration status expanded, and with them new forms and new screening mechanisms, federal immigration authorities did not update the registration system.[10]

32.    At no point since the mid-1940s did the federal government implement a universal registration system applicable to all noncitizens.

33.    After the early registration effort, the only time the federal government has instituted even a limited registration requirement separate from the immigration process was in response to an armed attack. The last implementation of registration was a controversial program called the National Security Entry-Exit Registration System ("NSEERS"), imposed soon after the 9/11 attacks to require nationals from 25 predominantly Muslim and Middle Eastern countries to register. In 2011, the federal government ceased use of NSEERS after it found the program unnecessary and that it provided no increase to national security. In 2016, DHS rescinded the regulatory framework that authorized NSEERS because it proved ineffective and was "rendered obsolete" in light of more universally applicable security measures. 81 Fed. Reg. 94231 (Dec. 23, 2016).

34.    The INA still contains the registration provisions from the Smith Act of 1940, as amended by the INA in 1952 and 1957. *See* 8 U.S.C. §§ 1201(b), 1301-1306. Visa applicants are registered through the visa process. *See* 8 U.S.C. §§ 1301, 1201(b). For those not registered through the visa process, the INA continues include provisions for registration and fingerprinting of noncitizens over the age of 14 who remain at least 30 days, and similarly to require parents and legal guardians to register their children. *See id.* § 1302(a), (b). It further states that noncitizens 18 years of age or older must "at all times carry . . . any certificate of alien registration or alien registration receipt card to [them]." *Id.* § 1304(e). Failure to carry is a crime

---

[10] *Myth of Comprehensive Registration* at 169-71.

punishable by a fine and up to 30 days in jail. *Id.* Finally, the INA makes it a crime to "willfully fail[]" to register or be fingerprinted and for a parent or legal guardian to similarly fail to register their child, punishable by a fine and up to six months of imprisonment. *Id.* § 1306(a).

35.    Any noncitizen who is required to register must also notify DHS within ten days of any change of address. *Id.* § 1305(a). Failure to do so is a crime punishable by a fine and up to 30 days in jail, *id.* § 1306(b), and is a ground of deportation, *id.* § 1227(a)(3)(A).

36.    Notwithstanding these provisions, the current regulations demonstrate the immigration agencies' longstanding determination that any registration requirement is best handled through the immigration process. As the agencies have for over half a century, the regulations provide that registration and proof of registration is obtained through existing forms for gaining admission and establishing immigration status. *See* 8 C.F.R. § 264.1(a), (b). The regulations contain two lists: acceptable registration forms, *id.* § 264.1(a), and evidence of registration, *id.* § 264.1(b). Many existing forms used to screen immigration benefits applicants are not included on these lists.

37.    In addition to listing forms for registration and proof of registration, the current regulations waive the fingerprint requirement for certain categories of nonimmigrants while they maintain their nonimmigrant status, including all nonimmigrants who remain in the United States for less than one year. 8 C.F.R. § 264.1(e); *see* 8 U.S.C. § 1302(c).[11]

38.    As has been the case for decades, the existing regulations do not include a registration form or evidence of registration for a noncitizen who has entered without inspection and is ineligible for any immigration benefit. Noncitizens who were ineligible to use one of the

---

[11] At various times in the 1990s the INS required nonimmigrants from certain countries to submit fingerprints at ports of entry as part of their applications for admission. *See* 56 Fed. Reg. 1566 (Jan. 16, 1991); 61 Fed. Reg. 46829 (Sept. 5, 1996); 63 Fed. Reg. 39109 (July 21, 1998).

designated registration forms were under no enforceable obligation to register or to carry any proof of registration.  *See* 8 U.S.C. § 1306(a) (punishing "*willful* failure to register") (emphasis added); *United States v. Mendez-Lopez*, 528 F. Supp. 972, 973 (N.D. Okla. 1981).

**B. Defendants Attempt to Create a New Universal Registration Enforcement Regime in 30 Days**

39.     On the day of his inauguration, President Trump issued Executive Order 14159, Protecting the American People Against Invasion (Jan. 20, 2025), 90 Fed. Reg. 8443 (Jan. 29, 2025) [hereinafter Jan. 20 Executive Order]. Through that order, President Trump instructed the Secretary of Homeland Security, in coordination with the Attorney General and the Secretary of State, to "(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of [the registration statutes]; (b) Ensure that all previously unregistered aliens in the United States comply with the requirements of [the registration statutes]; and (c) Ensure that failure to comply with the legal obligations of [the registration statutes] is treated as a civil and criminal enforcement priority." 90 Fed. Reg. at 8444.

40.     On February 5, 2025, Attorney General Bondi issued a memorandum in which she instructed that DOJ "shall use all available criminal statutes . . . to support the Department of Homeland Security's immigration and removal initiatives." Memorandum from the Attorney General re: General Policy Regarding Charging, Plea Negotiations, and Sentencing 3 (Feb. 5, 2025), https://tinyurl.com/ycxa3ua9 [hereinafter Bondi Memo]. Among the statutes prioritized by the Attorney General for enforcement were 8 U.S.C. §§ 1304 and 1306. *Id.*

41.     On February 25, 2025, USCIS posted on its website notice that a new registration form and process was forthcoming for individuals not counted as registered under the existing regulations. On that same day, DHS announced the new requirement under the heading "DHS

Will Use Every Available Tool to Compel Illegal Aliens to Self-Deport." Press Release, DHS, Secretary Noem Announces Agency Will Enforce Laws That Penalize Aliens in the Country Illegally (Feb. 25, 2025), https://tinyurl.com/mrex6hhy. Defendant Noem explained that noncitizens had a choice to register and self-deport or face criminal enforcement, stating that the government would help noncitizens who register "relocate right back to their home country."[12]

42.    On March 12, 2025, less than two months into the start of the Trump administration, Defendants published the eight-page IFR seeking to upend immigration registration. Defendants do so without explaining this change in policy – or even acknowledging the change. To the contrary, Defendants claim that the IFR "does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the Act." 90 Fed. Reg. at 11796.

43.    Defendants issued the IFR without a notice or any opportunity to comment, asserting that it "is a rule of agency organization, procedure, or practice ('procedural rule')," because it "does not alter the rights or interests of any party." 90 Fed. Reg. at 11796 (citing 5 U.S.C. § 553(b)(A)). The IFR invites comments on whether to impose a $30 biometrics fee. *Id.* Any comments are due by April 11, 2025. *Id.* at 11793. Absent court intervention, the IFR will go into effect on April 11, 2025, just 30 days from its publication. *Id.*

44.    Defendants sought an emergency exception to the Paperwork Reduction Act's requirement that the public be given notice and an opportunity to comment on all collections of information, *see* 44 U.S.C. §§ 3506(c)(2)(A), 3507(b). *See* 90 Fed. Reg. at 11799 (citing 8 C.F.R. § 1320.13). Despite longstanding abandonment of universal registration, Defendants' asserted

---

[12] Billal Rahman, *Kristi Noem Breaks Down How Federal Migrants Register Works*, Newsweek, https://tinyurl.com/bdz9prye (Feb. 26, 2025) (quoting Secretary Noem interview).

"emergency" in the supporting statement to OMB for the G-325R was the need "to allow aliens to comply with the registration and fingerprinting requirements of the INA . . . and to enable the execution of" President Trump's January 20th Executive Order. OMB approved the request for emergency authorization for the collection of information for a period of six months. *See* 90 Fed. Reg. at 11799.

45.     Thus, the public and impacted individuals will not have had an opportunity to review and comment, and have those comments considered, for either the new registration form or the IFR itself before it goes into effect on April 11, 2025.

46.     Absent court intervention, Defendants will not be required to ever consider the comments they receive in response to the IFR or to finalize the rule.

47.     The IFR creates a new online general registration form, Form G-325R. *See* 90 Fed. Reg. at 11795.

48.     Form G-325R can only be submitted online through myUSCIS.gov. 90 Fed. Reg. at 11795. A noncitizen must first create a unique account through myUSCIS.gov for themself or for their child. *Id.*

49.     Form G-325R is *only* available in English, which renders it unusable by numerous noncitizens.

50.     The new Form G-325R collects a range of information including the noncitizen's contact information, mailing address, physical address, addresses for the past five years, details regarding the person's last entry, including their status at entry, detailed biographic information, information about the person's spouse and location of marriage, and details about the person's parents, including their current locations.

51.     Among the required questions on the form are: "Have you EVER committed a crime of any kind (even if you were not arrested, cited, charged with, or tried for that crime, or convicted)?" "Since entry, in what activities have you been engaged?" "In what activities do you intend to engage between now and your expected date of departure?"

52.     The new form collects information beyond what is specifically enumerated in the statute. *See* 8 U.S.C. § 1304(a).

53.     In addition to creating an entirely new form independent of any immigration process, the IFR creates a process for DHS to collect biometrics, including fingerprints, photographs, and signatures, at a USCIS Application Support Center ("ASC") upon submission of the Form G-325R. *See* 90 Fed. Reg. at 11795. USCIS will schedule an appointment at an ASC for noncitizens to submit their biometrics. *See id.*

54.     After the biometrics appointment, or, for children under 14 or Canadian nonimmigrants not required to be fingerprinted after the submission of the Form G-325R, USCIS will generate an online "Proof of Alien Registration." *See id.*

55.     The IFR outlines the criminal consequences that purportedly attach to these new obligations:

- Noncitizens not previously registered through the visa process and newly required to register and be fingerprinted under the IFR can be prosecuted if they fail to register or to be fingerprinted. *See* 90 Fed. Reg. at 11794 (citing 8 U.S.C. § 1306(a)).

- Noncitizens newly issued proof of registration and fingerprinted under the IFR who are 18 years of age or over can be prosecuted for failure to carry that proof of registration at all times. *See id.* (citing 8 U.S.C. § 1304(e)).

- Noncitizens newly required to register under the IFR can be prosecuted for failing to notify DHS within 10 days from any change of address. *See id.* (citing 8 U.S.C. § 1306(b)).

56.     Defendants intend to vigorously enforce these new criminal consequences. *See* Jan. 20 Executive Order; Bondi Memo at 3 (Feb. 5, 2025) (instructing that U.S. Attorneys' offices and other DOJ components "shall pursue charges relating to criminal immigration-related violations," including sections 1304 and 1306).

57.     With just 30 days' warning, the IFR abandons the eighty-year-old approach to registration and imposes a new universal registration scheme and attendant civil and criminal liabilities on an enormous number of people. According to Defendants' own estimates, between 2.2 million and 3.2 million people would be newly required to register. *See* 90 Fed. Reg. at 11797.

**C.  The IFR Failed to Consider Substantial Impacts of the New Universal Registration Enforcement Regime**

58.     By imposing a new universal registration regime in just 30 days through the IFR and bypassing the notice and comment requirement of the APA, Defendants failed to consider the wide-ranging impacts the rule will have on numerous communities.

59.      Millions of noncitizens—including 14- and 15-year-olds—must now navigate a new process that involves providing detailed information about themselves, their children, their families, and their personal activities; submitting their fingerprints and other biometric information at a federal building; and carrying proof of registration at all times.

60.     Those impacted include people who have already submitted detailed immigration forms and reasonably believe themselves to be "registered" already, people who do not speak English, people who do not have familiarity with federal immigration laws, people who do not

have reliable access to computers or the Internet, people with disabilities that preclude them from accessing the online form, and young teenagers. Parents and legal guardians of children newly required to register must weigh the consequences to their children of registration in the face of criminal penalties if they do not register them.

61.    The IFR fails to consider the impact of the new universal registration scheme on communities that rely on the revenue from the Canadian retirees who travel to the United States every winter and who will now be at risk of federal prosecution if they fail to register via the new process or fail to carry registration documents with them at all times. In fact, Canada recently issued a travel advisory to its citizens warning of the forthcoming registration requirements.

62.    The IFR does not address the impact of the new universal registration requirement on immigration attorneys who must advise their clients of this new requirement and related consequences. For example, as discussed below, CHIRLA's Legal Programs will be overwhelmed with the needs of members, current clients, and community members seeking legal advice and assistance with the new registration process. Even those members and clients who may be considered "registered" will need legal advice to make that determination, particularly those with pending applications or mixed-status households where there is greater ambiguity as to who will need to comply with the process set forth in the new IFR. The complexity and inconsistency in the rule, coupled with its nearly universal impact, has also posed huge challenges to MRNY's staff, who cannot confidently advise members on their need to register in group settings, such as committee meetings and workshops. This undermines MRNY's model of providing community education and know-your-rights presentations to members and their communities, since the registration requirement is nearly impossible to advise on in a group

setting. Given that MRNY has tens of thousands of members, MRNY's legal team cannot possibly advise all of them.

63.    The IFR fails to acknowledge or consider how the new universal registration scheme infringes on the rights of noncitizens required to register and the public.

64.    The IFR fails to consider or address the fact that the new registration requirement infringes on noncitizens' Fifth Amendment privilege against self-incrimination. *See Grosso v. United States*, 390 U.S. 62, 67-68 (1968). The IFR targets almost exclusively noncitizens who entered the United States "without inspection and admission or inspection and parole"—in other words, noncitizens who entered the United States in violation of the federal criminal statute 8 U.S.C. § 1325. 90 Fed. Reg. at 11797; *see id.* at 11793 (noting that 8 U.S.C. § 1302 excludes "visa holders"). In fact, the question that asks "Immigration status at last arrival" in Form G-325R provides a blank text box and only one pre-printed text option in the dropdown menu of answers: "EWI – Entry Without Inspection." Moreover, the form *requires* the submitter to state whether the person has "EVER committed a crime of any kind." Thus, a noncitizen who submits Form G-325R is implicating themselves in a crime.

65.    The IFR is an effort to authorize widespread criminal enforcement of this regulatory requirement and facilitate immigration enforcement against those who register.

66.    For many of those directly targeted, they must also make the choice presented by Defendant Noem: register and submit to deportation, frequently resulting in separation from family, community, and "all that makes life worth living," *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922); or fail to register and expose themselves to arrest and federal prosecution.

67.    The IFR will have a chilling effect on the public advocacy and organizing work of noncitizens, who will reasonably fear that they can be stopped at any time and asked for proof of

registration—increasing the risk of both criminal prosecution and deportation. For example, MRNY's most visible and active members, who regularly participate in MRNY's events, fear they could become targets for retaliatory enforcement, whether they register or not. MRNY members' fear has a direct impact on MRNY's advocacy work, which relies on attendance at in-person events, such as rallies, protests, and lobbying days, and sharing of individual stories. The disclosures of activities required on the G-325R form also causes a chilling effect, by requiring members to list advocacy efforts that may be seen as in opposition to current government policy.

68.     A universal registration requirement, including a mandate to carry proof of registration at all times, and a promise to enforce such requirement, impacts *all* U.S. residents, both citizens and noncitizens alike, who are now at heightened risk of being stopped and ordered to produce such proof.

69.     Widespread enforcement will lead to racial profiling and the mistaken targeting of U.S. citizens. Since January 21, 2025, across several states, U.S. citizens, especially of Hispanic descent and Native American backgrounds, have already been increasingly ensnared in immigration raids and detentions due to the Trump administration's aggressive enforcement policies.

70.     The aggressive implementation of the IFR will plainly result in increased harassment of U.S citizens.

**D. The Rushed IFR and Lack of Notice and Comment Resulted in an Incoherent, Inconsistent, and Confusing Registration Scheme that Defendants Have Not Explained.**

71.     Defendants' failure to seek and consider public comments before implementing a change to an eighty-year-old policy with far-reaching consequences has produced an incoherent,

inconsistent, and impractical scheme—one that infringes on the rights of the people it seeks to

regulate. Some examples are provided below.

72.    The IFR is unclear as to when a noncitizen must submit the new Form G-325R in

order to comply with the new registry requirements. USCIS has already made Form G-325R

available, *see* 90 Fed. Reg. at 11793, but the IFR does not go into effect until April 11, 2025, *see*

*id.*. It is unclear whether noncitizens must register *before* the IFR even goes into effect in order to

avoid arrest and prosecution, or if Defendants view the obligation to register within 30 days to

begin to run only when the IFR goes into effect.

73.    The IFR fails to add existing commonly used immigration forms to the regulatory

list of accepted registration and proof of registration documents. *See* 8 C.F.R. § 264.1(a), (b).

Among the forms missing from the list are the applications for asylum (Form I-589), for

Temporary Protected Status ("TPS") (Form I-821), and U and T nonimmigrant status (Forms I-

918 and 914 for certain victims of crime and human trafficking).

74.    Each of these applications requires the submission of a multi-page form that

collects detailed personal information and triggers USCIS to collect biometrics. Nevertheless,

noncitizens who entered without inspection and have applied for asylum, TPS, U or T status are

not considered registered, even if those applications are approved. Recipients of relief are only

registered if they are eligible for and granted an Employment Authorization Document ("EAD").

75.    The IFR further fails to explain—or even address—the decision not to use these

existing forms for purposes of registration. The IFR utterly ignores the impact it will have on

these groups.

76.    As a result, under the IFR, noncitizens who have submitted multipage

immigration applications and even fingerprints may still not be considered registered and are

therefore obligated to follow the new registration process. *See* 90 Fed. Reg. at 11795. In fact, the IFR only specifically mentions that asylum and TPS applicants are not registered, creating additional confusion for those who have applied for benefits not mentioned. Many individuals might reasonably *believe* that they are registered and, especially given the lack of notice, may not understand their new obligations under this rule. Moreover, by adding a new collection of information rather than incorporating existing forms, Defendants are collecting unnecessary and duplicative information from individuals who have already submitted themselves for screening. *Cf.* 44 U.S.C. § 3506(c)(3)(B).

77.     Similarly, Canadians are permitted to enter the United States as nonimmigrants for business or pleasure without obtaining a visa and are generally not issued a Form I-94 if they arrive by land. *See* 8 C.F.R. §§ 212.1(a)(1), 235.1(f)(1)(ii). The IFR requires, without explanation as to why, that these visitors must now also register if they stay more than 30 days, even though they have physically presented themselves for inspection at a port of entry and been screened by a CBP officer.

78.     The IFR creates confusion regarding how already registered noncitizens can provide proof of their registration. The IFR emphasizes the obligation to carry proof of registration "at all times" on penalty of prosecution. 90 Fed. Reg. at 11794 (citing 8 U.S.C. § 1304(e)). However, the IFR also states that noncitizens who have registered using a form listed in 8 C.F.R. § 264.1(a) *or* have evidence of registration listed in 8 C.F.R. § 264.1(b) "need not register again." *Id.* at 11796. The IFR does not address how noncitizens who are considered registered because they completed or possess one such form meet the carry requirement or otherwise avoid being stopped and arrested for failure to register.

79.     The IFR is internally inconsistent regarding the obligation of children to register once they turn 14. The IFR states that noncitizens who have previously registered using a form listed in 8 C.F.R. § 264.1(a) or who have one of the forms of evidence of registration listed in 8 C.F.R. § 264.1(b) "need not register again." *Id.* But elsewhere, when describing the "affected population," the IFR asserts that all noncitizen children must register when they turn 14, "whether previously registered or not." *Id.* at 11797.

80.     The IFR does not address whether noncitizens who were previously registered using one of the listed forms, but who were not fingerprinted, must go through the new registration process to provide fingerprints (or use some other mechanism to ensure the agency has their fingerprints). Fingerprinting is a separate obligation described in the IFR. *See, e.g. id*. at 11793 (citing 8 U.S.C. § 1302(a)). The IFR is unclear whether noncitizens who are considered registered must nevertheless also submit to the new registration process in order to be fingerprinted, given Defendants' stated commitment to enforce all aspects of the registration statute.

81.     The IFR fails to consider how noncitizens who do not speak English or do not have reliable access to a computer and the Internet will be able to register. The IFR makes registration available only online and only in English. There is no option to obtain a printed Form G-325R or to submit that registration form by mail.

82.     The IFR fails to provide sufficient notice to noncitizens of the new obligations imposed by the rule. Defendants have not widely publicized the IFR's new requirements other than the USCIS website, the Federal Register, and Defendant Noem's brief appearance on Fox News. An abrupt and significant policy change and attendant criminal penalties requires a plan to widely disseminate information about its requirements on platforms people targeted with

enforcement are likely to see. The IFR contains no information about how DHS intends to notify the impacted public about this sweeping new obligation.

83.    Thirty days is insufficient notice to those newly obligated to register and be fingerprinted.

84.    In addition, the IFR fails to grapple with the costs of requiring USCIS—an agency notoriously backlogged with existing applications—to administer millions of new biometrics appointments and processing. The OMB Supporting Statement for the G-325R estimates a cost to the government of $71,960,000 but the IFR does not discuss this cost or how the new requirements will impact other critical agency functions.

### E.  The IFR Will Irreparably Harm Plaintiffs[13]

85.    Many of CHIRLA's members will be newly required to register under the IFR and suffer harm as a result. Member "Luisa" is a 48-year-old domestic worker who has been in the U.S. for nearly 20 years, when she entered without inspection. She is the spouse of a CHIRLA client who has temporary protections, but she is not eligible for this form of protection herself and would have to register. Together they have two U.S. citizen children, 11 and 15 years old. Luisa is a very active CHIRLA member and a part of the Domestic Workers organizing group. During the COVID-19 pandemic, she was an essential worker who volunteered to clean classrooms in her own children's school, focusing on those for the youngest age groups. She advocates for better work conditions for her profession in Los Angeles, Sacramento and on the national level via the Domestic Workers Alliance. In particular, Luisa has worked to assist indigenous domestic workers, receiving training on how to preserve indigenous languages and

---

[13] Plaintiffs' members are identified by pseudonym.

act as an interpreter. She is fearful that she will be specifically targeted for enforcement because of her advocacy for undocumented workers.

86.    CHIRLA Member "Tiana" is a forty-two-year-old woman who came to the U.S. at the age of 15 with her family. In the United States, she initially worked as a seamstress to help the family out and was unable to complete her education. Tiana married a U.S. citizen who abused her and never helped her adjust her status. She is currently in the process of self-petitioning for protection under the Violence Against Women Act (VAWA). Form I-360, which is used for VAWA petitions is not included in the IFR so Tiana would be required to register. Tiana is a single parent of a U.S. citizen son who is in second grade and was eventually able to earn her G.E.D. She is terrified that registering could make her a target for immigration enforcement given the government's public statements that registration is intended for that purpose. This would prevent her from pursuing her VAWA petition and worse, could separate her from her son.

87.    "Ursela" is an 18-year-old CHIRLA member who lives in California. She entered the U.S. without inspection in 2023 as an unaccompanied minor when she was 17. She fled El Salvador with her mother after suffering years of severe physical abuse by her father, but they were separated on their journey. After making inquiries with the Salvadoran Consulate, she learned that her mother is officially listed as a missing person in Mexico. Ursela, who is not in removal proceedings, has filed for asylum but has not yet had biometrics taken; she is also applying for Special Immigrant Juvenile Status based on her parental circumstances. Despite pursuing these lawful pathways to permanent status, Ursela would be required to register pursuant to the IFR. She knows that the government wants to use the registration process to deport people, and that the government has already deported people even though they have

pending asylum applications. She fears she could be targeted for enforcement before her applications are approved and be deported to El Salvador, where she faces persecution.

88.    Plaintiff UFW's members would also be harmed by the IFR, both in terms of the potential consequences of registration, as well as the technological barriers it creates. The following UFW members would be newly required to register under the IFR.

89.    UFW member "Ana" is a 50-year-old indigenous farmworker from Oaxaca, she has dedicated 24 years to the strawberry and blueberry harvests in Oxnard, California. She is a single mother of six children, four U.S.-born citizens aged 16, 18, 20, and 22, and two undocumented children aged 32 and 30. Ana lost her husband to murder in 2010 and was left to provide for several children alone. She has been a UFW supporter since 2014, participating in general meetings, marches, and holiday activities. Ana speaks a thousand-year-old indigenous language, Mixteco Bajo, and has very little understanding of Spanish. She worries about the registration process because she is extremely unfamiliar with technology and has always needed assistance with online forms. Ana believes that it would be extremely challenging for her to access, navigate, and understand the registry given her limited understanding of Spanish and the Internet. She is concerned that she would make a mistake in the process that could be misconstrued as fraud and used against her. She worries about both immigration or criminal consequences of registering given that she is the sole provider of four children.

90.    UFW Member "Gloria" is a 49-year-old indigenous farmworker from Oaxaca who has dedicated the last six years to harvesting strawberries in Oxnard, California. Her native language is Mixteco Bajo and she speaks limited Spanish. She and her partner have six children. Gloria and two of her children have received labor-based deferred action ("DALE"). However, she has four undocumented children ages 16, 18, 21, and 23 who do not qualify for DALE.

Although Gloria has a temporary protection and is already registered, her undocumented children, including her minor 16-year-old son, would be subject to the IFR. She feels extremely vulnerable in her community due to her inability to speak fluent Spanish and navigate technology. She only owns a flip phone and cannot access the internet on her phone. She feels anxious for the safety of her undocumented teenage son because she will be responsible for registering him and she would be unable to assist him with the process. She is afraid her minor son would make a mistake on the registration form, or that he might lose or forget to carry proof of registration, which could expose him to criminal consequences.

91.    Many of MRNY's members will be newly required to register under the IFR and suffer irreparable harm as a result.

92.    Long-time MRNY member "Guvelia" is a 62-year-old grandmother and great-grandmother, and a noncitizen who lives in New York. She has been in the U.S. for more than 20 years and has applied for U nonimmigrant status by filing a Form I-918, which she did using a safe address, and recently provided biometrics as part of her application process. Guvelia has five children, two of whom are U.S. citizens and one of whom is a lawful permanent resident, ten U.S. citizen grandchildren, and one U.S. citizen great-grandchild. She is very low income, works as a nanny, and collects recycling on the street to make ends meet. She is eligible for U nonimmigrant status because she and two of her children were assaulted by a group of young men with sticks, rods, and fists outside of their apartment building in Brooklyn, NY and she assisted in the arrest and prosecution of one of the assailants. She recently filed this petition and, as a result, Guvelia does not yet have an EAD document related to it; she also does not have any other proof of registration to carry on her person if she is stopped and criminally prosecuted for failing to carry "registration" papers under the IFR. Guvelia has been an active MRNY member

since 2011, and she has regularly participated in MRNY's committee meetings, been a part of protests in New York City, and traveled to Washington, D.C. to advocate for her community. In addition to being fearful of registration in general, she is concerned that she would have to list her advocacy and related activities on behalf of undocumented immigrants on the G-325A form and that this would make her a target for enforcement.

93.     MRNY member "Michael" is a 27-year-old noncitizen who has lived in the U.S. since the age of eleven. He attended middle school, high school and college in New York City, graduating with bachelor's degrees in three different subjects. He lives with his mother and two siblings, all of whom are undocumented and, like him, do not have proof of registration. The United States is the only home that he knows, having lived here for the majority of his life.  Michael is concerned about racial profiling under the new registration regime, particularly against his mother and brother who are darker-skinned than he is. Michael has been an extremely active member of MRNY for over a decade, participating in trips to Albany, Washington DC, and elsewhere and joining protests in the streets of New York. He has also given press interviews and written letters in English and Spanish on key issues of importance to MRNY and MRNY members. He fears that registration would make him and his family members easy targets for retaliation.

94.     MRNY member "Alice" is a noncitizen who lives in New York City and who has lived in the U.S. for over 20 years. She has never applied for an affirmative immigration benefit and does not have any registration documents. Alice has been a victim of domestic violence and sought recourse through the court system. She is afraid that the new registration process will be used as a tool to intimidate and abuse people, particularly Latinos, because of their race and their immigration status. She fears that the registration requirement will also empower others, including employers and abusive partners, to intimidate individuals without status by threatening to report

them. Alice has been an extremely active member of MRNY's committees and participated in many MRNY actions and events, including protests and press events. She is concerned that the new registration process and rumors stemming from the process will prevent people like her from engaging in political speech and activism with organizations like MRNY.

95.     Many of CASA's members will be newly required to register under the IFR and suffer irreparable harm as a result.

96.     "YL" is a CASA member originally from Mexico who currently resides in Georgia. She entered the U.S. in 2016 without inspection and did not have any contact with immigration authorities.  She has never had a case in immigration court or applied for immigration relief.  YL has been active with CASA for the last two years, engaging in her local organizing committee, and participating in public demonstrations related to a variety of issues, including housing and climate justice. In support of these issues, she has engaged in lobbying activity with CASA at both the state and national level. Outside of CASA, she has engaged in political activity, including engaging voters to support candidates who champion immigrant communities though she cannot vote herself. YL is the mother of a 5-year-old son, who has a speech impediment and needs occupational and speech therapy. The IFR has caused her to become more afraid to speak out because she fears that it could expose her and her son to targeting by the federal government. With respect to the actual registration process, she doesn't feel like she would be able to complete it because she is not very good with technology, and wouldn't feel comfortable creating an account and completing the form online – especially because she has limited English proficiency, and the form is only available in English.

97.      "AC" is a CASA member originally from Mexico, currently residing in Pennsylvania.  She entered the U.S. without inspection and without contact with immigration

authorities in 2000. She has never been placed in removal proceedings or applied for any immigration benefit in the U.S. She has four U.S. citizen children, ages 9, 12, 13 and 23. She lives with her partner, who is the father of her youngest three children. She has been an outspoken advocate with CASA, exercising her First Amendment rights to speak out against immigration detention and other issues. AC regularly participates in organizing meetings and has engaged in public protests with CASA as well as lobbying efforts to persuade elected officials in Pennsylvania to support CASA priorities. As a CASA member leader, AC has traveled to Washington DC, to participate in national protests and lobby Congress, and given interviews to the media on issues she is passionate about. The IFR has caused her to feel panic about speaking out in public, however, because she fears that she could be targeted and arrested for her actions.

98.    "ALDC" is a CASA member originally from Honduras who currently resides in Virginia with her husband. She entered the United States without inspection and without contact with immigration authorities in 2006. ALDC has three United States citizen children, ages 12, 14 and 16. Her youngest child has complications from meningitis that requires constant medication with antibiotics and regular doctors' visits to ensure that the infection is under control. The meningitis is in his brain and he required surgery on it right after he was born, when he was only four months old. ALDC has been an active leader with CASA over the last three years, speaking out about issues that are important to her through CASA's organizing committees and through participation in public actions like marches and rallies. She decided to become a leader with CASA because she saw the need to take action to build community power and solidarity. The IFR makes her afraid to speak out because she feels like she might be targeted by the government for her participation. Additionally, she doesn't even know how she would complete the

registration requirement, since she doesn't read or understand English well and isn't good with computers, so she wouldn't feel able to complete the online registration form.

99.    The IFR will harm Plaintiff CHIRLA's organization itself. As an organization, CHIRLA's legal and advocacy programs, as well as its hotline, will be overrun with requests for information and needs for legal advice and assistance regarding the IFR's registration requirement. This will interfere with CHIRLA's core function of providing immigration legal services.

100.    CHIRLA receives a significant amount of its funding from grants and contracts that require specific deliverables of immigration legal services, including grants that cover services affirmative immigration benefits, removal defense, and college students. Some of the contracts are paid on a "per case" basis, while others are paid in cycles based on reporting requirements. However, advising and assisting CHIRLA members, existing clients, and other community members with registration will not qualify under these grants as deliverables as this process involves neither an affirmative immigration benefit nor assistance with removal proceedings. Failure to comply with current grant metrics and reporting may result in loss of the remaining funds under those grants and may jeopardize CHIRLA's ability to apply for future ones.

101.    For example, CHIRLA's grant for its Student Legal Services ("SLS") Program applies to college students at certain community and state colleges throughout California. Students can receive certain limited legal services such as DACA renewals or naturalizations, and in some cases, so can their family members.  Because of the success of this program and CHIRLA's years of advocacy for DACA recipients, CHIRLA is known in the community as a trusted source of information and advice for immigrant youth. Since the announcement of the

new registration process, SLS has already seen an increase in inquiries from former clients and other students seeking assistance and advice. If the new rule goes into effect, CHIRLA staff and resources will be diverted from providing advice and assistance with affirmative immigration benefits covered by the grant to helping students and their family members navigate registration.

102.    If Defendants provided an opportunity for notice and consideration of comments before implementation of any registration rule, Plaintiffs CHIRLA, UFW, MTRNY, and CASA would submit comments raising the concerns of their organizations and their members.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2)(D))

103.    The Administrative Procedure Act, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. *See* 5 U.S.C. §§ 553(b), (c).

104.    The IFR is a legislative rule within the meaning of the APA.

105.    Defendants issued the IFR without prior notice and an opportunity for comment as required by the APA.

106.    The IFR is not a procedural rule because it alters the rights and interests of parties, imposes new substantive obligations and criminal liability, and collects personal information not required by the INA.

107.    Defendants' failure to provide for notice and comment violates 5 U.S.C. §§ 553(b) and (c), 706(2)(D).

## SECOND CLAIM FOR RELIEF

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))**

108.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

109.    Among other reasons, the IFR is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; failed to consider reasonable alternatives; entirely failed to consider important aspects of the problem; failed to take into account reliance interests; and offered explanations for their decision that run counter to the evidence before the agency.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.  Issue an order to stay or postpone the effective dates of the IFR under 5 U.S.C. § 705 and/or a preliminary injunction under Federal Rule of Civil Procedure 65 pending the Court's final adjudication of the claims herein;

2.  Declare unlawful and set aside the IFR;

3.  Enter an order vacating the IFR;

4.  Enjoin Defendants and all those acting in active concert with them from enforcing or implementing the IFR;

5.  Award Plaintiffs' counsel reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, and any other applicable statute or regulation; and

6.  Award such other and further relief in favor of Plaintiffs and against Defendants that the Court may deem just, equitable, and proper.

JA49

Dated: March 31, 2025

Respectfully submitted,

*/s/ Emma Winger*

Emma Winger (DC Bar No. 90010721)
Michelle Lapointe (DC Bar No. 90032063)
   (admission pending)
Leslie K. Dellon (DC Bar No. 250316)
Chris Opila (DC Bar No. 90029724)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

Cody Wofsy (DDC Bar No. CA00103)
Stephen B. Kang (DDC Bar No. CA00090)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org
skang@aclu.org

Anthony Enriquez* (NY Bar No. 5211404)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanights.org

Lynn Damiano Pearson*
Cassandra Charles*
Joanna Cuevas Ingram*
National Immigration Law Center
P.O. Box 34573
Washington, D.C.  20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Nicholas Espiritu*
National Immigration Law Center
3450 Wilshire Blvd. No. 108-62
Los Angeles, CA  90010
Tel: (213) 639-3900
Fax: (213) 639-3911
espiritu@nilc.org

Jennifer R. Coberly (DC Bar No.
90031302)*
   (admission pending)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692
Jcoberly@AILA.org

Nicholas Katz*
CASA, Inc.
8151 15th Avenue
Hyattsville, MD 20783
Tel: (240) 491-5743
nkatz@wearecasa.org

*Application for pro hac vice admission
forthcoming*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, et al., <br>        *Plaintiffs* <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, et al., <br>        *Defendants*. | Case No. 1:25-cv-00943 |

**DECLARATION OF ANGELICA SALAS IN SUPPORT OF PLAINTIFFS'
MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705
OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*<br><br>    *Defendants*. | Case No. |

## DECLARATION OF ANGELICA SALAS, EXECUTIVE DIRECTOR
## OF THE COALITION FOR HUMANE IMMIGRANT RIGHTS ("CHIRLA")

I, Angelica Salas, upon my personal knowledge, hereby declare as follows:

1.  I am the Executive Director of the Coalition for Humane Immigrant Rights ("CHIRLA"). I have held this position since 1999. In this capacity, I oversee all of CHIRLA's program areas and am responsible for strategic planning and CHIRLA's annual budget.

2.  CHIRLA is a nonprofit organization headquartered in Los Angeles, California, with ten offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986 and its mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources.

## CHIRLA'S MISSION

3.  CHIRLA's mission is to ensure that immigrant communities are fully integrated into our society with full rights and access to resources. CHIRLA's first director was Father Luis Olivares, the pastor at Our Lady Queen of Angels Church. As a leading voice of the Sanctuary

Docusign Envelope ID: D5742FC7-A592-4EA9-A5F4-7A7ECCF8D629

movement, Olivares used his church to protect refugees fleeing human rights abuses in Central America in the 1980s. Since its founding in 1986, CHIRLA has continued to advocate for immigrant rights, organizing, educating, serving, and defending immigrants and refugees in Los Angeles and throughout California.

4.      Today, CHIRLA is the largest statewide immigrant rights organization in California, with fourteen unique departments and over 185 staff members who help provide a range of services that reach tens of thousands of Californians each year. For example, over the last three years, CHIRLA's education programs have reached over 820,000 people through more than 7,800 events and its legal department has assisted approximately 30,000 people. In furtherance of its mission, CHIRLA handles the full spectrum of needs of those primarily residing within low-income immigrant communities in an area with very high costs of living and in areas of California that have long been under-served.

5.      CHIRLA is a membership-based organization, funded, in part, by its approximately 13,000 dues-paying and active members. The fee for an individual membership is a minimum of $25, although families may become members for $60. The majority of our members are low-income immigrants in mixed status families, one or more of whom are undocumented. Some are members first, who due to circumstances then become legal service clients, while others are clients before they become members.

6.      CHIRLA has approximately 50,000 active members across California. Our membership is diverse, and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Many of our members belong to mixed-status families—that is, families consisting of both individuals with citizenship or lawful status and individuals without. Most of our members are low-income. CHIRLA educates its membership as well as our broader

JA53

community through know-your-rights trainings, workshops, social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

7.      In 2012, CHIRLA launched its legal services program to support its members and others in the community in seeking the benefits and protections of Deferred Action for Childhood Arrivals ("DACA"). Since then, we have expanded our legal services program, first by representing clients in applying for permanent residence and citizenship as well as other applications before U.S. Citizenship and Immigration Services ("USCIS"), including family-based petitions, Special Immigrant Juvenile Status petitions, Military Parole in Place, and U visas, and then expanding in 2017 to representing individuals in removal proceedings in immigration court. We now have three main components within the Department of Legal Services: 1) Programs and Subcontract Administration; 2) Worker Rights and Labor; and 3) Legal Programs, with over sixty staff members across the components. Subcontract Administration oversees funding from the California Department of Social Services, the County of Los Angeles, and the City of Los Angeles, and in this way helps ensure wider access across the State of California to legal services. Among the subcontractors are other nonprofit organizations as well as California State Universities Chico, Humboldt, Sacramento, and Sonoma. Within Legal Programs, we have distinct Removal Defense, Clinical, and Family Unity units, as well as our Student Legal Services Program. During the past three years, CHIRLA has conducted nearly 30,000 legal consultations and has assisted with hundreds of immigration matters, including I-130 family petitions and attendant adjustments of status, Military Parole in Place cases, consular processes, as well as humanitarian-based applications including asylum, U visas, and Special Immigrant Juvenile Status (SIJS) and Violence Against Women Act (VAWA) petitions.

8.      CHIRLA's programs also include a hotline where individuals—including members, clients, and community members can call with questions. The assistance hotline that CHIRLA operates fields on average 15,000 calls per year. Given CHIRLA's deep community ties and longstanding legal services programs, CHIRLA is often a first point of contact for individuals seeking information about recent policy changes impacting immigrants. The hotline is staffed by members of CHIRLA's Community Education team who can refer callers to Legal Programs staff as needed as well as to regular triage services where intakes are conducted.

9.      Student Legal Services Program (SLS) is part of Legal Programs and provides limited legal assistance to college students across 14 community colleges and four California State University (CSU) campuses. Additionally, at the CSU campuses, the assistance can also extend to family members. These services include immigration consultations, affirmative immigration applications like DACA renewals, naturalization and family-based petitions, as well as know-your-rights sessions. This program dovetails with CHIRLA's longstanding advocacy on behalf of DACA recipients and immigrant youth more broadly and is funded through a state grant specifically for providing immigration legal services to college students.

10.     In addition to member dues, CHIRLA also receives funding through private foundations and state and local grants. Many of these other sources of funding come with expectations or requirements that CHIRLA achieve certain metrics in its immigration services work. For example, CHIRLA receives grants that are predicated on the organization meeting specified deliverables, which can include representing a set number of individuals or achieving certain outcomes. For at least one of CHIRLA's contracts to provide removal defense representation, the organization receives funding on a "per case" basis - i.e., a set amount of funding for each new client whose case CHIRLA contracts to accept for representation. Payments under this contract

are made in stages, with a percentage of the funding paid to the organization at the beginning of the funding cycle, mid-cycle, and when the contractual obligations have been fulfilled.

11.     Funding from private grants and contracts with public agencies are critical to CHIRLA's ability to provide essential services in furtherance of its mission and to deliver to the full scope of benefits CHIRLA affords its members. If one significant stream of funding is compromised, the effects ripple across the organization. If CHIRLA were to be unable to meet its deliverables, the organization's grantors would either not reimburse CHIRLA for its expenses, require that CHIRLA continue the work needed to complete its commitments but without additional funding for staffing or to cover the increased costs, and in some instances would decrease or decline to renew funding in the future. With our contract to provide removal defense representation, if CHIRLA were to be unable to take on the number of new cases promised, our organization would not receive the balance of the funds under the contract and would have to return the funds provided to that point for those cases. Thus, an inability to meet case acceptance and completion goals leads to diminished funding for the organization. In the process, CHIRLA's reputation in the grantor community would also be harmed, jeopardizing future funding.

12.     In addition to its education initiatives and legal services, CHIRLA engages in policy advocacy efforts on behalf of its members at the local, state, and national levels. For example, a recent CHIRLA campaign focused on advocacy for stronger health and safety protections for domestic workers. This campaign began in response to COVID-19, where domestic workers were at the forefront of the pandemic. Since then, CHIRLA has been supporting state legislation that would remove an exemption that denies domestic workers the same health and safety protections as other workers.

13.     CHIRLA reaches its members and community members through in-person meetings and

JA56

Docusign Envelope ID: D5742FC7-A592-4EA9-A5E4-7A7ECCF8D629

events throughout California and through its virtual platforms, including a Facebook Live series "CHIRLA en tu Casa," CHIRLA TV YouTube channel, and TikTok. Organizers, along with legal and communications staff, work collaboratively to prepare materials and content for these events that are geared towards members and non-members alike.

14.    CHIRLA regularly submits comments on agency rules and regulations that impact its members and the communities it serves. CHIRLA plans to submit a comment on the Interim Final Rule ("IFR") explaining how it will be burden our organization and members.  However, given the mere 30-day comment period and the fact that the agency is not considering public comments before finalizing the rule, the comment will not be as robust as when we submit them through the regular rulemaking process.

**HARM TO CHIRLA AS AN ORGANIZATION**

15.    The new registration requirement created by the IFR will impact CHIRLA across the organization: its programming, staffing, communications, and funding. The community members CHIRLA serves have already begun reaching out to its hotline and at community events with questions about the registration requirement, leading staff to reallocate their time to addressing concerns and revising materials and presentations to address these growing concerns.

16.    If the regulation goes into effect, CHIRLA will be overwhelmed by individuals in need of legal advice and assistance with the new registration process. CHIRLA has thousands of current and former clients in its Legal Programs, many of whom will need to register even if they have some kind of pending application for immigration relief, for example family-based petitioners where the applicants are awaiting priority dates and have not yet undergone biometrics. Further, even those who do not need to register will likely seek legal advice to determine if they need to register. Indeed, of the numerous calls CHIRLA has already received

about registration, many community members have asked whether DACA recipients or TPS holders have to register.

17.     Since CHIRLA serves its members, legal services clients, and community members alike, it expects thousands of individuals are likely to reach out for assistance and advice with the new registration process.  Addressing this volume of community needs will impact multiple programs and will strain its staff and budget. Specifically, the hotline staff will not be able to keep up with the volume of callers regarding registration once greater awareness is reached in the community. Just last week, CHIRLA sent an e-blast to its members outlining registration and previewing a call to action on how to file a public comment on it.

18.     Further, Legal Services attorneys and staff will not be able to provide legal advice or assistance to all of those in need while managing their current caseloads. CHIRLA has already identified over a hundred current clients who may have to register, including around 60 particularly vulnerable U-visa applicants who have not had their biometrics taken. Reviewing client files to determine who will need to have a separate consultation about registration is also diverting significant staff resources that will only increase if the rule goes into effect.  This case review will be particularly challenging and time-consuming given that the IFR is silent with respect to many of the immigration benefits our clients have applied for and due to absence of any instructions for the G-325R on the USCIS website.  Another complexity in determining whether clients would need to register under the IFR is ascertaining their manner of entry and whether they were served with a Notice to Appear or paroled.  For some clients, CHIRLA legal staff will need to file Freedom of Information Act ("FOIA") requests to make those determinations.

19.     The need for legal advice and assistance with the registration will further impact CHIRLA's core legal work and compliance with existing grants and deliverables.  As noted

above, CHIRLA's Legal Programs grants are allocated for provision of legal services leading to affirmative immigration benefits (for example, DACA renewals, U visas, or naturalization) or to defend individuals in removal proceedings from deportation. The registration requirement does not meet the criteria for these grants as it does not confer a benefit but instead is a requirement to avoid civil and criminal penalties. CHIRLA is required by its mission and its ethical obligations to its clients to assist members, clients and community members with the registration process. However, this would require CHIRLA to divert its staff to assist them at the expense of grant compliance, particularly those involving "per case" deliverables. Noncompliance with grant requirements will likely result not only in withholding of disbursements during the next funding cycle, but also in CHIRLA's eligibility to apply for future grants.

20.     Another example of how CHIRLA's current resources would need to be diverted would be responding to the needs of immigrant youth. The grant funding it receives under the Student Legal Services Program to assist students on college campuses is undertaken as "limited legal services" that do not create a long-term attorney-client relationship. Nonetheless, because California college students are familiar with CHIRLA—and because of its longtime advocacy for immigrant youth through its DACA work and other campaigns—they will look to CHIRLA for advice and assistance with the new registration requirement. CHIRLA has already received increased inquiries about the registration requirement from students who are concerned that they or their family members would be subject to it. However, responding to these inquiries, and/or advising and assisting students about it, would not fall within the scope of legal services covered by the grant. Given CHIRLA's commitment to immigrant youth and its existing relationships with students that is core to its mission, CHILRA will be compelled to respond to these inquiries.

21.     Even though many of CHIRLA's hundreds of existing clients across its Legal Programs

may be considered to have already "registered" because of the past services they receive, they will want to seek clarity about the new process and will likely have concerns about whether family members will be required to register. Given that the new registration rule is unclear as to whether individuals with certain types of immigration statuses, benefits, and visa categories are considered registered—and the absence of instructions—Legal Programs staff will need to expend significant time counseling current clients.

**HARM TO CHIRLA'S MEMBERS**

22.     Many of CHIRLA's members will experience harm as a direct result of the IFR.  As its members have a variety of immigration statuses and/or belong to mixed-status families, the IFR will create uncertainty of which members are considered "registered." Even those who are registered may have children or family members who would be required to do so.

23.     The following members would be newly required to register under the IFR.[1]

24.     "Ursela" is an 18-year-old CHIRLA member who lives in California. She entered the U.S. without inspection in 2023 as an unaccompanied minor when she was 17. She fled El Salvador with her mother after suffering years of severe physical abuse by her father, but they were separated on their journey. After making inquiries with the Salvadoran Consulate, she learned that her mother is officially listed as a missing person in Mexico. Ursela, who is not in removal proceedings, has filed for asylum but has not yet had biometrics taken; she is also applying for Special Immigrant Juvenile Status based on her parental circumstances. Despite pursuing these lawful pathways to permanent status, Ursela would be required to register pursuant to the IFR. She knows that the government wants to use the registration process to deport people, and that the government has already deported people even though they have pending asylum applications. She fears she could be targeted for

---

[1] All member names in this declaration are pseudonyms.

enforcement before her applications are approved and be deported to El Salvador, where she faces persecution.

25.     CHIRLA Member "Tiana" is a forty-two-year-old woman who came to the U.S. at the age of 15 with her family. In the U.S., she initially worked as a seamstress to help the family out and was unable to complete her education. Tiana married a U.S. citizen who abused her and never helped her adjust her status. She is currently in the process of self-petitioning for protection under the Violence Against Women Act (VAWA) but has not yet filed Form I-360 or undergone biometrics.  Even when she files, the Form I-360 used for VAWA petitions is not included in the IFR as evidence of registration, so Tiana would still be required to register.

26.     Tiana is a single parent of a U.S. citizen son who is in second grade. To help support him, she eventually earned her G.E.D. She worked in a restaurant that burned down during the recent Los Angeles wildfires, but with the help of one of her former colleagues she has taken the first step to fulfilling a long-held dream of opening her own restaurant. She wants to serve a fusion of Oaxacan and American cuisine. She is terrified that registering could make her a target for immigration enforcement given the government's public statements that registration is intended for that purpose. This would prevent her from pursuing her VAWA petition and, worse, could separate her from her son.

27.     CHIRLA Member "Luisa" is a 48-year-old domestic worker who has been in the U.S. for nearly 20 years, when she entered without inspection. She is the spouse of a CHIRLA client who has temporary protections, but she is not eligible for this form of protection herself and would have to register. Together they have 2 U.S. citizen children, 11 and 15 years old. Luisa is a very active CHIRLA member and a part of the Domestic Workers organizing group. During the COVID-19 pandemic, she was an essential worker who volunteered to clean classrooms in her own children's

school, focusing on those for the youngest age groups. She advocates for better work conditions for her profession in Los Angeles, Sacramento and on the national level via the Domestic Workers Alliance. In particular, Luisa has worked to assist indigenous domestic workers, receiving training on how to preserve indigenous languages and act as an interpreter. Additionally, Luisa champions better housing and helping to get out the vote. On numerous occasions, she has participated in pro-immigrant protests and she also attended the Women's March. She is fearful of the registration process and that she will be specifically targeted for enforcement because of her advocacy on behalf of undocumented workers.

28.    For CHIRLA's members, as well as their families and communities, the IFR's registration requirement is causing fear and confusion. If it goes into effect, it will give CHIRLA's members and families and impossible choice of facing criminal charges or facing potential deportations regardless of their family and community ties--and significant contributions--to the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March 29, 2025 in Los Angeles, California.

DocuSigned by:

_____
771191AC6E364DD...

Angelica Salas

JA62

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, et al., | |
| *Plaintiffs* | Case No. 1:25-cv-00943 |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | |
| *Defendants*. | |

**DECLARATION OF ELIZABETH STRATER IN SUPPORT OF PLAINTIFFS'
MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705
OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

JA63

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, | |
| *Plaintiffs*, | Case No. |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.* | |
| *Defendants*. | |

**DECLARATION OF ELIZABETH STRATER,**
**NATIONAL VICE PRESIDENT AND DIRECTOR OF STRATEGIC CAMPAIGNS,**
**UNITED FARM WORKERS OF AMERICA ("UFW")**

I, Elizabeth Strater, declare:

1.      I serve as Director of Strategic Campaigns and National Vice President of the United Farm Workers of America ("UFW"). I have worked for UFW since 2017 and have been National Vice President since I was elected by a Convention of farm worker union members in September 2024. As a member of the elected Union Executive Board, I help direct the union's work in organizing, negotiating, public campaigns, rulemaking, legislative campaigns, and wide-reaching advocacy on behalf of farm workers.

2.      As Director of Strategic Campaigns, I direct campaigns on behalf of farm workers to empower them to improve their safety, wages, and working conditions and to underscore their basic human dignity. An important part of my role is to humanize the essential contributions of farm workers and to protect the rights of UFW's membership, the majority of whom are

immigrants. I have detailed knowledge about UFW's membership demographics, membership

criteria, member needs and priorities, and how members direct UFW's mission and advocacy.

3.     As part of my role as Director of Strategic Campaigns and National Vice President, I

regularly hear from UFW members about their safety, wages, working conditions, immigration

issues, and other concerns members face in their communities. I also hear these concerns

communicated through UFW organizers who speak directly with members and report to the

Board. In recent weeks, I have heard from numerous organizers and union members who are

concerned about the new registration process set forth in an Interim Final Rule ("IFR") and who

have questions about how registration will impact themselves and other members.

**UFW's Mission & Membership**

4.     UFW is the first and largest farm worker union in the country. It represents thousands of

migrant and seasonal farm workers in various agricultural occupations throughout the United

States. UFW is headquartered in Kern County in Keene, California.

5.     Founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other leaders, UFW

was created from the merger of workers' rights organizations to form one union. Our mission is to

improve the lives, wages, and working conditions of agricultural workers and their families.

UFW has members throughout California, and in Oregon, Washington, and New York.

6.     To fulfill our mission, UFW engages in collective bargaining, worker education, advocacy,

state and federal legislation, and public campaigns. Our stated values are integrity, "Sí se puede"

attitude, dignity, and innovation. We promote total nonviolence as a core tenet. As a result of

UFW's work, thousands of agricultural workers are protected under UFW contracts. UFW has

also sponsored and advocated for legal reforms to protect all farm workers at the state and federal

level, including on issues related to overtime pay, heat safety, pesticides safety, COVID-19

protections, and other policies to protect farmworkers and advance their rights.

7.     As part of this work, UFW is a national leader in the movement for immigration reform and immigrants' rights. We have spearheaded national campaigns and congressional lobbying efforts to raise public awareness of the critical role migrant farm workers play in our communities and economy and to advocate for immigration reform, including a path to citizenship for farm workers.

8.     As of March 2025, UFW has approximately 7,000 members.

9.     UFW membership is voluntary and consists of various categories of members. Among these, contributing or associate members are individuals who make a monthly or annual contribution of a designated amount to UFW. Dues-paying members are those who benefit from a UFW collective bargaining agreement. In addition to these categories, UFW recognizes other forms of membership, including full-time employees who have been employed for at least two years, individuals recognized as martyred members due to their sacrifice in the struggle for social justice, honorary members who are family members of martyred members, and retired members who contribute voluntarily after leaving active employment.

10.    Generally, individuals seeking to become contributing or associate members of UFW complete an official application, which is reviewed and processed by UFW staff for approval. Dues-paying members become members through the procedures set forth in the California Agricultural Labor Relations Act or other applicable laws, their collective bargaining agreements, and union rules.

11.    UFW members play an important role in deciding what activities UFW engages in as an organization. At UFW's quadrennial Constitutional Convention, members introduce and vote on motions to govern and guide the union's work, and to elect the Union Executive Board. On an ongoing basis, UFW members respond to surveys, provide feedback, and participate in advisory meetings (known as "consejo de base" in Spanish) to actively participate in the Union's decisions.

UFW has created various programs in response to members' feedback and requests. For example, in 2008, in response to requests from our members, we created educational scholarships for students who are working toward an undergraduate degree and are either eligible UFW members or their dependents in California, Oregon, and Washington state.

12.    UFW membership comes with a variety of benefits. Dues-paying members receive protections in the form of collective bargaining in which UFW engages on their behalf. Through an established negotiating committee comprised of workers, UFW members negotiate benefits such as medical insurance, pension, wages, paid time off, working conditions, seniority, right to recall, equipment provisions and other terms of employment.

13.    Members reach out to UFW seeking assistance, advocacy, advice, and information, and to raise concerns that their communities are facing. My team is in constant contact with UFW's membership. Members guide the organization at Conventions and quarterly consejo de base (advisory) meetings and will reach out to union staff, including me and my direct reports, on a daily basis.

14.    UFW members in Kern County were recently impacted, directly and indirectly, by Border Patrol's January 2025 enforcement operation, "Operation Return to Sender," in which hundreds of Latinos were arrested and detained, many of whom had a lawful status. In response to the harm it inflicted on UFW members, we mobilized quickly to support our members. We connected members with immigration attorneys and helped them identify where their loved ones were being detained. We aided farm workers by helping to arrange travel between their homes and Border Patrol's detention centers, often hundreds of miles away. When breadwinners were detained or summarily expelled from the country, we assisted affected families in locating emergency food, diapers, and infant formula supplies needed for survival.

15.    Despite UFW's efforts to support members and their families, the harms from "Operation Return to Sender"—and Border Patrol's statements that they will replicate their operations elsewhere in California—has stoked fear among farmworker communities, including among documented farmworkers. UFW members have reported that they are terrified that Border Patrol will—again—arrest people without regard to how long someone has been living in the community or the family members they have waiting for them, including young children.

16.    This climate of fear has raised significant concerns among UFW members about the registration process set forth in the new IFR. These concerns are coming from members with a variety of immigration statuses, including those who are already considered "registered," but are worried about the online process and how it will affect them and their families.

17.    The UFW frequently submits comments on rules and regulations that directly impact farm workers. UFW only submits comments when it has had the opportunity to solicit input from its members. Given the 30-day deadline for commenting on the IFR and the fact that the agency has already finalized the language of the regulation without public input, UFW will not have the capacity to write a comment in this timeframe, despite the registration's negative impact on its members. If the time period were extended, UFW would have more time to speak to its members and to submit a comment that incorporates their perspectives.

**UFW Members Who Will be Harmed by the Registration Requirement**

18.    Each of the following members would be newly required to register and be fingerprinted under the IFR.[1]

19.    UFW Member "Ana" is a 50-year-old indigenous farmworker from Oaxaca. She has dedicated 24 years to the strawberry and blueberry harvests in Oxnard, California. She is a single

---

[1] All member names in this declaration are pseudonyms.

mother of six children, four US-born citizens aged 16, 18, 20, and 22, and two undocumented children aged 32 and 30. Ana lost her husband to murder in 2010 and was left to provide for several children alone. She has been a UFW supporter since 2014, participating in general meetings, marches, and holiday activities. Ana speaks a thousand-year-old indigenous language, Mixteco Bajo, and has very little understanding of Spanish or English.

20.     Having to focus on work to provide for her family left Ana very little time to learn how to read, write, or speak Spanish. She worries about the registration requirement because she is extremely unfamiliar with technology and has always needed assistance with online forms. Ana believes that it would be extremely challenging for her to access, navigate, and understand the registration process given her limited understanding of Spanish and the Internet. She is concerned that she would make a mistake in the process that could be misconstrued as fraud and used against her. She worries about both immigration and criminal consequences of registering given that she is the sole provider of four children.

21.     UFW Member "David" is a 69-year-old farmworker who has resided in Sunnyside, Washington since 2007, after entering without inspection at the Southern border. David has worked for 18 years in various agricultural jobs including apple, cherry, pear, and peach harvests. He has six children, four of whom remain in Mexico and two in the US. One of his children does not have any legal status and one has a temporary status. David has a sixth-grade level education and is unfamiliar with technology and navigating the Internet; he worries about how he will be able to comply with the new registration requirement given the process is only online.

22.     UFW Member "Gloria" is a 49-year-old indigenous farmworker from Oaxaca who has dedicated the last six years to harvesting strawberries in Oxnard, California. Her native language is Mixteco Bajo and she speaks limited Spanish and no English. She and her partner have six

children. Gloria and two of her children have received for labor-based deferred action ("DALE").
However, she has four undocumented children ages 16, 18, 21, and 23 who do not qualify for
DALE. Although Gloria has a temporary protection and is already considered "registered," her
undocumented children, including her minor 16-year-old child, would be subject to the IFR. She
feels extremely vulnerable in her community due to her inability to speak fluent Spanish and
navigate technology. She only owns a flip phone that does not have internet access. She feels
anxious for the safety of her undocumented teenage son because she will be responsible for
registering him, and she would be unable to assist him with the process. She worries her minor
child could make a mistake on the registration form—or might lose or forget to carry proof of
registration—which could expose him to criminal consequences.

23.    These stories illustrate the harm that the registration requirement would cause UFW
members. UFW remains committed to advocating for laws and policies that support farm workers
and reflect their enormous contributions to their communities and the economy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 28, 2025.
Los Angeles, California

_____
Elizabeth Strater

7

JA70

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, et al.,

     *Plaintiffs*

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

      *Defendants*.

Case No. 1:25-cv-00943

### DECLARATION OF GEORGE ESCOBAR IN SUPPORT OF PLAINTIFFS'
### MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705
### OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

JA71

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

          *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

          *Defendants*.

Case No.

**DECLARATION OF GEORGE ESCOBAR,
CHIEF OF PROGRAMS AND SERVICES, CASA, INC.**

I, George Escobar, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.      I am the Chief of Programs and Services of CASA, Inc. ("CASA"). I have worked at CASA for fourteen years. In my role, I oversee CASA's portfolio of community-facing direct services, including its health, legal, and educational services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs. An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs. I therefore speak frequently with community members and receive feedback from my staff regarding CASA members' fears, concerns, and decisions.

2.      I make this statement based upon personal knowledge, files and documents of CASA that I have reviewed (such as case files, reports, and collected case metrics), as well as information supplied to me by employees of CASA whom I believe to be reliable. These files,

1

documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CASA business.

3.      CASA is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.

4.      Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses.

**CASA's Mission and Activities**

5.      A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities. CASA members play an important role in deciding what campaigns we work on and how CASA serves the community.

6.      CASA membership is voluntary. In order to become a member, an individual must apply for membership, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community.

7.      Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived for individuals who experience financial hardship or are otherwise unable to pay. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of our immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the

JA73

purposes of engaging with certain government agencies, including the police.

8.      CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From CASA's beginnings in a church basement, we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

9.      In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to our members across the United States. Those individuals who are not geographically close to a physical CASA office are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and integrated into our member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying a variety of government benefits. In addition, CASA provides its members with free remote legal assistance, including free legal consultations on immigration issues.

**The Interim Final Rule (IFR) and Registration Requirements Directly Harm CASA's Members**

10.     CASA has many members who are, or are likely to be, directly harmed by the Interim Final Rule and the registration requirements it imposes. Many of our members are noncitizens, including individuals with U.S. citizen children or plans to start families here.

11.     CASA has provided legal and other social services to thousands of such individuals and is a national leader in advocating for immigration protections, such as Temporary

3

Protected Status (TPS), DACA and other forms of relief.

12.    Based on CASA's records, I am aware of several members[1] who would be negatively impacted if the IFR were allowed to go into effect:

13.    **YL** is a CASA member originally from Mexico who currently resides in Georgia. She entered the U.S. in 2016 without inspection and did not have any contact with immigration authorities. She has never had a case in immigration court or applied for immigration relief. YL has been active with CASA for the last two years, engaging in her local organizing committee, and participating in public demonstrations related to a variety of issues, including housing and climate justice. In support of these issues, she has engaged in lobbying activity with CASA at both the state and national level. Outside of CASA, she has engaged in political activity, including engaging voters to support candidates who champion immigrant communities though she cannot vote herself. YL is the mother of a 5-year-old son, who has a speech impediment and needs occupational and speech therapy. The IFR has caused her to become more afraid to speak out because she fears that it could expose her and her son to targeting by the federal government. With respect to the actual registration process, she doesn't feel like she would be able to complete it because she is not very good with technology, and wouldn't feel comfortable creating an account and completing the form online – especially because she has limited English proficiency, and the form is only available in English. Her biggest fear is that she will be separated from her young son, who is a U.S. citizen, and who has never been cared for by anyone else. That fear keeps her up at night. She is also afraid that her partner, who is the sole wage earner in the family, could be detained and deported as well, depriving them of their only income. YL has been exposed to discrimination in the U.S. because

---

[1] All names used in this declaration are pseudonyms.

JA75

of her inability to speak English, including in the school system when she enrolled her child in pre-Kindergarten and when she reported a situation of bullying at school.  The Principal promised to help resolve the situation, but it only got worse.  Her son would have night terrors and lost his appetite because of the situation. When she visited her son's classroom, she saw him being bullied without teachers intervening.  In contrast, parents who were able to speak English got the support they needed.  With CASA, she is fighting for a just immigration system that will allow her and her family to live in peace, free from the fear that this IFR invokes.  She sees the deep concern about the IFR and anti-immigrant environment generally from the other parents at her school and wants to continue fighting for immigration reform so that they can speak out and create a better education system for all the children where she lives.  Children deserve to have a dignified education, not to live in fear.

14.    **ME** is a CASA member originally from Guatemala who currently resides in Pennsylvania.  He entered the U.S. without inspection and without contact with immigration authorities in 2004.  He has never been placed in removal proceedings or applied for any immigration benefit in the United States.  ME currently works as a carpenter and has four children, aged 1, 8, 15 and 18, all of whom are United States citizens.  ME proudly pays his taxes every year and abides by all the laws of this country. He has been active with CASA since 2023 and currently sits on our member leadership council, helping to decide on the priorities for CASA in Pennsylvania and across the organization.  During his time as a CASA member he has participated in public demonstrations, including a rally for citizenship in Washington DC. Outside of CASA, ME has engaged in political activity to support his preferred candidates, hoping to elect leaders who will improve the lives of immigrant communities and fight for just immigration reform, though he cannot vote himself.  He is afraid to register, because it could

JA76

expose himself and his family, including his wife who is also undocumented, to the risk of detention and deportation. This would tear his family apart and leave his children, including their one-year-old, without any support. Even if he tried to register, though, like many of our members he would struggle to complete the process due to his limited English proficiency and lack of technical expertise.

15. **AC** is a CASA member originally from Mexico, currently residing in Pennsylvania. She entered the U.S. without inspection and without contact with immigration authorities in 2000. She has never been placed in removal proceedings or applied for any immigration benefit in the U.S. AC has four U.S. citizen children, ages 9, 12, 13 and 23. She lives with her partner, who is the father of her youngest three children. He is also undocumented and at risk of detention and deportation if forced to register. She has been an outspoken advocate with CASA since 2018, exercising her First Amendment rights to speak out against immigration detention and other issues. AC regularly participates in organizing meetings and has engaged in public protests with CASA as well as lobbying efforts to persuade elected officials in Pennsylvania to support CASA priorities. As a CASA member leader, AC has traveled to Washington DC, to participate in national protests and lobby Congress, and given interviews to the media on issues she is passionate about. She has never been arrested or had any negative interactions with law enforcement in the U.S. and regularly performs community service. Sadly, AC has frequently been the victim of discrimination in the U.S. When she was working in a restaurant, she experienced verbal abuse and threats of deportation from her manager. This is part of what motivates her activism. The IFR has caused her to feel panic about speaking out in public, however, because she fears that she could be targeted and arrested for her actions. She is afraid that if she complies with the registration requirement, immigration will come to arrest her

JA77

and separate her from her family, while if she doesn't comply she could be subject to criminal penalties.  To her, the IFR represents an attack on the life that she has built in this country and a way to silence her voice.  Her children rely on her for support and would be terrified if she were taken away from them.  Having lived in the United States for decades, since she was a teenager, after fleeing domestic violence as a child in Mexico, she cannot imagine returning there, to a country she has not known her entire adult life.

16.     **JC** is a CASA member originally from El Salvador who currently resides in Virginia.  He entered the U.S. without inspection and without contact with immigration authorities in 2014.  He has never been placed in removal proceedings or applied for any immigration benefit in the U.S.  JC works for a construction company, doing plumbing and electrical work.  His elderly father who still lives in El Salvador depends on him for economic support, and if he were unable to work or was deported back to El Salvador his father would not be able to support himself.  Recently, his father needed surgery, from which he is still recovering.  JC helped pay for the surgery and without the money he sends home his father would not have been able to get the care he needs.  JC has been an outspoken advocate with CASA for more than eight years, exercising his First Amendment rights to call for immigration reform and other causes at the state and national level.  He has engaged with CASA's organizing committees throughout his time with our organization, and has been an outspoken public activist, participating in lobbying elected officials, engaging in marches and rallies, as well as speaking to the media about issues that are important to him personally and to CASA's membership generally.  He believes that there is strength in unity, and that it is vital for people to feel free to come together to fight against injustice.  JC thinks the community must be empowered with information and education about their rights, while building hope for a better future together.

The IFR makes him afraid to speak out publicly, because his political views and the policy positions he believes in are not aligned with the current administration. If he complies with the regulation and registers, he is afraid that he could be targeted and persecuted for his activism, while if he does not comply with the requirement he could be subjected to criminal penalties. Additionally, he does not trust the registration process online, because he is afraid of government surveillance. He is very careful with how he interacts with the internet on his phone and other devices. He doesn't want them to be able to access his sensitive and private information.

17.    **ALDC** is a CASA member originally from Honduras who currently resides in Virginia with her husband. She entered the United States without inspection and without contact with immigration authorities in 2006. She has never been placed in removal proceedings or applied for any immigration relief in the United States. Her husband also does not have lawful immigration status and would be required to register under the IFR. ALDC has three United States citizen children, ages 12, 14 and 16. Her youngest child has complications from meningitis that requires constant medication with antibiotics and regular doctors' visits to ensure that the infection is under control. The meningitis is in his brain and he required surgery on it right after he was born, when he was only four months old.  ALDC has been an active leader with CASA over the last three years, speaking out about issues that are important to her through CASA's organizing committees and through participation in public actions like marches and rallies. She decided to become a leader with CASA because she saw the need to take action to build community power and solidarity. The IFR makes her afraid to speak out because she feels like she might be targeted by the government for her participation. She is also afraid to register with the government because she believes it will lead to her detention and potential deportation. Her children need her and if they were separated they would have no one to take

care of them other than her husband, who is also at risk of deportation.  Her youngest son would

not be able to get the medical care and support he needs in Honduras and her other children

would be at risk of being victimized by gangs or other bad actors – whether they were here, in

the United States without her or if they were forced to go with her to Honduras.  Additionally,

she doesn't even know how she would complete the registration requirement, since she doesn't

read or understand English well and isn't good with computers, so she wouldn't feel able to

complete the online registration form.

      **18.**    **NC** is a CASA member originally from El Salvador who currently resides in

Maryland with her two adult children.  She entered the United States without inspection in 2004

and has resided in this country since then.  She has never had contact with immigration officials,

had a case in immigration court, or applied for any immigration benefit in the United States.  NC

works as a cleaner and supports her elderly mother who lives in El Salvador.  Her mother does

not work and depends on the money NC sends to live.  NC has been a vocal activist with CASA,

giving testimony before elected officials on issues that are important to her.  Since 2021 she has

participated in numerous public demonstrations with CASA, in support of causes like tenant

rights, increased access to healthcare for Marylanders, and expanded immigration protections for

people across the country.  She has spoken publicly at many of these events, including testifying

and lobbying in front of elected officials at the local, state and national government, as well as

giving interviews to the media.  The IFR has caused her a lot of fear and uncertainty about

exercising her right to speak out and caused her to question whether she should participate in the

activities she has in the past, because she does not have any protection if the government decides

to target her for her speech.  More broadly, the IFR has impacted her whole life.  She feels that is

being offered a terrible choice, between putting herself and her family at risk by giving her

JA80

information to immigration officials or being criminalized for failing to comply with the registration requirement. Being deported would be a disaster for her because she would have to abandon the life that she has built here and start over in El Salvador. She doesn't feel like she has a future there and if she were forced to return, she could not come back to the U.S. where her life is. She's most worried, though, about her family, who would lose all the financial support she provides. NC runs a small business and always pays her taxes, contributing to her community in whatever way she can. The income she earns from that business, in addition to supporting her immediate family and her elderly mother, also helps to pay for medicine for her brother, who is very sick. He would not be able to afford that medicine if she could not provide for him. Even if she tried to register, however, she doesn't think she would be able to do so because she wouldn't be able to navigate the process to set up an account and fill out the registration form online. NC has very limited English proficiency and wouldn't be able to read or understand the questions on the form, forcing her to complete and sign something she didn't understand. After living in the U.S. for more than 20 years, NC believes that rather than forcing people like her to fill out a registration form, the government should create a pathway to citizenship for undocumented immigrants living in this country and finally enact immigration reform that respects the dignity and humanity of all people.

19.    **PH** is a CASA member originally from Mexico who now resides in Maryland, with his partner and two children. He entered the United States without inspection and without contact with immigration officials in 2004. Both of his children are U.S. citizens, but his wife is also undocumented and at risk of deportation. He has never appeared before an immigration court in the United States or applied for any immigration benefit. PH works in a church two days a week doing maintenance and the other three days he works at a mechanic's shop. He has

JA81

been engaged with CASA for two decades and has participated in a number of our campaigns, including the successful fight to get access to drivers' licenses for immigrants in Maryland. PH routinely participates in public demonstrations with CASA, proudly joining regardless of conditions, including turning out in the rain and snow to lift up his voice for immigrant communities. PH has given numerous interviews to the media over the course of his activism with CASA. Due to the IFR, however, he is afraid to speak out because he fears that he will be targeted by the government. Navigating the process to register would be incredibly difficult for him, with his limited English proficiency posing a huge barrier to his ability to create an online account, let alone fill out the registration form. In addition, he is afraid to register because he believes it could lead to his detention and deportation by immigration officials, with his previous outspoken activism and support of immigrant rights issues a cause for selection prosecution. If he were detained and eventually removed from the U.S., it would leave his children without a father or hope for the future.

20.     These members—and countless others like them—represent the human cost of the IFR and the registration requirement. If enforced, the rule will irreparably harm the communities CASA serves by placing families at risk of separation, jeopardizing livelihoods, and cutting off access to essential healthcare and services. It will also exacerbate fear and anxiety among immigrants, especially those who have built their lives here and contribute meaningfully to their communities.

21.     Since the IFR's publication, we have already seen an increase in fear and hesitation among our members. Many are choosing not to seek services or participate in civic life due to concerns over government surveillance and deportation. The mental anguish alone—stemming from the possibility of family separation and forced return to countries they fled—has

JA82

been severe and widespread.

22.    CASA has also been harmed as an organization as a result of the Registration IFR.  We have had to devote significant internal resources to developing messaging guidance for our staff and members, explaining the Rule and answering community questions about it.  We have devoted staff time that is desperately needed for other things, including other legal services from our legal department and existing priorities for our community organizing department, to building educational materials about the IFR.

23.    Had we been offered the opportunity to comment via the Notice and Comment process, CASA could have organized our members to respond to the proposed rule.  Given the very short time period for the IFR, and the fact that the government does not even have to consider the comments submitted, we were not able to do so.

24.    As noted in the member stories from this Declaration, there are significant technical hurdles to even engaging in the Registration process and the majority of our members, as well as similarly situated individuals in immigrant communities across the country, would not be able to comply with the requirements due to limited English proficiency, lack of technical skills, difficulties accessing the internet and other barriers.  Even if they were able to successfully create an online account and try to fill out the registration form, the form itself is confusing.  For example, the question that asks "Immigration status at last arrival" in Form G-325R provides a blank text box and only one pre-printed text option in the dropdown menu of answers: "EWI – Entry Without Inspection."

25.    This IFR, which hastily resurrects a registration system that was never meant to fulfill the purpose articulated in the Rule, represents a significant challenge to CASA's mission, a major burden on our members and staff, and a source of fear and apprehension for our

JA83

communities.  Both in process and substance, the IFR fails to meet the basic standards of what is

required under the law and what we as an organization demand of our government.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 30, 2025
Washington, District of Columbia


Respectfully submitted,

George Escobar

JA84

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, et al., *Plaintiffs* <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, et al., *Defendants*. | Case No. 1:25-cv-00943 |

**DECLARATION OF SIENNA FONTAINE IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A STAY OF EFFECTIVE DATES UNDER 5 U.S.C. § 705**
**OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, | |
| *Plaintiffs*, | Case No. |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.* | |
| *Defendants*. | |

**DECLARATION OF SIENNA FONTAINE,
GENERAL COUNSEL,
MAKE THE ROAD NEW YORK**

I, Sienna Fontaine, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am General Counsel of Make the Road New York (MRNY). I am slated to become a co-Executive Director of MRNY as of April 1, 2025. As part of MRNY's Executive Team, I am responsible for shaping many of MRNY's organizational priorities; overseeing our staff; and fundraising. I have worked at MRNY since 2015.

2. MRNY is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY

JA86

has five community centers in New York, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

**MRNY's Mission and Activities**

3.   MRNY's mission is to build the power of immigrant and working-class communities to achieve dignity and justice.

4.   MRNY provides services to thousands of individuals every year. To fulfill our mission, MRNY engages in four core strategies: the provision of legal and survival services, transformative education, community organizing, and policy innovation.

5.   MRNY is a membership-based organization. Currently, we have over 28,000 members residing in New York City, Westchester County, and Long Island. Members must demonstrate a commitment to the mission of the organization and be enrolled by one of our organizers.

6.   Our membership is drawn primarily from Spanish-speaking immigrant communities. Although we do not collect immigration status information for our members, our long history engaging our members in the fight for immigration reforms and supporting them in sharing their personal stories with elected officials and others has shown that many of our members are neither U.S. citizens nor Lawful Permanent Residents. MRNY's membership includes U.S. citizens and noncitizens alike, many of whom belong to mixed-status families—that is, families consisting of both individuals with U.S. citizenship, lawful immigration status or lawful presence, and individuals who are undocumented, or without such status.

7.   MRNY maintains a database of its members. However, we do not have current contact information or a means of reaching all of our members, as individuals change phone numbers and addresses frequently. The frequency of these changes reflects the composition of our membership, which is drawn from low-income and working communities who often face financial hardship.

JA87

While we strive to remain in contact with our members, these realities mean we cannot reliably reach all our members in a timely way.

8.  Because of concerns for our members' privacy and the importance of their trust in MRNY as crucial to our mission and work, MRNY does not share our membership information with third parties including governmental agencies.

9.  MRNY's organizing team leads our advocacy work and campaigns. In the past, we have helped secure important legislative victories and reforms from expansion of eligibility for drivers' licenses in New York State to creation of a groundbreaking Excluded Workers Fund for workers unable to access unemployment and pandemic benefits because of their immigration status.

10. MRNY's organizing team facilitates standing issue-based committees in areas of importance to our members including immigrant and civil rights, housing and environmental justice, educational justice, workplace justice and TGNCIQ (Transgender, Gender Non-Conforming, Intersex, Queer) justice and various youth issues. Newcomers to the organization are invited to join one of our organizing committees in which participants share stories, learn about legal and policy developments, and engage in discussions about the problems they are facing and collectively devise solutions. Some of MRNY's longstanding committees are the Civil Rights and Immigrant Power Project ("CRIPP"), which works on campaigns for immigration reforms at the state and federal level; BASTA, which works on campaigns for housing and environmental justice; Youth Power Project, which works on issues impacting young people; and the Trans Immigrant Project (TrIP), which supports and advocates for rights for TGNCIQ    communities.

11.    MRNY's services teams, which include legal, health, and adult education, are on the front line with immigrant communities in New York and serve thousands of immigrants each

year. Our immigration legal team covers a wide range of cases, including affirmative applications such as adjustment of status, naturalization, DACA, TPS, and visas for survivors of violence, as well as removal defense before the immigration courts. In addition, the legal team assists other departments in advocacy, planning, and training related to proposed laws or regulations. Our housing legal team, which represents many MRNY members, assists hundreds of families in housing court cases involving evictions, hazardous conditions, and housing discrimination. Our workplace justice team represents workers to recover unpaid wages, paid sick leave, and combat unlawful employment discrimination.

12.    Both our organizing and our legal teams devote tremendous resources to providing community education and legal information. Just in 2025, we have provided dozens of trainings and presentations, primarily geared towards providing our members with crucial information about policy changes and their rights. Our staff develops and provides these trainings in response to our members' questions and needs.

13.    Our legal team has also led numerous efforts to submit comments on federal regulations, both on behalf of MRNY and on behalf of our individual members. MRNY has submitted detailed comments in response to notices of proposed rulemaking on a wide range of issues of importance to our members and to the broader immigrant and immigration services community. Among those we have commented on are proposed regulatory changes to asylum processing; the public charge rule; the Special Immigrant Juvenile Status application process; fees charged by USCIS and the immigration court; the "transit ban" affecting asylum seekers; employment authorization processing; and expedited removal.

14.    MRNY's health team promotes the health and well-being of our community members, by providing health services to community members, assisting eligible individuals in

obtaining health insurance and other benefits, operating food pantries and other programs to expand health and food access, and advocating for improved access to healthcare for immigrants.

15.    Lastly, MRNY's adult education team provides English-language classes for hundreds of individuals for whom English is not their first language and assists immigrants with civics, adult basic education, and citizenship classes.

**The Interim Final Rule and Registration Requirements Directly Harm MRNY's Members**

16. MRNY has members who are or may be directly impacted by Executive Order 14159, (Jan. 20, 2025), 90 Fed. Reg. 8443 (Jan. 20, 2025) [hereinafter Jan. 20 EO] and Interim Final Rule ("IFR"), 90 Fed. Reg. at 11794, the proposed G-325R registration form and mandatory registration and carry requirements.

17. MRNY's members include noncitizens who have entered without inspection, are over the age of 14, and have been continuously present for more than 30 days. *See* IFR, 90 Fed. Reg. at 11794.

18. The IFR makes clear that "Noncitizens not previously registered through the visa process and newly required to register and be fingerprinted under the IFR can be prosecuted if they fail to register or to be fingerprinted." 90 Fed. Reg. at 11794 (citing 8 U.S.C. § 1306(a)).

19. The IFR also states that "Noncitizens newly issued proof of registration and fingerprinting under the IFR can be prosecuted for failure to carry that proof of registration at all times." *Id.* (citing 8 U.S.C. § 1304(e)); *id.* at 11795 (stating the intent to enforce that requirement); *id.* at 11797 (stating that new universal registration comes with a new obligation to carry proof of registration).

20. MRNY's members include noncitizens who may have entered without inspection but who may currently have a pending application for immigration relief such as a U visa or DACA

application, some of whom have had a biometrics appointment already, but have not yet received a U.S. Employment Authorization Document (EAD) that would qualify as valid "registration" under the IFR requirement. *See* 90 Fed. Reg. at 11795.      For instance, MRNY has actively advocated for DACA and protection for the DACA program for many years and is one of the largest providers of DACA-related legal services in New York. In 2020 and 2021, MRNY helped dozens of people submit first-time DACA applications, including some of our members, which were never adjudicated due to a court order in July 2021. Some of these members provided biometrics to the government prior to the halt in adjudications.

21. For those members not required to register, they still face a risk of being erroneously stopped, arrested, or charged under the IFR's criminal misdemeanor provisions, or required to "self-deport", either because they do not have, or do not carry on their person at all times, documentation of their application or receipt of application for immigration relief. This risk is especially acute if they are detained, which impedes access to documents and contact with MRNY or other legal service providers. All of our members, meanwhile, now face a risk of biased enforcement action, whether based on their race as people of color; their perceived lack of English-language fluency; or their participation in core speech, like attendance at MRNY rallies and events.

22. MRNY members live in areas where encounters with Immigration and Customs Enforcement (ICE) Officers are common. MRNY has assisted hundreds of families in the New York City area who have been or who have had a loved one detained by ICE. In addition, under the present administration, ICE regularly detains so-called "collateral" individuals when conducting home or other raids. A feature of these detentions in recent months is that individuals are often difficult to contact, because they are transferred quickly out of the New York area or between detention facilities, and their inaccessibility makes it difficult to obtain important

documentation related to their cases. These detentions demonstrate the high risk of detention and potential criminal penalties faced by MRNY members and all undocumented New Yorkers, which the IFR heightens.

23. Among our members who will be impacted by the IFR because they would be newly required to register are the following:

24. "Guvelia"[1] is a 62-year-old grandmother and great-grandmother, a long-time member of MRNY, and a noncitizen who lives in New York. She has been in the U.S. for more than 20 years. She has applied for U Nonimmigrant Status by filing a Form I-918, which she did using a safe address, and recently provided biometrics as part of her application process. "Guvelia" has five children, two of whom are U.S. citizens and one of whom is a Lawful Permanent Resident, ten U.S. citizen grandchildren, and one U.S. citizen great-grandchild. She is very low income, works as a nanny, and collects recycling on the street to make ends meet. She is eligible for U Nonimmigrant Status because she and two of her children were assaulted by a group of young men with sticks, rods, and fists outside of their apartment building in Brooklyn, NY and she assisted in the arrest and prosecution of one of the assailants. She recently filed this petition and, as a result, "Guvelia" does not yet have an EAD document related to it; she also does not have any other proof of registration to carry on her person if she is stopped and criminally prosecuted for failing to carry "registration" papers under the IFR. "Guvelia" has been an active MRNY member since 2011, and she has regularly participated in MRNY's committee meetings, been a part of protests in New York City, and traveled to Washington, D.C. to advocate for her community. In addition to being

---

[1] To protect the privacy, safety and security of our members, all members listed in this declaration are identified under pseudonyms.

fearful of registration in general, she is concerned that she would have to list her advocacy and related activities on behalf of undocumented immigrants on the G-325R form and that this would make her a target for enforcement, separating her from her U.S. citizen children and grandchildren.

25. "Rosa" is a 49-year-old mother, a long-time member of MRNY, and a noncitizen who lives in New York. She has been in the U.S. for more than 20 years, and has never applied for an affirmative immigration benefit. "Rosa" and her husband have two U.S. citizen children, aged nine and thirteen. She takes care of her children full-time at home. "Rosa" fears that registration would mean that she would either face criminal consequences or be deported, and that in either case she would be separated from her young children and from her husband. She has not returned to her home country in more than 20 years; she left in 2002 because she received death threats from gangs in her community, and has not returned because she faces continued threats of persecution from distant family members and the same gangs. She has never had any interaction with law enforcement and just wants to live in peace with her children—one of whom intends to join the army. "Rosa" has been an active MRNY member since 2010, and she has regularly participated in MRNY's committee meetings, been a part of protests in New York City, and often attends press conferences and other events. In addition to being fearful of registration in general, she is concerned that she would have to list her advocacy and related activities on the G-325R form, and that this would make her a target for retaliatory enforcement.

26. "Michael" is a 27-year-old member of MRNY and a noncitizen who has lived in the U.S. since the age of eleven. He attended middle school, high school and college in New York City, graduating with bachelor's degrees in three different subjects. He lives with his mother and two siblings, all of whom are undocumented and, like him, do not have proof of registration. The United States is the only home that he knows, having lived here for the majority of his life.

"Michael" is also concerned about racial profiling under the new registration regime, particularly against his mother and brother who are darker-skinned than he is. "Michael" has been an extremely active member of MRNY for over a decade, participating in trips to Albany, Washington DC, and elsewhere and joining protests in the streets of New York. He has also given press interviews and written letters in English and Spanish on key issues of importance to MRNY and MRNY members. He fears that registration would make him and his family members easy targets for retaliation.

27. "Alice" is a member of MRNY and a noncitizen who lives in New York City and has lived in the U.S. for over 20 years. She has never applied for an affirmative immigration benefit and does not have any registration documents. "Alice" has been a victim of domestic violence and sought recourse through the court system. She is afraid that the new registration process will be used as a tool to intimidate, abuse and exclude people, particularly Latinos, because of their race and their immigration status. She fears that the registration requirement will also empower others, including employers and abusive partners, to intimidate individuals without status by threatening to report them. "Alice" has been an extremely active member of MRNY's committees and participated in many MRNY actions and events, including protests and press events. She is concerned that the new registration process and rumors stemming from the process will prevent people like her from engaging in political speech and activism with organizations like MRNY.

28. "Marie" is a 22-year-old member of Make the Road New York and a noncitizen. "Marie" came to the U.S. at the age of two and earned her high school and bachelor's degrees in New York. When she turned 15, she became eligible for DACA—but before she could file her application, the program was halted through an executive order. When it reopened in late 2020, she submitted her application, with proof of her presence in the U.S. since 2007 and compliance with other requirements, and she attended a biometrics appointment. But another halt to the

program, this time through a court order in July 2021, halted adjudication of her application. Because she never received employment authorization through the DACA process, she is subject to the registration requirement. She is nervous about the choice registration will force her to make between putting herself and her family members at risk of immigration enforcement and facing fines or other penalties for failing to register, something she did not fear as a DACA applicant because of the purpose of the DACA program and the protections that it offered. "Marie" became active in MRNY five years ago and has attended events and spoken with elected officials in New York City and in Albany on behalf of the organization. She fears that registration would make her and her family members targets for retaliation.

29. As these individuals demonstrate, MRNY members and the communities MRNY serves will be irreparably harmed by the Registration EO and IFR.

30. MRNY also witnesses and experiences these harms through our broader work. Every day, hundreds of people come to MRNY's five community-based offices or directly contact a member of our staff seeking information and assistance on a range of issues, particularly in the aforementioned areas including immigration, housing, workplace justice and healthcare. Our staff regularly hold committee meetings, community-education sessions, and one-on-one meetings with our members and the communities we serve. Because of this, we experience firsthand the very harmful impact of national policy changes targeting immigrants. Already, members and staff at MRNY have expressed concern about the IFR and requested information, trainings and advice.

31. Our staff have shared that there is immense confusion about the IFR and to whom it applies among our members. The questions posed by our members have reflected a variety of immigration postures: for instance, people who have previously been in removal proceedings; have a denied application with USCIS; or are unsure under what legal mechanism they entered at the

U.S. border. A group of members in Queens asked if having an ITIN fulfilled the registration requirement. The complexity and hasty rollout of the IFR have left many members confused and vulnerable to misinformation.

32. This confusion is very difficult to dispel except through extensive one-on-one consultation.   Already, our legal team's experience in providing immigration legal services and engaging in community education has demonstrated how complex the individual analysis into whether one is required to register—and the barriers to our members understanding and complying with this rule—may be.   For instance, individuals may not know whether their admission at a U.S. border was pursuant to parole or not. Individuals may not have an easy way to tell whether a Notice to Appear (NTA) was issued to them, given the wide variation in case processing that individuals who entered through the southern U.S. border have undergone in recent years (including the issuance of other documents in place of an NTA, such as an I-385 Notice to Report, and long lapses between issuance and filing of an NTA) as well as the unreliability of service by mail.   Members and clients that we work with generally do not know which documents were issued to them at the border and many have lost their documents by the time they reach New York. Under the IFR, the only way to verify their registration status and obtain the documents they must now carry by law would be through a FOIA request—which is a multi-step process that can take months, consumes staff time, and requires maintaining contact. It is also confusing. For instance, not all of our members issued NTAs were fingerprinted in the process. The IFR's suggestion that they do not need to do anything else to be considered "registered" leaves no guidance and open questions about whether they also need to comply with the fingerprinting requirement. The same is true with our members who submit an I-485 and for whom it is unclear if they were previously

fingerprinted or if any prior fingerprinting, potentially decades ago, is sufficient for purposes of the registration.

33. This complexity and inconsistency in the rule already pose huge challenges to MRNY's staff, who cannot confidently advise our members on their need to register in the group settings in which we conduct committee meetings and workshops, often with dozens of attendees. The confusing nature of the registration, coupled with its nearly universal impact, undermines our model of providing community education and know-your-rights presentations to our members and communities, since the registration requirement is nearly impossible to advise on in a group setting. Given that we have tens of thousands of members, our legal team cannot possibly advise all of them.

34. This confusion facilitates fraud. MRNY has seen fraud perpetrated against immigrant communities over many years. Many members and other community members have been defrauded by people promising to complete immigration-related forms that the members did not understand—for instance, change of venue forms, asylum applications, or other relief applications for which the individuals did not qualify. In some instances, these fraudulent providers then do not submit the form at all; in others they submit it with erroneous information and without advising the applicant of the consequences or next steps. Our staff fear that the registration process will facilitate the growth of this type of fraud in the future, particularly given the hasty way the IFR was rolled out, the widespread confusion among our members and immigrant communities about who is required to register, and the necessity of creating a MyUSCIS account and filing online, which many of our members lack the technological and language capability to do.

35. Community members we serve have also expressed fear and confusion about this change. Among those concerns is that MRNY's most visible and active members, who regularly

participate in our events, could become targets for retaliatory enforcement, whether they register or not. Our members' fear has a direct impact on our work, which centers on building power and advocating for the rights of low-income and immigrant communities. MRNY's organizing often relies on attendance at in-person events, such as rallies, protests, and lobbying days, and on story-telling and sharing of individual stories publicly in furtherance of our policy proposals and goals. The IFR has a chilling effect on individuals' willingness to participate in those crucial forms of advocacy and storytelling. The disclosures required on the G-325R form also cause a chilling effect, by requiring members to list advocacy efforts that may be seen as in opposition to current government policy. This chilling effect directly impacts our work as our members, even those not required to register under the new rule, become afraid to exercise their First Amendment right to speech.

36.     Our members demonstrate the difficulty of compliance with registration. MRNY's base is low-income and working New Yorkers, many of whom face barriers to technology access; do not speak English; or do not have a stable address. In 2024, the New York City's shelter system also began a mandatory 30- or 60-day eviction system, which deepened address instability. Our membership includes dozens of individuals in the shelter system who are impacted by the transitory nature of shelter housing.

37.     Our members, including those newly subject to the mandatory registration requirement and those who are not legally required to register but may have difficulty adducing proof of "registration," may now face arbitrary racial profiling at any time. Neither the EO nor the IFR explain how law enforcement will be expected to identify individuals who either failed to register or are actively violating the requirement that they carry proof of registration at all times. This leaves open the possibility that people who resemble our members—people of color who

primarily speak languages other than English—will be stereotyped and subjected to arbitrary stops and arrests for failing to carry proof of registration. The consequences of such arbitrary arrests and detentions include trauma, family separation, deportation, criminal prosecution, and the broader normalization of discrimination against our members. The EO and IFR force immigrants and mixed-status families to live in daily fear that they will be permanently separated from their U.S.-citizen or other lawfully present family members, or that other members of their family will be subjected to the same fate, as they are required to disclose their "personal activities" and the identity and location of their closest family members on the proposed G-325R Form.

38. Given our commitment to participating in the notice and comment process, MRNY would certainly have submitted a detailed comment in response to a notice of proposed rule-making about changes to the registration process and would have supported our members and staff in doing the same.

39. Instead, the IFR and G-325R mandatory registration requirements, abruptly promulgated without any opportunity for input from organizations like ours, subjects MRNY members to a drastic and confusing change in law. Our members may now face arbitrary searches, seizures, racial profiling, criminal charges or potential deportations, from which there is no relief, simply by stepping outside their home to run an errand at the grocery store, going to the doctor, or picking up their children from school – if they fail to carry their "papers" or "proof of registration" on their person at all times. This harms not only our members but MRNY itself.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____

Sienna Fontaine

Executed this 30th day of March, 2025
New York, New York

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COALITION FOR HUMANE IMMIGRANT RIGHTS**, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-00943 (TNM) |
| **U.S. DEPARTMENT OF HOMELAND SECURITY**, et al., | |
| Defendants. | |

<u>**MEMORANDUM ORDER**</u>

Advocacy organizations serving immigrant communities bring a motion to stay the effective date of an interim final rule issued by the Department of Homeland Security. They alternatively move for a preliminary injunction. Plaintiffs allege that the challenged Rule creates a form that previously unregistered aliens must complete to comply with statutory registration requirements. Plaintiffs also allege that the Rule directs these previously unregistered aliens to provide biographic and biometric information and always carry proof of registration.

The Court cannot reach the merits of these claims. Plaintiffs have failed to show that they have a substantial likelihood of standing. As organizations, many of their harms are too speculative, and they have failed to show that the Rule will erode their core missions. Nor may Plaintiffs derive standing from their members. Plaintiffs have not shown that any individual member possesses a concrete harm cognizable by an Article III court.

JA101

**I.**

**A.**

The story behind this case begins in 1940, when Congress enacted the Smith Act, also known as the Alien Registration Act.  Pub. L. No. 76-670, 54 Stat. 670 (codified at 8 U.S.C. § 451) (repealed 1952).  This Act instructed aliens (excluding foreign government officials and their families) who were present in the United States, 14 years or older, and who remained in the country for at least 30 days to register and be fingerprinted at a local post office.  *See id.* §§ 31(b), 32(b), 33(a), 54 Stat. at 673–674.  Upon registration, the alien was issued form AR-3, a registration receipt that itself conferred no immigration status or benefit.  *See Policy Manual*, U.S. Citizen and Immigration Services, https://perma.cc/Q87R-AX7Z.

Over the decades, the administrative state would dilute these statutory requirements by regulation.  In 1944, the Immigration and Naturalization Service (INS) eliminated the division responsible for universal registration and shifted registration from post offices to ports of entry and INS offices.  *See Flexoline Index (Flex)*, U.S. National Archives, https://perma.cc/5PKF-LPZD.  And in 1950, the INS suspended the use of the AR-3.  15 Fed. Reg. 579 (Feb. 2, 1950).  Instead, the INS subbed in preexisting immigration forms that were only available to aliens with *legal* immigration status, like the Form I-151 for lawful permanent residents or the Form I-94 for aliens with a record of lawful entry.  *Id.* at 579–580.  So through regulation, aliens who had entered the country illegally were effectively exempt from the statutory registration requirements, since there existed no process by which they could register.

This statutory and regulatory dissonance continued with the passage of the Immigration and Nationality Act of 1952 (INA).  This statute supplanted the Smith Act.  But it incorporated its registration mandates.  *See* Immigration and Nationality Act, Pub. L. No. 82-414, §§ 261–64, 66 Stat. 163, 223–25 (codified at 8 U.S.C. §§ 1201(b), 1301–1306) (1952).  The statute requires

that visa applicants be registered through the visa process. 8 U.S.C. §§ 1301, 1201(b). And for those not registered this way, the INA includes provisions for registration and fingerprinting of all aliens over the age of 14 who remain at least 30 days, and similarly to require parents to register their children. *See id.* § 1302(a), (b). It also adds onto the Smith Act by adding a requirement that aliens ages 18 and older carry proof of this registration "at all times." *Id.* § 1304(e). More, the INA makes it a crime to "willfully fail[]" to register or be fingerprinted, punishable by a fine or up to six months of imprisonment. *Id.* § 1306(a).

The implementing regulations are a bit different. They first provided that the only available registration form for aliens who were not lawful permanent residents was a record of lawful admission and departure (Form I-94). *See* 17 Fed. Reg. 11532, 11533 (Dec. 19, 1952). Over the years, as Congress created additional forms of immigration status, the INS added some of these forms as proxies for the registration document demanded by the statute. But still, this means that the only aliens who are registered are those with legal immigration status; the regulations do not include a nondiscretionary registration form for an alien who entered illegally.[1] More, in 1960, the INS removed the carry requirement from the Code of Federal Regulations. *Compare* 22 Fed. Reg. 9805, 9806 (Dec. 6, 1957) (requiring "Carrying and possession of proof of alien registration."), *with* 25 Fed. Reg. 7180, 7181 (July 29, 1960) (no carry requirement).

This scheme persisted for decades. But in January 2025, President Trump switched course. He instructed the Secretary of Homeland Security, in coordination with the Attorney

---

[1] At a motions hearing, the Government at first suggested that aliens who illegally entered the United States could obtain a Notice to Appear ("NTA") from a port of entry to satisfy the statutory registration requirement. Hr'g Tr. 24:3–18. It then walked back that assertion, conceding that an NTA was a discretionary prosecutorial document that would not be available to every alien upon request. Hr'g Tr. 42:13–21.

General and the Secretary of State, to "[i]mmediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of the [registration statutes]"; to "[e]nsure that all previously unregistered aliens in the United States comply with the requirements of the [registration statutes]"; and to "[e]nsure that the failure to comply with the legal obligations of [the registration statutes] is treated as a civil and criminal enforcement priority." Exec. Order No. 141509, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8444 (Jan. 20, 2025).

Last month, the Department of Homeland Security obeyed. DHS published an Interim Final Rule creating a new online general registration form, Form G-325R. *See* 90 Fed. Reg. 11793, 11795–96, 11800. The Interim Final Rule allows for submitting a Form G-325R to register under the statute and regulations and the proof of filing a G-325R as evidence of registration under the statute and regulations. Plaintiffs argue that this broadens the requirement of registration to aliens who do not have immigration forms obtained through preexisting immigration programs. By its terms, the Interim Final Rule is set to go into effect on April 11, 2025.

## B.

Before that could happen, Plaintiffs filed this suit, seeking a stay of the effective date of the Interim Final Rule or, in the alternative, a preliminary injunction. *See* Mot. Stay, ECF No. 4, at 1. Plaintiffs are a handful of nonprofit organizations serving immigrant communities: the Coalition for Humane Immigrant Rights Los Angeles (CHIRLA), United Farmworkers of America, Make the Road New York, and CASA. *See* Compl., ECF No. 1, at ¶¶ 6–13. These organizations are member-based and comprise many aliens and citizens who belong to mixed-status families. *See id.*

Plaintiffs allege that the Interim Final Rule was issued in violation of the Administrative Procedure Act because it is a legislative rule but was published without notice or an opportunity for public comment.  Compl. ¶¶ 103–107; *see* 5 U.S.C. §§ 553(b) *and* (c), 706(2)(D).  More, they insist that the Interim Final Rule is arbitrary and capricious.  Compl. ¶¶ 108–109; *see* 5 U.S. § 706(2)(A).  They seek relief before the rule goes into effect.

The Government opposes relief.  Opp'n Br., ECF No. 15, at 1.  It contends that Plaintiffs are unlikely to succeed on the merits of their claim because they lack standing to bring it.  *Id.* And even if this Court had jurisdiction to issue relief, the Government insists that the Interim Final Rule is a procedural rule immune from notice and comment requirements.  *Id.*  More, the Government asserts that the rule is not arbitrary and capricious.  *Id.*

The Court held a motions hearing earlier this week.  *See* Minute Order April 8, 2025. The motion is now ripe for disposition.

## II.

A preliminary injunction is "an extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (cleaned up).  The movant faces a high bar for success, as it must establish four elements by "a clear showing":  First, that it is likely to succeed on the merits.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). "Merits" here encapsulates "not only substantive theories but also establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).  Second, the plaintiff must show that it will likely suffer irreparable harm in the absence of injunctive relief.  *Winter*, 555 U.S. at 20.  Third, that the balance of equities favors granting the relief.  *Id.*  And fourth, that the public interest favors the injunction.  *Id.*  Where, as here, the Government is the party

opposing injunctive relief, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Under 5 U.S.C. § 705, courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." The same factors for issuance of a preliminary injunction apply to issuance of a stay under § 705. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

### III.

Plaintiffs have not shown that they are likely to succeed on the merits. They have failed to demonstrate that they have standing to bring this suit. *See Env't Working Group v. Food & Drug Admin.,* 301 F. Supp. 3d 165, 170 (D.D.C. 2018) (noting the party invoking federal jurisdiction bears the burden of establishing it).

Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80. And it ensures that "the Framers' concept of the proper—and properly limited—role of the courts in a democratic society" is vindicated, by ensuring decisions meant for the political process are left to the political process. John Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1220 (1993).

To establish standing, a plaintiff must show that it "has suffered or likely will suffer an injury in fact"; "that the injury likely was caused or will be caused by the defendant"; and "that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380. Where, as here, the plaintiffs are organizations, there are two ways to satisfy this test. *See Abigal All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). First, an organizational plaintiff can bring action "on its own behalf," which is known as "organizational standing." *Id.* Second, a plaintiff organization can demonstrate standing by bringing a claim "on behalf of its members," also known as "associational standing." *Id.* Plaintiffs fail both options here.

Start with organizational standing. For an organizational plaintiff to demonstrate that it has suffered an injury in fact, it must show "more than a frustration of its purpose," since mere hindrance to a nonprofit's mission "is the type of abstract concern that does not impart standing." *Food & Water Watch, Inc.*, 808 F.3d at 919 (cleaned up). Instead, for an organization to have standing, it must have "suffered a concrete and demonstrable injury to [its] activities." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). That is, the defendant's conduct must have "perceptibly impaired the organization's ability to provide services" and the organization must have then "used its resources to counteract that harm." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (cleaned up); *PETA*, 797 F.3d at 1094.

But it is not enough if the organization merely "diverts its resources in response to a defendant's actions" such that it has not been "subjected . . . to operational costs beyond those normally expended" to fulfill its core aims. *All. for Hippocratic Med.*, 602 U.S. at 395; *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). Instead, the organization must show that the defendant's conduct has forced it to "expend resources in a

manner that keeps [it] from pursuing its true purpose[s]" or has "directly affected and interfered with" the organization's "core . . . activities." *Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434; *All. for Hippocratic Med.*, 602 U.S. at 395.

For an illustration of this distinction, compare *Food & Water Watch* with *PETA*. In *Food & Water Watch*, one of plaintiff's primary purposes as an organization was "to educate the public about food systems that guarantee safe, wholesome food produced in a sustainable manner." *Food & Water Watch, Inc.*, 808 F.3d at 920. The organization brought a challenge to a new system promulgated by the government that decentralized poultry inspection processes. *See id.* at 910–11. The organizational plaintiff asserted it would suffer harm if the proposed system went into effect, as it "would have to increase the resources that it spends on educating the general public and its members" about poultry inspection protocols and poultry safety. *Id.* at 920. It also claimed that it would be forced to "increase the amount of resources that it spends encouraging its members who wish to continue to eat chicken to avoid poultry" from companies utilizing the new system and "to purchase poultry at farmers' markets or direct from producers." *Id.* But this was not enough. The D.C. Circuit held that the organization lacked standing to challenge the new system, stressing that it had "alleged no more than an abstract injury to its interests." *Id.* Although the organization "allege[d] that [it] w[ould] spend resources educating its members and the public about" the new provisions, nothing in its declarations "indicate[d] that [plaintiff's] organizational activities [were] perceptibly impaired in any way." *Id.* at 921.

Now consider *PETA*. There, PETA challenged the government's refusal to apply the Animal Welfare Act's general animal welfare regulations to birds. 797 F.3d at 1089. The court found PETA had standing to do so. It stressed that one of the "primary" ways PETA accomplished its mission of "prevent[ing] cruelty and inhumane treatment of animals" was by

"educating the public" through "providing information about the conditions of animals held by particular exhibitors." *Id.* at 1094 (cleaned up). But the USDA's refusal to protect birds meant "that the USDA was not creating bird-related inspection reports that PETA could use to raise public awareness." *Id.* at 1091. More, the agency's failure to apply the AWA's animal welfare regulations to birds stripped PETA of the ability to file a formal complaint with the agency to seek redress for mistreatment. *Id.* Thus PETA "had to expend resources to seek relief through other, less efficient and effective means." *Id.* Given these harms, the court concluded that the government's conduct "perceptibly impaired PETA's ability to both bring AWA violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public."[2] *Id.* at 1095. In short, organizations whose activities have been impeded by the government suffer a cognizable injury, while organizations whose missions have only been compromised do not. *Abigail All. for Better Access to Developmental Drugs,* 469 F.3d at 133.

This case looks less like the organizational impediment in *PETA* and more like the organizational expansion in *Food & Water Watch*. Out of the Plaintiffs, only CHIRLA claims organizational standing. Pls.' Reply Br., ECF No. 20, at 5. But there are a few issues with this claim. First, CHIRLA's injuries are highly speculative, sounding in prospective fears about what might happen when the rule takes effect. CHIRLA projects that "it expects thousands of individuals are likely to reach out for assistance and advice with the new registration process." Decl. A. Salas, ECF No. 4-2, ¶ 17. And it expects that "[a]ddressing this volume of community

---

[2] *PETA* sits near the outer edge of organizational standing, as its analysis arguably granted standing in a situation the Supreme Court has said an individual would lack it. *See PETA*, 797 F.3d at 1099–1106 (Millett, J., dubitante). The Supreme Court has also noted that the precedential origin of organizational standing doctrine—*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)—"was an unusual case" that the Court "has been careful not to extend . . . beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396. This Court heeds these words of caution in applying binding precedent here.

needs will impact multiple programs and will strain its staff and budget." *Id.* It also expresses

anxiety that the anticipated demand for "legal advice and assistance with the registration" may

cause it to fail to meet certain grant conditions and thus face withheld disbursements. *Id.* ¶ 19.

But "[a]s [the Supreme Court] ha[s] said many times, conjectural or hypothetical injuries

do not suffice for Article III standing." *Clinton v. City of New York*, 524 U.S. 417, 459 (1998)

(Scalia, J., concurring in part). CHIRLA's feared harms have yet to come to fruition, and they

very well may never manifest. They rely on the choices of an unspecified volume of intervening

third parties— the aliens who may or may not demand an indefinite amount of CHIRLA's

resources. "When the existence of one or more of the essential elements of standing . . . depends

on the unfettered choices made by independent actors not before the courts and whose exercise

of broad and legitimate discretion the courts cannot presume either to control or to predict, it

becomes substantially more difficult to establish standing." *Scenic Am., Inc. v. U.S. Dep't of

Transp.*, 836 F.3d 42, 50 (D.C. Cir. 2016) (cleaned up). CHIRLA might not be so taxed by a

swell of inquiries regarding the registration requirements that they lose funding. There are no

numbers before the Court to even suggest as much, nor is there any evidence from the grant

providers that termination looms. Without facts, the Court has uncorroborated fear. But Article

III requires more than maybes—it demands that harms be "actual or imminent." *Whitmore v.

Arkansas*, 495 U.S. 149, 155 (1990). CHIRLA has not shown as much here.

More, CHIRLA cannot demonstrate that the Interim Final Rule has "perceptibly

impaired" its mission. *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011).

There is certainly no claim that the Government is blocking CHIRLA from carrying out its

mission, unlike the agency's inaction in *PETA,* 797 F.3d at 1094-95, or an agency's restriction of

information in *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 935–38 (D.C. Cir.

1986).  Rather, CHIRLA insists that the "community members [it] serves have already begun

reaching out to its hotline and at community events with questions about the registration

requirement, leading staff to reallocate their time to addressing concerns and revising materials

and presentations to address these growing concerns."  Decl. A Salas ¶ 15.

But mere "self-serving observation[s]" that an organization will "have to increase the

resources that it spends on educating the general public and its members" about the

consequences of government regulation are "insufficient to support standing."  *Nat'l Taxpayers*

*Union, Inc.*, 68 F.3d at 1434.  So are broad claims that an organization has "divert[ed] its

resources in response to a defendant's actions."  *All. for Hippocratic Med.*, 602 U.S. at 395.

When a nonprofit merely expands its operations to address increased demands in the

communities it serves, its activities have not been tampered with.  *Cf. League of Women Voters*

*of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (holding mission of voting rights

organizations was perceptibly impaired where proof-of-citizenship laws "presented formidable

obstacles to [the organizations'] registration efforts.").  Arguably, these enhanced advocacy

efforts are a *fulfillment* of an organization's mission.  In other words, "the Final Rule has not

impeded [CHIRLA's] programmatic concerns and activities, but fueled them."  *Elec. Priv. Info.*

*Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014).  Indeed, "the expenditures that

[CHIRLA] has made in response to the Final Rule have not kept it from pursuing its true purpose

as an organization but have contributed to its pursuit of its purpose."  *Id.*

CHIRLA's own descriptions of its pursuits only undergird this conclusion.  CHIRLA

describes its mission as "ensur[ing] that immigrant communities are fully integrated into our

society with full rights and access to resources."  Decl. A. Salas, ¶ 3.  "In furtherance of its

mission, CHIRLA handles the full spectrum of needs of those primarily residing within low-

income immigrant communities" near Los Angeles.  *Id.* ¶ 4.  One of CHIRLA's primary programs is "a hotline where individuals—including members, clients, and community members can call with questions."  *Id.* ¶ 8.  "Given CHIRLA's deep community ties and longstanding legal services programs, CHIRLA is often a first point of contact for individuals seeking information about recent policy changes impacting immigrants."  *Id.* ¶ 8.

It would be odd if CHIRLA could assert that its core services have been impaired by using these very services to educate its members about the Interim Final Rule.  Sure, the Rule may have caused CHIRLA to rearrange some labor and resources to meet the increased demand from this unexpected policy.  But organizations have not suffered a concrete injury just because shifts in government policy demand shifts in internal operations.  *Accord Env't Working Group,* 301 F. Supp. 3d at 172.  If that were the case, an organization could claim injury-in-fact nearly any time there was a change in the law relevant to its mission.  That cannot be the law.  And indeed it is not—organizations only suffer concrete injury if a challenged government action has made their advocacy efforts "more difficult to achieve, thereby requiring 'operational costs beyond those normally expended to . . . educate' about matters that might relate to the organization['s] mission."  *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 343 (D.D.C. 2021) (quoting *Nat'l Taxpayers Union,* 68 F.3d at 1434).  CHIRLA simply has not shown that here.

That leaves the possibility of associational standing.[3]  An organization has standing to bring suit on behalf of its members when three requirements are met.  First, "its members would

---

[3] Many legal scholars have doubted the constitutionality of associational standing.  *See All. for Hippocratic Med.*, 602 U.S. at 400 (Thomas, J., concurring) ("I thus have serious doubts that an association can have standing to vicariously assert a member's injury) (citing amici).  The Court, of course, is bound by existing precedent.

otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Second, "the interests it seeks to protect are germane to the organization's purpose." *Id.* And third, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* Plaintiffs here stumble at the first step. They have failed to show that any of their individual members would independently have standing to challenge the Interim Final Rule.

Associational standing fails for two independent reasons. The first problem is that Plaintiffs have failed to adduce sufficient evidence to support their allegations. The only allegations of concrete harm to individual members that Plaintiffs present are in the form of pseudonymous hearsay. That is, the organizations are describing the harms their members have suffered while using false names for those members. *See, e.g.*, Decl. G. Escobar ¶ 14 ("ME is a CASA member" who "is afraid to register, because it could expose himself and his family, including his wife who is also undocumented, to the risk of detention and deportation."). The Court has no sworn testimony from the members themselves. More, these pseudonymous reports are contained in affidavits submitted by the organizations, which are themselves hearsay evidence. *See Karem v. Trump*, 404 F. Supp. 3d 203, 215 & n.3 (D.D.C. 2019), *aff'd as modified*, 960 F.3d 656 (D.C. Cir. 2020); *see also Humane Soc. v. Animal & Plant Health Inspec. Serv.*, 386 F. Supp. 3d 34, 44 (D.D.C. 2019) (refusing to rely on "second-hand, unsubstantiated accounts" in defendant's declarations). This means all the Court has to go on is hearsay-within-hearsay.

While "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," and courts often rely on affidavits "for the limited purpose of determining whether to award a preliminary injunction,"

stretching these exceptions to hearsay-within-hearsay strikes the Court as a step too far. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). Layered hearsay innately lacks credibility, as it only exacerbates the preexisting veracity issues inherent to typical hearsay. This problem becomes even more pronounced when the underlying testimony is presented under pseudonym, leaving the Court and defense completely unable to verify the testimony. The Court is therefore very wary of this evidence.[4] Most importantly, this nameless double hearsay is going towards the Court's jurisdiction. And the Court must abide by its unflagging obligation to police its own constitutional bounds. *See Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 384 (1884) ("[T]he judicial power of the United States must not be exerted in a case to which it does not extend, even if both parties desire to have it exerted"). Asserting the formidable authority of Article III based only on nameless double hearsay strikes the Court as an exercise in judicial arrogation. The Court declines to engage in such acts of personal aggrandizement.

But even if the Court were to credit the double hearsay, the Plaintiffs have failed to articulate a viable theory of associational standing. Plaintiffs' primary conception of their members' injury is that the members are "directly regulated parties." Pl's Reply at 2. That is, Plaintiffs insist that their members have suffered an injury-in-fact by having "to submit Form G-325R, provide biometrics, and carry proof of this registration as proscribed by the IFR at all times or face arrest and federal prosecution." *Id.*

---

[4] Plaintiffs point to a handful of cases to argue that this evidence can properly be considered. *See* Pls.' Notice Suppl. Authority, ECF No. 26, at 1–2. But only one of the cases that Plaintiffs cite permitted double hearsay. *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, 2020 WL 3265533, at *3 n.2 (D.D.C. June 17, 2020). That case is different. There, one of the challenged affidavits was not under pseudonym, came directly from one of the organization's clients, and tended to verify the accuracy of testimony contained in the other affidavits. *Id.* at *3; Decl. A. Sanchez Martinez, ECF No. 105-2, No. 1:18-cv-00760.

But Plaintiffs have failed to show that the mere requirement to abide by the law—even if true that the accompanying regulation flouted procedural requirements when enacted—constitutes a concrete injury for standing purposes.  Plaintiffs' briefing and oral argument had no claim that such a harm "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021).  That inquiry is "[c]entral to assessing concreteness."  *Id.* at 417.

As made clear by the Supreme Court in *TransUnion*, plaintiffs must "identif[y] a close historical or common-law analogue for their asserted injury" to demonstrate their asserted injury is concrete.  *Id.* at 424.  Certain harms readily fit this bill, such as "traditional tangible harms" like "physical harms and monetary harms."  *Id.* at 425.  "Various intangible harms can also be concrete," such as those traditionally remediable by the common law of contract, tort, and property.  *See id.* (listing reputational harm and intrusion upon seclusion as examples).  More, "harms specified by the Constitution itself" are thought to be traditionally cognizable.  *Id.*

Plaintiffs have not shown how merely being subject to a regulation—without incurring some other injury—fits within this framework.  They have not attempted to analogize their members' predicament to harms traditionally cognizable in American courts.  Nor does a historical analogue so readily come to mind such that explanation could be thought superfluous.  But "[a]s the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing."  *Id.* at 430–31.

Plaintiffs point to *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018), to argue that subjection to new regulatory requirements can confer an injury in fact.  Pls.' Reply at 3.  This reliance is misplaced.  First, this case was decided before the sea change *TransUnion* imparted upon standing doctrine.  *See Dinerstein v. Google, LLC*, 73 F.4th 502, 522 (7th Cir.

2023) (calling *TransUnion* "a watershed decision on the standing doctrine."). Thus the Circuit had no occasion to ponder whether the plaintiff's asserted harm was sufficiently analogous to a historically recognized harm, as *TransUnion* demands.

And second, the case is readily distinguishable. In *City of Clarksville*, the court found that a regulated party had standing to appeal an adverse agency adjudication that subjected the plaintiff to ongoing data retention obligations. *Id.* at 482. Potential common law analogues abound in the data retention context that Plaintiffs have not shown here. For instance, forced data retention imposes real costs on companies, the prototypical type of concrete harm. *City of Clarksdale* cannot excuse the Plaintiffs from meeting their obligation under *TransUnion* to show their "injury bears a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 432.

It is true that courts have occasionally found standing when a plaintiff brings a preenforcement challenge to a law he fears will subject him to criminal penalties if enforced. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). But in those cases, the plaintiffs also had to show that the challenged law proscribed constitutionally protected conduct in which they imminently intended to engage, *Seegars v. Gonzales*, 396 F.3d 1248, 1251–52 (D.C. Cir. 2005), or that they would "have to take significant and costly compliance measures" to avoid prosecution. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988).

In other words, standing in these risk-of-prosecution cases requires that a plaintiff to show he has been put to an intolerable choice—on the one hand, he can refrain from engaging in protected conduct and incur substantial costs to avoid being penalized under an unlawful measure. On the other hand, he can violate the measure and risk unjustified prosecution. Standing doctrine in preenforcement challenges recognizes that courts can intervene before this

archetypal catch-22. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct *arguably affected with a constitutional interest*, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.") (emphasis added) (cleaned up); *see also Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 108 n.5 (D.D.C. 2016) (rejecting plaintiff's argument that "the injury-in-fact requirement is *automatically* met, if the law is aimed directly at the plaintiff, who, if its interpretation of the statute is correct, is placed at risk of criminal prosecution.").

But the Plaintiffs here have not shown that their members have been trapped in such a paradox. If there are costly compliance measures, Plaintiffs are mum as to their amount. *See also* 90 Fed. Reg. 11797 ("DHS will incur additional costs due to the added activities from the collection of biometrics given the impacted population of aliens do not pay fees for registration or biometrics.").

Nor have Plaintiffs shown that the Interim Final Rule penalizes constitutionally protected conduct. Plaintiffs insist that the Rule will force their members "to reveal that they entered the United States without inspection, in violation of 8 U.S.C. § 1325, a federal criminal misdemeanor." Mot. Stay at 32. According to Plaintiffs, "[t]his compelled admission violates these members' Fifth Amendment right against self-incrimination." *Id.* Indeed, a major thrust in Plaintiffs' motion relates to the potential Fifth Amendment implications their members face by completith Form G-325R.

This line of attack fails factually and legally. Factually, because Plaintiffs have failed to demonstrate that any of their members would actually be subject to criminal prosecution based on their answers to Form G-325R. A charge for entry without inspection usually carries a statute

of limitations of five years, which begins to run once a defendant enters the United States.  18

U.S.C. § 3282; Robert J. McWhirter & Jon M. Sands, *A Primer for Defending a Criminal

Immigration Case*, 8 Geo. Immigr. L. J. 23, 38 (1994).  Nearly all of Plaintiffs' members have

been residing in the United States for far longer than five years.  *See* Decl. A Salas ¶¶ 25–27;

Decl. E. Strater, ECF No. 4-3, ¶¶ 19–22; Decl. G. Escobar ¶¶ 13–19; Decl. S. Fontaine, ECF No.

4-5, ¶¶ 24–28.  And Plaintiffs conceded that their members do not have other crimes to report on

the G-325R.  Hr'g Tr. at 10:10–13.  Thus for nearly all of Plaintiffs' members, the Fifth

Amendment right against self-incrimination is not implicated.

There is a possible exception: "Ursula," a CHIRLA member.  Decl. A Salas ¶ 23.  Ursula

"entered the U.S. without inspection in 2023 as an unaccompanied minor when she was 17."  *Id.*

Perhaps she could be subject to prosecution for an illegal entry misdemeanor.  Yet Plaintiffs

waffled on whether Ursula would be subject to criminal prosecution as an adult for illegal entry

as a juvenile.  Hr'g Tr. 10:1–3.  But does the Government even prosecute juveniles for

misdemeanor illegal entry?

Because the burden is on the Plaintiffs to establish their standing, the Court will not go

digging into the intricacies of immigration law to deduce whether one member out of dozens

could assert a potential infringement of her Fifth Amendment right.  *See Lujan v. Defs.* of

*Wildlife*, 504 U.S. 555, 561 (1992).

But even if Ursula could be prosecuted, her Fifth Amendment claim would fail as a

matter of law.  A plaintiff can rest her standing on a violation of her right against self-

incrimination in two circumstances.  First, "where a plaintiff remains silent, asserts the Fifth

Amendment privilege against self-incrimination, and is then subjected to some sanction or

penalty for refusing to testify, [s]he clearly can assert a Fifth Amendment claim."  *Nat'l Treasury*

JA118

*Emps. Union v. U.S. Dep't of Treasury*, 25 F.3d 237, 241–42 (5th Cir. 1994).  And "[s]econd, where a plaintiff has *refrained* from invoking the privilege, given an incriminating statement, and then seeks to bar the use of the statement in a later criminal proceeding . . . a justiciable claim will surely exist."  *Id.* at 242.  Outside of these two circumstances, a plaintiff has not suffered a violation of her right against self-incrimination.  *See also Chavez v. Martinez*, 538 U.S. 760, 770 (2003) ("[A] violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case.") (plurality opinion of Thomas, J.).  In other words, "a Fifth Amendment self-incrimination claim is not ripe until a claim of the privilege is actually made."  *Carman v. Yellen*, 112 F.4th 386, 404 (6th Cir. 2024).

Plaintiffs do not allege that any of their members have actually invoked their Fifth Amendment right, only to be rebuffed.  Nor do Plaintiffs even allege that an invocation of the right against self-incrimination on Form G-325R would lead to sanctions.  At this point, then, any claims that the members risk a violation of their right against self-incrimination are speculative and premature.  *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 291 (D.C. Cir. 1993) ("Ordinarily, a person must invoke the privilege in order to gain its advantage . . . . The reason is apparent:  The Fifth Amendment does not forbid the government from asking questions and it does not forbid the government from taking the answers.").

That leaves the Plaintiffs' assertions that Form G-325R chills their members' protected speech.  They assert that "CASA and MRNY members fear that the new registration process, which requires them to report their organizing and advocacy work, will cause immigration authorities to target them based on their First Amendment protected activities."  Mot. Stay at 32;

JA119

*see, e.g.*, Decl. G. Escobar ¶ 13 ("The IFR has caused [YL] to become more afraid to speak out because she fears that it could expose her and her son to targeting by the federal government.").

But "allegations of a subjective chill are not . . . adequate" to confer standing.  *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (cleaned up) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).  Instead, a plaintiff must allege an "imminence of concrete, harmful action such as threatened arrest for specifically contemplated First Amendment activity."  *Id.* at 1380.  Here, all Plaintiffs contend is that their members have engaged in self-censorship because they have a conjectural fear that they may be targeted by the Government for their speech.  In other words, they have not "point[ed] to anything beyond [their] own subjective apprehension and a personal (self-imposed) unwillingness to communicate."  *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 610 (6th Cir. 2008).  What they have *not* done is offered any evidence that they face a "credible threat of prosecution" *for their speech* "under a statute that appears to render [their] arguably protected speech illegal."  *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1194 (D.C. Cir. 1992).  But under controlling law, that is what they had to do.  *Laird*, 408 U.S. at 13–14 (holding plaintiffs lacked standing on chilling theory where they could not show "claim of specific present objective harm or a threat of specific future harm" apart from self-imposed chilling).

**IV.**

In sum, Plaintiffs are not likely to succeed on the merits of their claim because they have

failed to demonstrate that they have a "substantial likelihood" of standing.  *Food & Water*

*Watch, Inc*., 808 F.3d at 913.  Their Motion for a Stay and Preliminary Injunction is accordingly

**DENIED.**

      **SO ORDERED**.


Dated: April 10, 2025                                  TREVOR N. McFADDEN, U.S.D.J.

JA121

<pre>
 1                   UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3     * * * * * * * * * * * * * * *   )
       COALITION FOR HUMANE IMMIGRANT  )   Civil Action
 4     RIGHTS, et al.,                 )   No. 25-00943
                                       )
 5                   Plaintiffs,       )
                                       )
 6       vs.                           )
                                       )
 7     U.S. DEPARTMENT OF HOMELAND     )   Washington, D.C.
       SECURITY, et al.,               )   April 8, 2025
 8                                     )   10:03 a.m.
                     Defendants.       )
 9     * * * * * * * * * * * * * * *   )

10

11

12               TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE TREVOR N. McFADDEN
                    UNITED STATES DISTRICT JUDGE
13

14
       APPEARANCES:
15
       FOR THE PLAINTIFFS:      EMMA C. WINGER, ESQ.
16                              LESLIE K. DELLON, ESQ.
                                MICHELLE LAPOINTE, ESQ.
17                              AMERICAN IMMIGRATION COUNCIL
                                2001 L Street, Northwest
18                              Suite 500
                                Washington, D.C. 20036
19
                                CODY WOFSY, ESQ.
20                              AMERICAN CIVIL LIBERTIES UNION
                                425 California Street
21                              Seventh Floor
                                San Francisco, California 94104
22
                                JENNIFER COBERLY, ESQ.
23                              AMERICAN IMMIGRATION LAWYERS
                                  ASSOCIATION
24                              1331 G Street
                                Suite 300
25                              Washington, D.C. 20005
</pre>

```
1    APPEARANCES, CONT'D:

2    FOR THE PLAINTIFFS:      ANTHONY ENRIQUEZ, ESQ.
                              ROBERT F. KENNEDY HUMAN RIGHTS
3                             88 Pine Street
                              Suite 801
4                             New York, New York 10005

5

6    FOR THE DEFENDANTS:      KARTIK N. VENGUSWAMY, ESQ.
                              U.S. ATTORNEY'S OFFICE FOR THE
7                                DISTRICT OF COLUMBIA
                              601 D Street, Northwest
8                             Washington, D.C. 20579

9    REPORTED BY:            LISA EDWARDS, RDR, CRR
                             Official Court Reporter
10                            United States District Court for the
                                 District of Columbia
11                            333 Constitution Avenue, Northwest
                              Room 6706
12                            Washington, D.C. 20001
                              (202) 354-3269
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        THE COURTROOM DEPUTY:  This is Civil Action

2    25-943, Coalition for Humane Immigrant Rights, et al.,

3    versus U.S. Department of Homeland Security, et al.

4        Counsel, please come forward to identify

5    yourselves for the record, starting with the Plaintiff.

6        MS. WINGER:  Good morning, your Honor.  Emma

7    Winger on behalf of the Plaintiff.

8        THE COURT:  Good morning, Ms. Winger.

9        MR. VENGUSWAMY:  Good morning, your Honor.  Karlik

10   Venguswamy from the U.S. Attorney's Office on behalf of the

11   Defendants.

12       THE COURT:  Good morning, Mr. Venguswamy.

13       All right.  We're here for a motion hearing on the

14   Plaintiffs' motion for preliminary injunction.

15       Ms. Winger, I'll hear from you.

16       MS. WINGER:  Good morning, your Honor.  Emma

17   Winger on behalf of the Plaintiffs.

18       This case is about what process Defendants must

19   follow and what decision-making they must engage in before

20   they radically alter how non-citizen registration operates

21   in this country.

22       The Defendants do not dispute that the federal

23   government has never operated a universal registration and

24   carry requirement.  Across 14 different presidential

25   administrations, the government has adopted a tailored

1     approach to registration.  Except in the context of war or

2     armed invasion, armed assault, registration has operated

3     through existing immigration processes.

4           Defendants attempt to categorize the IFR as a

5     benign measure that merely adds one other method of

6     registration.

7           But frankly, that's just not true.  It ignores the

8     fact expressly recognized in the IFR and consistent with

9     longstanding policy that millions of people previously had

10     no mechanism to register and therefore no enforceable

11     obligation to register or carry proof of registration at all

12     times.

13           Defendants' effort to expand registration in this

14     way is clearly not an internal housekeeping measure that

15     justifies avoiding notice and comment, and it has likewise

16     been done in a manner that is arbitrary and capricious.  For

17     those reasons, Plaintiffs are likely to succeed on the

18     merits.

19           If I may, I'll turn to the notice and comment

20     argument first.

21           THE COURT:  I'll tell you, frankly, I thought the

22     government primarily focused on standing.  And as I look at

23     it, it feels to me like that's probably the area that I'm

24     least comfortable with on your argument.  So it might be

25     useful to focus there.

1          MS. WINGER:  On standing?

2          THE COURT:  Yes.

3          MS. WINGER:  Yes.  Of course.

4          Your Honor, we have plainly established

5   associational standing here.  Our Plaintiffs through their

6   declarations have identified with particularity multiple

7   members who are subject to registration and who will suffer

8   a harm as a result.  The members themselves therefore have

9   standing.

10         And then we meet the second two prongs of the *Hunt*

11  test, both that the goal of this lawsuit to stop the IFR and

12  protect their members is germane to the missions of each of

13  our associational Plaintiffs and that there's no need for

14  individual participation here.  We have purely legal claims.

15  We're not seeking individualized damages.

16         THE COURT:  Ms. Winger, so associational standing,

17  first, I mean, we get a fair number of associational

18  standing cases in this courthouse.  And my recollection is

19  that they usually come with affidavits from the members.  Is

20  it appropriate for me to rely on what I take to be hearsay

21  from pseudonymous members to determine associational

22  standing?

23         MS. WINGER:  Yes, your Honor.  As the

24  pseudonymity --

25         THE COURT:  Sit down, please, ma'am.  Thank you.

1          MS. WINGER:  The issue of pseudonymity -- and

2     maybe I'll take those two separately.  But as to

3     pseudonymity, the declarations here specify in detail the

4     way in which each of these members satisfies the

5     requirements individually for standing.  And so the failure

6     to give a proper name doesn't undermine our ability to again

7     identify members.

8          We have submitted sworn declarations.  The

9     Defendants here have not challenged the accuracy of those

10    declarations.  They haven't disputed that our individual

11    members here have standing.  And at least certainly at this

12    stage of the case, those detailed declarations, sworn

13    declarations, meet the basic elements for associational

14    standing here.

15         THE COURT:  Yes.  I guess I'm focused on the

16    hearsay point.  Is it appropriate for me to rely on hearsay

17    to determine standing?

18         MS. WINGER:  At this stage of the game, your

19    Honor, yes.  You know, I think it is.  These are -- this is

20    reliable evidence.  The Court can weigh it.  And based on

21    it, based on again the fact that the declarants have

22    personal knowledge of the details of these particular

23    members, that in and of itself is sufficient here to find

24    standing in this case.

25         THE COURT:  I thought -- looking through the

1   briefing, I felt like one of the things you focus on -- and

2   it certainly struck me -- was the form requiring aliens to

3   state not only whether they have a criminal history, but

4   whether basically they've ever done anything wrong.

5           MS. WINGER:  Yes.  Yes.

6           THE COURT:  Am I right in thinking that's a

7   primary focus, kind of trigger of this potential Fifth

8   Amendment exposure?  Is that what you see as one of the

9   primary problems or one of the primary hooks for your

10  members to have standing?

11          MS. WINGER:  That's right, your Honor.

12          Well, I mean, our primary -- I guess as an initial

13  matter, our primary hook for standing is that they are now

14  required to go through a process that previously they didn't

15  have and weren't required to do.  So that's one level of

16  standing.

17          An additional level of injury here is the Fifth

18  Amendment concerns that they are being asked directly and

19  required in fact by the form to confess to uncharged

20  criminal conduct, that the form itself implicates them

21  because it is primarily targeted at people who entered

22  without inspection; in other words, who violated 8 USC 1325.

23  That is an additional injury.

24          The form also asks them to describe all of their

25  activities in the country, which for many of these members,

1　they have been vocal, active advocates for CASA, for Make

2　the Road New York.  They would be -- they are under the

3　terms of the form required to --

4　　　　THE COURT:  I'm sorry.  Are you saying the form

5　would require them to say whether or not they've gone to

6　protests?

7　　　　MS. WINGER:  Your Honor, the question on the

8　form -- and there's no instruction, but the question on the

9　form specifically says -- I can read it here:  Since entry,

10　in what activities have you been engaged?

11　　　　And for many of these members, including, for

12　example, Michael at Make the Road, he has been for ten years

13　an active member of Make the Road.  It is a part of his

14　activities.  And unless the government says otherwise, he's

15　been told to report on those activities.

16　　　　THE COURT:  And so your understanding and your

17　guidance to your members would be, You've got to say

18　everything that you're a member of, like a member of this

19　church, a member of that bowling league, a member of this

20　organization?  Is that the legal guidance that you'd be

21　giving your clients based on this form?

22　　　　MS. WINGER:  Well, I guess what I would say, your

23　Honor, is that 1306(c) makes it a crime to commit -- to

24　provide false information.  And for respondents who are

25　wishing to be careful and not -- the form itself indicates

1   that they need to produce -- to list at least all of the --

2   what you might call material activities, key activities.

3   Here, you know, what my legal advice might be would depend

4   on the particular circumstances of the person.  But the form

5   speaks for itself, at least in terms of the breadth of --

6   the information it's seeking to collect.

7          THE COURT:  Give me just one moment.

8          Understood.  So your position is kind of out of an

9   abundance of caution, your clients would need to indicate

10  that they're members of CHIRLA or something?

11         MS. WINGER:  I'm not even sure it's an abundance

12  of caution.  But my position is that that is the sort of

13  information that the form asks for.  Yes.

14         THE COURT:  And going back to the Fifth Amendment

15  point, have any of your pseudonymous members actually

16  admitted to committing crimes with which they would still

17  face liability -- for which they would still face liability

18  at that point?

19         MS. WINGER:  Within the time --

20         THE COURT:  The statute of limitations.

21         MS. WINGER:  The statute of limitations?  Some of

22  these members are newly -- new entrants.  For example,

23  Ursula, I believe, who is this 18-year-old member, who

24  entered at 17 and is applying for asylum and special

25  juvenile status --

1          THE COURT:  So you think she would face criminal

2    liability for entering as a juvenile?

3          MS. WINGER:  She might.  Yes, your Honor.

4          THE COURT:  It looked like -- I mean, the bulk of

5    them, you'd agree with me, entered decades ago, it seems

6    like, and would not face criminal liability for illegal

7    entry.  Do you agree with that?

8          MS. WINGER:  A number of them, yes, have been here

9    for a period of time.  That is true.

10          THE COURT:  And I didn't see any other crimes that

11    your pseudonymous members said they would have to divulge

12    under this form.  Do you agree with that?

13          MS. WINGER:  I agree with that.  Yes, your Honor.

14          THE COURT:  If I was to look at -- obviously, your

15    clients have listed a number of pseudonymous individuals.

16    Do you have a couple that I should be focused on in

17    particular?  I mean, maybe Ursula.  Anybody else you thought

18    is really kind of your strongest examples for standing?

19          MS. WINGER:  For harm?

20          THE COURT:  Yes, ma'am.

21          MS. WINGER:  Yeah.  Absolutely.  Well, let me --

22    there are two -- give me one second.

23          So two members of UFW, United Farm Workers, David

24    and Ana, both describe insurmountable obstacles to even

25    accessing the registration process because of language

1   barriers and inability to access technology.

2         The registration process the Defendants are

3   implementing here is an online-only, English language-only

4   process.  If they don't do it, they're subject to criminal

5   penalties.  If they do do it and they make a mistake,

6   they're still subject to criminal penalties.

7         Those people also have a cognizable injury, your

8   Honor.

9         There are in addition members like Ursula, but

10  also Guvelia and Tiana, who are pursuing statutorily

11  authorized benefits, applications, who are now required to

12  go through an additional registration fingerprinting and

13  carry requirement, a process that Defendants have expressly

14  said is for the purpose of pursuing mass deportation, a

15  process also that doesn't have the statutory protections,

16  for example, that the VAWA statute has in terms of the use

17  of information.

18        So these people who have -- are eligible for

19  relief have to go through an additional process that exposes

20  them to removal and also potential use of their private

21  information in a way that the VAWA application, for example,

22  does not.

23        And that's --

24        THE COURT:  Ms. Winger, is your point there

25  VAWA -- if you make statements under VAWA, it cannot be used

1  for deportation proceedings?

2  　　　　MS. WINGER:  Well, there are stricter privacy

3  limitations by statute than what's included in this

4  registration process.

5  　　　　THE COURT:  I take it there's no privacy

6  limitations in this one.  Is that correct?

7  　　　　MS. WINGER:  There's a broader grant of use by --

8  for sort of any federal -- by any federal agency.  I'm

9  sorry.  I don't have the exact statute here.  But it does

10  not -- it is not the same in scope as the protections that

11  are provided under VAWA.

12  　　　　THE COURT:  Okay.  I wanted to go back to your

13  primary injury for your members, which is just kind of

14  completing the form.  I mean, it looks to me like there's

15  certainly some prior case law that would be supportive to

16  you on that.  But I also thought *TransUnion* was a bit of a

17  sea change or certainly a raising of the bar, anyway, for

18  what would count as standing in cases like this and

19  suggested that we need to look to the common law if there is

20  not some sort of monetary or physical harm that, you know,

21  filling out a form -- isn't filling out a form a bit like

22  the congressionally created standing at *TransUnion* that the

23  Supreme Court said is insufficient?

24  　　　　MS. WINGER:  No, your Honor.

25  　　　　Here, our members have to submit a form.  Again, a

1    new requirement.  They submit a form.  They provide

2    fingerprints, biometrics.  They have to travel to a federal

3    office.  And then they also have to carry on their person at

4    all times proof of registration, all at the risk of federal

5    prosecution.

6         This is not a *de minimis* harm.  This is a real,

7    tangible harm that is distinct and new and an appreciable

8    burden on all of these members here.

9         THE COURT:  Okay.  So it sounds like it's that

10   combination together that would get you over the *TransUnion*

11   hump?

12        MS. WINGER:  Yes.  This is not about just a form,

13   your Honor.  Absolutely.

14        THE COURT:  Okay.  And am I correct in

15   understanding under the current system, you only need to

16   register if you have a legal immigration status?  Is that

17   correct?

18        MS. WINGER:  The mechanism that has existed up

19   until this point is that registration operated through the

20   immigration processes.  The agency delegated certain

21   immigration forms.  That was the way -- that was the only

22   way to register.  And so people that were eligible for those

23   particular pathways could register and those that weren't

24   could not and could not be forced to do things that are

25   impossible.

1    They might be subject to removal and to civil

2    consequences.  We don't dispute that.  But they weren't

3    subject to this criminal registration scheme that's now been

4    expanded to them.

5    THE COURT:  Got it.  Okay.

6    Anything else you wanted to say on standing for

7    the individual members before we chat about the

8    organizational standing?

9    MS. WINGER:  No, your Honor.  I think the record

10   is strong as to our individual members.

11   THE COURT:  So on the actual Plaintiffs here,

12   several of them have testified that they're going to have to

13   divert their resources and labor to meet the increased

14   demand from their members.

15   How has this impacted your clients' other

16   activities?

17   MS. WINGER:  Absolutely.  And again, because we

18   feel like we have a strong associational standing here, your

19   Honor need not address this.

20   But if you choose to, CHIRLA here is our only

21   Plaintiff that's asserting organizational standing.  And as

22   they articulate in their declaration, this registration

23   requirement, which in Defendants' own terms impacts two to

24   three million people, has already resulted in a drastic

25   increase in -- that has impacted both their hotlines, but

1     also their existing clients.

2          They've already begun the process of reviewing

3     hundreds of existing clients for when there's an obligation

4     to register, a process that involves FOIA, work that will --

5     and in addition, their program providing the legal services

6     to students is also likely to result in an increase

7     in inquiries in assistance and advice, all as a result of

8     this IFR, all compelled by their existing programs, their

9     existing work, which will make it more difficult for them to

10    take on new cases, new immigration legal services cases, and

11    therefore harm their core business function, and also

12    threaten their grant funding because they can't meet the

13    grant deliverables, the per-case deliverables that are

14    required under those grants.

15          Of course, the loss of funding is the classic

16    injury.

17          THE COURT:  So I guess I was a little confused by

18    that, because I thought this was going to drive more

19    business to CHIRLA so they'd be getting more cases.

20          MS. WINGER:  So right.  As they explain, because

21    registration does not provide an immigration benefit, it's

22    not the kind of legal services that their grants fund.

23    Their grants fund particular immigration benefit legal

24    services.

25          So the funding doesn't cover this new kind of

1   work, even though it's essential to their holistic

2   representation of their clients.  So while it will lead to

3   more work, including more complicated representation of

4   their existing clients, it will prevent them from taking on

5   the new kinds of cases that, you know, for lack of a better

6   word bring in the money.

7           THE COURT:  And why isn't this kind of the

8   self-harm that the Circuit has advised against in

9   organizational standing circumstances, that the Circuit has

10  warned against in other cases?  Why can't CHIRLA say, Our

11  mission is to handle these kind of traditional cases.  Yes,

12  there's this new thing out there, but that's not what we're

13  getting funding for and that's not what we're focused on?

14          MS. WINGER:  Two responses.  One is of course that

15  their mission is not narrowly focused just on providing

16  particular statutorily authorized forms of relief.  Part of

17  their mission is to represent their existing clients.

18          The registration process is going to impact those

19  clients on their other applications for relief.  As

20  discussed, your Honor, this application asks people to

21  provide quite a bit of personal information, information

22  that may overlap with their other forms of relief, may

23  impact that form of relief.  Serving existing clients is

24  part of their existing obligations.  And as a result, all of

25  those cases will take more time, which will limit their

1    capacity to take on new cases.

2          Their existing programs, for example, their

3    hotline, their student legal services programs, are designed

4    and intended to respond to inquiries that come in through

5    there and inquiries from the student population.  It's part

6    of the purpose of each of those programs.  And choosing to

7    exclude what is frankly going to have a huge impact on

8    almost all of the people that CHIRLA contacts would in and

9    of itself be a harm to these programs.  It diminishes their

10   value, their purpose.

11         THE COURT:  Maybe you can help me think through

12   this.  As you know, I mean, organizational standing is a

13   pretty tricky exercise.  And Judge Millett has kind of

14   warned that this Circuit's standing may well be drifting

15   from Article III foundations.

16         It looked to me like the Circuit has been pretty

17   careful about limiting organizational standing to

18   circumstances where some sort of government rule basically

19   prevents the organization from completing its mission.  Like

20   in the *PETA* case, I think you no longer are able to get

21   information from this government agency that the *PETA* had

22   relied on.

23         It doesn't feel to me like we're in that category

24   here.  It feels to me like this is just, you know,

25   organizations looking to further their mission and that the

1   government's -- a change in a government program means

2   there's going to be more or slightly different opportunities

3   for the organization to further that mission.

4        But I don't see the government preventing your

5   clients from carrying out their mission in the way that you

6   saw in *PETA* and the way that it seems to me that the Circuit

7   has limited organizational standing to at this point.

8        Am I wrong about that?  How should I be thinking

9   through this?

10       MS. WINGER:  Your Honor, we would disagree that

11  the standard is quite -- is as high as your Honor has

12  articulated it.  And we cite -- this Court has not held that

13  *Alliance for Hippocratic Oath* has overruled Circuit

14  precedent in this Circuit.

15       And we cite cases such as *Clinic* and *Northwest*

16  *Immigrant Rights Project*, where courts within this district

17  have found standing based on again facts very similar to

18  here.

19       But I would also point out --

20       THE COURT:  What's the best one?  I mean, what do

21  you feel like is your case that's closest to what we've got

22  here?

23       MS. WINGER:  I think both *Clinic* and *Northwest*

24  *Immigrant Rights* both involve harm to core legal services

25  programs.

1          THE COURT:  Okay.  Those were the two DDC cases?

2          MS. WINGER:  That's right.

3          But I would also say, your Honor, we are talking

4    about loss of grant funding.  And dollar amounts are clearly

5    standing, clearly sufficient for standing, even separate and

6    aside from harm to core business functions.

7          The last thing I will just reiterate, we have

8    associational standing here.  If your Honor has concerns

9    about receiving pseudonymous individual member declarations

10   after your Honor considers this, we can explore that with

11   our Plaintiffs.

12         We don't think that's necessary.  We think the

13   detailed declarations here are sufficient reliable evidence

14   that the Defendants have not disputed to support

15   associational standing.  And if your Honor finds

16   associational standing, there's no need of course to address

17   organizational standing.

18         THE COURT:  Sure.

19         One of the things I was trying to think through

20   here, you know, we're on a PI posture.  I typically think of

21   standing as being a relatively low burden.  Irreparable harm

22   is a much higher burden.

23         It felt to me, though, that in the organizational

24   context, maybe there's actually not much difference, that if

25   you can show organizational standing under the case law it's

1    kind of -- you've also shown irreparable harm.  Is that how

2    you read the case law?

3           MS. WINGER:  That's how I read the case law, too.

4    Yes, your Honor.  Harm to a core business function of an

5    organizational plaintiff is irreparable harm.

6           THE COURT:  Okay.  Anything else, Ms. Winger?

7           MS. WINGER:  No, your Honor.  Not at this time.

8    Thank you.

9           THE COURT:  Thank you.

10           Mr. Venguswamy?

11           MR. VENGUSWAMY:  Yes, your Honor.

12    Good morning, your Honor.

13           THE COURT:  Good morning, sir.

14           MR. VENGUSWAMY:  Your Honor, Karlik Venguswamy on

15    behalf of the United States and the federal Defendants.

16           Your Honor, this case, Plaintiffs are trying to

17    characterize this as a significant change, as a new

18    requirement, as causing substantive harm.

19           But I think, your Honor, we need to start looking

20    at the actual statute that underpins everything that's going

21    on in this case.  And there is two specific sections.  One

22    is 8 USC Section 1325, which makes it a federal offense to

23    enter the country without, you know, appearing at a port of

24    entry or otherwise complying with the registration

25    requirements.

1       And so what we have here is a specific subset of

2   aliens who have not complied with the registration -- the

3   proper immigration process.  They have entered the country

4   without complying with 8 USC 1325.

5       So already we're looking at not just every alien

6   in the United States; it's the ones who have not complied

7   with this rule -- sorry -- the statute and are already here

8   without that.

9       Second, you've got the set of sections, which is 8

10  USC Sections 1301 to 1306, which set forth the registration

11  requirements and the carrying requirements.  And there, let

12  me just start by noting Plaintiff said that Defendants do

13  not contest or I think do not oppose the idea that there has

14  never been a universal registration requirement.

15      Your Honor, when the registration requirement was

16  enacted, there was a universal registration requirement.

17  The statute was passed from the beginning as a universal

18  registration requirement.  It has slowly been reduced as DHS

19  and other agencies responsible with enforcing those statutes

20  have found other ways to work around it.  But it's certainly

21  not the case that there has never been a universal

22  registration requirement.

23      THE COURT:  I'll tell you, my impression here from

24  the briefing is that at least much of your registration

25  requirement, this IFR, seems pretty clearly to be envisioned

1    by the statute.

2          But it also seems to me that, as Plaintiffs say,

3    this is basically -- the government has not been enforcing

4    the statute for quite some time.  And maybe it should have

5    been, and maybe you're doing the right thing.  But this is a

6    pretty big switcheroo from what's been happening, and that

7    the case law and the APA would require something more than

8    what you've done to implement this rule.

9          Why aren't they right about that?

10         MR. VENGUSWAMY:  Respectfully, your Honor, they're

11   not right about that because of the fact that the APA --

12   that this rule is, in fact, a procedural rule.

13         You're absolutely right, your Honor:  The

14   government has not been enforcing particular sections of the

15   registration requirement.  And as you say, maybe it should

16   have been.

17         But the case law is clear that the prior lack of

18   enforcement cannot estop the government from now trying to

19   enforce it.

20         THE COURT:  And I don't think they're saying that

21   you can't; or at least I'm not.  I'm wondering, aren't there

22   hoops that you have to jump through, notice and comment,

23   explanation for why this is necessary, what have you, that

24   that has not happened here?

25         MR. VENGUSWAMY:  Your Honor, I think if this were

1    a different rule that was seeking to expand the burden upon

2    any individual immigrant or seeking to change the

3    substantive nature of the aliens' rights or their

4    responsibilities with respect to the immigration laws, your

5    Honor, I think that would be a different case.

6         Here, what we have is you have a statute that says

7    you have to register.  You have a statute that says you have

8    to carry proof of registration.  And then you have a CFR

9    which up until now has listed 11 different ways in which you

10   can comply with that.

11        There are 11 -- I think 11 or 12 forms in -- I

12   think it's 8 CFR 241, your Honor, that are set forth as,

13   Here are the ways in which the department or the agencies

14   have said you can comply with Sections 1301 to 1306.

15        All the IFR is doing is it's adding one more form

16   to that.  And Plaintiffs are in their reply sort of -- they

17   dismiss the ability of the agencies to do that.  But the

18   footnote that we set forth -- I think it's Footnote 3 on

19   Page 17 of our opposition -- you know, there are countless

20   instances in the past where the agencies have changed forms

21   or added forms as a purely procedural rule.  But the

22   addition of the form does not itself create any criminal

23   liability.  It does not create any burden.

24        All that's happening here is, here's one more way

25   with which an alien can comply with Section 1305, 1306 and

1  1325.

2          THE COURT:  But I mean, aren't Plaintiffs correct

3  that until this point most illegal aliens could not comply

4  with the statute and therefore were not required to comply

5  with the statute or didn't face criminal liability for it,

6  and now that they will?

7          MR. VENGUSWAMY:  No, your Honor.  I think under a

8  clear reading of the statutory -- the statutes applicable in

9  this case, every illegal alien should have reported to a

10  port of entry, asked for an NTA and registered with the port

11  of entry at that case.

12          Yes, that requires them to go to a port of entry

13  and register.  But that's what Section 1325 already requires

14  of them.  So --

15          THE COURT:  So is it your perspective that all of

16  these members already face criminal liability for failure to

17  go to a port of entry and get an NTA?

18          MR. VENGUSWAMY:  Your Honor, I believe they all

19  face -- leaving aside the statute-of-limitations question,

20  your Honor, which you raised earlier, I think they all face

21  criminal liability for entering the country without

22  inspection under --

23          THE COURT:  Sure.

24          MR. VENGUSWAMY:  -- 1325.

25          THE COURT:  But there's an ongoing violation.

1          MR. VENGUSWAMY:  Yes.  Under 1302, there is an

2     ongoing continual requirement to carry your -- to be

3     registered and carry your registration.  And I think they

4     all face that, independent of the existence of the IFR and

5     the form here, the G-325.

6          THE COURT:  Are you aware of any prosecutions for

7     that?

8          MR. VENGUSWAMY:  I'm not, your Honor.  But again,

9     the fact that the government has not in the past enforced

10    this statute does not estop the government from attempting

11    to do so now.

12         THE COURT:  But I mean, again, that's not what --

13    we're not talking about you enforcing the -- well, we're not

14    talking about you enforcing the criminal provision of the

15    statute here.  But I think under your theory, there's no --

16    there's nothing to stop you from right now bringing criminal

17    enforcement against any illegal aliens for failure to carry

18    registration.  And yet you're not doing that.  Right?

19         MR. VENGUSWAMY:  Your Honor, I believe that there

20    is no -- under the statute, Section 1302, there is nothing

21    stopping the government from pursuing statutory claims

22    against any illegal alien who is not registered, because

23    that is a separate violation of the code.

24         The fact that the government is not doing so now,

25    I think, has a combination to do with years of policy, which

1    the government is attempting to address in this IFR, as well

2    as it's an information issue again, which the government is

3    attempting to address through this IFR.

4           But at heart, at core, what we're looking at here

5    is the government is simply attempting to enforce an

6    already-existing, extant provision of the code, which has

7    been around since 1940-something, I think.

8           THE COURT:  And what's your best case for this

9    proposition that, you know, because we're enforcing a

10   statute that we just have failed to enforce -- and now I'm

11   kind of switching gears back to the IFR, to be clear -- but

12   because we're just enforcing this notice provision that

13   Congress always wanted us to enforce, this is just a

14   procedural rule that need not go through notice and comment?

15          MR. VENGUSWAMY:  Yes, your Honor.  I think the --

16   bear with me just one second, your Honor.  I apologize.

17          Your Honor, I think the *AFL-CIO* case is

18   particularly instructive in this instance because that

19   specifically dealt with rules of agency organization and

20   procedure as compared to substantive rights.  And in that

21   case, they specifically -- both in that case and in the

22   *James V. Herson versus Glickman* case, your Honor, as the

23   Court pointed out, as the D.C. Circuit pointed out,

24   merely -- you know, the fact that this agency is making a

25   decision about its procedural efficiency doesn't somehow

1  convert the decision into affecting substantive rights.

2  What we're looking at here is a way in which the agency is

3  attempting to be procedurally efficient in its attempts to

4  enforce Section 1302 and Section 1325.

5       So the analogy that comes to mind, your Honor, is

6  a previous administration might choose to focus its efforts

7  on certain violent crimes and not on certain substance --

8  you know, drug crimes.  A subsequent administration may

9  change its mind on that.

10      But they haven't decriminalized anything.  The

11 statute still says the substance is illegal.  You just --

12 different administrations have different things that they're

13 focusing on.

14      THE COURT:  Sure.  But I mean, that feels pretty

15 clearly -- is it *Chenery* grounds? -- on prosecutorial

16 discretion.

17      But here, we're talking about the APA and the

18 requirement for notice and comment rulemaking.

19      MR. VENGUSWAMY:  Yes.  Again, your Honor, if the

20 IFR created a new form of liability, if failure to

21 fulfill -- a failure to file this form, G-325, if that were

22 somehow itself a cause -- a source of liability or an

23 enforceable claim on an individual, your Honor, I think then

24 we could -- we would be in -- solidly in the notice and

25 comment section of the APA.

1          But as we pointed out in our brief, you don't have

2     to fill out the G-325.  There is no requirement on any

3     individual that they fill out this form.

4          This is just one more way in which an individual

5     can comply with Section 1302.  They can go to a port of

6     entry.  They can fill out one of the other 11 options that

7     are set forth in the CFR.

8          The failure to fill this form out does not itself

9     open the door to any additional liability or claim or

10    anything else.  It's just one more tool that an alien has to

11    follow the statutory requirements.

12               THE COURT:  I understand.

13          So what would be the consequences for one of the

14    Plaintiffs' members if they refused to fill out the question

15    about "Tell me all the bad things you've ever done"?  What

16    if they kind of invoked Fifth Amendment privileges there?

17               MR. VENGUSWAMY:  Your Honor, that's a good

18    question.

19          I think there's -- I think if they failed to

20    answer the question, "Tell me all of the bad things you've

21    ever done," your Honor, I think there's case law

22    specifically in the IRS context that indicates that you

23    could invoke a privilege in that way.

24          But the failure -- the desire to invoke a

25    privilege does not excuse the failure to comply with other

1     statutory requirements.

2          So in the IRS context, for example, drug dealers

3     still have to report their income.  They can be careful

4     about how they say it, but they still have to pay taxes on

5     it, in much of the same way you still have to comply with

6     the statutory requirement that you register and that you

7     carry registration around.

8          There may be, your Honor -- and there's -- I think

9     there's a separate question about the way in which you could

10    comply with that and still have your Fifth Amendment right

11    preserved.  I think there's -- in *United States versus*

12    *Sullivan*, which is an older case from 1927, a taxpayer used

13    the Fifth Amendment to basically say that he did not have to

14    file his taxes.  The Supreme Court roundly rejected that

15    proposition.

16         On the other hand, in *Garner versus United States*,

17    a little bit more recently, they found that a voluntary

18    disclosure of incriminating evidence on a form waived the

19    privilege.

20         So I think there's some ground there and, you

21    know, I think it's important to remember that this form is

22    also -- it's pending under the Paperwork Reduction Act, you

23    know.  The agency is still figuring out exactly how to --

24    the exact questions to put on this form.

25         But I will say that there are several other

1   instances where the same question was basically asked.  As

2   far as I know, those forms are not -- have not been

3   contested.  For example, the I-485, which is the application

4   to register permanent residence, has a yes/no checkbox

5   question:  Have you ever entered the United States without

6   being inspected?

7           Similarly, the I-821, which is for temporary

8   protected status, asks the same questions with respect to

9   address and current activities and mode of entry to the

10  United States.  Those are all already-existing forms that

11  aliens can and do fill out.  As far as I know, those have

12  not been contested or they've not been sort of raised in

13  this context.

14          THE COURT:  And would you agree with me that,

15  other than -- maybe it sounds like Ursula -- none of

16  Plaintiffs' members actually face Fifth Amendment liability

17  at least based on what we have in front of us for illegal

18  entry from decades ago?

19          MR. VENGUSWAMY:  Your Honor, to the best of my

20  reading, that appears to be the case.

21          I would -- I want to hedge a little bit because

22  I'm not in a position to sort of offer Fifth Amendment

23  immunity to anyone at this point.  But based upon my

24  reading, it certainly appears that everyone other than

25  Ursula is outside of the sort of 1325 rule.  There is a 1302

1    issue, but that's a separate ongoing requirement under

2    registration.  That's what we're trying to address here in

3    this IFR.

4              THE COURT:  And do you happen to know, do

5    juveniles face 1325 liability?

6              MR. VENGUSWAMY:  I don't, your Honor.  I can go

7    back and ask the agency.  I don't have that off the top of

8    my head.

9              THE COURT:  So why don't the members have standing

10   by virtue of being subject to the new regulatory

11   obligations, which would then give the Plaintiffs

12   associational standing?

13             MR. VENGUSWAMY:  Your Honor, for associational

14   standing, the members themselves have to have standing.  And

15   for an individual to have standing, they have to show that

16   they're facing a harm that is directly attributable to the

17   agency.

18             In this case, the harm that they're facing is

19   attributable to 8 USC 1302.  That harm to the extent it

20   exists is a failure to follow the United States Code that

21   they are already facing.  The only thing that this form does

22   is it gives them one more way in which they can not face

23   that harm.

24             So there's no new harm associated with this form

25   or the failure to fill this form out, because they're

1   already facing a harm under Section 1302.  So there is no

2   harm that these individual members are facing as a result of

3   the IFR, and therefore there is no associational standing

4   because the individual members are not facing any harm --

5              THE COURT:  Your briefing --

6              MR. VENGUSWAMY:  -- or new harm, I should say.

7              THE COURT:  -- talks about third-party standing.

8              I think it looks to me like Plaintiffs are correct

9   that that's not the right framework here and that we should

10  actually be thinking about associational standing, which has

11  its own intricate test.

12             Do you agree with me on that?

13             MR. VENGUSWAMY:  Your Honor, I think we wanted to

14  make sure that we were overly cautious in addressing every

15  possible way in which a Plaintiff might attempt to raise

16  standing in this instance.  I think third-party standing is

17  one more avenue in which I could see one of the named

18  Plaintiffs in this case attempting to get around the fact

19  that they do not have associational standing or

20  organizational standing.  But I think the associational

21  standing is the more conclusive analysis in this case.  I

22  think that deals, I think, more appropriately and more

23  conclusively with the issues of this case.

24             THE COURT:  And so just to kind of tease out

25  something that I think you've already said, the government's

1    position is this does not institute a new carry requirement,

2    that the members must now carry proof of registration, that

3    they already face that, that they faced that two months ago,

4    and this just gives them a new thing they could carry if

5    they wish.

6              Am I correct on that?

7              MR. VENGUSWAMY:  Yes, your Honor.  The -- they

8    could have just as easily gone to a port of entry, asked for

9    a notice to appear, which these already are listed under the

10   CFR as one of the ways that they could comply with Section

11   1302.  So they're already facing the carry requirement, the

12   registration requirement.  This is just one more document

13   that is an option for them.

14             THE COURT:  Wouldn't you agree with me, though,

15   that G-325R is asking for some things that are not required

16   by statute?  And, if so, why doesn't that make this a

17   legislative rule?

18             MR. VENGUSWAMY:  Your Honor, the fact that it's

19   asking for some additional documents outside of maybe what's

20   the first few -- your Honor, if you'd bear with me, I've got

21   my stuff at the table.

22             So, your Honor, as far as what the form asks for,

23   I think there's two answers there.  One is under Section

24   1304(a), which sets forth what the forms can contain.  It

25   asks for -- this is under the statute -- so 1304(a), the

1   date and place of entry, activity in which he has been and

2   intends to be engaged.  So "What activities are you engaged

3   in?" is statutorily considered already as an appropriate

4   question.

5          Then the length of time he expects to remain;

6   police and criminal record, if any, of such alien; and then

7   the catch-all, "such additional matters as may be

8   prescribed."  That's under the discretion of the secretary

9   and the attorney general.

10          So the mere fact that it isn't one of the four

11   enumerated categories of information under Section 1304(a)

12   doesn't automatically push this outside of the scope of a

13   procedural rule.

14          And then second, your Honor --

15          THE COURT:  What would make it a procedural rule?

16          MR. VENGUSWAMY:  What would make it -- I think it

17   is a procedure.

18          THE COURT:  I'm sorry; more than a procedural

19   rule?

20          MR. VENGUSWAMY:  Your Honor, I think if it was

21   attempting maybe to again elicit information that would

22   create some new burden or elicit some information that was

23   creating a new form of liability or exposure to liability

24   that's not already encompassed with Sections 1302 and 1304,

25   again, your Honor, that might be a different question that

1    we're not facing in this case.

2         This form, it's really just attempting to provide

3    an illegal alien -- an unregistered alien with one more way

4    of complying with the statute.

5         And as far as the information, again, your Honor,

6    there are other DHS forms, the I-821, which asks almost the

7    exact same questions as already in the G-325.

8         If anything, your Honor, I think the additional

9    questions here again go to the Paperwork Reduction Act.

10   These are questions that maybe would be on separate form

11   that, once you fill out this form, then you get the other

12   form.  It's a Paperwork Reduction Act question, not an APA

13   question.

14        THE COURT:  Your briefing really focuses on

15   standing.  Am I correct in thinking that your arguments on

16   standing would also go to irreparable harm?

17        MR. VENGUSWAMY:  Absolutely, your Honor.  If they

18   don't have standing, then they -- one way in which they

19   don't have standing in this case is they don't have

20   irreparable harm.  I think there's also -- you know, the

21   individual members don't have standing and there's a

22   traceability issue.

23        But certainly I think there is no irreparable harm

24   in this case because the form and the IFR aren't putting any

25   harm or burden on them that doesn't -- that they're not

1    already facing through the statutes.

2             THE COURT:  And do you read the organizational

3    standing cases the same way Ms. Winger and I do, that

4    basically if CHIRLA can show organizational standing,

5    they've also shown irreparable harm?  Or do you see that

6    irreparable harm as being a second, higher burden that

7    CHIRLA has to meet?

8             MR. VENGUSWAMY:  Your Honor, I think if they're

9    able to show the organizational standing with respect to the

10   effect on CHIRLA, I think that would go a long way towards

11   the irreparable harm prong of the preliminary injunction.  I

12   think they still face the success on the merits, which is a

13   different question.

14            But leaving aside the fact that I disagree that

15   they can show an organizational harm, I do believe, your

16   Honor, as you say, if they could show organizational harm, I

17   think that would at least get you most of the way towards

18   the irreparable harm prong of the PI.

19            THE COURT:  Okay.

20            MR. VENGUSWAMY:  Is there anything else, your

21   Honor?

22            THE COURT:  Nothing from me.  Thanks.

23            Ms. Winger, I'll give you the last word.

24            MS. WINGER:  Your Honor, I wanted to respond first

25   to the new idea proposed just today that noncitizens could

register by seeking an NTA.

A few points about that: First of all, the government has never set up a process or publicized a process by which someone can go and demand an NTA. An NTA, in fact, is a discretionary prosecutorial document. It's a charging document to initiate removal proceedings. So there's nothing that requires DHS to issue one.

In fact, there are other -- for example, some might be subject to expedited removal and not even be entitled to an NTA, or the agency might not think so.

But again, there just simply is not a process and it's certainly never been advertised to people that they can and should go and seek an NTA. And in fact, the agency sometimes refuses to issue NTAs. Occasionally people ask for it in order to be placed in removal proceedings to pursue discretionary relief that's only been available there.

So it's been viewed as an exercise of prosecutorial discretion. It's just simply not a realistic mechanism for universal registration. It's never been used that way. And the IFR itself acknowledges that explicitly. It says there's no registration form for these people. So frankly, I think it is a little disingenuous to propose that solution today in open court. It's not even discussed in the rulemaking here.

1          Briefly, the I-598 and the I-485, which have the

2     questions about uncharged criminal activity, those are

3     discretionary benefits.  You voluntarily apply for them.

4     There's an element of discretion whether you get to adjust

5     your status, whether you're eligible for asylum.  People can

6     choose or not choose to apply for this relief.  There's no

7     criminal penalties for not submitting an I-485 or an I-598.

8          Here, we're talking about a form that is required

9     of everybody with no benefit at all on the threat of federal

10    prosecution.

11         And the last point I would just say is, your

12    Honor's been talking about this in the context of a

13    preliminary injunction.  I do just want to elevate that we

14    also in the alternative seek a stay.  And consistent with

15    longstanding court practice, a universal stay of an IFR here

16    would be appropriate.

17         THE COURT:  And on that point, I mean, it sounds

18    like something we all agree on is that basically the

19    irreparable harm is not going to do -- doesn't do a lot of

20    work here, at least as to organizational standing.

21         And so whether I see this as a stay or an

22    injunction, I basically am doing the same analysis.  Right?

23         MS. WINGER:  Same analysis, yes.  Absolutely.  I

24    mean, again, we do think we have shown irreparable harm for

25    a host of ways for our members.  But as to our organization,

1     the fact that they have standing is really enough on its own

2     to be irreparable harm, too.

3              THE COURT:  And those other -- you mentioned a

4     couple other forms.  I-458?

5              MS. WINGER:  Sorry.  The I-485 is an application

6     to adjust to lawful permanent resident status.  It's a

7     discretionary benefit.  You apply basically to get a green

8     card.  It's a green card application.  An I-598 is an asylum

9     application.

10             THE COURT:  And you said those forms do not

11    require you to disclose your criminal history?

12             MS. WINGER:  They do.

13             So -- I'm sorry.  I don't want to mispronounce

14    your name, but the United States represented that there are

15    forms that request information about uncharged criminal

16    conduct like the form at issue here.  I'm just trying to

17    distinguish between certainly in the Fifth Amendment context

18    there's -- they're different beasts because you don't have

19    to apply for asylum.  You don't have to apply to adjust your

20    status.  You have to register.  And so the -- so it's

21    compelling statements, unlike -- in a way that the 485 and

22    the I-598 are not.

23             THE COURT:  I see.

24             You said a couple minutes ago that the rulemaking

25    actually says that your members can't currently seek -- have

1    registration.  Is that right?

2              MS. WINGER:  That's right.

3              So it's at 11795 of the IFR.  And it says:  Aliens

4    who entered without inspection and have not otherwise been

5    encountered by DHS lack a designated registration form.

6              THE COURT:  Okay.  And your position is there's

7    really no realistic option -- well, a month ago, there was

8    no realistic option for those individuals to get a

9    registration?

10             MS. WINGER:  Absolutely, your Honor.  And I think

11   of course the question here is, could they be prosecuted for

12   willful failure to register?  Right?

13             There was no -- there simply was -- nobody here

14   until a month ago would have thought that they had any way

15   to register and certainly couldn't be guilty of willful

16   failure to do so as a result.

17             Also, the agency itself has acknowledged that the

18   carry requirement only attaches to people who have

19   registered.  In other words, you can't be prosecuted for

20   failure to carry proof of registration if you have not

21   registered.  And so necessarily, by expanding who can

22   register, you're adding this new both requirement and

23   criminal penalty for failure to carry.  And the IFR

24   recognizes that, too.

25             THE COURT:  Okay.  And you were just talking about

1    a form to seek an application for a green card.  I take it

2    that obviously, if you're successful in getting a green

3    card, you've got your document; you're in compliance with

4    the statute; but you don't get some other -- that wouldn't

5    provide something else short of a green card that would

6    nonetheless meet the terms of the statute?

7            MS. WINGER:  So the I-485 in the regulation is

8    listed as a registration form.  So people who have,

9    according to -- who have -- who are eligible for applying

10   for a green card under the regulations have registered.

11           What they carry as proof is a lot less clear,

12   because the I-458 is a multipage form.  That's one of the

13   issues that Defendants don't really explain in their IFR.

14           But people who enter without inspection by and

15   large are ineligible to adjust their status to lawful

16   permanent resident, at least while they're still in the

17   United States, unless they -- yeah.  There's some

18   exceptions.  But not everybody can do that.

19           THE COURT:  And what would prevent them from

20   applying, getting rejected, but nonetheless meeting the

21   terms of this carry statute?

22           MS. WINGER:  Well, I guess they are -- they have

23   to sign this sworn declaration that establishes their

24   eligibility in order to submit it.  Again, there's never

25   been any announcement that people should apply for relief

1    that they're ineligible for in order to be considered

2    registered.  It's simply not the system the government has

3    set up.

4           Frankly, I think it risks forcing people to

5    misrepresent.  I mean --

6           THE COURT:  So your point is there are things in

7    the application -- to apply, you've got to say --

8           MS. WINGER:  You have to check off the box.

9    You've got to indicate who's the qualifying relative.  I

10   mean, the whole point of it is to establish eligibility for

11   something for which people are not eligible for.

12          THE COURT:  Got it.  Got it.  That makes sense.

13          All right.  Thank you.  Anything else, ma'am?

14          MS. WINGER:  No, your Honor.

15          THE COURT:  So --

16          MR. VENGUSWAMY:  Your Honor, can I just -- one

17   point?

18          THE COURT:  Yes.

19          MR. VENGUSWAMY:  I apologize, your Honor.

20   Plaintiff correctly pointed out I think I misspoke and

21   overstated it when I suggested that illegal aliens should or

22   can report to a port of entry to get an NTA.  I was merely

23   trying to highlight the number of options under the

24   regulations already existing.  I certainly didn't mean to

25   say that that is a thing that has been advertised or should

1    be done or, as you pointed out, it is discretionary.  So I

2    apologize, your Honor, if I overstated that.

3              THE COURT:  I appreciate that.

4              So what is the option, then, for somebody right

5    now, understanding the IFR is not out?

6              MR. VENGUSWAMY:  Your Honor, as Plaintiff

7    correctly says -- and it's in the IFR -- there is not

8    currently a universal form that would apply across the board

9    for every illegal alien to comply with the registration and

10   carry requirements at this -- at this point, pending the

11   IFR.

12             THE COURT:  But is there any option for these

13   members?

14             MR. VENGUSWAMY:  Your Honor, I think it's a

15   case-by-case basis.  Again, there were 11 different forms.

16   Some of them may be eligible for one and not others.  Some

17   of them may not be eligible for any of the 11.  The IFR

18   seeks to basically patch that hole in the existing set of

19   forms.

20             But I just wanted to apologize and acknowledge

21   that I did misspeak there.

22             THE COURT:  I appreciate the correction.  And this

23   is why we have rebuttals.  Right?

24             All right.  Thanks, folks.  I appreciate your

25   rapid briefing and helpful arguments here.  I'll certainly

1    try to get an opinion out to you in the next couple days.

2              Thanks, folks.  I'll take it under advisement.

3              (Proceedings concluded at 11:05 a.m.)

1               **<u>CERTIFICATE</u>**

2

3               I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10               Dated this 15th day of April, 2025.

11

12          <u>/s/ Lisa Edwards, RDR, CRR</u>
            Official Court Reporter
13          United States District Court for the
              District of Columbia
14          333 Constitution Avenue, Northwest
            Washington, D.C. 20001
15          (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.,* | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:25-cv-00943-TNM |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.,* | ) ) ) ) |
| Defendants. | ) ) |

**NOTICE OF APPEAL FROM DENIAL OF PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that Plaintiffs Coalition for Humane Immigrant Rights, United Farmworkers of America, CASA, Inc., and Make the Road New York hereby appeal to the U.S. Court of Appeals for the District of Columbia Circuit from this Court's April 10, 2025, Memorandum Order (ECF No. 27) denying Plaintiffs' motion for preliminary injunction.

Dated: April 24, 2025

Respectfully submitted,

*/s/ Michelle Lapointe*

Lynn Damiano Pearson*
Cassandra Charles*
Joanna Cuevas Ingram*
National Immigration Law Center
P.O. Box 34573
Washington, D.C.  20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Michelle Lapointe (DC Bar No. 90032063)*
   (admission pending)
Emma Winger (DC Bar No. 90010721)
Leslie K. Dellon (DC Bar No. 250316)
Chris Opila (DC Bar No. 90029724)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

1

JA167

Jennifer R. Coberly (DDC Bar No. 90031302)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692
Jcoberly@AILA.org

Cody Wofsy (DDC Bar No. CA00103)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org

Nicholas Katz**
CASA, Inc.
8151 15th Avenue
Hyattsville, MD 20783
Tel: (240) 491-5743
nkatz@wearecasa.org

Anthony Enriquez* (NY Bar No. 5211404)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanights.org

*Admitted Pro Hac Vice*
**Pro Hac Vice application forthcoming*

2

# EXHIBIT B

# Criminal Complaints Under 8 U.S.C. § 1306(a)

AO 91 (Rev. 11/11)  Criminal Complaint

DOA: 4/17/2025

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

United States of America  )
v.  )
Eduardo Prado Flores  )  Case No.  25-5225MJ
▮▮▮▮▮▮▮  )
  )

*Defendant*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on or about April 15, 2022, and continuing through April 16, 2025, in Maricopa County, in the District of Arizona, the defendant violated Title 8, United States Code, Section 1306(a) (Failure to Register as an Alien), an offense described as follows:

EDUARDO PRADO FLORES, then being an alien required to apply for registration and to be fingerprinted in the United States, did willfully fail or refuse to file an application for such registration, in violation of Title 8, United States Code, Section 1306(a) (Class B Misdemeanor).

I further state that I am a Deportation Officer.

This criminal complaint is based on these facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein**

AUTHORIZED BY: AUSA Addison Owen  *(Digitally signed by ADDISON OWEN Date: 2025.04.17 14:34:07 -07'00')*

☒ Continued on the attached sheet.

**JOHN A BURGER**  Digitally signed by JOHN A BURGER Date: 2025.04.17 15:15:44 -07'00'

*Complainant's signature*

Supervisory Detention and Deportation
Officer John Burger
Department of Homeland Security,
Enforcement and Removal Operations

*Printed name and title*

Sworn to telephonically.

Date:  April 17, 2025  @ 4:14pm

*Judge's signature*

HONORABLE DEBORAH M. FINE
United States Magistrate Judge

*Printed name and title*

City and state:  Phoenix, Arizona

JA170

# STATEMENT OF PROBABLE CAUSE

I, Deportation Officer John Burger, declare under penalty of perjury that the following is true and correct.

1. I am a Deportation Officer. I have learned the facts recited herein from direct participation in the investigation and from the reports and communications of other agents and officers.

2. EDUARDO PRADO FLORES, hereafter "Defendant", is a twenty-five-year-old alien unlawfully present in the United States. Defendant is a citizen of Mexico.

3. On April 16, 2025, Defendant was contacted by Department of Homeland Security, Enforcement and Removal Operations (ICE/ERO) after being released from jail on Driving Under the Influence charges.

4. Defendant was advised of his constitutional rights. Defendant freely and willingly acknowledged his rights and agreed to provide a statement under oath.

5. Defendant stated he had been in the United States since 2022. Defendant claimed to have entered illegally through Juarez city.

6. Pursuant to Title 8, United States Code (U.S.C.) Section 1302(a), aliens, who are 14 years or older and unlawfully present in the United States without visas or status, are required to apply for registration and to be fingerprinted if they have been in the United States 30 or more days.

7. On April 17, 2025, your affiant checked all databases and confirmed Defendant has never registered or filed any immigration paperwork.

8. Your affiant also learned Defendant was previously return to Mexico from the United

1

States on several occasions, to include March 29, 2022; April 1, 2022; April 7, 2022, April 9, 2022; and April 14, 2022.

9. In Defendant's written statement provided under oath after he was read his *Miranda* rights, he acknowledged the following:

   a. He does not have a visa or other immigration paperwork to lawfully enter the United States.

   b. He knew he needed legal documentation from the United States to enter and he has not filed paperwork with United States immigration service for legal status or permission to be in the United States.

   c. He had not registered his presence or entry to the United States with immigration service or other United States government agency.

10. For these reasons, this affiant submits that there is probable cause to believe that beginning on or about April 15, 2022 through April 16, 2025, that Defendant, an alien, who is required to register and be fingerprinted pursuant to Title 8 U.S.C. 1302(a), willfully failed to do so, in violation of Title 8, U.S.C. Section 1306(a).

//

//

//

//

//

//

//

2

JA172

11. This affidavit was sworn to telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose. I have thoroughly reviewed the affidavit and the attachments to it, and attest that there is sufficient evidence to establish probable cause that the defendant violated Title 8, U.S.C., Section 1306(a).

JOHN A BURGER
Digitally signed by JOHN A BURGER
Date: 2025.04.17 15:16:36 -07'00'

Supervisory Officer John Burger
Immigration and Customs Enforcement

Sworn to telephonically on
April 17, 2025 @ 4:14 pm

HONORABLE DEBORAH M. FINE
United States Magistrate Judge

3



U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2025 APR 21 P 3: 06

CAROL L. MICHEL
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

# PETTY OFFENSE

### BILL OF INFORMATION FOR FAILURE TO REGISTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. **25 - 96** |
| v. | * | SECTION: **DUTY MAG.** |
| JOSUE ALEJANDRO GUERRERO | * | VIOLATION: 8 U.S.C. § 1306(a) |

\* \* \*

The United States Attorney charges that:

### COUNT 1

Beginning in or about 2022, and continuing until at least April 17, 2025, in the Eastern District of Louisiana and elsewhere, the defendant, **JOSUE ALEJANDRO GUERRERO**, then being an alien required to apply for registration and to be fingerprinted in the United States, did willfully fail or refuse to file an application for such registration, in violation of Title 8, United States Code, Section 1306(a).

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

FREDERICK W. VETERS, JR. (23584)
G. DALL KAMMER
Assistant United States Attorneys

New Orleans, Louisiana
April 21, 2025

✓ Fee _USA_
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

JA174

No. _____

# United States District Court

### FOR THE

_____EASTERN_____ DISTRICT OF _____LOUISIANA_____

UNITED STATES OF AMERICA

*vs.*

JOSUE ALEJANDRO GUERRERO

## BILL OF INFORMATION
## FOR FAILURE TO REGISTER

Violation(s): 8 U.S.C. § 1306(a)

*Filed* _____, 20 __25__

_____, *Clerk.*

*By* _____, *Deputy*

*Assistant United States Attorney*
FREDERICK W. VETERS, JR.

JA175

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2025 APR 17 PM 4 21
CAROL L. MICHEL, CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

# PETTY OFFENSE

### BILL OF INFORMATION FOR FAILURE TO REGISTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. **25-0094** |
| v. | * | SECTION: DUTY MAG. |
| JUAN CARLOS CASTRO-IGNACIO | * | VIOLATION:  8 U.S.C. § 1306(a) |
| | * * * | |

The United States Attorney charges that:

### COUNT 1

Beginning in or about 2001, and continuing until at least April 13, 2025, in the Eastern District of Louisiana and elsewhere, the defendant, **JUAN CARLOS CASTRO-IGNACIO**, then being an alien required to apply for registration and to be fingerprinted in the United States, did willfully fail or refuse to file an application for such registration, in violation of Title 8, United States Code, Section 1306(a).

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

PAUL HUBBELL
Assistant United States Attorney

New Orleans, Louisiana
April 17, 2025

___Fee_____
___Process_____
_X_Dktd_____
___CtRmDep_____
___Doc.No._____

JA176

Case 2:25-cr-00092-JDW   Document 42-2   Filed 04/17/25   Page 1 of 17

No. _____

## United States District Court

### FOR THE

_____EASTERN_____ DISTRICT OF _____LOUISIANA_____

UNITED STATES OF AMERICA

*vs.*

JUAN CARLOS CASTRO-IGNACIO

**BILL OF INFORMATION FOR
FAILURE TO REGISTER**

Violation(s):      8 U.S.C. § 1306(a)

*Filed* _____, 20 _25_

_____, *Clerk.*

*By* _____, *Deputy*

*Assistant United States Attorney*
PAUL J. HUBBELL

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2025 APR 18 AM 11 56
CAROL L. MICHEL, CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**PETTY OFFENSE**

__BILL OF INFORMATION FOR FAILURE TO REGISTER__

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** 25-0095 |
| v. | * | **SECTION:** **DUTY MAG.** |
| **OSBORN NASH BODDEN WELCOME** | * | **VIOLATION:** 8 U.S.C. § 1306(a) |
| a/k/a OSBORN N. BODDEN | | |
| a/k/a OSTIN WELCOME-BODDEN | * | |

\* \* \*

The United States Attorney charges that:

### COUNT 1

Beginning in or about 2001, and continuing until at least April 13, 2025, in the Eastern District of Louisiana and elsewhere, the defendant, **OSBORN NASH BODDEN WELCOME**, then being an alien required to apply for registration and to be fingerprinted in the United States, did willfully fail or refuse to file an application for such registration, in violation of Title 8, United States Code, Section 1306(a).

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

PAUL J. HUBBELL
G. DALL KAMMER
Assistant United States Attorneys

New Orleans, Louisiana
April 18, 2025

___Fee_____
___Process_____
_X_Dktd_____
___CtRmDep_____
___Doc.No._____

JA178

No. _____

# United States District Court

FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

UNITED STATES OF AMERICA

*vs.*

OSBORN NASH BODDEN WELCOME
a/k/a OSBORN N. BODDEN
a/k/a OSTIN WELCOME-BODDEN

BILL OF INFORMATION FOR
FAILURE TO REGISTER

Violation(s):    8 U.S.C. § 1306(a)

*Filed* _____, 20 __25__

_____, *Clerk.*

*By* _____, *Deputy*

*Assistant United States Attorney*
PAUL J. HUBBELL

JA179

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2025 APR 22 PM03 04
CAROL L. MICHEL, CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**PETTY OFFENSE**

## BILL OF INFORMATION FOR FAILURE TO REGISTER

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 25-00101** |
| **v.** | * | **SECTION:** DUTY MAG. |
| **ARNOL HUMBERTO REYES-GALINDO** | * | **VIOLATION:** 8 U.S.C. § 1306(a) |
| **aka ARNOL REYES-GALINDO** | * | |
| | * * * | |

The United States Attorney charges that:

### COUNT 1

Beginning in or about 2022, and continuing until at least April 21, 2025, in the Eastern District of Louisiana and elsewhere, the defendant, **ARNOL HUMBERTO REYES-GALINDO**, then being an alien required to apply for registration and to be fingerprinted in the United States, did willfully fail or refuse to file an application for such registration, in violation of Title 8, United States Code, Section 1306(a).

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

FREDERICK W. VETERS, JR. (23584)
Special Assistant United States Attorney
G. DALL KAMMER
Assistant United States Attorneys

New Orleans, Louisiana
April 22, 2025

JA180

No. _____

# United States District Court

## FOR THE

__EASTERN__ DISTRICT OF __LOUISIANA__

UNITED STATES OF AMERICA

*vs.*

ARNOL HUMBERTO REYES-GALINDO
aka ARNOL REYES-GALINDO

### BILL OF INFORMATION
### FOR FAILURE TO REGISTER

Violation(s): 8 U.S.C. § 1306(a)

*Filed* _____, 20 _25_

_____, *Clerk.*

*By* _____, *Deputy*

*Special Assistant United States Attorney*

FREDERICK W. VETERS, JR.

JA181

AO 91 (Rev. 11/11) Criminal Complaint

DOA: 4/17/2025

# UNITED STATES DISTRICT COURT
for the
District of Arizona

United States of America

v.

Santiago Lopez Hernandez

████████████

_____
*Defendant*

Case No. 25 - 5231MJ

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on or about April 17, 2023 and continuing through April 17, 2025, in Maricopa County, in the District of Arizona, the defendant violated Title 8, United States Code, Section 1306(a) (Failure to Register as an Alien), an offense described as follows:

SANTIAGO LOPEZ HERNANDEZ, then being an alien required to apply for registration and to be fingerprinted in the United States, did willfully fail or refuse to file an application for such registration, in violation of Title 8, United States Code, Section 1306(a).

I further state that I am a Deportation Officer.

This criminal complaint is based on these facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein**

AUTHORIZED BY: AUSA Addison Owen

☒ Continued on the attached sheet.

JOHN A BURGER
Digitally signed by JOHN A BURGER
Date: 2025.04.18 13:25:24 -07'00'

_____
*Complainant's signature*

Supervisory Detention and Deportation
Officer John Burger
Department of Homeland Security,
Enforcement and Removal Operations
*Printed name and title*

Sworn to telephonically.

Date: April 18, 2025 @ 2:53pm

_____
*Judge's signature*

City and state: Phoenix, Arizona

HONORABLE DEBORAH M. FINE
United States Magistrate Judge
*Printed name and title*

JA182

# STATEMENT OF PROBABLE CAUSE

I, Deportation Officer John Burger, declare under penalty of perjury that the following is true and correct.

1. I am a Deportation Officer. I have learned the facts recited herein from direct participation in the investigation and from the reports and communications of other agents and officers.

2. SANTIAGO LOPEZ HERNANDEZ, hereafter "Defendant", is a thirty-three-year-old alien unlawfully present in the United States. Defendant is a citizen of Mexico.

3. On April 17, 2025, Defendant was contacted by Department of Homeland Security, Enforcement and Removal Operations (ICE/ERO) after being released from jail on Driving Under the Influence charges.

4. Defendant was advised of his constitutional rights. Defendant freely and willingly acknowledged his rights and agreed to provide a statement under oath.

5. Defendant stated he had been in the United States since 2023. Defendant claimed to have entered illegally through Altar, Sonora [Sasabe, Arizona].

6. Pursuant to Title 8, United States Code (U.S.C.) Section 1302(a), aliens, who are 14 years or older and unlawfully present in the United States without visas or status, are required to apply for registration and to be fingerprinted if they have been in the United States 30 or more days.

7. On April 17, 2025, your affiant reviewed record checks of all databases and confirmed Defendant has never registered or filed any immigration paperwork.

8. Your affiant also learned Defendant was previously granted voluntary return to Mexico

1

and removed from the United States on December 27, 2022.

9. In Defendant's written statement provided under oath after he was read his *Miranda* rights, he acknowledged the following:

   a. He indicated he does not have a visa or other immigration paperwork to lawfully enter the United States.

   b. He knew he needed legal documentation from the United States to enter and he has not filed paperwork with United States immigration service for legal status or permission to be in the United States.

   c. He indicated that since entering, or before entering, he knew he was required to get a visa, or other permission from the United States, and required to register his residence.

   d. He responded "No" indicating he has not registered his presence or entry to the United States with immigration service or other United States government agency.

   e. He further stated "Si" (yes) that he was trying to avoid arrest and deportation by not registering his entry, presence, and residence.

10. For these reasons, this affiant submits that there is probable cause to believe that beginning on or about April 17, 2023 through April 17, 2025, that Defendant, an alien, who is required to register and be fingerprinted pursuant to Title 8 U.S.C. 1302(a), willfully failed to do so, in violation of Title 8, U.S.C. Section 1306(a).

//

//

//

2

11. This affidavit was sworn to telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose. I have thoroughly reviewed the affidavit and the attachments to it, and attest that there is sufficient evidence to establish probable cause that the defendant violated Title 8, U.S.C., Section 1306(a).

JOHN A
BURGER

Digitally signed by
JOHN A BURGER
Date: 2025.04.18
13:26:24 -07'00'

John Burger
Immigration and Customs Enforcement

Sworn to telephonically on
April 18, 2025

HONORABLE DEBORAH M. FINE
United States Magistrate Judge

3

# EXHIBIT C

# Declaration of UFW Member "Ana"

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

               *Plaintiffs*,

          v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

               *Defendants*.

Case No. 1:25-CV943

## DECLARATION OF ████████████

I hereby declare as follows:

1. My name is ████████████.

2. I reside in Oxnard, California. I am 50 years old.

3. I have spent the last 24 years as a farm worker picking strawberries, blueberries and cilantro.

4. I have been a United Farm Workers member since 2014. I have participated in their meetings, marches, and holiday activities.

5. I am an indigenous woman from Oaxaca, Mexico. I speak a thousand-year-old language, Mixteco Bajo. I speak very little Spanish and do not speak English. I cannot read or write.

6. I am a single mother of six children. Four of them are United States citizens, ages 16, 18, 20, and 22. My two oldest children were born in Mexico and are 30 and 32.

7. My husband was murdered in 2010. Since then, I have been raising the children on my own. I have had to work very hard to support my family and have not had time to work on improving my Spanish or English.

8. I recently learned I will need to register online with the government. I am very worried because I will not be able to complete the online form.

9. I am fearful of getting arrested and sent to jail because I am not able to complete the form.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April _____ , 2025.


_____

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

               *Plaintiffs*,

               v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

               *Defendants*.

Case No. 1:25-CV943

## DECLARACIÓN DE ████████████

Por la presente declaro lo siguiente:

1. Me llamo ████████████.

2. Vivo en Oxnard, California. Tengo 50 años.

3. He pasado los últimos 24 años como trabajadora agrícola piscando fresa, mora azul y cilantro.

4. Soy miembro de la Unión de Campesinos desde 2014. He participado en sus reuniones, marchas y actividades en días festivos.

5. Soy una mujer indígena de Oaxaca, México. Hablo una lengua milenaria, el mixteco bajo. Hablo muy poco español y no hablo inglés. No sé leer ni escribir.

6. Soy madre soltera de seis hijos. Cuatro de ellos son ciudadanos estadounidenses, de 16, 18, 20 y 22 años. Mis dos hijos mayores nacieron en México y tienen 30 y 32 años.

8. Hace poco me enteré de que tendré que registrarme en línea con el gobierno. Estoy muy preocupada porque no voy a poder rellenar el formulario en línea.

9. Tengo miedo de que me detengan y me manden a la cárcel por no ser capaz de rellenar el formulario.

Declaro bajo pena de perjurio que lo anterior es cierto y correcto.

Ejecutado el 17 de abril de 2025

**CERTIFICATE OF TRANSLATION**

I, <u>Meredith Cabell</u>, hereby certify under penalty of perjury that I am qualified to translate from English to Spanish, that I translated the Declaration of ████████ from English to Spanish, read the Spanish translation to the declarant and Mixteco Bajo interpreter and that my translation was true and correct to the best of my ability.

Signature of Interpreter

4/15/25
Date

## CERTIFICATE OF INTERPRETATION

I, _____, hereby certify under penalty of perjury that I am qualified to interpret from Spanish to Mixteco Bajo, that I interpreted the Declaration of ████████ to Mixteco Bajo for the declarant, and that my interpretation was true and correct to the best of my ability.

_____                          _____
Signature of Interpreter                                              Date

## CERTIFICADO DE INTERPRETACIÓN

Yo, Felix Rodríguez _____, por lo presente certifico bajo pena de perjurio que estoy calificado para interpretar del español a mixteco bajo, que interpreté la Declaración de ████ ████ a mixteco bajo para la declarante y que mi interpretación fue verdadera y correcta en la medida de mis habilidades.

Felix Rodríguez                                        04/22/25
Firma del Interprete                                  Fecha

# EXHIBIT D

# Declaration of UFW Member "Gloria"

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

        *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

        *Defendants*.

Case No. 1:25-CV943

**DECLARATION OF** ███████████████████

I hereby declare as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. My name is ███████████████████.

3. I live in Ventura County, California.  I am 49 years old.

4. I am a farm worker.  I have spent the last six working in the strawberry fields. I am a member of the United Farm Workers.

5. I am from Oaxaca, Mexico and speak and indigenous language, Mixteco Bajo.

6. I have six children who were all born in Mexico. Two have received labor-based deferred action ("DALE").  My other children are ages 16, 18, 21 and 23.

7. I do not understand technology.  I only have a flip phone that does not have Internet access.

8.  I recently learned that I, along with my undocumented children, will be required to register with the government using an online system.

9.  I am very concerned that I will not be able to use the online system. I am especially worried for my 16-year-old minor son, who will also need to register. If one of us makes a mistake we could get in trouble for lying to the government.  I am also afraid if we don't register correctly, we could be arrested.  I am also worried about my children forgetting to carry their registration and getting arrested.

10. I feel especially vulnerable and defenseless to protect my family because of my limited language skills.  For example, my son faced discrimination and has been threatened by schoolmates to be reported to immigration.

11. I am fearful that I will not be able to complete the registration properly or assist my minor son with it and that I could be arrested and separated from my family.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on April ____ , 2025.


_____

JA195

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

        *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

        *Defendants*.

Case No. 1:25-CV943

## DECLARACIÓN DE ███████████████

Por la presente declaro lo siguiente:

1. Tengo más de 18 años y soy competente para testificar, con conocimiento personal, sobre los hechos aquí expuestos.

2. Me llamo ███████████████.

3. Vivo en Ventura County, California. Tengo 49 años.

4. Soy trabajadora agrícola.  Llevo seis años trabajando en el campo de fresas. Soy miembro de la Unión de Campesinos.

5. Soy de Oaxaca, México y hablo una lengua indígena, el mixteco bajo.

6. Tengo seis hijos, todos nacidos en México. Dos han recibido la acción diferida basada en el trabajo ("DALE").  Mis otros hijos tienen 16, 18, 21 y 23 años.

7. No entiendo de tecnología.  Sólo tengo un teléfono plegable que no tiene acceso a Internet.

8. Hace poco me enteré de que yo, junto con mis hijos indocumentados, tendremos que registrarnos con el gobierno mediante un sistema en línea.

9. Estoy muy preocupada que no voy a poder utilizar el sistema en línea. Me preocupa especialmente por mi hijo menor de 16 años, que también tendrá que registrarse. Si uno de nosotros cometemos un error, podríamos tener problemas por mentir al gobierno. También temo que, si no nos empadronamos correctamente, nos arrestan. También me preocupa que mis hijos se olviden llevar su registro y sean detenidos.

10. Me siento especialmente vulnerable e indefensa para proteger a mi familia debido a mis limitados conocimientos lingüísticos. Por ejemplo, mi hijo ha sufrido discriminación y ha sido amenazado por compañeros de colegio con denunciarlo a inmigración.

11. Tengo miedo de no poder completar el registro correctamente o ayudar a mi hijo menor de edad con el y de que me detengan y me separen de mi familia.

12. Declaro bajo pena de perjurio que lo anterior es cierto y correcto.

Ejecutado el 15 de abril de 2025

## CERTIFICATE OF TRANSLATION

I, <u>Meredith Cabell</u>, hereby certify under penalty of perjury that I am qualified to translate from English to Spanish, that I translated the Declaration of ▓▓▓▓▓▓▓▓ from English to Spanish, and that my translation is true and correct to the best of my ability.

_____
Signature of Interpreter

4/15/25
_____
Date

## CERTIFICATE OF TRANSLATION

I, _____, hereby certify under penalty of perjury that I am qualified to translate from Spanish to Mixteco Bajo, that I orally translated the Declaration of █████ ████████ to the declarant from Spanish to Mixteco Bajo, and that my translation was true and correct to the best of my ability.

_____                                    _____
Signature of Interpreter                                          Date

## CERTIFICADO DE TRADUCCION

Yo, Francisco Panfilo, por lo presente certifico bajo pena de perjurio que estoy calificado para traducir del español a mixteco bajo, que traduje oralmente la Declaración de █████████████ del español a mixteco bajo al declarante y que mi traducción fue verdadera y correcta en la medida de mis habilidades.

Francisco PL                                      4-21-2025
Firma del Interprete                              Fecha

# EXHIBIT E

# Declaration of CHIRLA Member "Luisa"

JA200

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

        *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

        *Defendants*.

Case No. 1:25-CV943

## DECLARATION OF ███████████

Upon my personal knowledge, I hereby declare:

1. My name is █████████████.  I am a 49-year-old domestic worker.

2. I have been in the U.S. for nearly 20 years, when I entered by crossing the Southern Border.

3. My husband and I are CHIRLA members.  He has a temporary immigration status but I am not eligible.  Together we have 2 U.S. citizen children, 11 and 15 years old.

4. I am a very active CHIRLA member and a part of the Domestic Workers organizing group. During the COVID-19 pandemic, I was an essential worker who volunteered to clean classrooms in my own children's schools, focusing on those for the youngest age groups.

5. I have also worked with CHIRLA to fight for better working conditions for domestic workers with the Domestic Workers Alliance. In particular, I try to help indigenous

JA201

domestic workers because they are the most vulnerable. I have gotten training on preserving rare languages and assisting as an interpreter.

6. I have also advocated for better housing and helping to get out the vote in Los Angeles. On numerous occasions, I have participated in pro-immigrant protests, and I have also attended the Women's March.

7. I am fearful of the registration process, and that I will be specifically targeted for enforcement because of my advocacy on behalf of undocumented workers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17 , 2025.



## CERTIFICATE OF INTERPRETATION

I, _Adam Reese_, hereby certify under penalty of perjury that I am qualified to interpret from English to Spanish, that I read this Declaration to the declarant
in Spanish, and that my interpretation was true and correct to the best of my ability.

_Adam Reese_

Signature of Interpreter

4/18/25

Date

# EXHIBIT F

# Declaration of CHIRLA Member "Ursela"

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

        *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

        *Defendants*.

Case No. 1:25-CV943

### DECLARATION OF █████████████████████████

Upon my personal knowledge, I hereby declare:

1. My name is ██████████████████████ . I am 18 years old.

2. I am originally from El Salvador.

3. I came to the United States in 2023 when I was 17 to escape abuse by my father. My mother and I fled together but got separated during our journey. After making inquiries with the Salvadoran Consulate, I learned that my mother is officially listed as a missing person in Mexico.

4. I have applied for asylum based on my fear of return to El Salvador. I have not yet had biometrics or received a work permit. I am not in removal proceedings.

5. I am also applying for Special Immigrant Juvenile Status based on my parental circumstances.

JA205

6. I am a member of CHIRLA. Being a part of CHIRLA has given me a sense of safety and community in this country.

7. I recently learned from CHIRLA staff that I will be required to register online with the government. I am confused why I need to complete this process when I am already submitting immigration applications. The government already has my information.

8. I worry that by registering the government could try to deport me back to El Salvador before my other applications get approved, which I have been told can take years. I know that the government wants to use the registration process to deport people, and that the government has already deported people even though they have pending asylum applications.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2025.



# EXHIBIT G

# Declaration of CHIRLA Member "Tiana"

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

        *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

        *Defendants*.

Case No. 1:25-CV943

**DECLARATION OF** ███████████████████

Upon my personal knowledge, I hereby declare:

1. My name is ███████████████████ .  I am forty-two years old and a member of CHIRLA.

2. I came to the United States from Mexico with my family when I was 15 years old.

3. As a teenager, I worked as a seamstress to support the family. I was unable to complete my education.

4. Later I married a man who was a U.S. citizen.  He treated me very badly and abused me.  He also never helped me adjust my immigration status.

5. I am now in the in the process of self-petitioning for protection under the Violence Against Women Act (VAWA).  I have not yet filed the application or undergone biometrics.

6. I am also a single parent of a U.S. citizen son who is in second grade. He means everything to me. I have worked hard to support him and am proud to have finally earned my G.E.D.

7. I worked in a restaurant that burned down during the recent Los Angeles wildfires, but with the help of one of my former colleagues I have taken the first step to fulfilling a life-long dream of opening my own restaurant. I plan to serve a fusion of Oaxacan and American cuisine.

8. I understand that I would be required to register with a new system the government is saying will help deport people. I am terrified that registering could make me a target even though I am applying for legal status. My greatest fear is being separated from my son.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2025.



# EXHIBIT H

# Declaration of MRNY Member "Guvelia"

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

       *Plaintiffs*,

       v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

       *Defendants*.

Case No. 1:25-CV943

## DECLARATION OF ████████████

I declare under penalty of perjury that the foregoing is true and correct.

1. My name is ██████████. I would like to be known as "Guvelia." I am using a pseudonym because I fear for my safety should the Government decide to retaliate against me for participating in a lawsuit against them.

2. I entered the United States by crossing the border without inspection in or around 2003.

3. I have continuously lived in the United States since that time.

4. I live in New York City.

5. I have five children. Two are U.S. citizens, and one is a Lawful Permanent Resident. I have ten U.S. citizen grandchildren, and one U.S. citizen great-grandchild.

6. I struggle to make ends meet. I work as a nanny and collect recycling on the street to earn

7. extra money.

8. I have been a member of Make the Road New York since 2011. In the time since, I have participated in protests and political actions. I am a member of Make the Road

NewYork's BASTA and CRIPP committees and regularly attend their meetings. I have participated in press conferences in New York City, advocated before state lawmakers Albany, and marched in Washington, D.C., to demand fair treatment for the immigrant community.

8. I have heard stories of people being deported for making statements that Trump disagrees with, or for being vocal for immigrant justice. I fear being surveilled or targeted by immigration authorities for participating in political activities.

9. I filed Form I-918 with USCIS to apply for U Nonimmigrant Status in December, 2024. I listed a safe address in that application, not my home address. I recently provided biometrics as part of the U visa process but I still do not have an employment authorization.

10. I am eligible for U Nonimmigrant Staus because I and two of my children were assaulted by a group of young men with sticks, rods, and fists outside of our apartment building in Brooklyn, NY and I assisted in the arrest and prosecution of one of the assailants.

11. I have not yet registered, and I have no proof of registration.

12. I fear being stopped on the street and having no proof of registration to show. I fear that in that case, I will be separated from my children, my grandchildren, and my great-grandchild and be detained.

13. On the other hand, I have a lot of fears related to registering also. I fear that by registering on form G-325R, I am exposing myself and my family to immigration enforcement. I am particularly concerned that my previous advocacy activity with Make the Road New York makes me a target for enforcement.

JA212

14. I fear that, after registering on form G-325R, I or my family will be surveilled by immigration enforcement authorities. I did not have to share my home address on my U visa application and the thought of my address being known is frightening, especially since I was a crime victim and helped law enforcement.

15. I fear that by registering on form G-325R, I am undercutting my application for U Nonimmigrant Status because by registering, I am risking removal before my application can be adjudicated.

16. I fear that by registering on form G-325R, I am exposing myself to criminal liability for not registering before. I worry that I will be subject to criminal prosecution and a fine or incarceration if I register now. I am concerned that I will self-incriminate by registering now.

I, ▮▮▮▮▮▮▮▮▮ do swear under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

Signed on this 23rd day of April, 2025.

**<u>CERTIFICATION</u>**

I, Diego Fernández-Pagés, certify that I am fully bilingual in English and Spanish. I translated the above declaration to ███████████ to Spanish, and she signed the English version on April 23rd, 2025.

_Diego F. Pag_
_____
Diego Fernández-Pagés

JA214

# EXHIBIT I

# Declaration of CASA Member YL

JA215

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

          *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

         *Defendants*.

Case No. 1:25-CV943

## DECLARATION OF ███████████

    I, ███████████ upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. I am a CASA member originally from Mexico who currently resides in Georgia. I entered the U.S. in 2016 without inspection and did not have any contact with immigration authorities. I have never had a case in immigration court or applied for immigration relief.

3. I have been active with CASA for the last two years, engaging in my local organizing committee, and participating in public demonstrations related to a variety of issues, including housing and climate justice. In support of these issues, I have engaged in lobbying activity with CASA at both the state and national level.

4. Outside of CASA, I have engaged in political activity, including engaging voters to support candidates who champion immigrant communities, even though I cannot vote myself.

5. I am the mother of a 5-year-old son, who has a speech impediment and needs occupational and speech therapy.

6. The IFR has caused me to become more afraid to speak out because I fear that it could expose me and my son to targeting by the federal government.

7. With respect to the actual registration process, I don't feel like I would be able to complete it because I am not very good with technology, and wouldn't feel comfortable creating an account and completing the form online – especially because I have limited English proficiency, and the form is only available in English.

8. My biggest fear is that I will be separated from my young son, who is a U.S. citizen, and who has never been cared for by anyone else. That fear keeps me up at night. I am also afraid that my partner, who is the sole wage earner in our family, could be detained and deported as well, depriving us of our only income.

9. I have been exposed to discrimination in the U.S. because of my inability to speak English, including in the school system when I enrolled my child in pre-Kindergarten and when I reported a situation of bullying at school. The principal promised to help resolve the situation, but it only got worse. My son would have night terrors and lost his appetite because of the bullying. When I visited my son's classroom, I saw him being bullied without teachers intervening. In contrast, parents who were able to speak English got the support they needed.

10. With CASA, I am fighting for a just immigration system that will allow me and my family to live in peace, free from the fear that this IFR invokes. I see the deep concern about the IFR and anti-immigrant environment generally from the other parents at my child's school and want to continue fighting for immigration reform so that they can speak out and create a better education system for all the children where I live. Children deserve to have a dignified education, not to live in fear.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED: April 23, 2025

## CERTIFICATE OF INTERPRETATION

I, <u>Lydia Walther-Rodriguez</u>, hereby certify under penalty of perjury that I am qualified to interpret from English to Spanish, that I read this Declaration to the declarant in Spanish, and that my interpretation was true and correct to the best of my ability.

_____          ___4/23/25_____
Signature of Interpreter                                              Date

# EXHIBIT J

# Declaration of CASA Member ME

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

                *Plaintiffs*,

             v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

                *Defendants*.

Case No. 1:25-CV943

## <u>DECLARATION OF</u> █████████

I, ████████ , upon my personal knowledge, hereby submit this declaration
pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I am more than 18 years of age and competent to testify, upon personal knowledge, to the
    facts set forth herein.

2.  I am a CASA member originally from Guatemala who currently resides in
    Pennsylvania.  I entered the U.S. without inspection and without contact with
    immigration authorities in 2004.  I have never been placed in removal proceedings or
    applied for any immigration benefit in the United States.

3.  I currently work as a carpenter and have four children, aged 1, 8, 15 and 18, all of whom
    are United States citizens.  I proudly pay my taxes every year and abide by all the laws of
    this country.

4. I have been active with CASA since 2023 and currently sit on CASA's member leadership council, helping to decide on the priorities for CASA in Pennsylvania and across the organization.

5. During my time as a CASA member I have participated in public demonstrations, including a rally for citizenship in Washington D.C.

6. Outside of CASA, I have engaged in political activity to support my preferred candidates, hoping to elect leaders who will improve the lives of immigrant communities and fight for just immigration reform, though I cannot vote myself.

7. I am afraid to register, because it could expose me and my family, including my wife, who is also undocumented, to the risk of detention and deportation. This would tear our family apart and leave my children, including our one-year-old, without any support.

8. Even if I tried to register, though, I would struggle to complete the process due to my limited English proficiency and lack of technical expertise.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED: April 23, 2025

JA222

## CERTIFICATE OF INTERPRETATION

I, <u>Lydia Walther-Rodriguez</u>, hereby certify under penalty of perjury that I am qualified to interpret from English to Spanish, that I read this Declaration to the declarant in Spanish, and that my interpretation was true and correct to the best of my ability.

_____                   ____4/23/25_____
Signature of Interpreter                              Date

JA223

# EXHIBIT K

# Declaration of CASA Member JC

JA224

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

              *Plaintiffs*,

            v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

              *Defendants*.

Case No. 1:25-CV943

## <u>DECLARATION OF ███████</u>

I, ███████ upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. I am a CASA member originally from El Salvador and currently residing in Virginia. I entered the U.S. without inspection and without contact with immigration authorities in 2014. I have never been placed in removal proceedings or applied for any immigration benefit in the U.S.

3. I work for a construction company, doing plumbing and electrical work. My elderly father who still lives in El Salvador depends on me for economic support, and if I were unable to work or was deported back to El Salvador my father would not be able to support himself. Recently, my father needed surgery, from which he is still recovering.

I helped pay for the surgery and without the money I send home my father would not have been able to get the care he needs.

4.  I have been an outspoken advocate with CASA for more than eight years, exercising my First Amendment rights to call for immigration reform and other causes at the state and national level.  I have engaged with CASA's organizing committees throughout my time with CASA, and I have been an outspoken public activist, participating in lobbying elected officials, engaging in marches and rallies, as well as speaking to the media about issues that are important to me personally and to CASA's membership generally.

5.  I believe that there is strength in unity, and that it is vital for people to feel free to come together to fight against injustice.  I think the community must be empowered with information and education about their rights, while building hope for a better future together.

6.  The IFR makes me afraid to speak out publicly, because my political views and the policy positions I believe in are not aligned with the current administration.  If I comply with the regulation and register, I'm afraid that I could be targeted and persecuted for my activism, while if I don't not comply with the requirement I could be subjected to criminal penalties.

7.  Additionally, I don't trust the registration process online, because I am afraid of government surveillance.  I am very careful with how I interact with the internet on my phone and other devices.  I don't want them to be able to access my sensitive and private information.

I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED: April 23, 2025

**CERTIFICATE OF INTERPRETATION**

I, <u>Lydia Walther-Rodriguez</u>, hereby certify under penalty of perjury that I am qualified to interpret from English to Spanish, that I read this Declaration to the declarant in Spanish, and that my interpretation was true and correct to the best of my ability.

_____                                    ___4/23/25_____
Signature of Interpreter                                                              Date

JA228

# EXHIBIT L

# Declaration of CASA Member ALDC

JA229

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

         *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

        *Defendants*.

Case No. 1:25-CV943

## **DECLARATION OF** ███████████

    I, █████████, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. I am a CASA member originally from Honduras currently residing in Virginia with my husband. I entered the United States without inspection and without contact with immigration authorities in 2006. I have never been placed in removal proceedings or applied for any immigration relief in the United States. My husband also does not have lawful immigration status and would be required to register under the IFR.

3. We have three United States citizen children, ages 12, 14 and 16. Our youngest contracted meningitis that requires constant medication with antibiotics and regular doctors' visits to ensure that the infection is under control. The meningitis is in his brain and he required surgery on it right after he was born, when he was only four months old.

4. I have been an active leader with CASA over the last three years, speaking out about issues that are important to me through CASA's organizing committees and through participation in public actions like marches and rallies. I decided to become a leader with CASA because I saw the need to take action to build community power and solidarity.

5. The IFR makes me afraid to speak out because I feel like I might be targeted by the government for my participation.

6. I am also afraid to register with the government because I believe it will lead to my detention and potential deportation. My children need me here, and if we were separated they would have no one to take care of them other than my husband, who is also at risk of deportation. Our youngest son would not be able to get the medical care and support he needs in Honduras and our other children would be at risk of being victimized by gangs or other bad actors – whether they were here, in the United States without me or if they were forced to go with me to Honduras.

7. Additionally, I don't even know how I would complete the registration requirement, since I don't read or understand English well and am not good with computers. I wouldn't feel able to complete the online registration form.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: April 23, 2025

## CERTIFICATE OF INTERPRETATION

I, <u>Lydia Walther-Rodriguez</u>, hereby certify under penalty of perjury that I am qualified to interpret from English to Spanish, that I read this Declaration to the declarant in Spanish, and that my interpretation was true and correct to the best of my ability.

_____                    _____4/23/25_____
Signature of Interpreter                                            Date

JA232

# EXHIBIT M

# Declaration of CASA Member NC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

        *Plaintiffs*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

        *Defendants*.

Case No. 1:25-CV943

## DECLARATION OF ███████████

I, ███████████ , upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. I am a CASA member originally from El Salvador who currently resides in Maryland with my two adult children.  I entered the United States without inspection in 2004 and have resided in this country since then.  I have never had contact with immigration officials, had a case in immigration court, or applied for any immigration benefit in the United States.

3. I work as a cleaner and support my elderly mother who lives in El Salvador.  My mother does not work and depends on the money I send to live.

4. I have been a vocal activist with CASA, giving testimony before elected officials on issues that are important to me.  Since 2021 I have participated in numerous public

demonstrations with CASA, in support of causes like tenant rights, increased access to healthcare for Marylanders, and expanded immigration protections for people across the country.

5. I have spoken publicly at many of these events, including testifying and lobbying in front of elected officials of the local, state and national government, as well as giving interviews to the media.

6. The IFR has caused me a lot of fear and uncertainty about exercising my right to speak out and caused me to question whether I should participate in the activities I have in the past, because I don't not have any protection if the government decides to target me for my speech.

7. More broadly, the IFR has impacted my whole life. I feel that I am being offered a terrible choice, between putting myself and my family at risk by giving my information to immigration officials or being criminalized for failing to comply with the registration requirement.

8. Being deported would be a disaster for me because I would have to abandon the life that I have built here and start over in El Salvador. I don't feel like I have a future there and if I were forced to return, I could not come back to the U.S. where my life is. I'm most worried, though, about my family, who would lose all the financial support I provide.

9. I run a small business and always pay my taxes, contributing to my community in whatever way I can. The income I earn from that business, in addition to supporting my immediate family and my elderly mother, also helps to pay for medicine for my brother, who is very sick. He would not be able to afford that medicine if I could not provide for him.

10. Even if I tried to register, however, I don't think I would be able to do so because I wouldn't be able to navigate the process to set up an account and fill out the registration form online. I have very limited English proficiency and wouldn't be able to read or understand the questions on the form, forcing me to complete and sign something I didn't understand.

11. After living in the U.S. for more than 20 years, I believe that rather than forcing people like me to fill out a registration form, the government should create a pathway to citizenship for undocumented immigrants living in this country and finally enact immigration reform that respects the dignity and humanity of all people.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: April 23, 2025

JA236

**CERTIFICATE OF INTERPRETATION**

I, <u>Lydia Walther-Rodriguez</u>, hereby certify under penalty of perjury that I am qualified to interpret from English to Spanish, that I read this Declaration to the declarant in Spanish, and that my interpretation was true and correct to the best of my ability.

_____           ___4/23/25_____
Signature of Interpreter                                      Date

JA237

# EXHIBIT N

# Declaration of CASA Member PH

JA238

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

          *Plaintiffs*,

          v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

          *Defendants*.

Case No. 1:25-CV943

## <u>DECLARATION OF</u> █████████████

I, ████████████, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. I am a CASA member originally from Mexico who now resides in Maryland, with my partner and two children.  I entered the United States without inspection and without contact with immigration officials in 2004.  Both of my children are U.S. citizens, but my wife is also undocumented and at risk of deportation.   I have never appeared before an immigration court in the United States or applied for any immigration benefit.

3. I work in a church two days a week doing maintenance and the other three days I work at a mechanic's shop.  I have been engaged with CASA for two decades and have participated in a number of CASA campaigns, including the successful fight to get access to drivers' licenses for immigrants in Maryland.

JA239

4. I routinely participate in other public demonstrations with CASA, proudly joining regardless of conditions, including turning out in the rain and snow to lift up my voice for immigrant communities.  I have given numerous interviews to the media over the course of my activism with CASA.

5. Due to the IFR, however, I am afraid to speak out because I fear that I will be targeted by the government.

6. Navigating the process to register would be incredibly difficult for me, because I have limited English proficiency.  I don't think I could create an online account, let alone fill out the registration form.

7. In addition, I am afraid to register because I believe it could lead to my detention and deportation by immigration officials, with my previous outspoken activism and support of immigrant rights issues a cause for selective prosecution.  If I were detained and eventually removed from the U.S. it would leave my children without a father or hope for the future.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED: April 23, 2025

JA240

**CERTIFICATE OF INTERPRETATION**

I, <u>Lydia Walther-Rodriguez</u>, hereby certify under penalty of perjury that I am qualified to interpret from English to Spanish, that I read this Declaration to the declarant in Spanish, and that my interpretation was true and correct to the best of my ability.

_____          ___4/23/25_____
Signature of Interpreter                                  Date

JA241

# EXHIBIT O

# Declaration of Milagros Cisneros

JA242

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

            *Plaintiffs*,

       v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

            *Defendants*.

Case No. 1:25-CV943

## DECLARATION OF MILAGROS CISNEROS

I, Milagros Cisneros, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am more than 18 years of age and competent to testify, upon personal knowledge, to the facts set forth herein.

2. I am a Second Level Supervisory Assistant Federal Public Defender at the Federal Public Defender's Office for the District of Arizona in Phoenix, AZ. I have worked for over 20 years as an Assistant Federal Public Defender in Phoenix, Arizona, representing indigent clients in federal criminal cases.

3. I currently represent an individual charged with Willful Failure to Register under 8 U.S.C. § 1306(a). This week, I also represented another individual charged under 8 U.S.C. § 1306(a). These are the first charges I have ever encountered under this statute in my two-decade career as a Federal Defender.

4. One of the defendants was charged under 8 U.S.C. § 1306(a) on April 18, 2025. But he had been unable to register since the effective date of the Interim Final Rule because he was

being held in Maricopa County custody following his arrest and detention for unrelated charges from April 7, 2025 to April 17, 2025.

5. In light of the federal government's publicized intention to prioritize prosecutions for willful failure to register, I anticipate additional charges under § 1306(a) in my district of practice.

I declare under penalty of perjury that the foregoing is true and correct.


DATED: April 24, 2025
Phoenix, Arizona

Milagros Cisneros

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COALITION FOR HUMANE IMMIGRANT RIGHTS**, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY**, et al.,<br><br>    Defendants. | Case No. 1:25-cv-00943 (TNM) |

## <u>ORDER</u>

The Court denied Plaintiffs' [4] Motion for Preliminary Injunction on April 10. *Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-00943 (TNM), 2025 WL 1078776, at *1 (D.D.C. Apr. 10, 2025). Plaintiffs noticed their appeal two weeks later. Notice of Appeal, ECF No. 41. Notably, they did not seek an emergency stay from the Court of Appeals. Now, Plaintiffs move for an Injunction Pending Appeal. Mot. Inj. Pending Appeal, ECF No. 42.

The Court will not take off in another sprint now that Plaintiffs allege the previous Order was wrong, or alternatively, that they have fixed their mistakes. The Court already accommodated a tight deadline on the Plaintiffs' prior motion. *See* Mot. Prelim. Inj. at 2–3 (noting motion was filed on March 31 and requesting relief by April 11). Considering this history and the glut of emergency motions in this courthouse, the Court establishes the following briefing schedule for the Plaintiffs' Motion for an Injunction Pending Appeal. It is hereby

**ORDERED** that Defendants file a response to Plaintiffs' motion by May 19, 2025; and it is further

JA245

**ORDERED** that Plaintiffs file any Reply in support by May 27, 2025; and it is further

**ORDERED** that the parties appear for a motions hearing on June 6, 2025, at 11:00 a.m.

in Courtroom 2 before Judge Trevor N. McFadden.

**SO ORDERED**.


Dated: April 29, 2025                                    _____
                                                        TREVOR N. McFADDEN, U.S.D.J.

JA246

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **COALITION FOR HUMANE IMMIGRANT RIGHTS**, et al., |
| Plaintiffs, |
| v. |
| **U.S. DEPARTMENT OF HOMELAND SECURITY**, et al., |
| Defendants. |

Case No. 1:25-cv-00943 (TNM)

## MEMORANDUM ORDER

Advocacy organizations serving immigrant communities move for an injunction pending their appeal of this Court's denial of their motion for preliminary injunction. They again seek to halt an interim final rule issued by the Department of Homeland Security that creates a universal registration form for aliens. But the relief Plaintiffs seek is intentionally hard to come by. And they have not shown they will suffer irreparable harm without it. So the Court will not stop the executive branch from carrying out its duties during this litigation.

## I.

For a more thorough version of the facts, the Court points to its previous Memorandum Order denying Plaintiffs' motion for a preliminary injunction. *See Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-00943 (TNM), — F. Supp. 3d. —, 2025 WL 1078776, at *1–3 (D.D.C. Apr. 10, 2025). The gist of this dispute is as follows: In January 2025, the Department of Homeland Security published an Interim Final Rule creating a new registration form for illegal aliens, Form G-325R. *See* 90 Fed. Reg. 11793, 11795–96, 11800. This form filled a decades-long gap between statute and regulation.

JA247

Since 1940, immigration *statutes* have required aliens (excluding foreign government officials and their families) who are 14 years or older and have been in the country for at least 30 days to register and be fingerprinted.  *See* Alien Registration Act of 1940, Pub. L. No. 76-670, 54 Stat. 670, 673–74 (codified at 8 U.S.C. § 451) (repealed 1952); Immigration and Nationality Act, Pub. L. No. 82-414, §§ 261–64, 66 Stat. 163, 223–25 (codified at 8 U.S.C. §§ 1201(b), 1301–1306) (1952).  And for decades, the statutes have also required adult aliens to carry proof of registration "at all times."  8 U.S.C. § 1304(e).  The "willful failure" to register or be fingerprinted is a crime punishable by a fine or up to six months of imprisonment.  *Id.* § 1306(a).

The regulations have not always tracked.  Over the years, immigration authorities have narrowed the list of registration forms.  So the only available path to registration has been through preexisting forms that are only available to aliens with *legal* status, like the I-151 for lawful permanent residents or the Form I-94 for aliens with a record of lawful entry.  *See* 15 Fed. Reg. 579, 579–80 (Feb. 2, 1950); 17 Fed. Reg. 11532, 11533 (Dec. 19, 1952).  This means "the only aliens who are registered are those with legal immigration status; the regulations do not include a nondiscretionary registration form for an alien who entered illegally."  *Coal. for Humane Immigrant Rts.*, 2025 WL 1078776, at *2.

The Form G-325R provides a pathway to registration for illegal aliens.  Before it took effect, Plaintiffs filed this suit, seeking a stay of the effective date of the Interim Final Rule or, in the alternative, a preliminary injunction.  *See* Mot. Stay, ECF No. 4, at 1  They argued the Interim Final Rule violates the Administrative Procedure Act.  Compl., ECF No. 1, ¶¶ 103–09.  Plaintiffs are a handful of nonprofit organizations serving immigrant communities: the Coalition for Humane Immigrant Rights Los Angeles (CHIRLA), United Farmworkers of America, Make

the Road New York, and CASA. *See* Compl. ¶¶ 6–13. These organizations are member-based and comprise many aliens and citizens who belong to mixed-status families.

The Court declined to grant the "extraordinary and drastic remedy" of a preliminary injunction. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). It found that Plaintiffs failed to meet their burden to show standing. *Coal. for Humane Immigrant Rts.*, 2025 WL 1078776, at *3. As for organizational standing, the Court concluded that CHIRLA—the only entity asserting organizational standing—had alleged "highly speculative" injuries that "sound[ed] in prospective fears." *Id.* at *5. More, the Court stressed that "CHIRLA [could not] demonstrate that the Interim Final Rule has 'perceptibly impaired' its mission." *Id.* (quoting *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011)). Instead, CHIRLA had merely "expand[ed] its operations to address increased demands in the communities it serves." *Id.*

The same went for associational standing. First, the Court stressed that Plaintiffs failed to adduce sufficient evidence to support their claims that their individual members had standing to challenge the Interim Final Rule. *Id.* at *6. Because the "only allegations of concrete harm to individual members that Plaintiffs present[ed] [were] in the form of pseudonymous hearsay" that were themselves "contained in affidavits submitted by the organizations," "all the Court ha[d] to go on [was] hearsay-within-hearsay." *Id.* The Court declined to find standing based on double hearsay that "innately lack[ed] credibility." *Id.* at *7.

Plus, even if it did credit the evidence, Plaintiffs failed to meet their standing burden. The Court explained how "Plaintiffs' primary conception of their members' injury is that the members are 'directly regulated parties.'" *Id*. Yet, Plaintiffs cited no case law postdating *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), to persuade the Court that mere regulation

sufficed as a concrete injury. *Id.* Nor did Plaintiffs explain how simply being subject to a regulation satisfied the *TransUnion* test. *Id.*

More, the Court rejected Plaintiffs' attempts to derive standing from asserted constitutional harms. Their Fifth Amendment allegations faltered because "any claims that the members risk a violation of their right against self-incrimination [were] speculative and premature," given Plaintiffs did not "allege that any of their members ha[d] actually invoked their Fifth Amendment right, only to be rebuffed." *Id.* at 10. And their assertions that Form G-325R chilled their members' speech failed, as "allegations of a subjective chill are not adequate" to confer standing. *Id.* at 10 (quoting *United Presb'n Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984)). Because Plaintiffs did not show that their members "face[d] a credible threat of prosecution *for their speech* under a statute that appears to render their arguably protected speech illegal," the First Amendment could not undergird their standing claims. *Id.* (cleaned up).

Plaintiffs appealed the denial of the preliminary injunction, without seeking an emergency stay. Not. Appeal, ECF No. 43. Concurrently, they filed the present motion for an injunction pending appeal. Mot. Inj. Pending Appeal, ECF No. 42. With the motion, they file a dozen affidavits from their members. *See* Decls., ECF Nos. 42-3–42-14. The Government timely filed its opposition. Mem. Opp'n, ECF No. 45. The motion is now ripe for review.

## II.

Rule 62(d) of the Federal Rules of Civil Procedure governs injunctions pending appeal. The standards for evaluating such a motion are "substantially the same as those for issuing a preliminary injunction," meaning the movant must show that (1) "they are likely to succeed on the merits," (2) "they are likely to suffer irreparable harm in the absence of preliminary relief,"

(3) the balance of equities tips in their favor," and (4) "an injunction is in the public interest." *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 324 (D.D.C.), *aff'd in part*, 755 F. App'x 1 (D.C. Cir. 2018) (per curiam).

While these motions are unusual, the plain language of Rule 62(d) "contemplates the possibility that the district court may grant an injunction pending appeal from an interlocutory order denying preliminary injunction." *MediNatura, Inc. v. Food & Drug Admin.*, 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021); *see* Fed. R. Civ. P. 62(d) ("While an appeal is pending from an interlocutory order . . . that . . . refuses . . . an injunction, the court may . . . grant an injunction."). Namely, "in rare cases, the threat of irreparable harm may be so grave and the balance of equities may favor a plaintiff so decisively that an injunction pending appeal of a difficult or novel legal question may be proper." *MediNatura, Inc.*, 2021 WL 1025835, at *6. Affirmative injunctions—rather than stays—are especially disruptive and will be granted only sparingly lest Rule 62(d) undermine Rule 65. *Id.*

### III.

The Court denies the motion for an injunction pending appeal. Although Plaintiffs have remedied the Court's concerns about associational standing, they still fail to show irreparable harm. Given irreparable harm is an independent requirement for equitable relief, the Court will not provide the relief Plaintiffs seek.

### A.

Begin with standing. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("likelihood of success on the merits" encompasses "a substantial likelihood of standing."). On the second go-round, Plaintiffs have met their burden to show their members possess a "personal stake" in the case. *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

Associational standing permits an organization to bring suit on behalf of its members where its members "would otherwise have standing to sue in their own right"; where "the interests it seeks to protect are germane to the organization's purpose"; and where "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs have smoothened the stumbling blocks of the past; they now successfully assert associational standing.

First, they have resolved the evidentiary issues that plagued their preliminary injunction motion. They have submitted a dozen affidavits from their members describing how the regulation affects them. *See, e.g.*, Ana Decl., ECF No. 42-3, ¶ 9 ("I am fearful of getting arrested and sent to jail because I am not able to complete the form."); Gloria Decl. ¶ 11 ("I am fearful I will not be able to complete the registration properly or assist my minor son with it and that I could be arrested and separated from my family."). Thus the Court no longer must rely on pseudonymous double-hearsay to assess the "irreducible constitutional minimum" of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Second, they have met their legal burden to explain that mere subjection to regulation confers a concrete injury, even following *TransUnion*. *See Coal. for Humane Immigrant Rts.*, 2025 WL 1078776, at *7. On this do-over, Plaintiffs present sufficient facts and case law that shows their members suffer an injury in fact by being "directly regulated parties." Mot. Inj. Pending Appeal at 6; *see Corbett v. Transportation Security Admin.*, 19 F.4th 478, 483 (D.C. Cir. 2021) (holding that a frequent flyer challenging TSA plane mask mandate had standing to argue that the mandate was ultra vires); *Arizona v. Env't Prot. Agency*, 77 F.4th 1126, 1131 (D.C. Cir. 2023) (noting that in "cases involv[ing] rules that constrain[] what regulated parties can lawfully

do," "there is ordinarily little question of standing if the complainant is himself an object of the rule in question."). They also meet their burden to situate this injury in the *TransUnion* framework. Mot. Inj. Pending Appeal at 6.

Thus the first element of the *Hunt* test for associational standing is satisfied.

The latter two elements of the *Hunt* test are not difficult. Clearly the interests Plaintiffs seek to protect by filing this suit are germane to their purposes. *Hunt*, 432 U.S. at 343. Plaintiffs aim to improve the lives, protect the rights, and aid the needs of the immigrant communities they serve. Salas Decl., ECF No. 4-2, ¶¶ 2–4; Strater Decl., ECF No. 4-3, ¶¶ 5–6; Fontaine Decl., ECF No. 4-5, ¶¶ 3–4; Escobar Decl., ECF No. 4-4, ¶¶ 8–9. They see Form G-325R as imposing harms on the communities they aim to protect. And finally, this suit does not require the individual participation of Plaintiffs' members. *Hunt*, 432 U.S. at 343. "Member participation is not required where a suit raises a pure question of law"—and here, Plaintiffs bring solely legal claims under the APA. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (cleaned up). Plaintiffs have accordingly remedied the previous shortcomings identified by the Court for their showing of associational standing.[1]

## B.

But just because Plaintiffs' members suffered an injury-in-fact does not mean they are experiencing *irreparable* harm. The Circuit has stated "time and time again that the degree of proof required for irreparable harm is high." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (cleaned up). The injury "must be both certain and great; it must

---

[1] "To establish jurisdiction, the court need only find one plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Still, the Court adopts in full its findings from the previous Order that CHIRLA lacks organizational standing. *Coal. for Humane Immigrant Rts.*, 2025 WL 1078776, at *6. More, since none of the organizations have suffered a cognizable injury, none of their asserted harms can be the basis for a finding of irreparable injury, either. *See Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1508 (D.C. Cir.), *opinion amended on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995).

be actual and not theoretical and of such imminence that there is a clear and present need for equitable relief." *Id.* This burden is not insurmountable. But it does ensure that the purposefully extraordinary remedy of an injunction is withheld until grave injury is banging on a movant's door.

Plaintiffs have a few different theories for why their members will suffer irreversible injury in the absence of equitable relief. But none of these theories avails.

First, they insist that their members "do not speak English and have difficulty accessing the Internet, putting them at imminent risk of prosecution and detention for failure to register." Mot. Inj. Pending Appeal at 16 (citing Ana Decl. ¶¶ 5, 8; Gloria Decl. ¶¶ 7, 9). But this does not suffice to show irreparable harm. For one, "the mere threat of potential future prosecution is insufficient to establish irreparable harm for exercising equitable jurisdiction." *Lindell v. United States*, 82 F.4th 614, 620 (8th Cir. 2023). If the rule were otherwise, "the district court's exercise of its equitable jurisdiction would not be extraordinary, but instead quite ordinary," as "every potential defendant could point to the same harm and invoke the equitable powers of the district court." *Id.*; *accord D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019); *Ramsden v. United States*, 2 F.3d 322, 326 (9th Cir. 1993).

More, Plaintiffs have not shown that actual prosecution and detention is imminent for any one of their members. True, they file a handful of criminal complaints to show that prosecutions have begun for failure to register in a couple of jurisdictions. *See* Criminal Complaints, ECF No. 42-2. But there is no averment that the aliens charged are members of Plaintiffs' organizations. And these criminal complaints were filed in Arizona and Louisiana. *See generally id.* None of Plaintiffs' members who submitted affidavits reside in these states. The fact that a few U.S.

Attorneys have filed a clutch of charges against non-members elsewhere in the country says little about any danger CHIRLA's members face.

In short, numerous steps—many involving discretion and randomness—would have to occur before one of Plaintiffs' members was subject to prosecution.  But there is no proof that even a single step has been taken toward that end.  Thus while Plaintiffs' motion "establishes that [their members] may suffer irreparable harm at some point in the future, there is no indication that the harm is imminent."  *White v. Florida*, 458 U.S. 1301, 1302 (1982).

Second, Plaintiffs gesture toward an informational harm they claim is irreparable.  They argue that members "must undergo the G-325R process to register and provide far more information to the government" than they had under other immigration forms.  Mot. Inj. Pending Appeal at 16.  And Plaintiffs stress that "the G-325R process contains none of the statutory confidentiality provisions" that other registration avenues provide, such as the U-Visa and the Violence Against Women Act.  *Id.*  According to Plaintiffs, their members "face irreparable harm from the IFR's requirement to provide personal information that Defendants explicitly intend to use for immigration enforcement."  *Id.*

Plaintiffs cite no case law to support their argument.  And the Court is unaware of any circuit or Supreme Court precedent that finds the provision of personal data to government officials to be an irreparable injury.  Instead, courts evaluating informational harm as irreparable typically require *dissemination* of that information to the public or private individuals who are under no obligation to safeguard it, like a private information broker or a competitor.  *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025).  Plaintiffs do not even allege that the data is at risk being disseminated or misused—only that sharing the data with the Government for legitimate reasons is *itself* an irreparable injury.  But courts in this district have

"consistently declined" to find irreparable injury in the absence of a threat of leakage.  *All. for Retired Americans v. Bessent*, No. CV 25-0313 (CKK), 2025 WL 740401, at *21 (D.D.C. Mar. 7, 2025) (cleaned up); *see also Ashland Oil, Inc. v. F.T.C.*, 409 F. Supp. 297, 308 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976) (holding plaintiff failed to show irreparable harm where his data was shared with a congressional subcommittee and there was no imminent threat of "public dissemination or disclosure to [plaintiff's] competitors.").  "Under th[e]se circumstances, a court can fashion adequate corrective relief after the fact," if it comes to that.  *Bessent*, 2025 WL 740401, at *21.

Finally, Plaintiffs try to raise a couple of constitutional injuries to make their showing of irreparable harm.  But these attempts fall flat.

For one, they claim their members are irreparably harmed because Form G-325R chills their First Amendment activity by requiring them to disclose their organizing and advocacy work.  Mot. Inj. Pending Appeal at 16.  But there is a crucial mismatch here.  Plaintiffs expressly state that they are not bringing constitutional claims, only claims under the APA.  *Id.* at 8.  The Court is unaware of any cases—outside of narrow, speech-related employment law disputes[2]— where "chilling" suffices as irreparable harm when no First Amendment violation has been alleged.  Indeed, courts evaluating chill-as-irreparable-harm often acknowledge that the inquiry is inextricably intertwined with the viability of a First Amendment claim.  That is, courts recognize that plaintiffs are unlikely to be chilled unless they are likely to be successful on their claim that the challenged governmental action violated the First Amendment.  *See, e.g.*, *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002) ("In this case, as the district court recognized, the irreparable harm that Carandola alleged is inseparably linked to its claim of

---

[2] *See, e.g.*, *Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 91 (2d Cir. 1983).

violation of First Amendment rights. Determination of irreparable harm thus requires analysis of Carandola's likelihood of success on the merits."); *Blum v. Schlegel*, 830 F. Supp. 712, 724 (W.D.N.Y. 1993), *aff'd*, 18 F.3d 1005 (2d Cir. 1994) ("A showing of a chilling effect must amount to a clearcut infringement of first amendment rights which, absent preliminary injunctive relief, either has occurred or will occur in the future.").  In short, a plaintiff cannot willy nilly allege a chilling of her speech without alleging a concomitant violation of her First Amendment rights.  *See Wagner v. Taylor*, 836 F.2d 566, 576 n.76 (D.C. Cir. 1987) ("[T]he finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant, but depends on the appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment.").  Because Plaintiffs have expressly disclaimed any constitutional challenge, this attempt at irreparable harm must fail.

Plaintiffs also insist their members will suffer irreparable harm by being forced to disclose charged and uncharged criminal conduct on the Form G-325R.  Mot. Inj. Pending Appeal at 8, 17.  According to Plaintiffs, this burdens their members' Fifth Amendment rights against self-incrimination.  *Id.*  But for the reasons stated in the Court's prior opinion, this argument is bootless.  Again, "a Fifth Amendment self-incrimination claim is not ripe until a claim of the privilege is actually made."  *Carman v. Yellen*, 112 F.4th 386, 404 (6th Cir. 2024).  But there is no allegation that any of their members have sought to invoke their right, or that penalties would accompany such an invocation.  "At this point, then, any claims that the members risk a violation of their right against self-incrimination are speculative and premature." *Coal. for Humane Immigrant Rts.*, 2025 WL 1078776, at *10.  Without even a ripe injury to their members, Plaintiffs cannot assert that there is an irreparable one.

*    *    *

Plaintiffs could not have met their burden to show irreparable harm even if this were a motion for preliminary injunction. But Rule 62(d) suggests that the demand is higher still when a party is seeking a stay pending the appeal of a denial of a preliminary injunction. *Accord MediNatura, Inc.*, 2021 WL 1025835, at *6 ("[I]n rare cases, the threat of irreparable harm may be *so grave* and the balance of equities may favor a plaintiff so decisively than an injunction pending appeal of a difficult or novel legal question may be proper.") (emphasis added). Plaintiffs have not shown that irrevocable and irremediable injury has come knocking. Indeed, they never moved for an emergency stay of the Court's prior order, suggesting that no such emergency exists. This alternative effort to seek a do-over in this Court is permissible, but disfavored. Put simply, Plaintiffs are not entitled to this form of extraordinary relief.

## IV.

In short, though Plaintiffs' members have experienced a concrete injury by virtue of incurring new legal obligations under the Rule, Plaintiffs have not shown an imminent *irreparable* injury. Because that is a freestanding requirement for the issuance of an injunction, the Court will not exercise its equitable authority here. Plaintiffs' [42] Motion for Injunction Pending Appeal is accordingly **DENIED**.

**SO ORDERED.**

Dated: June 12, 2025

_____
TREVOR N. McFADDEN, U.S.D.J.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT
RIGHTS, et al.,
    *Plaintiffs*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,
    *Defendants*.

Case No. 1:25-cv-00943 (TNM)

**PLAINTIFFS' RENEWED MOTION FOR STAY UNDER 5 U.S.C. § 705 OR
PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE,
INJUNCTION PENDING APPEAL**

Plaintiffs respectfully renew their request for a preliminary injunction. While they recognize the Court already held it would deny a preliminary injunction even given its recent conclusion that they have demonstrated standing, Plaintiffs seek a formal denial order incorporating the Court's current reasoning to facilitate appellate review.

1. This case is a challenge to an Interim Final Rule ("IFR") establishing a new system of universal noncitizen registration, breaking with 75 years of agency practice. *See* Order, ECF 27 at 2-4. Plaintiffs, four organizations with members who are required to register under the IFR, sued and sought a preliminary injunction and stay under 5 U.S.C. § 705. On April 10, this Court denied the motion, holding that Plaintiffs lacked standing to sue. *Id*. at 6-20. It did not address the other factors. *Id*.

Plaintiffs appealed and sought an injunction pending appeal from this Court on April 24. ECF No. 42. The Court declined to rule quickly, set a briefing schedule on the motion and scheduled a hearing for June 6. ECF No. 44.

JA259

Plaintiffs sought an injunction or stay from the Court of Appeals on May 2. No. 25-5152, Doc. No. 2114110. Given that this Court's decision turned entirely on standing, that issue was a central focus of briefing. *See id*. Doc. No. 2114110 at 6-14 (Plaintiffs' Motion); Doc. No. 2117122 at 10-15 (Opposition); Doc. No. 2118909 at 2-6 (Reply).

In the meantime, this Court issued an opinion denying the motion. ECF No. 53. In this Order, the Court concluded that "Plaintiffs have met their burden to show their members" have standing. *Id*. at 5. The Court concluded that the submission of individual declarations from members attesting to the facts reflected in the previously submitted organizational declaration "resolved the evidentiary issues" it had discerned in their original motion. *Id*. at 6. And the Court accepted Plaintiffs' explanation that "mere subjection to regulation confers a concrete injury." *Id*. at 6-7. That is, the Court resolved in Plaintiffs' favor the central issue that had been briefed before the Court of Appeals. No. 25-5152, Doc. No. 2114110 at 6-11.

However, the Court found that Plaintiffs failed to establish irreparable injury. ECF No. 53 at 7-12. The Court opined that Plaintiffs would have failed to establish such injury "even if this were a motion for preliminary injunction," but relied on the fact that the motion sought an injunction pending appeal to suggest that "the demand is higher still" in the current posture. *Id*. at 12.

Because the ground had shifted substantially since the parties briefed the motion pending before the Court of Appeals, Plaintiffs filed a motion to hold the current motion for injunction pending appeal in abeyance. *See* No. 25-5152, Doc. No. 2120804. They informed the Court of Appeals that they would be appealing this Court's denial of the injunction pending appeal, seeking a new preliminary injunction ruling, and seeking expedited summary judgment proceedings.

2.  Plaintiffs hereby renew their request for a preliminary injunction or stay under 5 U.S.C. § 705. The Court's original denial order was based on a finding of lack of standing, but the Court has now determined that plaintiffs have standing to sue. The recent order denying an injunction pending appeal is grounded on the Court's conclusion that Plaintiffs lack irreparable injury, which was not addressed in the original order, from which the current appeal is pending.

Plaintiffs understand that this motion is a formality, as the Court has already indicated that it would deny a preliminary injunction on the same basis. ECF No. 53 at 12. But the procedural complexity of this case has led them to conclude it would be prudent to obtain a formal denial of a renewed preliminary injunction motion, reflecting or incorporating the Court's reasoning in its most recent opinion, to forestall any arguments or potential issues regarding the current appeal, appellate jurisdiction, and the appellate record. Because Plaintiffs have already briefed the issues and the court is familiar with them, Plaintiffs incorporate that briefing by reference in lieu of a new Statement of Points and Authorities. *See* ECF No. 4 (Motion for Stay or Injunction); ECF No. 14 (Opposition); ECF No. 20 (Reply).

Plaintiffs intend to renew their motion for an injunction or stay pending appeal before the Court of Appeals, addressing this Court's decision focused on irreparable injury. Because this Court has already denied a motion for injunction pending appeal, they do not believe it is necessary to renew that request as well. However, in an abundance of caution, Plaintiffs renew their motion for an injunction pending appeal pursuant to Fed. R. Civ. P. 8(a)(1)(C).

## **<u>CONCLUSION</u>**

The Court should grant a preliminary injunction or stay under 5 U.S.C. § 705 or, in the alternative, an injunction pending appeal.

Dated: June 18, 2025                          Respectfully submitted,


                                              /s/ Michelle Lapointe
Lynn Damiano Pearson*                         Michelle Lapointe (DC Bar No. 90032063)
Cassandra Charles*                            Emma Winger (DC Bar No. 90010721)
Joanna Cuevas Ingram*                         Leslie K. Dellon (DC Bar No. 250316)
National Immigration Law Center               Chris Opila (DC Bar No. 90029724)
P.O. Box 34573                                American Immigration Council
Washington, D.C. 20043                        PMB2026
Tel: (213) 639-3900                           2001 L Street, NW, Suite 500
Fax: (213) 639-3911                           Washington, DC 20036
damianopearson@nilc.org                       Tel: (202) 507-7645
charles@nilc.org                              ewinger@immcouncil.org
cuevasingram@nilc.org                         mlapointe@immcouncil.org
                                              ldellon@immcouncil.org
                                              copila@immcouncil.org

                                              Cody Wofsy (DDC Bar No. CA00103)
Jennifer R. Coberly (DDC Bar No. 90031302)    American Civil Liberties Union Foundation,
American Immigration Lawyers Association       Immigrants' Rights Project
1331 G. St. NW                                425 California St, 7th Floor
Washington, DC 20005                          San Francisco, CA 94104
Tel: (202) 507-7692                           Tel: (415) 343-0770
Jcoberly@AILA.org                             cwofsy@aclu.org

                                              Anthony Enriquez (DDC Bar No. NY0626)
Nicholas Katz**                               Sarah T. Gillman (DDC Bar No. NY0316)
CASA, Inc.                                    Robert F. Kennedy Human Rights
8151 15th Avenue                              88 Pine Street, Suite 801
Hyattsville, MD 20783                         New York, NY 10005
Tel: (240) 491-5743                           (917) 284-6355
nkatz@wearecasa.org                           enriquez@rfkhumanrights.org
                                              gillman@rfkhumanrights.org

                                              Sarah E. Decker (DDC Bar No. NY0566)
                                              Robert F. Kennedy Human Rights
                                              1300 19th Street NW, Suite 750
                                              Washington, DC 20036
  * Admitted Pro Hac Vice                     (202) 559-4432
** Pro Hac Vice application forthcoming        decker@rfkhumanights.org

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT
RIGHTS, et al.,

*Plaintiffs*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

*Defendants*.

Case No. 1:25-cv-00943 (TNM)

**PLAINTIFFS' MOTION FOR EXPEDITED SUMMARY JUDGMENT BRIEFING
SCHEDULE**

Plaintiffs respectfully move for the entry of an expedited summary judgment schedule, as

set forth below.

1.  This case is a challenge to an Interim Final Rule ("IFR") establishing a new system of

universal noncitizen registration, breaking with 75 years of agency practice. *See* Order, ECF 27

at 2-4. Plaintiffs, four organizations with members who are required to register under the IFR,

sued and sought a preliminary injunction and stay under 5 U.S.C. § 705. On April 10, this Court

denied the motion, holding that Plaintiffs lacked standing to sue. *Id*. at 6-20. It did not address

the other factors. *Id*.

Plaintiffs appealed and sought an injunction pending appeal from this Court on April 24.

ECF No. 42. The Court declined to rule quickly, set a briefing schedule on the motion and

scheduled a hearing for June 6. ECF No. 44.

Plaintiffs sought an injunction or stay from the Court of Appeals on May 2. No. 25-5152,

Doc. No. 2114110. Given that this Court's decision turned entirely on standing, that issue was a

central focus of briefing. *See id*. Doc. No. 2114110 at 6-14 (Plaintiffs' Motion); Doc. No. 2117122 at 10-15 (Opposition); Doc. No. 2118909 at 2-6 (Reply).

In the meantime, this Court issued an opinion denying the motion. ECF No. 53. In this Order, the Court concluded that "Plaintiffs have met their burden to show their members" have standing. *Id*. at 5. The Court concluded that the submission of individual declarations from members attesting to the facts reflected in the previously submitted organizational declaration "resolved the evidentiary issues" it had discerned in their original motion. *Id*. at 6. And the Court accepted Plaintiffs' explanation that "mere subjection to regulation confers a concrete injury." *Id*. at 6-7. That is, the Court resolved in Plaintiffs' favor the central issue that had been briefed before the Court of Appeals. No. 25-5152, Doc. No. 2114110 at 6-11.

However, the Court found that Plaintiffs failed to establish irreparable injury. ECF No. 53 at 7-12. The Court opined that Plaintiffs would have failed to establish such injury "even if this were a motion for preliminary injunction," but relied on the fact that the motion sought an injunction pending appeal to suggest that "the demand is higher still" in the current posture. *Id*. at 12.

Because the ground had shifted substantially since the parties briefed the motion pending before the Court of Appeals, Plaintiffs filed a motion to hold the current motion for injunction pending appeal in abeyance. *See* No. 25-5152, Doc. No. 2120804. They informed the Court of Appeals that they would be appealing this Court's denial of the injunction pending appeal, seeking a new preliminary injunction ruling, and seeking expedited summary judgment proceedings.

2.  While appellate proceedings regarding the question of an injunction or § 705 stay proceed in the Court of Appeals, Plaintiffs move the Court to set an expedited summary judgment schedule, as set forth below.

Proceeding directly to summary judgment would permit the Court to promptly address the merits of this case. It is well established that, if Plaintiffs prevail on their merits claims, "the normal remedy" would be to vacate the offending IFR. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). And while vacatur may be inappropriate in some circumstances, failure to abide by notice-and-comment procedures "is a 'fundamental flaw' that almost always requires vacatur." *Id.* (quoting *Heartland Reg'l Med. Ctr. v. Sebelius,* 566 F.3d 193, 199 (D.C. Cir. 2009)); *see Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (same). Irreparable injury is not part of the analysis, and so the Court's conclusions in its recent Order are no barrier to affording vacatur relief. *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 535 (D.C. Cir. 2018) ("The irreparable harm standard . . . is not the standard for the 'less drastic' APA remedy of vacatur."); *cf Allina Health Servs.*, 746 F.3d at 1109 ("We have not been hospitable to government claims of harmless error in cases in which the government violated § 553 of the APA by failing to provide notice. The most egregious are cases in which a government agency seeks to promulgate a rule by another name—evading altogether the notice and comment requirements.").

Good cause exists for an expedited schedule. Even according to Defendants, the IFR is currently impacting millions of noncitizens across the country. *See* 90 Fed. Reg. 11793, 11797 (Mar. 12, 2025). In reality, the impact is even broader. *See* ECF No. 4-1 at 24-26 (discussing substantial impact on the public of universal registration and carry requirement). Furthermore, the parties have extensively briefed the merits and the Court is already familiar with the issues.

And the government has never offered an adequate justification for bypassing notice-and-comment procedures. To vindicate Plaintiffs' and the public's right to procedural regularity under the APA, the Court should put this litigation to rest by ordering accelerated summary judgment proceedings and ruling as soon as practicable.

Plaintiffs respectfully request the following schedule:

July 1: Defendants produce administrative record

July 11: Plaintiffs' Motion for Summary Judgment

July 21: Defendants' Opposition and Motion for Summary Judgment

July 28: Plaintiffs' Opposition and Reply

August 4: Defendants' Reply

Plaintiffs conferred with Defendants regarding this motion, who indicated they oppose it.

## **CONCLUSION**

The Court should enter an expedited summary judgment schedule.

Dated: June 18, 2025

Respectfully submitted,

/s/ Michelle Lapointe

Lynn Damiano Pearson*
Cassandra Charles*
Joanna Cuevas Ingram*
National Immigration Law Center
P.O. Box 34573
Washington, D.C. 20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Michelle Lapointe (DC Bar No. 90032063)
Emma Winger (DC Bar No. 90010721)
Leslie K. Dellon (DC Bar No. 250316)
Chris Opila (DC Bar No. 90029724)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

Jennifer R. Coberly (DDC Bar No. 90031302)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692
Jcoberly@AILA.org


Nicholas Katz**
CASA, Inc.
8151 15th Avenue
Hyattsville, MD 20783
Tel: (240) 491-5743
nkatz@wearecasa.org

Cody Wofsy (DDC Bar No. CA00103)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanights.org

\* *Admitted Pro Hac Vice*
\*\* *Pro Hac Vice application forthcoming*

JA267

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.,* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-00943-TNM |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.,* | ) ) ) | |
| Defendants. | ) ) | |

**NOTICE OF APPEAL FROM DENIAL OF INJUNCTIVE RELIEF**

PLEASE TAKE NOTICE that Plaintiffs Coalition for Humane Immigrant Rights, United Farmworkers of America, CASA, Inc., and Make the Road New York hereby appeal to the U.S. Court of Appeals for the District of Columbia Circuit from this Court's June 12, 2025, Memorandum Order (ECF No. 53) denying Plaintiffs' motion for an injunction pending appeal.

Dated: June 25, 2025

Lynn Damiano Pearson*
Cassandra Charles*
Joanna Cuevas Ingram*
National Immigration Law Center
P.O. Box 34573
Washington, D.C.  20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Jennifer R. Coberly (DDC Bar No. 90031302)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005

Respectfully submitted,

*/s/ Emma Winger*
Emma Winger (DC Bar No. 90010721)
Michelle Lapointe (DC Bar No. 90032063)
Leslie K. Dellon (DC Bar No. 250316)
Chris Opila (DC Bar No. 90029724)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

Cody Wofsy (DDC Bar No. CA00103)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor

JA268

Tel: (202) 507-7692
Jcoberly@AILA.org

San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanrights.org

*Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.,* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-00943-TNM |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.,* | ) ) ) | |
| Defendants. | ) ) | |

**NOTICE OF APPEAL FROM DENIAL OF INJUNCTIVE RELIEF**

PLEASE TAKE NOTICE that Plaintiffs Coalition for Humane Immigrant Rights, United Farmworkers of America, CASA, Inc., and Make the Road New York hereby appeal to the U.S. Court of Appeals for the District of Columbia Circuit from this Court's constructive denial of Plaintiffs' renewed motion for a stay under 5 U.S.C. § 705 or preliminary injunction (ECF No. 54).

Dated: July 8, 2025                                      Respectfully submitted,

                                                                */s/ Emma Winger*
Lynn Damiano Pearson*                          Emma Winger (DC Bar No. 90010721)
Cassandra Charles*                                  Michelle Lapointe (DC Bar No. 90032063)
Joanna Cuevas Ingram*                           Leslie K. Dellon (DC Bar No. 250316)
National Immigration Law Center             Chris Opila (DC Bar No. 90029724)
P.O. Box 34573                                         American Immigration Council
Washington, D.C.  20043                          PMB2026
Tel: (213) 639-3900                                   2001 L Street, NW, Suite 500
Fax: (213) 639-3911                                  Washington, DC 20036
damianopearson@nilc.org                        Tel: (202) 507-7645
charles@nilc.org                                        ewinger@immcouncil.org
cuevasingram@nilc.org                             mlapointe@immcouncil.org
                                                                  ldellon@immcouncil.org
                                                                  copila@immcouncil.org

JA270

Jennifer R. Coberly (DDC Bar No. 90031302)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692
Jcoberly@AILA.org

Cody Wofsy (DDC Bar No. CA00103)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanrights.org

*\* Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **COALITION FOR HUMANE IMMIGRANT RIGHTS**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY**, et al.,<br><br>Defendants. |

Case No. 1:25-cv-00943 (TNM)

**ORDER**

Plaintiffs are advocacy organizations serving immigrant communities.  Compl., ECF No. 1, at ¶¶ 6–13.  They sue various Government officials in charge of enforcing immigration policy, seeking to halt implementation of a new alien registration scheme.  Compl. at 33.  Plaintiffs have been busy in this case.  Previously, this Court denied their motion for a preliminary injunction and their motion for injunction pending appeal.  *Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1078776, at *10 (D.D.C. Apr. 10, 2025); *Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1662910, at *6 (D.D.C. June 12, 2025).  Undeterred, Plaintiffs have since filed another motion for preliminary injunction, which the Court has yet to decide.  Mot. Prelim. Inj., ECF No. 54.  Plaintiffs have appealed all three motions to the D.C. Circuit.  *See* Not. Appeal I, ECF No. 41; Not. Appeal II, ECF No. 56; Not. Appeal III, ECF No. 62.

Plaintiffs now move to expedite future proceedings in this Court.  But given the three appeals pending at the D.C. Circuit and to conserve judicial resources, the Court finds it prudent to stay proceedings here.  Plaintiffs' [55] Motion to Expedite Summary Judgment Briefing

Schedule is accordingly **DENIED**, and this case is **STAYED** pending resolution of the appeals before the D.C. Circuit.  The parties are further **ORDERED** to file a Joint Status Report within two weeks of the D.C. Circuit's resolution of the pending matters in this case.

      **SO ORDERED.**


Dated: July 10, 2025                           TREVOR N. McFADDEN, U.S.D.J.

JA273

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT
RIGHTS, et al.,

    *Plaintiffs*

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

    *Defendants*.

Case No. 1:25-cv-00943 (TNM)

**PLAINTIFFS' MOTION TO LIFT STAY**

Plaintiffs respectfully move the Court to lift the stay entered on July 10, 2025 so that Plaintiffs may move for summary judgment, as set forth below.

1.  This case is a challenge to an Interim Final Rule ("IFR") establishing a new system of universal noncitizen registration, breaking with 75 years of agency practice. *See* Order, ECF 27 at 2-4. Plaintiffs, four organizations with members who are required to register under the IFR, sued and sought a preliminary injunction and stay under 5 U.S.C. § 705. On April 10, this Court denied the motion, holding that Plaintiffs lacked standing to sue. *Id*. at 6-20. The Court did not address the merits of Plaintiffs' Administrative Procedure Act ("APA") claim. *Id*.

Plaintiffs appealed and sought an injunction pending appeal from this Court on April 24. ECF No. 42. This Court denied that motion on June 12, 2025. ECF No. 53. In that Order, the Court concluded that "Plaintiffs have met their burden to show their members" have standing. *Id*. at 5. However, the Court found that Plaintiffs failed to establish irreparable injury. *Id.* at 7-12. The Court did not reach the merits of Plaintiffs' APA claim. *Id.*

On June 18, 2025, Plaintiffs filed a renewed motion for a stay or preliminary injunction pending appeal asking the Court to clarify the basis of its denial of preliminary relief for

purposes of appeal. ECF No. 54. That same day, Plaintiffs filed a motion for an expedited

summary judgment briefing schedule. ECF No. 55. Plaintiffs maintained that moving directly to

summary judgment would permit the Court to promptly resolve Plaintiffs' claims without

reconsidering the Court's decision denying preliminary relief, because irreparable injury is not

part of the analysis for vacatur under the APA. *Id.* at 3.

On July 10, 2025, the Court denied Plaintiffs' motion for expedited summary judgment

briefing and sua sponte stayed this case pending resolution of Plaintiffs' appeals before the D.C.

Circuit "to conserve judicial resources." ECF No. 64. By the time of this Court's July 10 Order,

Plaintiffs had appealed the Court's denial of preliminary relief, the Court's denial of a stay

pending appeal, and the Court's constructive denial of Plaintiffs' renewed motion for a

preliminary injunction. *See* ECF No. 41; ECF No. 56; ECF No. 62. Also pending before the

court of appeals were Plaintiffs' two motions for a stay or preliminary injunction pending appeal.

On August 12, 2025, the court of appeals denied Plaintiffs' motions for a stay or

injunction pending appeal in an order finding that they had "not satisfied the stringent

requirements" for that relief. Doc. No. 2129682. The court of appeals then ordered that the

consolidated appeals be expedited, with briefing to conclude by November 6, 2025, and oral

argument to follow. *Id.* at 2.

2.  This Court has discretion to stay proceedings "incident to its power to control its own

docket." *Ctr. for Biological Diversity v. Ross*, 419 F. Supp. 3d 16, 20 (D.D.C. 2019) (quoting

*Clinton v. Jones*, 520 U.S. 681, 706 (1997)). "[I]n 'the exercise of [that] judgment,'" the Court

must "'weigh competing interests and maintain an even balance' . . . between the [C]ourt's

interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev. Ltd. v.

Gov't of Belize*, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S.

248, 254-55 (1936)). Thus, where one party seeks a stay, courts consider: "(1) harm to the nonmoving party if a stay does issue; (2) the moving party's need for a stay — that is, the harm to the moving party if a stay does not issue; and (3) whether a stay would promote efficient use of the court's resources." *Ctr. for Biological Diversity*, 419 F. Supp. 3d at 20. The same factors should be considered when the Court weighs a stay on its own motion. *See Belize Soc. Dev.*, 668 F.3d at 732-33; *Ctr. for Biological Diversity*, 419 F. Supp. 3d at 20.

With respect to harm to Plaintiffs, Plaintiffs have articulated a range of harms they and their members are suffering because the IFR has gone into effect. ECF No. 4-1 at 36-41; ECF No. 42 at 16-17 (identifying a risk of prosecution under unlawfully promulgated rule, the chilling effect on protected speech, inability to access the registration process, threat of removal of those with pending applications for congressionally authorized relief). Plaintiffs will continue to be subject to the IFR for the duration of this Court's stay while waiting for a decision from the court of appeals. While this Court has concluded that Plaintiffs' injuries do not rise to the level of irreparable harm, there is nevertheless a "fair possibility" that continuing this stay "'will work damage to' Plaintiffs' interests." *Ctr. for Biological Diversity*, 419 F. Supp. 3d at 21 (quoting *Landis*, 299 U.S. at 255).

On the other side of the ledger, there can be no comparable harm to Defendants from lifting the stay. The IFR is in effect. Plaintiffs merely seek to proceed to summary judgment so that the Court can decide the merits of their claims for the first time. Defendants have already fully responded to Plaintiffs' APA claims—both before this Court and before the court of appeals. There is no harm to Defendants to proceeding to summary judgment.

Finally, with respect to judicial economy, permitting Plaintiffs' claims to proceed to summary judgment may conserve judicial resources by potentially rendering Plaintiffs' appeals

moot and bringing this case closer to a final resolution. If the Court were to resolve Plaintiffs'

summary judgment motion before the D.C. Circuit decides their appeal, it may render it

unnecessary for the court of appeals to rule, especially where the Court's basis for denying

relief—a lack of irreparable harm—is not necessary to grant Plaintiffs' summary judgment.

If Plaintiffs prevail on their merits claims, "the normal remedy" would be to vacate the offending

IFR. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). And while vacatur

may be inappropriate in some circumstances, failure to abide by notice-and-comment procedures

"is a 'fundamental flaw' that almost always requires vacatur." *Id*. (quoting *Heartland Reg'l Med.*

*Ctr. v. Sebelius,* 566 F.3d 193, 199 (D.C. Cir. 2009)); *see Nat. Res. Def. Council v. Wheeler*, 955

F.3d 68, 85 (D.C. Cir. 2020) (same). Irreparable injury is not part of the analysis, and so the

Court's determination that Plaintiffs have not shown irreparable harm is no barrier to affording

vacatur relief. *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 535 (D.C. Cir.

2018) ("The irreparable harm standard . . . is not the standard for the 'less drastic' APA remedy

of vacatur."); *cf Allina Health Servs.*, 746 F.3d at 1109 ("We have not been hospitable to

government claims of harmless error in cases in which the government violated § 553 of the APA

by failing to provide notice. The most egregious are cases in which a government agency seeks

to promulgate a rule by another name—evading altogether the notice and comment

requirements.").

      In the alternative, if the Court permits the parties to proceed to summary judgment but

does not resolve that motion before the D.C. Circuit rules on Plaintiffs' pending appeals, the case

will nevertheless be fully briefed and ready to move quickly to final judgment, incorporating

whatever guidance is included in the D.C. Circuit decision. The legal issues are clear and have

already been fully briefed before the Court. Plaintiffs' pending appeals regarding the Court's

decisions denying preliminary relief that were not based on the merits should be no barrier to resolving this APA case on summary judgment. *See Soc'y for Animal Rts., Inc. v. Schlesinger*, 512 F.2d 915, 918 (D.C. Cir. 1975) (denying injunction pending appeal but "assum[ing] that the case will proceed forward expeditiously in the district court despite the pendency of the [28 U.S.C.] § 1292(a) appeal in this court").

Plaintiffs conferred with Defendants regarding this motion, who indicated they oppose it.

## **CONCLUSION**

The Court should lift the stay pending resolution of Plaintiffs appeals so that the case may proceed to summary judgment.

Dated: August 21, 2025

Respectfully submitted,

*/s/ Emma Winger*

Lynn Damiano Pearson*
Cassandra Charles*
Joanna Cuevas Ingram*
National Immigration Law Center
P.O. Box 34573
Washington, D.C. 20043
Tel: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
charles@nilc.org
cuevasingram@nilc.org

Emma Winger (DC Bar No. 90010721)
Michelle Lapointe (DC Bar No. 90032063)
Leslie K. Dellon (DC Bar No. 250316)
Chris Opila (DC Bar No. 90029724)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
ewinger@immcouncil.org
mlapointe@immcouncil.org
ldellon@immcouncil.org
copila@immcouncil.org

Jennifer R. Coberly (DDC Bar No. 90031302)
American Immigration Lawyers Association
1331 G. St. NW
Washington, DC 20005
Tel: (202) 507-7692
Jcoberly@AILA.org

Cody Wofsy (DDC Bar No. CA00103)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
425 California St, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
cwofsy@aclu.org

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanrights.org

*Admitted Pro Hac Vice*

JA279

## CERTIFICATE OF SERVICE

Plaintiffs-Appellants certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on September 16, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

Dated: September 16, 2025

*/s/ Emma Winger*
Emma Winger
American Immigration Council

*Attorney for Plaintiffs-Appellants*