# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

───────────────────

COALITION FOR HUMANE IMMIGRANT RIGHTS, et al.,
Appellants,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,
Appellees.

───────────────────

On Appeal from the United States
District Court for the District of Columbia

───────────────────

## BRIEF FOR APPELLEE

───────────────────

JEANINE FERRIS PIRRO
United States Attorney

BRIAN P. HUDAK
JOHNNY H. WALKER, III
Assistant United States Attorney

KARTIK N. VENGUSWAMY
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
(202) 252-1790

Civ. A. No. 25-0943          *Attorneys for the United States of America*

## CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**Parties and Amici.** The plaintiff-appellants are Coalition for Humane Immigrant Rights, United Farm Workers of America, CASA, Inc., and Make the Road New York. The defendant-appellees are the United States Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security; U.S. Citizenship and Immigration Services; Joseph B. Edlow, in his official capacity as Director of U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; Todd M. Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. Customs and Border Protection; Rodney S. Scott,[1] in his official capacity as Commissioner of U.S. Customs and Border Protection; the United States Department of Justice; and Pamela Bondi, in her official capacity as Attorney General. Immigration Reform

---

[1]    Messrs. Edlow and Scott are automatically substituted as parties for their predecessors in office pursuant to Federal Rule of Appellate Procedure 43(c)(2) and Federal Rule of Civil Procedure 25(d).

Law Institute appeared as amicus before the district court and has been granted leave to participate as amicus before this Court. *See* Doc. No. 2129682.

**Ruling Under Review.** At issue in this appeal are the April 10, 2025, memorandum opinion and order by Judge Trevor N. McFadden denying plaintiffs' motion for a stay or preliminary injunction (JA101, 780 F. Supp. 3d 79), and the June 12, 2025, memorandum opinion and order by Judge Trevor N. McFadden denying plaintiffs' motion for a stay or injunction pending appeal (JA247, 2025 WL 1662910). Appellants further assert the right to seek review of the "constructive denial" of their Renewed Motion for a Stay or Preliminary Injunction (Jun. 18, 2025, JA259), though that right is disputed by Appellees.

**Related Cases.** This case has not previously been before this Court. Undersigned counsel is unaware of any pending related cases.

# TABLE OF CONTENTS

**Heading** **Page**

Certificate as to  Parties, Rulings, and Related Cases ............................. i

Table of Contents ....................................................................................... iii

Table of Authorities ................................................................................... v

Glossary ....................................................................................................... xi

Introduction ................................................................................................. 1

Jurisdictional Statement ............................................................................ 2

Statutes and Regulations ........................................................................... 3

Statement of Issues ..................................................................................... 3

Counterstatement of the Case .................................................................... 3

    I.    Summary of the Facts ................................................................. 3

    II.    Procedural History .................................................................... 8

Summary of the Argument ....................................................................... 10

Standard of Review ................................................................................... 12

Argument .................................................................................................... 14

    I.    Appellants' Second and Third Appeals Are Procedurally Improper and Should Be Dismissed ...................................... 14

    II.    Appellants Lack Standing ....................................................... 19

        A.    Appellants Lack Associational Standing ..................... 20

        B.    Appellants Are Outside the Zone of Interests of the APA ...................................................................................... 24

III. Appellants Are Otherwise Not Likely to Succeed on the Merits .................................................................................. 26

    A. The Notice and Comment Requirement Does Not Apply ...................................................................... 26

    B. The Rule Is Not Arbitrary or Capricious ..................... 34

IV. Appellants Failed to Establish a Likelihood of Irreparable Harm ............................................................................... 40

V. The Balance of Equities and the Public Interest Favor Appellees ............................................................................. 45

VI. Any Injunctive Relief Should Be Narrowly Tailored ............ 47

Conclusion ...................................................................................... 50

Certificate of Compliance .............................................................. 51

Certificate of Service ...................................................................... 51

Statutory and Regulatory Addendum ............................................ A

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach,*
   469 F.3d 129 (D.C. Cir. 2006) ................................................................. 20

*AFL-CIO v. Nat'l Lab. Rels. Bd.,*
   57 F.4th 1023 (D.C. Cir. 2023) ................................................ 27, 28, 34

*Am. Hosp. Ass'n v. Bowen,*
   834 F.2d 1037 (D.C. Cir. 1987) ............................................................. 27

*Animal Legal Def. Fund, Inc. v. Vilsack,*
   111 F.4th 1219 (D.C. Cir. 2024) ........................................................... 21

*Arizona v. EPA,*
   77 F.4th 1126 (D.C. Cir. 2021) ............................................................. 23

*Ark. Dairy Co-op Ass'n, Inc. v. Dep't of Agr.,*
   573 F.3d 815 (D.C. Cir. 2009) ............................................................... 13

*Batterton v. Marshall,*
   648 F.2d 694 (D.C. Cir. 1980) ............................................................... 27

*Carson v. Am. Brands,*
   450 U.S. 79 (1981) .......................................................................... 15, 18

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) .............................................. 13, 22, 40, 43

*Clarke v. Secs. Indus. Ass'n,*
   479 U.S. 388 (1987) ............................................................................... 25

*Corbett v. Transportation Security Administration,*
   19 F.4th 478 (D.C. Cir. 2021) ............................................................... 23

*Ctr. for L. & Educ. v. Dep't of Educ.,*
   396 F.3d 1152 (D.C. Cir. 2005) ............................................................ 20

*De Beers Consol. Mines v. United States,*
325 U.S. 212 (1945) ................................................................ 42

*Eastland v. U.S. Servicemen's Fund,*
421 U.S. 491 (1975) ................................................................ 45

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.,*
653 F.3d 1 (D.C. Cir. 2011) ...................................................... 31

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ............................................................ 34, 35

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ................................................................ 20

*Firestone Tire & Rubber Co. v. Risjord,*
449 U.S. 368 (1981) ................................................................ 15

*Food & Water Watch, Inc. v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015) ................................................... 44

*Grand Council of Crees (of Quebec) v. Fed. Energy Regul. Comm'n,*
198 F.3d 950 (D.C. Cir. 2000) ................................................... 25

*Hunt v. Wash. State Apple Advertising Comm'n,*
432 U.S. 333 (1977) ................................................................ 21

*Huron v. Cobert,*
809 F.3d 1274 (D.C. Cir. 2016) ................................................. 17

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.,*
510 U.S. 1301 (1993) (O'Connor, J., in chambers) ...................... 26

*James V. Hurson Assocs., Inc. v. Glickman,*
229 F.3d 277 (D.C. Cir. 2000) .............................................. 27, 31

*JEM Broad. Co. v. FCC,*
22 F.3d 320 (D.C. Cir. 1994) ............................................ 27, 28, 32

*Kinney-Coastal Oil Co. v. Kieffer,*
277 U.S. 488 (1928) ................................................................ 48

*Lamoille Valley R. Co. v. Interstate Com. Comm'n*,
711 F.2d 295 (D.C. Cir. 1983) ............................................... 31

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................... 13

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ............................. 46

*Michigan v. EPA*,
576 U.S. 743 (2015) ........................................................... 35

*Momenian v. Davidson*,
878 F.3d 381 (D.C. Cir. 2017) ................................................. 17

*Moran Maritime Assocs. v. Coast Guard*,
526 F. Supp. 335 (D.D.C. 1981),
*aff'd* 679 F.2d 261 (D.C. Cir. 1982) .......................................... 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................ 35

*Mova Pharm. Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998) ................................................ 13

*Narenji v. Civiletti*,
617 F.2d 745 (D.C. Cir. 1979) .................................................. 5

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
810 F.3d 631 (9th Cir. 2015) .................................................. 42

*Pac. Shrimp Co. v. United States*,
375 F. Supp. 1036 (W.D. Wash. 1974) ....................................... 39, 46

*PETA v. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) ................................................ 44

*Pub. Citizen v. Dep't of State*,
276 F.3d 634 (D.C. Cir. 2002) .............................................. 31, 34

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ................................................. 13

*Ranger v. FCC,*
   294 F.2d 240 (D.C. Cir. 1961) ................................................................ 31

*Republican Nat'l Comm. v. Pelosi*, Civ. A. No. 22-659 (TJK),
   2022 WL 1604670 (D.D.C. May 20, 2022) ................................ 45

*Rusk v. Cort,*
   369 U.S. 367 (1962) ........................................................................ 25

*Sampson v. Murray,*
   415 U.S. 61 (1974) .......................................................................... 49

*Serono Labs., Inc. v. Shalala,*
   158 F.3d 1313 (D.C. Cir. 1998) .................................................... 45

*Stringfellow v. Concerned Neighbors in Action,*
   480 U.S. 370 (1987) .......................................................... 14, 15, 16

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .................................................................. 22, 23

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ............................................................ i, 48, 49

*Trump v. Thompson,*
   20 F.4th 10 (D.C. Cir. 2021) ................................................. 45, 47

*Warshauer v. Chao*, Civ. A. No. 06-0103,
   2008 WL 2622799 (N.D. Ga. May 7, 2008),
   *aff'd* 577 F.3d 1330 (11th Cir. 2009) ........................................ 39

*Wash. Tour Guides Ass'n v. Nat'l Park Serv.,*
   808 F. Supp. 877 (D.D.C. 1992) ............................................ 38, 46

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ................................................................... 13, 45

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n,*
   758 F.2d 669 (D.C. Cir. 1985) ............................................... 40, 41

## Statutes

18 U.S.C. § 1001 ............................................................................ 6

18 U.S.C. § 1546 ............................................................................ 6

18 U.S.C. § 3559 ...................................................................... 6, 37

18 U.S.C. § 3571 ...................................................................... 6, 37

28 U.S.C. § 1291 ......................................................... 2, 10, 14, 19

28 U.S.C. § 1292 ..................................................................... 14, 15

28 U.S.C. § 1331 ............................................................................ 2

5 U.S.C. § 553 ............................................................................. 27

5 U.S.C. § 702 ............................................................................. 25

5 U.S.C. § 705 ...................................................................... 48, 49

8 U.S.C. § 1201 ........................................................... 4, 5, 24, 25

8 U.S.C. § 1201(b) ........................................................................ 4

8 U.S.C. § 1227 ................................................................ 7, 24, 25

8 U.S.C. § 1301 ....................................... 3, 4, 21, 24, 35, 41, B

8 U.S.C. § 1302 ................................. 5, 22, 24, 25, 32, 36, B

8 U.S.C. § 1303 ............................................................ 5, 24, 33, C

8 U.S.C. § 1304 ............................... 5, 6, 22, 24, 25, 33, 34, C

8 U.S.C. § 1305 ....................................... 6, 7, 24, 25, 37, E

8 U.S.C. § 1306 ..................................... 6, 22, 24, 33, 37, F

Pub. L. No. 76-670, 54 Stat. 670 ............................................... 3

**Rules**

Fed. R. App. P. 3 ........................................................................ 14

Fed. R. App. P. 8(a)(1) ........................................................ 8, 10, 16

**Regulations**

25 Fed. Reg. 10495 (Nov. 2, 1960) ........................................... 30

26 Fed. Reg. 3455 (Apr. 22, 1961) ............................................ 30

30 Fed. Reg. 13862 (Nov. 2, 1965) ........................................... 29

35 Fed. Reg. 12268 (July 31, 1970) ........................................... 29

39 Fed. Reg. 10885 (Mar. 22, 1974) .......................................... 29

78 Fed. Reg. 18457-01 (Mar. 27, 2013) ..................................... 29

8 C.F.R. § 264.1 ........................................... 7, 29, 30, 36, 37, 40

8 C.F.R. § 265.1 ................................................................ 6, 37

82 Fed. Reg. 94231 (Dec. 23, 2016) .......................................... 29

90 Fed. Reg. 11793 (Mar. 12, 2025) ................................ 1, 28, 35, 38, 40

**Other Authorities**

90 Fed. Reg. 11793 ..................................................................... 4

Exec. Order No. 14,159, *Protecting the American People Against
Invasion* (Jan. 20, 2025), 90 Fed. Reg. 8443 (Jan. 29, 2025) ........... 4, 36

H.R. Rep. No. 79-1980 (1946) ................................................... 49

# GLOSSARY

JA ..................................................................Joint Appendix

Coalition for Humane Immigrant Rights.................the Coalition

U.S. Department of Homeland Security ..................the Department

U.S. Customs and Border Protection .......................CBP

U.S. Immigration and Customs Enforcement .........ICE

U.S. Citizenship and Immigration Services ............USCIS

Immigration and Nationality Act .............................INA

Interim Final Rule, 90 Fed. Reg. 11793 ...................the Rule

Appellants' Brief, Doc. No. 2135224 .........................Opening Brief[2]

---

[2]  Citations to the Opening Brief are to Appellants' own page numbers, not the ECF-generated pagination.

# INTRODUCTION

On March 12, 2025, the Department of Homeland Security (the "Department") published an Interim Final Rule (the "Rule") which simply added a new registration form to a long list of currently acceptable forms for aliens to submit to comply with longstanding statutory registration and fingerprinting requirements. 90 Fed. Reg. 11793 (Mar. 12, 2025).

In the district court, Appellants moved for emergency relief under the Administrative Procedure Act ("APA"), seeking a stay of the effective date of the Rule or, in the alternative, to enjoin the Rule. After the parties briefed the matter and the district court heard argument on the issues, the district court denied the motion for emergency relief, finding that Appellants lacked standing to pursue their claims.

Appellants have since been uniformly unsuccessful, as both the district court and this Court ruled that Appellants had not "satisfied the stringent requirements for an injunction pending appeal." Order of Aug. 12, 2025 (Doc. No. 2129682); *see also* Mem. Order of Jun. 12, 2025 (JA247).

Appellants now seek review of the district court's repeated denials of injunctive or stay relief, asserting broadly that the district court

abused its discretion in denying them relief. As Appellees demonstrate below, Appellants have not and cannot establish standing, a likelihood of success on the merits, or irreparable harm; in addition, the two subsequent appeals consolidated in this matter (Nos. 25-5233, 25-5247) should be dismissed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. Appellants timely filed a notice of appeal of the district court's April 10, 2025, Order, on April 24, 2025. *See* JA13-14. This Court has jurisdiction over that appeal (No. 25-5152) under 28 U.S.C. § 1291.

After the district court denied a motion for injunction pending appeal (Mem. Order of Jun. 12, 2025, JA247), Appellants' notice of appeal on June 25, 2025 (JA268), was timely but procedurally improper, as it was neither a final decision nor an appealable order. This Court does not have jurisdiction over that appeal (No. 25-5233) under 28 U.S.C. § 1291.

Similarly, the July 8, 2025, notice of appeal (JA270) was also procedurally improper, premised as it was on a "constructive denial" of a motion. This Court does not have jurisdiction over that appeal (No. 25-5247) under 28 U.S.C. § 1291.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum submitted herewith.

## STATEMENT OF ISSUES

In the opinion of the United States, the questions presented are:

1.    Whether the district court abused its discretion in denying Plaintiffs-Appellants a stay or preliminary injunction of the Rule.

2.    Whether this Court has jurisdiction over procedurally improper appeals taken from non-final decisions or non-appealable orders.

## COUNTERSTATEMENT OF THE CASE

### I.    <u>Summary of the Facts</u>

The Immigration and Nationality Act ("INA") has long contained statutory requirements for every alien in the United States for thirty days or longer to register his or her presence.  8 U.S.C. §§ 1301-1306.  The registration requirements were incorporated from the Alien Registration Act of 1940, also known as the Smith Act, and predate the INA.  *See* Pub. L. No. 76-670, 54 Stat. 670.

On January 25, 2025, President Trump issued an Executive Order directing the Secretary of Homeland Security, in coordination with the

Attorney General and the Secretary of State to "(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of [the registration statutes]; (b) Ensure that all previously unregistered aliens in the United States comply with the requirements of [the registration statutes]; and (c) Ensure that failure to comply with the legal obligations of [the registration statutes] is treated as a civil and criminal enforcement priority." Exec. Order No. 14,159, *Protecting the American People Against Invasion* (Jan. 20, 2025), 90 Fed. Reg. 8443, 8444 (Jan. 29, 2025). On March 12, 2025, the Department published the Rule to allow for the use of a newly created Form G-325R, Biographic Information (Registration) ("Form G-325R") as a means of registration, and USCIS Proof of Alien G-325R Registration as evidence of registration. *See* 90 Fed. Reg. 11793, 11795-96, 11800.

While Form G-325R has been added to the registration scheme, the registration requirements themselves are not new. Just one of the many available manners through which aliens have long registered is the visa issuance process. 8 U.S.C. §§ 1201(b), 1301. All aliens fourteen years of age or older who remain in the United States thirty days or longer and

have not been registered or fingerprinted as part of their visa issuance under § 1201(b) must register and be fingerprinted. 8 U.S.C. § 1302.

The Secretary of Homeland Security is directed by statute to "prepare forms for the registration and fingerprinting of aliens," which "shall contain inquiries with respect to (1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the police and criminal record, if any, of such alien; and (5) such additional matters as may be prescribed." 8 U.S.C. § 1304(a). The Secretary also has authority to prescribe "special regulations and forms for the registration and fingerprinting of" certain classes of aliens, including "aliens of any other class not lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1303(a); *see also Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (recognizing the use of authority under § 1303(a) to require special registration for post-secondary student from Iran).

There have long been statutory criminal penalties related to registration. Willful failure to register or to be fingerprinted is punishable by a fine of up to $5,000 and imprisonment up to six months.

8 U.S.C. § 1306(a); *see also* 18 U.S.C. §§ 3559(a)(7), 3571(b)(6). Filing a registration application "containing statements known by him to be false, or who procures or attempts to procure registration of himself or through another person by fraud" is punishable by a fine of up to $5,000 and imprisonment to six months. 8 U.S.C. § 1306(c); *see also* 18 U.S.C. §§ 1001, 1546. Aliens who have been registered and fingerprinted are to "be issued a certificate of alien registration or an alien registration receipt card." 8 U.S.C. § 1304(d). Aliens eighteen years of age and over must carry and be in possession of their alien registration or alien registration receipt card. 8 U.S.C. § 1304(e). Noncompliance is a misdemeanor punishable by a fine of up to $5,000 and imprisonment for not more than thirty days. 8 U.S.C. § 1304(e); 18 U.S.C. §§ 3559(a)(8), 3571(b)(6). Finally, each alien required to be registered under the INA must notify the Department in writing of each change of address and new address within ten days from the date of such change. 8 U.S.C. § 1305(a); 8 C.F.R. § 265.1. Noncompliance is a misdemeanor punishable by a fine of up to $5,000 and imprisonment for not more than thirty days. 8 U.S.C. § 1306(b); 18 U.S.C. §§ 3559(a)(8), 3571(b)(6). In addition, failure to comply with the change-of-address notification requirements of 8 U.S.C.

§ 1305 is a ground of removability unless the alien establishes that such failure was reasonably excusable or was not willful. *See* 8 U.S.C. § 1227(a)(3)(A).

Even before the Rule, the regulations designated eleven different immigration forms as registration forms. 8 C.F.R. § 264.1(a). Examples include an I-94, Arrival-Departure Record; an I-485, Application for Status as Permanent Resident; and an I-95, Crewmen's Landing Permit. *Id.* There are also twelve items that are evidence of registration. 8 C.F.R. § 264.1(b). Examples include an I-94, Arrival-Departure Record; an I-551, Permanent Residence Card; an I-766, Employment Authorization Document; and an I-862, Notice to Appear for removal proceedings. *Id.* The Rule allows for the submission of Form G-325R to register under 8 C.F.R. § 264.1(a) and also provides for additional documentation that serves as evidence of alien registration under 8 C.F.R. § 264.1(b).

In sum, aliens have been required to register with the federal government since 1940, and those requirements have remained in the law ever since. *See* 8 U.S.C. §§ 1301–1306. And although the implementing regulations have varied over time—and have not consistently provided a registration form applicable to all aliens—the

underlying statutory requirements have remained unchanged for over eighty years.

## II. <u>Procedural History</u>

Appellants filed suit to block the implementation of the Rule and the use of Form G-325R as a means of registration that facilitated compliance with the INA for more aliens. *See* JA9. The district court denied a motion for a stay or preliminary injunction under the APA, ruling that Appellants had "failed to show that they have a substantial likelihood of standing" and, as such, had not proven a likelihood of success on the merits. JA101. The district court did not reach the other elements of the preliminary injunction analysis, though the parties had briefed them, as it found the lack of standing to be dispositive. *Id.* Appellants timely noticed an appeal from that ruling (JA167), which forms the basis of the present matter (No. 25-5152, the "First Appeal").

Appellants then moved, pursuant to Federal Rule of Appellate Procedure ("Appellate Rule") 8(a)(1), for a stay or injunction pending appeal before the district court. JA13. Without waiting for the district court to rule, however, Appellants then moved this Court for a stay or

injunction pending appeal, in violation of Appellate Rule 8(a)(2). *See* Doc. No. 214110.

While the First Appeal was pending, and before this Court had the opportunity to rule on the motion for a stay or injunction pending appeal, the district court denied the motion before it. JA247. The district court determined that, while Appellants had resolved the standing issues, they still had failed to demonstrate irreparable harm. JA252-53. Appellants then moved this Court to hold the First Appeal in abeyance (Doc. No. 2120804), moved the district court—again—for a preliminary injunction (JA259), and then noticed a new appeal, premised on the district court's denial of the motion for a stay or injunction pending appeal. JA269; No. 25-5233 (the "Second Appeal").

Less than two weeks later, and before the district court had had an opportunity to rule on the latest motion before it, Appellants noticed yet another appeal, premised on the "constructive denial" of their renewed motion for a preliminary injunction before the district court. JA270; No. 25-5247 (the "Third Appeal"). One day later, Appellants moved this Court to remove the consolidated cases from abeyance and expedite their treatment (Doc. No. 2124610) while simultaneously moving this Court—

yet again—for a stay or injunction pending appeal. *See* Doc. No. 2124591. Appellees opposed that motion and also moved to dismiss the Second and Third Appeals as procedurally improper. After briefing, this Court denied the motion for a stay or injunction pending appeal, referred Appellees' motion to dismiss to the merits panel, expedited the consolidated cases, and set a briefing schedule. *See* Order of Aug. 12, 2025 (Doc. No. 2129682).

## SUMMARY OF THE ARGUMENT

The Court should dismiss the Second and Third Appeals, as they are procedurally improper. Those appeals do not meet the finality requirement of 28 U.S.C. § 1291, they are not "effectively" refusals of injunctive relief, and a separate appeal is not the only effective means by which Appellants can obtain relief. In particular, the Second Appeal should have been nothing more than a motion before this Court, seeking a stay or injunction pending appeal, pursuant to Appellate Rule 8(a)(2). The Third Appeal, being premised on a "constructive denial," is both entirely impermissible and wholly unnecessary, as it is a concededly pro forma attempt to give this Court jurisdiction over arguments which it already has.

The district court did not abuse its discretion in determining, as an initial matter, that Appellants lacked standing. Although the district court later modified that conclusion in the face of additional evidence, the legal analysis therein—subject to de novo review—should instead lead this Court to determine that Appellants still lack standing. They have not established associational standing because their members do not have independent standing to challenge the Rule, and because they themselves are not within the zone of interests of the relevant statutory provisions of the INA.

Appellants are not otherwise likely to succeed on the merits, because the Rule is neither subject to notice and comment nor arbitrary and capricious. The Rule is instead a procedural rule that provides an additional mechanism for aliens to comply with the statutory requirements of the INA, which have been unchanged for over eighty years. Nothing in the Rule alters the legal requirements of aliens, nor does the Rule create new liabilities, impose new penalties, or encode value judgments.

The district court did not abuse its discretion in concluding that Appellants had failed to establish a likelihood of irreparable harm. None

of the potential harms of which Appellants complain arises directly from the Rule itself; rather, as the district court accurately determined, the only "harm" they face is compliance with the immigration statutes. Similarly, the Coalition has not established any harm to its "core programmatic work" and cannot use organizational standing to circumvent the harm requirement.

The balance of equities and the public interest favor the Appellees, who seek to enforce the longstanding and essentially unchanged statutory requirements of the INA. Any putative injunction would essentially estop the government from fulfilling its duty, which violates the public interest.

Even if this Court determines that the district court abused its discretion, any injunctive relief it determines is appropriate should be narrowly tailored to the specific members of the Appellant associations who have demonstrated eligibility for relief; a nationwide, universal injunction is inappropriate.

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24

(2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

On appeal, this Court reviews the district court's weighing of factors and the ultimate decision to deny a preliminary injunction for abuse of discretion, "though any legal conclusions . . . are reviewed de novo." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)); *see also Ark. Dairy Co-op Ass'n, Inc. v. Dep't of Agr.*, 573 F.3d 815, 821 (D.C. Cir. 2009) (same).

# ARGUMENT

## I. Appellants' Second and Third Appeals Are Procedurally Improper and Should Be Dismissed

The Second Appeal (No. 25-5233) is premised on the district court's denial of Appellants' motion for a stay or injunction pending appeal. JA268. The Third Appeal (No. 25-5247) is premised on the "constructive denial" of Appellants' renewed motion for a preliminary injunction filed before the district court. JA270. Appellants insist that these successive appeals are appropriate and necessary, but they are wrong. Open. Br. at 20-21 (Doc. No. 2135224). Neither is appropriately before this Court because neither is an appeal from a final judgment or appealable order.

An appeal to this Court may only be taken from either a judgment or an appealable order. *See* Fed. R. App. P. 3(c)(1)(B); 28 U.S.C. § 1291. Orders "granting, continuing, modifying, refusing or dissolving injunctions" are appealable, despite being interlocutory. 28 U.S.C. § 1292(a)(1). As the Supreme Court has held, "not all denials of injunctive relief are immediately appealable"; only those where the order will have a "serious, perhaps irreparable, consequence" and where the order can only be "effectually challenged" by immediate appeal. *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 379 (1987)

(citation modified). The same standard applies under § 1292(a)(1) as well: "a litigant must show more than that the order has the practical effect of refusing an injunction" and must instead demonstrate both a "serious, perhaps irreparable, consequence" and that immediate appeal is the only way to effectually challenge the order. *See Carson v. Am. Brands*, 450 U.S. 79, 84 (1981). The "finality rule" of § 1291 is therefore of utmost importance in protecting both the efficiency of the legal system and the freedom of trial judges to supervise their matters "without undue interference." *Stringfellow*, 480 U.S. at 380 (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981)). And since § 1292(a)(1) "was intended to carve out only a limited exception" to the rule of finality, the Supreme Court has "construed the statute narrowly" to limit appeals to those that meet the parameters outlined above. *Carson*, 450 U.S. at 84.

The Second Appeal, premised as it is on the denial of a motion for a stay or injunction pending appeal, does not meet these parameters. The underlying motion in such cases essentially asks the district court to revisit its earlier denial of injunctive relief, this time in the limited context of permitting the circuit court to rule on the pending appeal. In

other words, a motion for stay or injunction pending appeal is, self-evidently, available only when there is already an appeal pending. And the Appellate Rules contemplate that a denial of such a motion is to be followed by raising the same matter before the circuit. *See* Fed. R. App. P. 8(a)(2)(A)(ii). That is to say, the effective challenge of a district court's denial of a motion for a stay or injunction pending appeal is a motion filed in the circuit court seeking the same relief, in the already pending appeal. *Id.* It is not, as Appellants have attempted to do here, the notice and creation of an entirely new appeal. *Cf. Stringfellow*, 480 U.S. at 379-80.

Indeed, Appellees are aware of no authority that permits appealing a district court's denial of a motion to stay a case pending appeal, when said appeal has already been taken.[3] Appellants provide no authority or argument that they face serious consequences that can only be effectually challenged by appeal. Nor can they, as there is already a procedurally proper method of challenging a denial of a motion for stay or injunction pending appeal: filing a motion before this Court.

---

[3] Moreover, any appeal of the district court's determination that the Appellants are not entitled to a stay pending appeal (JA258) must undeniably result in an affirmance, given that this Court reached the same conclusion. *See* Order of Aug. 12, 2025 (Doc. No. 2129682).

The Third Appeal fares no better, as it is based on even more tenuous grounds: the "constructive denial" of a renewed motion for a preliminary injunction. Appellants filed their renewed motion with neither the expectation nor the intent that the district court grant their request for a preliminary injunction; indeed, they made clear that they sought only "a formal denial order" as "a formality[.]" JA259, 261. In essence, they sought a new opinion that incorporated the district court's analysis (and apparent reversal of position) on standing in order to make that analysis available to this Court. *Id.* Such a formalistic exercise is unnecessary as this Court has the discretion to consider any question of law or argument raised below, even if the district court did not necessarily rule on it. *See, e.g.*, *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016) (appellate court should only avoid entirely new arguments and can consider arguments made but unaddressed below); *Momenian v. Davidson*, 878 F.3d 381, 391 (D.C. Cir. 2017) (appellate court can affirm on different grounds than the district court).

Rather than rely on this well-settled principle of law—and without even waiting for the district court to rule on their concededly pro forma request—Appellants noticed the Third Appeal, asserting a "constructive

denial" of their motion for preliminary injunction. JA270. As with the Second Appeal, Appellees are aware of no authority that permits an appeal taken from inaction on a motion for preliminary injunction without any decision for this Court to review. And again, the Third Appeal can hardly be said to be premised on the effective denial of injunctive relief, given that the underlying motion was nothing more than a request for the district court to restate its conclusions and reiterate the already existing state of affairs. In other words, there is no "serious, perhaps irreparable consequence" underlying the Third Appeal, as there must be to warrant appellate review. *Cf. Carson*, 450 U.S. at 85.

In response, Appellants do little more than decry the "formalism" of Appellees' motion to dismiss. *See* Open. Br. at 20. Contrary to their assertion (*id.* at 20-21), the district court's ruling that forms the basis of the Second Appeal is not "effectively an interlocutory order refusing an injunction"; the denial of a stay or injunction pending appeal is not the same as the denial of an injunction generally. Similarly, Appellants' arguments and caselaw supporting their "constructive denial" theory are immediately undermined by their own concession that they "sought nothing more than a pro forma denial of relief" which essentially

consolidated the two previous district court opinions. Open. Br. at 21. Appellants claim (*id.* at 21) that the dismissal of the Third Appeal would "insulate" the denial of relief from review, but this misstates Appellees' fundamental point: the Third Appeal is pointless because this Court already has the authority to review all arguments made before—and conclusions reached by—the district court, and this Court can rule based on any arguments presented below, regardless of whether the district court relied on those particular grounds or not.

The Second and Third Appeals are procedurally improper and violate the finality rule of 28 U.S.C. § 1291. They are also an inefficient and ineffective waste of this Court's resources, as this Court can determine whether the district court abused its discretion in denying a preliminary injunction without the unnecessary distraction of multiple overlapping appeals. Appellees' respectfully request that this Court dismiss the Second and Third Appeals.

## II. <u>Appellants Lack Standing</u>

If a litigant lacks standing, a court has no subject-matter jurisdiction and, therefore, lacks constitutional authority to decide the case. *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156–57 (D.C.

Cir. 2005). "To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

## A. Appellants Lack Associational Standing

Because the Appellants here—organizations all—are not themselves personally subject to either the Rule or the immigration statutes implemented thereby, they must establish standing through alternate means. There are two ways for such an organization to establish standing. *See Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). First, an organizational plaintiff can bring action "on its own behalf," which is known as "organizational standing." *Id.* Second, a plaintiff organization can demonstrate standing by bringing a claim "on behalf of its members," also known as "associational standing." *Id.* Associational standing is available only if certain conditions are met: the association's members must have standing to sue in their own right, the interests the association seeks to protect must align with its organizational purpose, and neither

the claim asserted nor the relief requested requires individual members to participate in the litigation.  *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1225 (D.C. Cir. 2024) (same).

In its April 10, 2025, Memorandum Order ("First Order," JA101), the district court determined that the organizations here failed to show that any individual members would have independent standing to challenge the Rule.  JA113.  In particular, no individual member has been injured by the Rule.  Contrary to their assertion (Open. Br. at 22), the members of Appellant organizations are not "directly regulated" parties merely because those members may now utilize the newly created Form G-325R to register and carry proof of registration, because both the requirement to register and the requirement to carry proof of registration are not new.  *See* 8 U.S.C. §§ 1301–1306.  As the district court correctly determined, the "injury" of which Appellants complain is nothing more than "the mere requirement to abide by the law" which does not suffice for standing.  JA115.  Granted, the district court subsequently determined—in the face of additional evidence—that Appellants had overcome the issues and established that being subject to the Rule was

sufficient to grant standing to the association's members.  *See* Mem. Order of Jun. 12, 2025 ("Second Order," JA247).  That said, the district court largely assumed injury without detailed analysis (JA252), and this Court reviews that legal conclusion de novo.  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

The Supreme Court has ruled that, in the context of the standing inquiry, the alleged harm must be analogous to a historically recognized harm.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427-28, 432 (2021).  There is no traditionally recognized harm associated with filling out a form.  All the other "harms" potentially facing the members of Appellant associations derive not from the Rule and the completion of Form G-325R, but from the INA's statutory mandates.  Nothing in either the Rule or Form G-325R changes the requirements on all aliens who remain in the United States thirty days or longer to register, as that requirement is found in statute.  8 U.S.C. § 1302.  Neither the Rule nor Form G-325R imposes criminal penalties for the willful failure to register, for filing a false registration, or for failing to carry a registration; those requirements are also found in statute.  8 U.S.C. §§ 1304, 1306.

Compliance with this long-standing law is not itself an injury, and there are no historical analogs on which Appellants can rely.

The district court's reliance on two other regulatory cases in determining that Appellants had subsequently met their standing burden is misplaced in light of the clear mandate of *TransUnion*. *See* 2d Order, JA252-53. In *Corbett v. Transportation Security Administration*, 19 F.4th 478, 483 (D.C. Cir. 2021), this Court ruled that an individual had standing to challenge the TSA's mask mandates as he was a "directly regulated party[.]" *Id.* But the regulation there created both a new requirement and a new penalty, as the petitioner directly asserted that there was no statutory authority to either impose a mask mandate or to bar him from flying for failure to comply. *Id.* at 481-82. And in *Arizona v. EPA*, 77 F.4th 1126, 1131 (D.C. Cir. 2021), this Court denied standing where the regulation "expand[ed] the regulated parties' lawful range of choice," though it noted that rules that "constrain[] what regulated parties may lawfully do" more clearly give rise to standing. *Id.* Here, by contrast, the Rule does not directly regulate individuals, nor does it constrain what any individual alien may do. To the extent there are constraints placed upon aliens who wish not to register, those constraints

exist in the INA, independent of the Rule.  The Rule does nothing more than provide one additional method of registration, expanding the range of possibilities from the eleven other methods already in existence.

## B.     Appellants Are Outside the Zone of Interests of the APA

Appellants also lack associational standing because the alleged effect of the Rule on their expenditures and legal practices does not fall within the zone of interests of 8 U.S.C. §§ 1201(b), 1302(a), (b), 1304(e), 1305(a), and 1227(a)(3)(A).

Through the federal alien registration scheme, Congress has created a comprehensive system for monitoring the entry and location of aliens within the United States.   Congress has provided specific measures ranging from which aliens must register, *see* 8 U.S.C. §§ 1201, 1301, when they must register, *see id.* § 1302, the content of the registration forms and what special circumstances may require deviation, *id.* §§ 1303, 1304(a), the confidential nature of registration information, *id.* § 1304(b), the circumstances under which an already-registered alien must report his change of address to the government, *id.* § 1305, and the penalties for failing to register or failing to notify the government of a change in address, *id.* § 1306.

A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5 U.S.C. § 702. And "the interest sought to be protected" must be "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396 (1987) (quoting *Rusk v. Cort*, 369 U.S. 367, 379–380 (1962)). Nothing in the text, structure, or purpose of the INA generally, or 8 U.S.C. §§ 1201(b), 1302(a), (b), 1304(e), 1305(a), and 1227(a)(3)(A), specifically suggests that Congress intended to permit organizations similar to Appellants to contest statutory alien registration and fingerprint requirements based on attenuated effects on their own spending decisions and allocation of resources for education and legal representation of aliens. *See Grand Council of Crees (of Quebec) v. Fed. Energy Regul. Comm'n*, 198 F.3d 950, 955 (D.C. Cir. 2000) (a plaintiff "who is not itself the subject of the agency action is outside the zone of interests only if its interests are 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" (citation omitted)). As Justice O'Connor explained in granting the government's stay

application in an immigration case involving similar organizational plaintiffs, organizations that "provide legal help to immigrants" do not satisfy the zone-of-interests test. *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers). Federal immigration law clearly regulates the "interests of undocumented [aliens], not the interests of organizations." *Id*. at 1305. The fact that an immigration regulation "may affect the way an organization allocates its resources" for representing aliens does not bring the organization "within the zone of interests" that the asylum and withholding statutes protect. *Id*. Similarly, the agency's regulatory provisions, by their terms, provide no further interest to organizations. Accordingly, Appellants are not within the zone of interest of the relevant provisions of the INA, and they do not have standing.

## III. Appellants Are Otherwise Not Likely to Succeed on the Merits

### A. The Notice and Comment Requirement Does Not Apply

Appellants' assertion that the Rule violates the APA, while not reached by the district court, fares no better in the analysis of whether they are likely to succeed on the merits.

The APA specifically exempts from its notice and comment requirements, as relevant here, "rules of agency organization procedure, or practice." 5 U.S.C. § 553(b)(A); *see AFL-CIO v. Nat'l Lab. Rels. Bd.*, 57 F.4th 1023, 1034-35 (D.C. Cir. 2023). Procedural rules are ones that are "primarily directed toward improving the efficient and effective operations of an agency." *AFL-CIO*, 57 F.4th at 1034 (citation modified). A "'critical feature' of the procedural exception 'is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.'" *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (quoting *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980)). Moreover, although a procedural rule generally may not "encode[] a substantive value judgment or put[] a stamp of approval or disapproval on a given type of behavior," *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987), "the fact that the agency's decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 282 (D.C. Cir. 2000).

The statutory registration obligation has existed for more than eighty years, and the Rule merely provides a new means by which an alien can comply with that requirement; in other words, an alteration to "the manner in which [aliens] present themselves" to the Department. *See JEM Broad.*, 22 F.3d at 326. The Rule does not affect individuals' substantive interests or encode any value judgments about their behavior. *See AFL-CIO*, 57 F.4th at 1042 (concluding that a provision was not a procedural rule "because it encodes a substantive value judgment about the type of [union election] observers that best serve" the agency's own policy goals (citation modified)); *JEM Broad.*, 22 F.3d at 326 ("The issue . . . is one of degree, and our task is to identify which substantive effects are sufficiently grave so that notice and comment are needed to safeguard the policies of the APA" (citation modified)). Nor does the Rule establish any sort of new substantive policy; it is instead nothing more than a development in the agency's own procedures, intended to "improve registration outcomes" for different groups of aliens by "add[ing] another method . . . for compliance with existing statutory registration requirements." 90 Fed. Reg. at 11796; *see also id*. at 11797

("This rule fills a gap in registration by adding an online option to comply with existing statutory registration requirements.").

Indeed, excepting this Rule from notice and comment rulemaking is not an anomaly in the history of 8 C.F.R. § 264.1. The history of the regulation is replete with similar additions of registration documents. *See* 82 Fed. Reg. 94231, 94233 (Dec. 23, 2016) (removing National Security Entry-Exit Registration System based on exception to notice and comment as "impracticable, unnecessary or contrary to the public interest."); 78 Fed. Reg. 18457-01 (Mar. 27, 2013) (adding a valid, unexpired nonimmigrant admission or parole stamp in a foreign passport as evidence of registration based on exception for "rules of agency organization, procedure, or practice"); 39 Fed. Reg. 10885 (Mar. 22, 1974) (adding form I-221S (Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien) to § 264.1(b) without notice and comment as "adding a form to the listings"); 35 Fed. Reg. 12268 (July 31, 1970) (adding Form I-485A (Application by Cuban Refugee for Permanent Residence to § 264.1(a) without notice and comment as "relat[ng] to agency procedure."); 30 Fed. Reg. 13862 (Nov. 2, 1965) (amending listing of Forms I-90 (Application by Lawful Permanent Resident Alien for Alien

Register Receipt) and I-102 (Application by Nonimmigration alien for Replacement of Arrival Document or for Alien Registration) under Section § 264.1(b) without notice and comment as "relat[ing] to agency procedure"); 26 Fed. Reg. 3455 (Apr. 22, 1961) (waived fingerprinting without notice and comment because the amendment "relieve[s] restrictions and confer[s] benefits upon persons affected thereby."); 25 Fed. Reg. 10495 (Nov. 2, 1960) (added the Form I-590 (Registration for Classification as Refugee-Escapee) to § 264.1 without notice and comment as "relat[ing] to agency procedure and management.").

As a helpful analog, consider instead the hypothetical development of a new form of the ubiquitous Breathalyzer, except that it is now able to detect additional intoxicating substances other than merely alcohol. Allowing law enforcement to use the new tool does not create new criminal penalties for driving while intoxicated, nor does it alter the underlying requirements of probable cause prior to administering the test. Any heightened exposure an individual who chooses to drive while intoxicated may face is created not by the new device, but by the preexisting criminal statutes. While it may be the case that the statute has gone unenforced or underenforced in the past, the creation of a tool

to assist in implementing the statute does not meaningfully alter the intended reach of the statutes. So too with the INA and the Rule.

Thus, because the Rule merely improves existing agency procedures to make available an additional method to register, the Rule is primarily directed toward the manner by which aliens "present themselves or their viewpoints to the agency." *Glickman*, 229 F.3d at 280; *see Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011) (even "a rule with a 'substantial impact' upon the persons subject to it is not necessarily a substantive rule") (citing *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640-41 (D.C. Cir. 2002)); *Lamoille Valley R. Co. v. Interstate Com. Comm'n*, 711 F.2d 295, 328 (D.C. Cir. 1983) (holding that an order changing the schedule for an adjudication, including when parties were to submit briefing, was a procedural rule); *Ranger v. FCC*, 294 F.2d 240, 244 (D.C. Cir. 1961) (while holding that a rule was procedural, noting that "no substantive rights were actually involved by the regulation itself" even if "failure to observe it might cause the loss of substantive rights"). Moreover, because the Rule simply offers a new means of complying with a pre-existing statutory duty, the Rule lacks a "substantive effect[] sufficiently grave so that notice and comment

are needed to safeguard the policies of the APA." *JEM Broad.*, 22 F.3d at 326.

Appellants erroneously claim (Open. Br. at 24) that the Rule "imposes new criminal liability" because the Rule itself "obligates" aliens to apply for registration under pain of criminal liability. But both the registration requirement and the criminal penalties exist in the INA, not the Rule. As outlined above, the Rule does nothing more than add a new form of registration. Presumably, Appellants would concede that the Form I-94, which is an Arrival-Departure Record, does not create obligations or liabilities independent from the INA—neither does Form G-325R.

Appellants attempt to circumvent this issue (Open. Br. at 24-25) through a strawman, insisting that there is no "freewheeling duty to register" unless there is a means to do so, and that the Rule therefore creates a criminal penalty out of whole cloth. Not so. The duty to register is a separate statutory requirement that attaches to every alien over the age of fourteen and who has been in the country for more than thirty days. 8 U.S.C. § 1302. The government's authority to create forms to enable that registration is a separate grant of power, which does not

modify an alien's duty to register, but simply provides the basis by which registration forms can be created. 8 U.S.C. §§ 1303, 1304. Indeed, Section 1303 specifically states that the authority "to prescribe special regulations and forms" for registering aliens "not lawfully admitted" to the United States is made "[n]otwithstanding the provisions of sections 1301 and 1302," further separating the duty to register from the authority to create forms. 8 U.S.C. § 1303(a). The penalty for the "willful" failure to register, meanwhile, is further separated into yet another statutory provision. 8 U.S.C. § 1306. In other words, an alien's duty to register exists separately from the government's authority to create registration forms and also separately from any penalties. The Rule is not the source of any criminal penalties, only the INA is.

Appellants also assert (Open. Br. at 26-27) that the Rule embodies "substantive value judgments," relying in part on a misleading and incomplete citation to 8 U.S.C § 1304(a). Open. Br. at 27. According to Appellants, the fact that Form G-325R seeks information beyond four specific data points implicates policy decisions. Open. Br. at 27. But Appellants carefully cut their citation to § 1304(a) short, quoting only the first four provisions of that statute. They omit the catchall provision at

the end: "and (5) such additional matters as may be prescribed." 8 U.S.C. § 1304(a). By the plain text of the statute, the INA and § 1304(a) were intended to give the Department flexibility in determining how to prepare registration forms. Appellants' repeated invocation of what they believe to be the government's broader policy goals does little to demonstrate any sort of value-laden judgment within the four corners of the Rule, which is the question for the Court here. *See AFL-CIO*, 57 F.4th at 1042; *Pub. Citizen*, 276 F.3d at 641.

Nor is Appellants' assertion (Open. Br. at 29) correct that the Rule is "so substantial" that it necessitates notice and comment. Again, the Rule does not change any element of an alien's statutory responsibilities, obligations, and potential liabilities under the INA.

Accordingly, the Rule does not violate the notice and comment requirement, and Appellants are unlikely to succeed on the merits.

## B. The Rule Is Not Arbitrary or Capricious

The scope of APA review is narrow and deferential, and a court cannot substitute its judgment for that of the agency. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).  The agency need only articulate "a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (internal quotation and citation omitted).  The agency appropriately relies on its experience in exercising its judgment.  *See id.* at 29 ("It is not infrequent that the available data does not settle a regulatory issue[,] and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion.").  Thus, a reviewing court's task is only to determine whether an agency has engaged in "reasoned decisionmaking."  *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation modified); *see Prometheus Radio Project*, 592 U.S. at 423 ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision").

The Rule easily meets that deferential standard.  The Rule was promulgated to provide a registration pathway for aliens required to register under the existing statutory framework prescribed in 8 U.S.C. §§ 1301–1306.  90 Fed. Reg. at 11795.  It also serves to partially implement Section 7 of Executive Order 14,159, *Protecting the American People Against Invasion* (Jan. 20, 2025), 90 Fed. Reg. 8443 (Jan. 29,

2025). 90 Fed. Reg. at 11795. Section 7 directs the Secretary, among other matters, to ensure that all previously unregistered aliens in the United States comply with 8 U.S.C. §§ 1301-1306. *Id*. The Rule is reasonably related to these objectives.

Appellants are wrong that the Rule itself brought about a "significant change in registration policy." Open. Br. at 34-35. The registration requirement is a creature of statute that long predates the Rule. Under 8 U.S.C. § 1302(a), "every alien" fourteen years of age or older who remains in the United States for thirty days or longer is subject to registration if not already registered. Although 8 C.F.R. § 264.1(a) provides forms that satisfy an alien's registration requirements and means of showing evidence of registration, not all aliens who are subject to the registration requirements have a straightforward way to take advantage of those forms. For example, in some cases, the acceptable evidence of registration at 8 C.F.R. § 264.1(b) is the result of an approved application only, which may leave denied or pending applicants without any acceptable evidence that they have complied with the requirement to register. The Rule provides a convenient additional method to comply with statutory registration requirements by prescribing a registration

form available to all aliens regardless of their status, in addition to the other forms already listed.

An alien's willful failure or refusal to apply to register or to be fingerprinted is punishable by a fine of up to $5,000 or imprisonment for up to six months, or both. 8 U.S.C. § 1306(a); *see also* 18 U.S.C. §§ 3559(a)(7), 3571(b)(6). The same applies to an alien's parent or legal guardian's willful failure or refusal to register a minor. *Id.* The Rule simply provides an additional mechanism for aliens to comply with registration requirements. The Rule does not impose any new registration or fingerprinting obligations separate from the current statutory obligations. An alien who has previously registered consistent with 8 C.F.R. § 264.1(a), or an alien who has evidence of registration consistent with 8 C.F.R. § 264.1(b), need not register again, although such an alien is subject to ongoing change of address reporting requirements under 8 U.S.C. § 1305(a) and 8 C.F.R. § 265.1.

Because the Rule is rationally connected with providing a registration pathway for compliance with the law, it is not arbitrary or capricious. Appellants are therefore unlikely to succeed on the merits.

Appellants incorrectly assert (Open. Br. at 35-36) that the Rule fails to consider the implications of enforcement of the Rule, such as the consequences of the registration regime on the alien population and the ability of aliens subject to registration requirements to register, especially those they describe as "particularly vulnerable groups." But the Department expressly considered the aliens anticipated to be affected by the Rule and associated costs to them; including the time to become familiar with the steps and process to become compliant with the registration requirement, register, and maintain evidence of registration. 90 Fed. Reg. at 11797. Appellants identify no flaw in those considerations.

In a similar vein, Appellants assert (Open. Br. at 38-39) that the Rule fails to consider the impact of any plan to effectively enforce the law. The Department, however, cannot be estopped from fulfilling its duty to enforce the law. *See Wash. Tour Guides Ass'n v. Nat'l Park Serv.*, 808 F. Supp. 877, 882 (D.D.C. 1992) ("[T]he government cannot be estopped from fulfilling its duty to protect the public interest in accordance with specific regulations despite prior failure to enforce those regulations."); *Moran Maritime Assocs. v. Coast Guard*, 526 F. Supp. 335, 342 (D.D.C.

1981) ("[P]rior inaction by the Coast Guard does not now bar the agency from implementing the clear mandate of the regulation and its authorizing statute."), *aff'd*, 679 F.2d 261 (D.C. Cir. 1982); *Warshauer v. Chao*, Civ. A. No. 06-0103, 2008 WL 2622799, at *31 (N.D. Ga. May 7, 2008), *aff'd*, 577 F.3d 1330 (11th Cir. 2009) ("Courts repeatedly have held that the Government cannot be estopped from enforcing a law, even if the Government did not enforce the law in the past"); *Pac. Shrimp Co. v. United States,* 375 F. Supp. 1036, 1042 (W.D. Wash. 1974) ("An administrative agency charged with protecting the public interest, is not precluded from taking appropriate action nor can the principles of equitable estoppel be applied to deprive the public of a statute's protection because of mistaken action or lack of action on the part of public officials.").  Moreover, as stated previously, the Department's use of registration information is outside the scope of the Rule.

In asserting (Open. Br. at 37) that the Rule fails to consider its consequences on aliens who have submitted extensive paperwork to the government but have not complied with the registration requirement, Appellants overlook the reasoning provided by the Department in the Rule.  The Department explained that the general registration option is

to provide a registration avenue for those who have applied for a benefit, such as asylum or temporary protected status, but the application itself does not constitute evidence of registration under 8 C.F.R. § 264.1(b). 90 Fed. Reg. at 11795. And again, the Rule does not change who is required by statute to meet the registration requirements; it only provides aliens with an additional opportunity to do so.

Similarly, in claiming (Open. Br. at 39-41) that the Rule does not adequately consider the costs and benefits of implementation, Appellants again ignore the plain text of the Rule. The Rule expressly considers the costs to aliens and to the Department on its face. 90 Fed. Reg. at 11796. Moreover, the Rule solicits comment on a potential biometrics fee to offset the costs to the Department. *Id.*

## IV. Appellants Failed to Establish a Likelihood of Irreparable Harm

"This court has set a high standard of irreparable injury" sufficient to warrant an injunction or stay. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. The injury must be "both certain and great" as well as "beyond remediation." *Id.* (citing *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Furthermore, the alleged harm must "directly result from the action which the movant

seeks to enjoin." *Wis. Gas*, 758 F.2d at 674. Here, Appellants rely (Open. Br. at 41) on claims of the pending arrest and prosecution of their members, the threat of First and Fifth Amendment harm, the possibility of removal, and the alleged harm to the Coalition's "core programmatic work." None of these alleged harms satisfy this Court's high bar.

*First*, though Appellants allege that the prosecution of their members is "impending" (Open. Br. at 42), they fail to connect the prosecution with the action they seek to enjoin: the Rule and the use of Form G-325R. As Appellants concede, the prosecutions of which they complain stem from violations of the immigration statutes, not of the Rule or the Form G-325R. Again, the statutes criminalizing the failure to register and the failure to carry proof of registration have existed in some form for over eighty years and are set forth in 8 U.S.C. §§ 1301–1306. The harm of which Appellants complain is the "harm" of not complying with the law. And to be clear, nothing in either the Rule or the Form G-325R changes the statutory requirements applicable to all aliens; it does not alter the landscape in terms of who is subject to the registration requirements, what the penalties for noncompliance are, or how registration information is used. Additionally, at least at the district

court level, Appellants offered no proof or even averment that their members themselves were facing imminent prosecution, instead citing charges against non-members. *See* 2d Order at 8-9 (JA254–55).

*Second*, as Appellants concede (Open. Br. at 44)—and as the district court found compelling—they do not plead a cause of action or constitutional claim based upon their alleged First and Fifth Amendment injuries; they have therefore "expressly disclaimed any constitutional challenge." JA257; *see also De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (holding that preliminary injunction is limited to "grant[ing] intermediate relief of the same character as that which may be granted finally."); *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("A court's equitable power lies only over the merits of the case or controversy before it. When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."). In other words, Appellants attempt to claim constitutional injuries without alleging a constitutional violation. In addition, this Circuit has found that movants must "do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong," but must

establish that they are "engaging in constitutionally protected behavior." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301. But Appellants do not do so; Appellants offer no support for the implied concept that they have a constitutionally protected right not to comply with the registration statutes. Similarly, Appellants concede (Open. Br. at 47) that any Fifth Amendment claims are not ripe until the privilege is asserted; there can therefore be no Fifth Amendment harms.

*Third*, Appellants claim irreparable injury from the abstract possibility that their members may face removal proceedings or be prevented from pursuing immigration relief (Open. Br. at 48), but again, they fail to tie these alleged harms to the action they seek to enjoin. As addressed above, the prospect of removal connects directly with the prosecution for failure to comply with the long-standing statutory requirement to register; it does not arise directly from the Rule or the use of Form G-325R. This is to say nothing of the fact that any such removal is merely hypothetical and would require several intervening steps "involving discretion and randomness" before it becomes certain and great. JA255.

*Finally*, the Coalition reasserts (Open. Br. at 49) its theory that it faces harm to its "core programmatic work" of providing legal services. But the harms to which it points are in fact directly within the core business of the Coalition: assisting aliens to comply with the statutes. The Coalition asserts (Open. Br. at 50-51) that it will need to assist current clients with registering, that it will need legal staff to consult with those clients, and that it will need to answer questions about registration, but it fails to differentiate these activities from what the Coalition is already doing. If anything, the Rule will cause the Coalition to expand its core functions, not block them. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920-21 (D.C. Cir. 2015) (finding no organizational injury from using resources for litigation, advocacy, or education of its members); *cf. PETA v. Dep't of Agric.*, 797 F.3d 1087, 1094-95 (D.C. Cir. 2015) (finding that government action which blocks the organization's mission can give rise to standing).

Appellants have not established an irreparable harm sufficient to justify a preliminary injunction, and the district court did not abuse its discretion in reaching that conclusion. This Court should therefore affirm the denial of injunctive relief.

## V. The Balance of Equities and the Public Interest Favor Appellees

As established above, Appellants have not established irreparable harm, they lack standing, and they are unlikely to succeed on the merits. They are also unable to establish the last two prongs: the balance of equities and the public interest. *See Winter*, 555 U.S. at 20. And where, as here, Appellants are unlikely to succeed on the merits, it is of particular importance that the other three factors favor the Appellants; after all, "courts must take care not to unnecessarily 'halt the functions of a coordinate branch.'" *Trump v. Thompson*, 20 F.4th 10, 48 (D.C. Cir. 2021) (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 511 n.17 (1975)). Appellants must specifically establish that these last two factors favor the Appellants decisively; "where balancing the equities 'results roughly in a draw,' the 'sound disposition' of a request for injunctive relief 'depends on a reflective and attentive appraisal as to the outcome on the merits.'" *Republican Nat'l Comm. v. Pelosi*, Civ. A. No. 22-659 (TJK), 2022 WL 1604670, at *5 (D.D.C. May 20, 2022) (quoting *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998)). As already shown above, Appellants are unlikely to succeed on

the merits; "the sound disposition is to deny the motion" for an injunction. *Id.*

Here, the effect of an injunction would be to impede the Government's efforts to facilitate and enforce longstanding registration requirements and provide additional avenues for aliens to comply with the INA, which goes against the public interest. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation modified). While Appellants may be correct that the statutory registration requirement has not been consistently enforced over that time and that there has not always been a path for all aliens to register, this does not provide a basis on which to estop efforts to provide new avenues for compliance with those requirements. "An administrative agency charged with protecting the public interest is not precluded from taking appropriate action [because of] lack of action on the part of public officials." *Wash. Tour Guides*, 808 F. Supp. at 882 (quoting *Pac. Shrimp*, 375 F. Supp. at 1042). "Plaintiffs may well have been allowed" to go without registering for lack of an option "for many

years," but the "government cannot be estopped from fulfilling its duty to protect the public interest[.]" *Id.* There is undeniably a strong public interest in the enforcement of statutes enacted by Congress and in providing opportunities for compliance with those same statutes, and there is a concomitant equitable harm associated with "halt[ing] the functions of a coordinate branch" of government, as would be the result here. *See Trump*, 20 F.4th at 48. Whatever interests and equities Appellants can bring to bear on this analysis, they cannot outweigh these strong public interest factors, let alone do so decisively.

The final two factors favored the Government in the initial analysis; they continue to favor the Government now.

## VI. <u>Any Injunctive Relief Should Be Narrowly Tailored</u>

Even if Appellants are deemed to have standing to pursue their claims and even if the district court is found to have abused its discretion in denying injunctive relief, any preliminary injunction must be specific to those plaintiffs in this matter who have established standing, a likelihood of success, and irreparable harm.

The Supreme Court has made clear that unlimited preliminary injunctive relief, untethered to the plaintiffs in a litigation, is unlawful.

Specifically, the Supreme Court has ruled that a "universal injunction . . . falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). At most, a court "may administer complete relief between the parties" and ought not go beyond that to enjoin action or implementation more broadly. *Id.* at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). To the extent that this Court determines that injunctive relief is proper with respect to the implementation and application of the Rule, it should limit that injunction only to those members of the Appellant organizations who have established their rights to injunctive relief.

Appellants insist (Open. Br. at 54-55) that universal relief is proper under the APA, and they attempt to cabin the holding of *CASA* only to the Judiciary Act of 1789. But this misreads the APA and the traditional equitable principles that underlie stays and preliminary relief under the APA pursuant to 5 U.S.C. § 705—traditional equitable principles that the Supreme Court addressed in *CASA*. Section 705 authorizes courts to "issue all necessary and appropriate process" in granting relief from agency actions "to the extent necessary to prevent irreparable injury."

5 U.S.C. § 705.  That invocation of "necessary and appropriate process" was "primarily intended to reflect existing law," not to "fashion new rules of intervention for District Courts."  *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974).  And Section 705's provisions for relief "necessary to prevent irreparable injury" that "preserve[s] status or rights" invokes the language and law of equitable remedies.  Section 705 therefore does not cut its relief from whole cloth, but rather follows the established patterns of traditional equitable principles—including the "party-specific principles that permeate our understanding of equity."  *CASA*, 606 U.S. at 844; *see also* H.R. Rep. No. 79-1980, at 43 (1946) (Section 705 equitable relief "would normally, if not always, be limited to the parties' complainant").

To the extent this Court determines that preliminary injunctive relief is proper, therefore, it should limit that relief to the parties before it.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

BRIAN P. HUDAK
JOHNNY H. WALKER, III
Assistant United States Attorney

_/s/ Kartik N. Venguswamy_
KARTIK N. VENGUSWAMY
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
(202) 252-1790

*Attorneys for the United States of America*

Dated: October 27, 2025

**CERTIFICATE OF COMPLIANCE**
(Fed. R. App. P. 32(a)(7)(B))

This brief is prepared using 14-point Century Schoolbook, a proportionally spaced font and—omitting those items described in Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1)—contains **9,858** words as counted by Microsoft Word 365.

_/s/ Kartik N. Venguswamy_
KARTIK N. VENGUSWAMY
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that on this 23rd day of October 2025, I caused a true and correct copy of the above brief to be served upon all counsel of record by filing the brief using the Court's ECF system.

_/s/ Kartik N. Venguswamy_
KARTIK N. VENGUSWAMY
Assistant United States Attorney

# STATUTORY AND REGULATORY ADDENDUM

## 8 U.S.C.A. § 1301

### Alien seeking entry; contents

No visa shall be issued to any alien seeking to enter the United States until such alien has been registered in accordance with section 1201(b) of this title.


## 8 U.S.C.A. § 1302

### Registration of aliens

**(a)** It shall be the duty of every alien now or hereafter in the United States, who (1) is fourteen years of age or older, (2) has not been registered and fingerprinted under section 1201(b) of this title or section 30 or 31 of the Alien Registration Act, 1940, and (3) remains in the United States for thirty days or longer, to apply for registration and to be fingerprinted before the expiration of such thirty days.

**(b)** It shall be the duty of every parent or legal guardian of any alien now or hereafter in the United States, who (1) is less than fourteen years of age, (2) has not been registered under section 1201(b) of this title or section 30 or 31 of the Alien Registration Act, 1940, and (3) remains in the United States for thirty days or longer, to apply for the registration of such alien before the expiration of such thirty days. Whenever any alien attains his fourteenth birthday in the United States he shall, within thirty days thereafter, apply in person for registration and to be fingerprinted.

**(c)** The Attorney General may, in his discretion and on the basis of reciprocity pursuant to such regulations as he may prescribe, waive the requirement of fingerprinting specified in subsections (a) and (b) in the case of any nonimmigrant.

## 8 U.S.C.A. § 1303

### Registration of special groups

**(a)** Notwithstanding the provisions of sections 1301 and 1302 of this title, the Attorney General is authorized to prescribe special regulations and forms for the registration and fingerprinting of (1) alien crewmen, (2) holders of border-crossing identification cards, (3) aliens confined in institutions within the United States, (4) aliens under order of removal, (5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6) aliens of any other class not lawfully admitted to the United States for permanent residence.

**(b)** The provisions of section 1302 of this title and of this section shall not be applicable to any alien who is in the United States as a nonimmigrant under section 1101(a)(15)(A) or (a)(15)(G) of this title until the alien ceases to be entitled to such a nonimmigrant status.

## 8 U.S.C.A. § 1304

### Forms for registration and fingerprinting

### (a) Preparation; contents

The Attorney General and the Secretary of State jointly are authorized and directed to prepare forms for the registration of aliens under section 1301 of this title, and the Attorney General is authorized and directed to prepare forms for the registration and fingerprinting of aliens under section 1302 of this title. Such forms shall contain inquiries with respect to (1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the police and criminal record, if any, of such alien; and (5) such additional matters as may be prescribed.

**(b) Confidential nature**

All registration and fingerprint records made under the provisions of this subchapter shall be confidential, and shall be made available only (1) pursuant to section 1357(f)(2) of this title, and (2) to such persons or agencies as may be designated by the Attorney General.

**(c) Information under oath**

Every person required to apply for the registration of himself or another under this subchapter shall submit under oath the information required for such registration. Any person authorized under regulations issued by the Attorney General to register aliens under this subchapter shall be authorized to administer oaths for such purpose.

**(d) Certificate of alien registration or alien receipt card**

Every alien in the United States who has been registered and fingerprinted under the provisions of the Alien Registration Act, 1940, or under the provisions of this chapter shall be issued a certificate of alien registration or an alien registration receipt card in such form and manner and at such time as shall be prescribed under regulations issued by the Attorney General.

**(e) Personal possession of registration or receipt card; penalties**

Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him pursuant to subsection (d). Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both.

**(f) Alien's social security account number**

Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.

## 8 U.S.C.A. § 1305

### Notices of change of address

### (a) Notification of change

Each alien required to be registered under this subchapter who is within the United States shall notify the Attorney General in writing of each change of address and new address within ten days from the date of such change and furnish with such notice such additional information as the Attorney General may require by regulation.

### (b) Current address of natives of any one or more foreign states

The Attorney General may in his discretion, upon ten days notice, require the natives of any one or more foreign states, or any class or group thereof, who are within the United States and who are required to be registered under this subchapter, to notify the Attorney General of their current addresses and furnish such additional information as the Attorney General may require.

### (c) Notice to parent or legal guardian

In the case of an alien for whom a parent or legal guardian is required to apply for registration, the notice required by this section shall be given to such parent or legal guardian.

## 8 U.S.C.A. § 1306

### Penalties

### (a) Willful failure to register

Any alien required to apply for registration and to be fingerprinted in the United States who willfully fails or refuses to make such application or to be fingerprinted, and any parent or legal guardian required to apply for the registration of any alien who willfully fails or refuses to file application for the registration of such alien shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000 or be imprisoned not more than six months, or both.

### (b) Failure to notify change of address

Any alien or any parent or legal guardian in the United States of any alien who fails to give written notice to the Attorney General, as required by section 1305 of this title, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $200 or be imprisoned not more than thirty days, or both. Irrespective of whether an alien is convicted and punished as herein provided, any alien who fails to give written notice to the Attorney General, as required by section 1305 of this title, shall be taken into custody and removed in the manner provided by part IV of this subchapter, unless such alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

### (c) Fraudulent statements

Any alien or any parent or legal guardian of any alien, who files an application for registration containing statements known by him to be false, or who procures or attempts to procure registration of himself or another person through fraud, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000, or be imprisoned

not more than six months, or both; and any alien so convicted shall, upon the warrant of the Attorney General, be taken into custody and be removed in the manner provided in part IV of this subchapter.

## (d) Counterfeiting

Any person who with unlawful intent photographs, prints, or in any other manner makes, or executes, any engraving, photograph, print, or impression in the likeness of any certificate of alien registration or an alien registration receipt card or any colorable imitation thereof, except when and as authorized under such rules and regulations as may be prescribed by the Attorney General, shall upon conviction be fined not to exceed $5,000 or be imprisoned not more than five years, or both.


# Rules and Regulations

**Federal Register**

Vol. 90, No. 47

Wednesday, March 12, 2025

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## DEPARTMENT OF HOMELAND SECURITY

### 8 CFR Part 264

**[CIS No. 2810–25; DHS Docket No. USCIS–2025–0004]**

**RIN 1615–AC96**

### Alien Registration Form and Evidence of Registration

**AGENCY:** U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS").

**ACTION:** Interim final rule ("IFR") with request for comments.

**SUMMARY:** This IFR amends DHS regulations to designate a new registration form for aliens to comply with statutory alien registration and fingerprinting provisions. Aliens who are subject to alien registration requirements of the Immigration and Nationality Act, as amended ("INA") who have not yet registered may use this registration form to satisfy their statutory obligations. This IFR also amends DHS regulations to designate additional documentation that may serve as evidence of alien registration.

**DATES:**

*Effective date:* This IFR is effective April 11, 2025.

*Registration:* Aliens may register using the revised form G–325R, Biographic Information (Registration) immediately.

*IFR comment period:* Comments on the rule must be received by April 11, 2025.

*Information collection comment period:* Comments on the information collection described in the *Paperwork Reduction Act* section below must be received by May 12, 2025.

**ADDRESSES:**

*Comments on the IFR:* You may submit comments on this IFR, identified by DHS Docket No. USCIS–2025–0004, through the Federal eRulemaking Portal

at *https://www.regulations.gov.* Follow the website instructions for submitting comments.

*Comments on the Information Collection:* Submit comments on the information collection to the same docket as the IFR. In addition, all comments on the information collection must include the OMB Control Number 1615—NEW in the body of the comments.

Comments submitted in a manner other than the ones listed above, including emails or letters sent to the Department's officials, will not be considered comments on the proposed rule and may not receive a response from the Department. Please note that the Department cannot accept any comments that are hand-delivered or couriered. In addition, the Department cannot accept comments contained on any form of digital media storage devices, such as CDs, DVDs, or USB drives. The Department is not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Jerry Rigdon, Acting Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:** Mark Phillips, Residence and Naturalization Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Instructions for providing comments are in the **ADDRESSES** caption above.

*Privacy:* You may wish to consider limiting the amount of personal information that you provide in any public comment submission you make to the Department. The Department may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing DHS Docket No. USCIS–2025–0004. You may also sign up for email alerts on the online docket to be notified when comments are posted or when the final rule is published.

## II. Background

### A. Alien Registration Requirements of the INA

The Alien Registration Act of 1940, also known as the Smith Act, was enacted into law on June 28, 1940. *See* Public Law 76–670, 54 Stat. 670. The Act generally required all aliens in the country beyond 30 days to apply to register and to be fingerprinted. Congress later incorporated these requirements, as amended, in the Immigration and Nationality Act of 1952, Public Law 82–414, 66 Stat. 163. The registration and fingerprinting requirements currently appear, as amended, in part VII of subchapter II of chapter 12 of title 8, United States Code (8 U.S.C. 1301–1306). Throughout this preamble, we refer to such requirements as the alien registration requirements, or the alien registration requirements of the INA.

Under the alien registration requirements of the INA, with limited exceptions (*e.g.,* for visa holders who have already been registered and fingerprinted (through their application for a visa) and A and G visa holders, *see* 8 U.S.C. 1201(b)), all aliens above the age of 14 who remain in the United States for 30 days or longer must apply for registration and to be fingerprinted before the expiration of 30 days. *See* 8 U.S.C. 1302(a). Similarly, parents and legal guardians must ensure that their children below the age of 14 are registered. Within 30 days of reaching his or her 14th birthday, the alien child must "apply in person for registration and to be fingerprinted." 8 U.S.C. 1302(b). The Secretary of Homeland Security ("Secretary") may, in her discretion and on the basis of reciprocity pursuant to such regulations as she may prescribe, waive the requirement of fingerprinting specified in 8 U.S.C. 1302(a) and (b) in the case of any nonimmigrant. 8 U.S.C. 1302(c). As discussed in the next section, the Secretary has exercised this authority with respect to certain nonimmigrants.

An alien's willful failure or refusal to apply to register or to be fingerprinted is punishable by a fine of up to $5,000 or imprisonment for up to six months, or both. 8 U.S.C. 1306(a).[1] The same applies to an alien's parent or legal guardian's willful failure or refusal to register. *Id.* Any alien or any parent or legal guardian of an alien who files a registration application "containing statements known by him to be false, or who procures or attempts to procure registration of himself or through another person by fraud" is subject to criminal prosecution. 8 U.S.C. 1306(c); *see, e.g.,* 18 U.S.C. 1001, 1546. A conviction for fraudulent registration constitutes a ground of deportability under 8 U.S.C. 1227(a)(3)(B)(i).

The Secretary has authority to "prepare forms for the registration and fingerprinting of aliens," which "shall contain inquiries with respect to (1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the police and criminal record, if any, of such alien; and (5) such additional matters as may be prescribed." 8 U.S.C. 1304(a). The Secretary also has authority to prescribe "special regulations and forms for the registration and fingerprinting of" certain classes of aliens, including "aliens of any other class not lawfully admitted to the United States for permanent residence," "[n]otwithstanding the provisions of" 8 U.S.C. 1301 and 1302. 8 U.S.C. 1303(a). Although this rule is fully consistent with 8 U.S.C. 1301 and 1302 and related authority, the Secretary also invokes 8 U.S.C. 1303(a) to the extent necessary to support this rulemaking.

Every alien in the United States who has been registered and fingerprinted under the alien registration requirements of the INA must "be issued a certificate of alien registration or an alien registration receipt card in such form and manner and at such time as shall be prescribed under regulations issued by the [Secretary]." 8 U.S.C. 1304(d).[2] Every registered alien 18 years of age and over must at all times carry and have in their personal possession any certificate of alien registration or alien registration receipt card. Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1304(e); 18 U.S.C. 3559(a)(8), 3571(b)(6).

Finally, each alien required to be registered under the alien registration requirements of the INA who is within the United States must notify DHS in writing of each change of address and new address within ten days from the date of such change and provide such additional information as the Secretary may require by regulation. 8 U.S.C. 1305(a). Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1306(b); 18 U.S.C. 3559(a)(8), 3571(b)(6). In addition, any alien who has failed to comply with the change-of-address notification requirements of 8 U.S.C. 1305 is deportable unless the alien establishes that such failure was reasonably excusable or was not willful. *See* 8 U.S.C. 1227(a)(3)(A).

### B. Current Regulations

Longstanding regulations provide that within 30 days after reaching the age of 14, any alien in the United States who is not exempt from alien registration must apply for registration and fingerprinting, unless fingerprinting is waived under 8 CFR 264.1(e) (which waives fingerprinting for certain nonimmigrants[3]), in accordance with applicable form instructions. 8 CFR 264.1(g).

If such alien is a lawful permanent resident of the United States and is temporarily absent from the United States when he reaches the age of 14, the alien must apply for registration and provide a photograph within 30 days of his or her return to the United States in accordance with applicable form instructions. 8 CFR 264.1(g)(1). The alien, if a lawful permanent resident of the United States, must surrender any prior evidence of alien registration. *Id.* USCIS will issue the alien new evidence of alien registration. *Id.* In the case of an alien who is not a lawful permanent resident, the alien's previously issued registration document will be noted to show that he or she has been registered and the date of registration. 8 CFR 264.1(g)(2).

DHS has by regulation prescribed forms that satisfy registration requirements. *See* 8 CFR 264.1(a). The regulations also designate certain forms as constituting evidence of registration. 8 CFR 264.1(b).

DHS regulations identify the following forms as registration forms:
- I–67, Inspection Record—Hungarian refugees (Act of July 25, 1958).
- I–94, Arrival-Departure Record—Aliens admitted as nonimmigrants;[4] aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act; aliens whose claimed entry prior to July 1, 1924, cannot be verified, they having satisfactorily established residence in the United States since prior to July 1, 1924; aliens lawfully admitted to the United States for permanent residence who have not been registered previously; aliens who are granted permission to depart without the institution of deportation proceedings or against whom deportation proceedings are being instituted.
- I–95, Crewmen's Landing Permit—Crewmen arriving by vessel or aircraft.
- I–181, Memorandum of Creation of Record of Lawful Permanent Residence—Aliens presumed to be lawfully admitted to the United States under 8 CFR 101.1.
- I–485, Application for Status as Permanent Resident—Applicants under sections 245 and 249 of the Immigration and Nationality Act as amended, and section 13 of the Act of September 11, 1957.
- I–590, Registration for Classification as Refugee—Escapee—Refugee-escapees paroled pursuant to section 1 of the Act of July 14, 1960.
- I–687, Application for Status as a Temporary Resident—Applicants under section 245A of the Immigration and Nationality Act, as amended.
- I–691, Notice of Approval for Status as a Temporary Resident—Aliens adjusted to lawful temporary residence under 8 CFR 210.2 and 245A.2.

---

[1] Section 1306(a) refers to a fine of up to $1,000, but the general fine provisions of 18 U.S.C. 3571 supersede that language. As a class B misdemeanor, the applicable fine is not more than $5,000. *Id.;* 18 U.S.C. 3559(a)(7).

[2] As of March 1, 2003, in accordance with section 1517 of Title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Immigration and Nationality Act describing functions which were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. 6 U.S.C. 557 (2003) (codifying HSA, Title XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

[3] The Secretary may waive fingerprinting requirements for some nonimmigrants. Such waivers are in the Secretary's discretion, on the basis of reciprocity, and pursuant to such regulations as the Secretary may prescribe. 8 U.S.C. 1302(c). Applicable regulations waive fingerprinting requirements for some nonimmigrants. *See* 8 CFR 264.1(e)(1) and (2). The waiver covers various diplomatic and similar categories; other nonimmigrant aliens, while they maintain nonimmigrant status, who are nationals of countries which do not require fingerprinting of U.S. citizens temporarily residing therein; and nonimmigrants who depart from the United States within one year of admission. *Id.* A nonimmigrant who fails to maintain status must apply to be fingerprinted at once upon failing to maintain nonimmigrant status. 8 CFR 264.1(e)(3).

[4] This includes aliens admitted as B–1/B–2 nonimmigrants through the Visa Waiver Program who were issued Form I–94W.

• I–698, Application to Adjust Status from Temporary to Permanent Resident—Applicants under section 245A of the Immigration and Nationality Act, as amended.

• I–700, Application for Status as a Temporary Resident—Applicants under section 210 of the Immigration and Nationality Act, as amended.

• I–817, Application for Voluntary Departure under the Family Unity Program.

*See* 8 CFR 264.1(a).

The regulations identify the following forms as constituting evidence of registration:

• I–94, Arrival-Departure Record—Aliens admitted as nonimmigrants; aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act; aliens whose claimed entry prior to July 1, 1924, cannot be verified, they having satisfactorily established residence in the United States since prior to July 1, 1924; and aliens granted permission to depart without the institution of deportation proceedings.

• I–95, Crewmen's Landing Permit—Crewmen arriving by vessel or aircraft.

• I–184, Alien Crewman Landing Permit and Identification Card—Crewmen arriving by vessel.

• I–185, Nonresident Alien Canadian Border Crossing Card—Citizens of Canada or British subjects residing in Canada.

• I–186, Nonresident Alien Mexican Border Crossing Card—Citizens of Mexico residing in Mexico.

• I–221, Order to Show Cause and Notice of Hearing—Aliens against whom deportation proceedings are being instituted.

• I–221S, Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien—Aliens against whom deportation proceedings are being instituted.

• I–551, Permanent Resident Card—Lawful permanent resident of the United States.

• I–766, Employment Authorization Document ("EAD").

• Form I–862, Notice to Appear—Aliens against whom removal proceedings are being instituted.

• Form I–863, Notice of Referral to Immigration Judge—Aliens against whom removal proceedings are being instituted.

*See* 8 CFR 264.1(b). In addition, under a note to section 264.1(b), a valid, unexpired nonimmigrant DHS admission or parole stamp in a foreign passport constitutes evidence of registration.

## III. Basis and Purpose of the IFR

This rule would partially implement section 7 of Executive Order 14159, Protecting the American People Against Invasion (Jan. 20, 2025), 90 FR 8443 (Jan. 29, 2025). Section 7 directs the Secretary, in coordination with the Secretary of State and the Attorney General, to take all appropriate action to:

• Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, U.S. Code (8 U.S.C. 1301–1306);

• Ensure that all previously unregistered aliens in the United States comply with 8 U.S.C. 1301–1306; and

• Ensure that failure to comply with the legal obligations of 8 U.S.C. 1301–1306 is treated as a civil and criminal enforcement priority.

90 FR 8444.

Following issuance of this Executive Order, DHS reviewed the registration regulations at 8 CFR part 264 and determined that it would be appropriate to designate a general registration form in addition to those already identified in the regulations. DHS believes that a general registration option may improve registration outcomes for certain groups of aliens. For instance, under current regulations, in general:

• Aliens who entered without inspection and have not otherwise been encountered by DHS lack a designated registration form.

• Even an alien who entered without inspection and who is later encountered by DHS, such as by applying for (or being granted) asylum or Temporary Protected Status (TPS), would not typically use the registration forms identified in § 264.1(a) when applying for asylum or TPS.[5]

• Many Canadian nonimmigrants for business or pleasure are not issued a Form I–94 even though they have not been registered through the visa process. *See* 8 CFR 212.1(a)(1), 235.1(f)(1)(ii).

• Some forms designated for registration in 8 CFR 264.1(a) (such as the Form I–485) are not normally used within 30 days of entry into the United States (the relevant time period for registration under 8 U.S.C. 1302 and 8 CFR 264.1(g)).

• In some cases, the acceptable evidence of registration at 8 CFR 264.1(b) is the result of an approved application only, which may leave denied or pending applicants without any acceptable evidence that they have complied with the requirement to register.

• The regulatory registration structure does not use any of the petitions filed on behalf of children or other derivative beneficiaries who may be in the United States.

Consistent with the Executive Order and the alien registration requirements of the INA, this rule designates a general registration option available to all unregistered aliens regardless of their status. To use this option, aliens must create their own unique account, or an account for their child, in myUSCIS at *https://my.uscis.gov/* and then complete G–325R Biographic Information (Registration), which is currently free of charge.

Submission of the registration in myUSCIS initiates the process for the alien's Biometrics Services Appointment at a USCIS Application Support Center (ASC). USCIS contacts the registrant regarding the biometrics services appointment and the collection of biometrics, including fingerprints, photograph and signature. USCIS uses this information for purposes of identity verification, and background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI).[6] USCIS sends an appointment notice with the date, time and location of the registrant's biometric services appointment.

Once an alien successfully completes his or her biometrics appointment at an ASC, the ELIS case management systems will trigger the creation of "Proof of Alien Registration" with a unique identifier printed on the document. For those aliens, such as Canadian nonimmigrants and aliens under the age of 14, required to register but for whom the fingerprint requirement is waived, the ELIS case management system will trigger the creation of the "Proof of Alien Registration" upon receipt of Form G–325R. This Proof of Alien Registration document will then be posted to the alien's myUSCIS account. In the myUSCIS account, the alien will be allowed to download a .PDF version of the document, and can print it. This document serves as evidence of the

---

[5] Such aliens may receive an EAD, which is designated as evidence of registration in § 264.1(b), but such aliens frequently are not required to apply for an EAD and may not be entitled to one. In addition, the application for an EAD (Form I–765, Application for Employment Authorization) is not designated as a registration form in § 264.1(a), which could result in confusion.

[6] *See* 8 CFR 103.16.

alien's registration for purposes of 8 U.S.C. 1304(d).[7]

This IFR fills the gaps in the regulatory regime by prescribing a registration form available to all aliens regardless of their status, in addition to the other forms already listed. Specifically, this IFR lists the new form at 8 CFR 264.1(a) and lists the corresponding evidence of registration at 8 CFR 264.1(b).

Consistent with 8 U.S.C. 1359, DHS interprets the registration and fingerprinting requirements of 8 U.S.C. 1302 to exclude from "all aliens" American Indians born in Canada who possess at least 50 per centum of blood of the American Indian race who are present in the United States under the authority of 8 U.S.C. 1359, as 8 U.S.C. 1302 and other provisions of subchapter II of Chapter 12, title 8 of the U.S. Code are construed consistent with their right to pass the borders of the United States.[8] Therefore, the registration form added in this IFR would not be used by section 1359 entrants because such entrants do not have to register, although they may do so if they wish.

The rule does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the Act. An alien who has previously registered consistent with 8 CFR 264.1(a), or an alien who has evidence of registration consistent with 8 CFR 264.1(b), need not register again, although such an alien is subject to ongoing change of address reporting requirements under 8 U.S.C. 1305(a) and 8 CFR 265.1.

## IV. Request for Comment on Potential Fee

While DHS is not incorporating a fee for filing Form G–325R at this time, DHS welcomes comment on the option of adding a biometric services fee per registrant of $30, for the collection, use, and storage of biometric information, pursuant to 8 CFR 103.16 and 17.

DHS has broad statutory authority to collect biometric information when

such information is necessary or relevant to the administration of the INA, including 8 U.S.C. 1304(a). Pursuant to 8 CFR 103.2(b)(9), 8 CFR 103.16 and 17, DHS may collect, use, and store biometrics for purposes of conducting background and security checks, adjudicating benefits and performing other functions related to administering and enforcing the immigration laws. *See* 8 CFR 103.2(b)(9). USCIS may require the payment of any biometric services fee identified in 8 CFR 106.2, or also charge a fee that is required by law, regulation, form instructions, or **Federal Register** notice applicable to the request type. *See* 8 U.S.C. 1356(m); 8 CFR 103.2(b)(9), 103.7, 103.17; 8 CFR part 106.

In previous rules, USCIS has evaluated the cost to USCIS of conducting biometric activities, including FBI Name checks and fingerprints, ASC contractual support, and biometric service management overall, including the cost of federal employees at the ASC locations.[9] USCIS currently pays approximately $10.00 to the FBI for fingerprinting results.[10] As part of USCIS' recent Fee Schedule rule, and for purposes of the creation of a separate biometric fee for certain programs, USCIS calculated that the biometric collection, storage and use at an ASC costs approximately $19.50.[11] The sum of these costs is approximately $29.50, which USCIS rounded up to the nearest $5 increment, similar to other Immigration Examinations Fee Account (IEFA) fees, making the fee $30.[12] Therefore, DHS welcomes comment on whether to cover these costs via a $30 biometric services fee for this population. DHS welcomes comments on this potential fee, including the calculation of the fee.

## V. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

DHS has issued this IFR without prior notice and opportunity for comment because this is a rule of agency organization, procedure, or practice ("procedural rule"). *See* 5 U.S.C. 553(b)(A). The procedural-rule exception "covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *JEM Broad. Co., Inc.* v. *FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (quoting *Batterton* v. *Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980)); *see also Mendoza* v. *Perez*, 754 F.3d 1002, 1023–24 (D.C. Cir. 2014); *Am. Hosp. Ass'n* v. *Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987) (holding that procedural rules are those that do not "encode a substantive value judgment or put a stamp of approval or disapproval on a given type of behavior").

The IFR merely adds another method (the myUSCIS registration process) for compliance with existing statutory registration requirements. It does not alter the rights or interests of any party, or encode a substantive value judgment on a given type of private behavior. Accordingly, DHS has proceeded without advance notice and opportunity for comment. DHS nonetheless welcomes post-promulgation comment on all aspects of this IFR consistent with the instructions provided in section I of this preamble.

### B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review), direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. Executive Order 13563 emphasizes the importance of quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. The Office of Management and Budget has determined that this rule is significant under Executive Order 12866 and has reviewed this regulation.

### Summary

DHS is amending existing regulations to make available another method for aliens to comply with the alien registration requirements of the INA. The rule seeks to better ensure that all

---

[7] As noted above, every registered alien 18 years of age and over must at all times carry and have in their personal possession any certificate of alien registration or alien registration receipt card. Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1304(e); 18 U.S.C. 3559(a)(8), 3571(b)(6).

[8] *See Akins* v. *Saxbe*, 380 F. Supp. 1210 (D. Me. 1974); *Matter of Yellowquill*, 16 I&N Dec. 576 (BIA 1978). Certain members of the Texas Band of Kickapoo Indians similarly are not required to register. *See Texas Band of Kickapoo Act*, Public Law 97–429, sec. 4(d) (1983) ("Notwithstanding the Immigration and Nationality Act, 8 U.S.C. 1101, all members of the Band shall be entitled to freely pass and repass the borders of the United States and to live and work in the United States.").

[9] *See* DHS, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Immigration Benefit Requests.* 88 FR 402, 484–485 (Jan. 4, 2023). DHS finalized the proposed rule and published a final rule in January 2024, with an effective date of April 1, 2024. *See* 89 FR 6194 (Jan. 31, 2024).

[10] *See* 88 FR at 485 (Jan. 4, 2023) (reflecting $11.25 for fingerprint-based Centralized Billing Service Provider (CBSP) checks). Since the publication of the NPRM, the Federal Bureau of Investigation (FBI), U.S. Department of Justice, has revised its fee scheduled, effective January 1, 2025, and lowered the fee for CBSPs to $10.00. *See* 89 FR 68930 (Aug. 28, 2024).

[11] *See* 88 FR at 485 (addressing the calculation of biometric services fee for purposes of applicants for Temporary Protected Status (TPS) under proposed 106.2(a)[48](iii), now included at 8 CFR 106.2(a)[50](iii), and DHS–EOIR biometric services fee under 8 CFR 103.7(a)(2)).

[12] *See* 88 FR at 485.

aliens in the United States comply with such requirements. The rule does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the INA.

DHS has assessed both the costs and benefits of this rule as required by Executive Orders 12866 and 13563. The rule will result in costs to aliens not currently complying with the requirements of the Act, which include the cost of time to complete and file a registration form as well as time spent submitting biometrics. DHS will incur additional costs due to the added activities from the collection of biometrics given the impacted population of aliens do not pay fees for registration or biometrics. However, the rule also offers benefits by providing a general registration option to allow all unregistered aliens to comply with their registration requirements, which will have direct benefits via improved DHS law enforcement efficacy and indirect benefits as a result of improved enforcement.

Affected Population

The most recent DHS population estimate for aliens without lawful status residing in the United States was 11 million as of January 1, 2022.[13] Most of these aliens either entered the United States without inspection or were admitted temporarily and remained past the date they were required to depart. This population comprises aliens who may have filed one of the forms as discussed in the preamble as designated registration forms under 8 CFR 264.1(a), and may have evidence of registration under 8 CFR 264.1(b).

The population impacted by this rule are those who are currently unregistered and who would use the general registration form designated under this rule. DHS estimates the affected population to be between 2.2 million and 3.2 million, after accounting for groups who have engaged with DHS and have previously filed one of the designated registration forms discussed in the preamble (requirements under 8 CFR 264.1(a) or 8 CFR 264.1(b)).[14] The

affected population includes, for instance:

• Aliens who are present in the United States without inspection and admission or inspection and parole and have not yet registered (*i.e.*, have not yet filed a registration form designated under 8 CFR 264.1(a), and do not have evidence of registration under 8 CFR 264.1(b)).

• Canadian visitors who entered the United States at land ports of entry and were not issued evidence of registration (*e.g.*, Form I–94).

• An alien, whether previously registered or not, who turns 14 years old in the United States and therefore must register within 30 days after their 14th birthday.

DHS recognizes there could be additional aliens subject to this rule in the future. Relying on this estimate may somewhat overstate those who need to fully comply as aliens under 14 years of age are required to be registered but do not need to provide fingerprinting.

Costs

DHS recognizes that there are costs to aliens to comply with registration requirements in the Executive Order and the INA's alien registration provisions. Because this rule does not impose any new alien registration or biometric obligations separate from those already contained in the Act, the costs described in this section are inherent to compliance with the statute and are not a result of this rule. DHS nonetheless assesses the effects of the increased compliance that may result from this rule. DHS similarly assesses the benefits in the following section.

Costs to aliens may include the time to complete and file a registration form, as well as time spent traveling to an ASC, submitting fingerprints, and record retention. There is currently no fee for applicants to file the prescribed form or to submit biometrics, but applicants take on the burden of time to complete the form.[15] While travel times and distances vary, applicants would need to travel to an ASC in order to submit biometrics and spend an additional amount of time to complete the collection.[16] The total filing burden

for new registrations will include the cost of time to submit biometrics and the time burden of registration using the prescribed forms in the regulation.

Additional compliance with registration obligations would also result in more aliens needing to maintain evidence of registration in the mode prescribed by DHS. Aliens may also spend some marginal amount of time to become familiar with the process and specific steps they should take to be compliant.

This IFR has the potential impact of increasing the biometric activities for DHS, such as additional FBI Name checks, fingerprinting, and support from ASC locations, estimated to cost $30 per applicant. The additional costs of the registration activities will be taken on by DHS given the population subject to this IFR currently does not pay fees for registration or biometric services, increasing costs to DHS. Earlier in this preamble, DHS has sought comment on a potential fee.

Benefits

The benefit of this IFR is the designation of a general registration form option that will improve registration outcomes for aliens identified in the Affected Population section above, consistent with the requirements of the alien registration provisions of the INA. This IFR provides a registration form available to all unregistered aliens regardless of their status. This rule fills a gap in registration by adding an online option to comply with existing statutory registration requirements.

The IFR is also expected to improve DHS law enforcement efficacy, because law enforcement personnel would have access to more comprehensive registration data. To the extent that the rule results in DHS receiving more comprehensive information about the location of aliens in the United States, the rule will make it easier and safer for DHS to enforce the law. In addition, increased compliance with fingerprinting requirements would provide DHS with additional information about an alien's criminal record, including whether the alien is a known or suspected terrorist. Such information provides greater situational awareness to law enforcement, including when executing arrest warrants. When DHS has more information about potential targets of

---

[13] *See* DHS Office of Homeland Security Statistics (OHSS), Estimates of the Unauthorized Population Residing in the United States: January 2018–January 2022 (Apr. 2024), *https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf.*

[14] Estimate calculated by the Office of Homeland Security Statistics. This estimate does not include aliens who have already met one or more conditions for registration, and accounts for changes to the alien population from 2022 through 2024 as well as emigration and mortality rates.

Other groups already considered registered for purposes of this analysis and not part of the affected population include those who have been issued an I–94 form, were paroled into the United States, were issued an EAD, or were issued a notice to appear in section 240 removal proceedings.

[15] The respondent burden to file Form G–325R is discussed below in the Paperwork Reduction Act section.

[16] *See Employment Authorization for Certain H–4 Dependent Spouses*, 80 FR 10284 (Feb. 25, 2015); and *Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives*, 78

FR 536, 572 (Jan. 3, 2013); *see also* USCIS, DHS, "Instructions for Application to Register Permanent Residence or Adjust Status (Form I–485)," OMB No. 1615–0023 (expires Oct. 31, 2027), *https://www.uscis.gov/sites/default/files/document/forms/i-485instr.pdf.*

law enforcement, it can make more efficient use of law enforcement resources and better protect public safety and officer safety.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 et seq.), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (i.e., small businesses, small organizations, and small governmental jurisdictions). The RFA's regulatory flexibility analysis requirements apply only to those rules for which an agency is required to publish a general notice of proposed rulemaking pursuant to 5 U.S.C. 553 or any other law. See 5 U.S.C. 604(a). DHS did not issue a notice of proposed rulemaking for this action. Therefore, a regulatory flexibility analysis is not required for this rule. Nonetheless, DHS has determined that this rule will not have a significant economic impact on a substantial number of small entities. This rule directly regulates individual aliens. However, the RFA's regulatory flexibility analysis requirements apply only to small entities subject to the requirements of the rule.[17] The individual aliens subject to the requirements of this rule are not small entities as defined in 5 U.S.C. 601(6). Accordingly, DHS certifies that this rule does not have a significant economic impact to a substantial number of small entities.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, which includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector.[18] The inflation adjusted value of $100 million in 1995 is approximately $200 million in 2023

based on the Consumer Price Index for All Urban Consumers (CPI–U).[19] This rule is exempt from the written statement requirement, because DHS did not publish a notice of proposed rulemaking for this rule. In addition, this final rule does not contain a Federal mandate as the term is defined under UMRA.[20] The requirements of title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

## E. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

This IFR is not a "rule" as defined by the Congressional Review Act (CRA), enacted as part of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121. See 5 U.S.C. 804(3)(C) (defining the term "rule" to exclude "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties"). DHS will nonetheless submit this IFR to both houses of Congress and the Comptroller General before the rule takes effect.

## F. Executive Order 14192 (Unleashing Prosperity Through Deregulation)

This rule is exempt from Executive Order 14192 as it is a regulation issued with respect to national security, homeland security and the immigration-related function of the United States.

## G. Executive Order 13132 (Federalism)

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, Federalism, 64 FR 43255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the

preparation of a federalism summary impact statement.

## H. Executive Order 12988 (Civil Justice Reform)

This rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this rule meets the applicable standards provided in section 3 of E.O. 12988.

## I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This rule does not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

## J. National Environmental Policy Act

DHS and its components analyze final actions to determine whether the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq., applies to them and, if so, what degree of analysis is required. DHS Directive 023–01 Rev. 01 and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual)[21] establish the policies and procedures that DHS and its components use to comply with NEPA, 42 U.S.C. 4321 et seq.[22]

NEPA allows Federal agencies to establish categories of actions ("categorical exclusions") that experience has shown do not, individually or cumulatively, have a significant effect on the human

---

[17] Small Business Administration, A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act at 22 (Aug. 2017), https://advocacy.sba.gov/wp-content/uploads/2019/07/How-to-Comply-with-the-RFA-WEB.pdf.

[18] See 2 U.S.C. 1532(a).

[19] See BLS, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202406.pdf (last visited Aug. 6, 2024). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2023); (2) Subtract the average CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2023–Average monthly CPI–U for 1995) ÷ (Average monthly CPI–U for 1995)] × 100 = [(304.702 − 152.383) ÷ 152.383] = (152.319/152.383) = 0.99958001 × 100 = 99.96 percent = 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

[20] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. See 2 U.S.C. 1502(1), 658(6).

[21] The Instruction Manual contains DHS's procedures for implementing NEPA and was issued November 6, 2014, available at https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex.

[22] The Council on Environmental Quality (CEQ) regulations, 40 CFR parts 1500 through 1508. also discuss NEPA implementing procedures. DHS is aware of the November 12, 2024 decision in Marin Audubon Society v. FAA, 121 F.4th 902 (D.C. Cir. 2024), reh'g en banc denied, No. 23–1067, 2025 WL 374897 (D.C. Cir. Jan. 31, 2025). To the extent that a court may conclude that the CEQ regulations implementing NEPA are not judicially enforceable or binding on this agency action, DHS notes that its NEPA procedures and approach here are fully consistent with the NEPA statute in addition to being consistent with the CEQ regulations. Even in the absence of the CEQ regulations, DHS would proceed as it has here.

environment and, therefore, do not require an environmental assessment (EA) or environmental impact statement (EIS).[23] *See* 42 U.S.C. 4336(a)(2), 4336e(1). The Instruction Manual, Appendix A lists the DHS Categorical Exclusions.[24]

Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[25]

This rule amends DHS's existing regulations at 8 CFR 264.1(a) to identify another method for aliens to apply to register and be fingerprinted under the alien registration requirements of the INA. DHS has reviewed the rule and finds that the rule is of a strictly administrative or procedural nature, and that no significant impact on the environment, or any change in environmental effect will result from the rule.

Accordingly, DHS finds that the promulgation of this final rule's amendments clearly fits within categorical exclusion A3 established in DHS's NEPA implementing procedures as an administrative change with no change in environmental effect, is not part of a larger federal action, and does not present extraordinary circumstances that create the potential for a significant environmental effect.

*K. Family Assessment*

DHS has reviewed this rule in line with the requirements of section 654 of the Treasury General Appropriations Act, 1999.[26] DHS has systematically reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and

personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this regulation will not negatively affect family well-being and will not have any impact on the autonomy and integrity of the family as an institution.

*L. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995 (PRA), 44 U.S.C. 3501 *et seq.,* DHS is required to submit to the Office of Management and Budget (OMB) for review and approval any new collections of information. This rule requires the use of Form G–325R, Biographic Information (Registration). Consistent with 5 CFR 1320.13, USCIS has submitted and OMB has approved a request for emergency authorization of the required changes for a period of 6 months, as a new collection of information.

In this final rule, USCIS is requesting comments on this information collection. Comments are due by May 12, 2025. When submitting comments on the information collection, your comments should include OMB Control Number 1615—NEW and address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, such as permitting electronic submission of responses.

A summary of the information collection follows.

USCIS Form G–325R (OMB Control Number 1615—NEW)

(1) *Type of Information Collection:* New collection.

(2) *Title of Form/Collection:* Biographic Information (Registration).

(3) *Agency form number, if any, and the applicable component of DHS*

*sponsoring the collection:* Form G–325R; USCIS.

(4) *Affected public who will be asked or required to respond:* Aliens, Individuals or Households. Aliens who are subject to alien registration requirements of the Immigration and Nationality Act, as amended, who have not yet registered.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection is 1,400,000 annually over a three-year period.[27] The estimated hour burden per response is 0.67 hours. The estimated total number of respondents for the information collection of biometrics is 1,400,000 annually over a three-year period and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The estimated total annual hour burden associated with this collection is 2,576,000 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden (*e.g.,* filing fees and postage) associated with this collection of information is $0

In addition, for PRA purposes, the estimated total annual opportunity cost of responding to this collection is $43,110,480 for completing the Form G–325R online and $75,282,480 for obtaining biometrics. This burden cost is prepared for PRA purposes and does not include travel time.

For further information on the approved collection of information, including the estimated burden and the expiration date, please refer to the OMB Control Number 1615—NEW at *www.reginfo.gov.*

**List of Subjects in 8 CFR Part 264**

Aliens, Reporting and recordkeeping requirements.

Accordingly, for the reasons set forth in the preamble, DHS amends 8 CFR part 264 as follows:

---

[23] *See also* 40 CFR 1507.3(e)(2)(ii) and 1501.4.

[24] *See* Appendix A, Table 1.

[25] *Instruction Manual 023–01* at V.B(2)(a)–(c).

[26] Public Law 105–277, 112 Stat. 2681 (1998).

[27] DHS notes that the estimate of annual filing volume in the PRA section is different from the average of the estimated population discussed in the Affected Population section above. DHS uses a different method for estimating the average annual number of respondents for the information collection over the 3-year OMB approval of the control number generally assuming more registrations may be expected to occur in year one than in later years. When the information collection request is nearing expiration USCIS will update the estimates of annual respondents based on actual results in the submission to OMB. The PRA burden estimates are generally updated at least every 3 years. Thus, the PRA estimated annual respondents would be updated to reflect the actual effects of this rule within a relatively short period after a final rule takes effect.

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 1. The authority citation for part 264 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1302–1305; 8 CFR part 2.

■ 2. Amend § 264.1 by:
■ a. In the table in paragraph (a), adding an entry, in alphabetical order, for "G–325R, Biographic Information (Registration), or its successor form"; and
■ b. In the table in paragraph (b), adding an entry, in alphabetical order, for "USCIS Proof of Alien G–325R Registration, or its successor form".

The additions read as follows:

### § 264.1 Registration and fingerprinting

(a) * * *

Form No. and Class

\* \* \* \* \*

G–325R, Biographic Information (Registration), or its successor form.

\* \* \* \* \*

(b) * * *

Form No. and Class

\* \* \* \* \*

USCIS Proof of Alien G–325R Registration, or its successor form.

\* \* \* \* \*

**Kristi Noem,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2025–03944 Filed 3–7–25; 4:35 pm]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 39

**[Docket No. FAA–2024–2420; Project Identifier MCAI–2024–00143–T; Amendment 39–22978; AD 2025–05–06]**

**RIN 2120–AA64**

**Airworthiness Directives; De Havilland Aircraft of Canada Limited (Type Certificate Previously Held by Bombardier, Inc.) Airplanes**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** The FAA is superseding Airworthiness Directive (AD) 2022–01–02, which applied to certain De Havilland Aircraft of Canada Limited Model DHC–8–400, –401, and –402 airplanes. AD 2022–01–02 required

inspecting for corrosion of the nacelle to wing rear spar attachment pins, and the nacelle to landing gear attachment pins, and doing all applicable corrective actions. This AD was prompted by a determination that some operators were unable to identify the airplanes subject to each requirement. This AD continues to require the actions specified in AD 2022–01–02, clarifies the affected airplanes for each required action, and revises the applicability by removing Model DHC–8–400 airplanes; as specified in Transport Canada AD, which is incorporated by reference. The FAA is issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective April 18, 3036.

The Director of the Federal Register approved the incorporation by reference of a certain publication listed in this AD as of April 18, 3036.

**ADDRESSES:**

*AD Docket:* You may examine the AD docket at *regulations.gov* under Docket No. FAA–2024–2420; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, the mandatory continuing airworthiness information (MCAI), any comments received, and other information. The address for Docket Operations is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

*Material Incorporated by Reference:*
• For Transport Canada material identified in this AD, contact Transport Canada, Transport Canada National Aircraft Certification, 159 Cleopatra Drive, Nepean, Ontario K1A 0N5, Canada; telephone 888–663–3639; email *TC.AirworthinessDirectives-Consignesdenavigabilite.TC@tc.gc.ca.* You may find this material on the Transport Canada website at *tc.canada.ca/en/aviation.*
• You may view this material at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available at *regulations.gov* under Docket No. FAA–2024–2420.

**FOR FURTHER INFORMATION CONTACT:**
Fatin Saumik, Aviation Safety Engineer, FAA, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7300; email *9-avs-nyaco-cos@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

The FAA issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 to supersede AD 2022–01–02, Amendment 39–21890 (87 FR 4145, January 27, 2022) (AD 2022–01–02). AD 2022–01–02 applied to certain De Havilland Aircraft of Canada Limited Model DHC–8–400, –401, and –402 airplanes. AD 2022–01–02 required doing a detailed visual inspection for corrosion of the nacelle to wing rear spar attachment pins, and the nacelle to landing gear attachment pins, and doing all applicable corrective actions. The FAA issued AD 2022–01–02 to address premature corrosion and subsequent failure of the nacelle to landing gear and nacelle to rear wing spar attachment pins, which, if undetected, could lead to a single or dual collapse of the main landing gear.

The NPRM published in the **Federal Register** on November 12, 2024 (89 FR 88910). The NPRM was prompted by AD CF–2020–51R2, dated February 27, 2024, issued by Transport Canada, which is the aviation authority for Canada (Transport Canada AD CF–2020–51R2) (also referred to as the MCAI). The MCAI provides clarification of the applicability for each of its parts (Parts I through V) and otherwise maintains the requirements of Transport Canada AD CF–2020–51R1. It also revises the applicability section to remove Model DHC–8–400 airplanes since no Model DHC–8–400 airplanes have been delivered.

In the NPRM, the FAA proposed to continue to require the actions specified in AD 2022–01–02, clarify the affected airplanes for each required action, and revise the applicability by removing Model DHC–8–400 airplanes, as specified in Transport Canada AD CF–2020–51R2. The NPRM also proposed to correct an error in AD 2022–01–02, which included a compliance time that incorrectly used the number of flight cycles on the airplane instead of on the pins. The FAA is issuing this AD to address premature corrosion and subsequent failure of the nacelle to landing gear and nacelle to rear wing spar attachment pins. The unsafe condition, if not addressed, could result a single or dual collapse of the main landing gear.

You may examine the MCAI in the AD docket at *regulations.gov* under Docket No. FAA–2024–2420.

## Discussion of Final Airworthiness Directive

### Comments

The FAA received a comment from Air Line Pilots Association,