Oral Argument Scheduled December 18, 2025
Nos. 25-5152, 25-5233, 25-5247

# In the United States Court of Appeals for the District of Columbia Circuit

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,
*Plaintiffs -Appellants*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Defendants – Appellees*,

On Appeal from the United States District Court for the District of Columbia
Case No. 1:25-cv-00943-TNM, Honorable Trevor N. McFadden, District Judge

**BRIEF OF *AMICUS CURIAE* FEDERATION FOR AMERICAN IMMIGRATION REFORM IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

CHRISTOPHER J. HAJEC
*Counsel of Record*
MATT A. CRAPO
DAVID L. JAROSLAV
*On the Brief*
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Ste 330
Washington, DC 20001
(202) 232-5590
chajec@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

# DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, *amicus curiae* Federation for American Immigration Reform makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3) The following entity has an interest in the outcome of this case: Federation for American Immigration Reform.

## TABLE OF CONTENTS

                                                                           **Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ................................................................................ ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ................................................ 1

INTRODUCTION ................................................................................................ 2

ARGUMENT ....................................................................................................... 4

    I.     A less efficient registration system is contrary to the public interest ........... 6

    II.    The IFR does not irreparably harm either Plaintiffs as organizations or individual aliens ................................................................................................ 8

CONCLUSION ................................................................................................. 13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Library Assn. v. Barr*,
  956 F.2d 1178 (D.C. Cir. 1992) ................................................................ 12

*Ark. Dairy Co-op Assn., Inc. v. Dept. of Agr.*,
  573 F.3d 815 (D.C. Cir. 2009) .................................................................. 4

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .............................................................. 4, 9

*Coal. for Humane Immigrant Rights v. U.S. Dept. of Homeland Sec.*,
  780 F. Supp. 3d 79 (D.D.C. 2025) ....................................................... 8, 12

*Hartman v. Moore,*
  547 U.S. 250 (2006) ................................................................................ 11

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ..................................................................... 8

*Mova Pharm. Corp. v. Shalala*,
  140 F.3d 1060 (D.C. Cir. 1998) ............................................................... 4

*Nat. Family Planning & Reprod. Health Assn. v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ............................................................... 10

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ............................................................................... 11

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ..................................................................................... 8

## STATUTES

Alien Registration Act of 1940, Pub. L. No. 76-670, 54 Stat. 670 ..................... 4

Enhanced Border Security and Visa Entry Reform Act of 2002,
    Pub. L. No. 107-173, § 602, 116 Stat. 543 ............................................................5

Illegal Immigration Reform and Immigrant Responsibility Act,
    Pub. L. No. 104-208, § 304, 110 Stat. 3009-546 (1996) ......................................5

Immigration and Nationality Act,
    Pub. L. No. 82-414, 66 Stat. 163 (1952) ..............................................................5

Secure Fence Act of 2006,
    Pub. L. No. 109-367, § 2(b), 120 Stat. 2638 ........................................................6

8 U.S.C. § 1229(a)(1)(F) ...................................................................................................5

8 U.S.C. § 1229a(b)(5) ......................................................................................................5

8 U.S.C. § 1306 ...............................................................................................................10

8 U.S.C. § 1611(a) .............................................................................................................7

8 U.S.C. § 1701 (note) ......................................................................................................6

## MISCELLANEOUS

Alien Registration Form and Evidence of Registration,
    90 Fed. Reg. 11793 (Mar. 12, 2025) ...............................................................9, 10

# IDENTITY AND INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a non-profit 501(c)(3) public interest organization dedicated to informing the public about the effects of both unlawful and lawful immigration, and to defending in court the interests of Americans in limiting overall immigration, enhancing border security, and ending illegal immigration. FAIR has been involved in more than 100 legal cases since 1980, either as a party or as *amicus curiae*. The decision in this case will likely have an impact on the ability of the executive branch of the federal government to identify and deal efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States.

FAIR is also the successor in interest to the Immigration Reform Law Institute (IRLI), a supporting organization that merged into FAIR in August 2025.[2] IRLI filed an *amicus* brief in the lower-court proceedings which are the subject of these consolidated appeals, as well as an *amicus* brief in this case opposing Appellants' motion for injunction pending appeal.

---

[1] All parties have consented to the filing of this brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

[2] *See* FAIR Press Release, "FAIR Expands Its Impact by Adding Litigation and Investigations Divisions: IRLI integration creates 'a unique opportunity,' August 20, 2025, https://www.fairus.org/press-release/fair-irli-merger-litigation-and-investigations.

# INTRODUCTION

The United States remains engulfed in a crisis of illegal immigration that undermines national sovereignty and public safety. From 2021 to 2024, the Biden Administration facilitated mass illegal and extralegal entries into the United States through policies that paused removals and weakened immigration enforcement guidelines. That Administration terminated the Migrant Protection Protocols ("Remain in Mexico"), halted border wall construction, reinstated "catch-and-release" at the border, loosened asylum requirements, and implemented unlawful mass parole programs. These measures violated both the executive's statutory duty to secure the border and its constitutional obligation to take care that the nation's immigration laws be faithfully executed.

The Migration Policy Institute estimates that 5.8 million total migrants were paroled or otherwise allowed entry to pursue asylum from the beginning of President Biden's term until July 2024. *See* Migration Policy Institute, *Biden's Mixed Immigration Legacy* (Dec. 6, 2024), https://www.migrationpolicy.org/article/biden-immigration-legacy. A report by the House Committee on Homeland Security Found that border officials recorded 10.8 million encounters nationwide from 2021 to October 2024. *See* U.S. House Committee on Homeland Security, *"CRISIS BY DESIGN": A Comprehensive Look at the Biden-Harris Administration's Unprecedented Border Crisis*, September

*2024 Border Report* (Sept. 2024), https://homeland.house.gov/wp-content/uploads/2024/09/September-2024-Border-Report.pdf. *See also* Andrew Prokop, *What Democrats Must Learn from Biden's Disastrous Immigration Record*, Vox (Jan. 17, 2025) https://www.vox.com/politics/395339/biden-border-immigration-record-legacy.

Estimates of the total number of illegal aliens in the United Sates range from 11 million to over 18 million. *See* Jeffrey S. Passel & D'Vera Cohn, *What We Know About Unauthorized Immigrants Living in the U.S.*, Pew Rsch. Ctr. (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/; Federation for American Immigration Reform, *How Many Illegal Aliens Are in the United States?* (Mar. 7, 2025), https://www.fairus.org/issue/how-many-illegal-aliens-are-united-states-2025-update. Despite the determined and successful measures taken by the current Administration in its first 100 days[3] and since to remedy this situation, millions of illegal aliens remain in the country.

Alien registration is central to effective immigration enforcement and has been a statutory requirement since at least 1940, well predating the enactment of

---

[3] *See* U.S. Dep't of Homeland Sec., 100 Days of Secretary Noem: Making America Safe Again (May 5, 2025), https://www.dhs.gov/news/2025/05/05/100-days-secretary-noem-making-america-safe-again (detailing the results of actions taken by the current administration in its first 100 days).

the Immigration and Nationality Act ("INA") in 1952. The Interim Final Rule ("IFR") challenged in this case furthers the ability of the Department of Homeland Security ("DHS") to achieve congressionally-mandated objectives by allowing any alien, regardless of status, to comply with the registration requirement by using Form G-325R. The district court properly declined to enjoin or stay the IFR as this would constitute an irreparable harm to the government by preventing DHS from carrying out its congressionally mandated responsibility to enforce immigration law. An injunction or stay also would be clearly contrary to the public interest and the balance of equities, because it would undermine public safety and make immigration enforcement more difficult. No harm alleged by Plaintiffs can justify such outcomes.

## ARGUMENT

This Court reviews the district court's weighing of factors and ultimate decision whether to grant or deny a preliminary injunction (or the equivalent) for abuse of discretion. *See Ark. Dairy Co-op Assn., Inc. v. Dept. of Agr.*, 573 F.3d 815 (D.C. Cir. 2009); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998)). The district court did not abuse its discretion in denying injunctive relief.

Registration requirements for aliens date back at least to the Alien Registration Act of 1940, Pub. L. No. 76-670, 54 Stat. 670, which was enacted to

safeguard national security during World War II. To prevent espionage and sabotage, Congress saw the need for a reliable system to document and keep track of aliens who entered the country. Later, the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952), formalized this system further, establishing a comprehensive framework for maintaining records of aliens. Alien registration helps the government identify and track aliens, monitor compliance with immigration laws, and maintain public safety.

In 1996, Congress reaffirmed the importance of alien registration with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which ensured that aliens who fail to register or update their addresses can face removal. *See* Pub. L. No. 104-208, § 304, 110 Stat. 3009-546 (codified at 8 U.S.C. §§ 1229(a)(1)(F), 1229a(b)(5)) (requiring aliens placed in removal proceedings to provide current address information and permitting removal in absentia if an alien fails to do so and thereafter fails to attend a removal hearing). Congress reinforced the need for a reliable, centralized registration system to improve tracking of aliens and to ensure that those present in the United States are lawfully present and identifiable in the Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. No. 107-173, § 602, 116 Stat. 543 (directing the General Accounting Office to study the feasibility and utility of requiring nonimmigrants to submit a current address and, where applicable, the name and

address of an employer every year). And in 2006, Congress directed the Secretary of Homeland Security to achieve "operational control" of the borders, defined as preventing "all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, and instruments of terrorism." Secure Fence Act of 2006, Pub. L. No. 109-367, § 2(b), 120 Stat. 2638 (codified as a note to 8 U.S.C. § 1701).

I. **A less efficient registration system is contrary to the public interest.**

The balance of equities and public interest favor allowing the IFR to remain in effect. The IFR merely facilitates long-standing statutory alien registration requirements and is essential for national security, law enforcement, and immigration enforcement. By introducing the digital Form G-325R, the IFR modernizes the process, making registration more accessible for all aliens regardless of status and more efficient for DHS. Perhaps most notably, the rule does not impose any new obligations: rather, it simply facilitates greater compliance with existing statutory requirements while addressing enforcement challenges caused by prior policies. Accurate registration data have always been vital to public safety, especially after 9/11, when gaps in alien registration hindered monitoring of potential security threats. *See* Cong. Rsch. Serv., Immigration: Alien Registration, RL31570 (Jan. 6, 2004), https://www.everycrsreport.com/reports/RL31570.html ("Since the September 11,

2001 terrorist attacks, many U.S. officials and others have expressed concerns that the U.S. government is unaware of the addresses and whereabouts of many foreign nationals in the country."). Implementing the IFR ensures DHS has current information on aliens, which will advance both security and enforcement efforts.

Federal law expressly permits only "qualified aliens" to receive public benefits, and accurate alien registration data can allow agencies to ensure the eligibility of beneficiaries. *See* 8 U.S.C. § 1611(a). For example, the Systematic Alien Verification for Entitlements (SAVE) Program operationalizes this restriction by allowing agencies to verify an applicant's immigration status against DHS records. *See* USCIS, SAVE Verification Process, https://www.uscis.gov/save/about-save/save-verification-process, (listing Alien Registration number as one means of identifying applicants). Without reliable registration data, agencies face increased risk of unlawful disbursements of public benefits. In 2024 alone, the U.S. Department of Agriculture reported $10.5 billion in improper SNAP payments, many of which were attributable to eligibility verification failures. *See* Govt. Accountability Ofc., Report GAO-24-107461, Improper Payments: USDA's Oversight of the Supplemental Nutrition Assistance Program (2024), https://www.gao.gov/products/gao-24-107461. By providing a uniform, accessible method for alien registration, the IFR enhances the accuracy of DHS data and

fortifies federal and state mechanisms designed to limit public benefits to qualified individuals.

## II. The IFR does not irreparably harm either Plaintiffs as organizations or individual aliens.

Plaintiffs argue that, because of the significant burdens on both their organizational operations and the aliens they serve, the balance of equities weighs in favor of an injunction or a stay of agency action. They contend that the IFR will force them to divert limited resources away from their core advocacy and assistance programs, thereby reducing their capacity to fulfill their primary missions. *See, e.g.*, Appellants' Brief, at 50-52. They also suggest that the new registration requirements will significantly increase the need for legal assistance, overwhelming their ability to meet their clients as well as reducing their funding. *See id*.

The burdens alleged by Plaintiffs, such as diversion of resources, are insufficient to establish standing, which the district court correctly initially ruled that they lack. *See Coal. for Humane Immigrant Rights v. U.S. Dept. of Homeland Sec.*, 780 F. Supp. 3d 79, 87-95 (D.D.C. 2025). But even if they had standing, these harms are insufficient to meet their burden for a preliminary injunction, which "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). *See also League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (laying out the factors for a court to consider a

preliminary injunction); *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (requiring a "clear showing" by the moving party that the requested relief is warranted).

It is not burdensome to give aliens an additional, more convenient option to comply with their pre-existing statutory duty to register. On the contrary, it is burdensome for both aliens and the government to continue using outdated, fragmented processes that impede efficient registration. Indeed, far from burdening aliens, the IFR actually serves their interests by making it easier for them to demonstrate their compliance with immigration laws and to avoid legal consequences for failing to register. This in turn aids Plaintiffs as organizations, who can focus their resources on those aliens who comply with statutory registration requirements rather than those who willfully disregard the law.

As noted, far from irreparably harming aliens, the IFR actually benefits them by providing a more accessible way to comply with existing statutory registration obligations. The long-standing statutory obligation of aliens to register and update address information is unchanged by the IFR. *See* Alien Registration Form and Evidence of Registration, 90 Fed. Reg. 11793, 11796 (Mar. 12, 2025) ("The rule does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the Act.") The IFR streamlines the process by introducing an online registration option—an update that reflects the realities of

modern administration. The Proof of Alien Registration that aliens receive after completing the form reduces the risk of enforcement actions based on perceived noncompliance. *Id.* at 11795 (describing the process for acquiring the Proof of Alien Registration). *See also* 8 U.S.C. § 1306. Additionally, any "chilling effect" on aliens is owing not to the new IFR form but to some aliens' fear of deportation or criminal penalties due to their underlying unlawful immigration status and failure to comply with the statutory registration requirement. Therefore, Plaintiffs are mistaken in arguing that the IFR, rather than their own noncompliance with the law, "puts millions of [aliens] in the crosshairs." Appellants' Brief at 52.

The aliens mentioned in Plaintiffs' brief, Ursela and Guvelia, are supposedly harmed because the information they would be required to provide via registration "will place these individuals in the direct crosshairs of immigration enforcement authorities and interfere with their ability to pursue immigration relief for which they are eligible." *Id.* at 48-49. But a violation of the law committed while waiting for possible immigration relief is nonetheless a violation of the law—for which, of course, these aliens are responsible. Accordingly, the harm these aliens might experience by unlawfully waiting here, rather than abroad, is self-inflicted. *See, e.g., Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (stating this circuit's consistent position that self-inflicted harm does not amount to a cognizable injury).

Plaintiffs' invocation of First Amendment harms is also unconvincing. They allege that their members will fear unlawful backlash due to forced disclosure of First Amendment activities, including immigration advocacy. Appellants' Brief at 45; *see also* EXHIBIT N Declaration of MRNY Member "Guvelia," (discussing fear of deportation because of never-specified immigration advocacy or criticism of President Trump). Plaintiffs' illegally-present members, if believed to be, and arrested on probable cause of being, in the country unlawfully based on information they provide on Form G-325R, would be unable to show such unlawful retaliation. *See, a fortiori, Hartman v. Moore*, 547 U.S. 250 (2006) (holding that a *Bivens* plaintiff cannot succeed in a claim of retaliatory criminal prosecution in violation of the First Amendment without alleging and proving that the charges were unsupported by probable cause). And, indeed, the Supreme Court has held that, in the deportation context, the interest in avoiding selective treatment "is less compelling than in criminal prosecutions." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999). As the Court further observed:

> Even when deportation is sought because of some act the alien has committed, in principle the alien is not being punished for that act (criminal charges may be available for that separate purpose) but is merely being held to the terms under which he was admitted. And in all cases, deportation is necessary in order to bring to an end *an ongoing violation* of United States law. The contention that a violation must be allowed to continue because it has been improperly selected is not powerfully appealing.

*Id.* (emphasis in original).

Accordingly, Plaintiffs wholly fail to show imminent irreparable harm from unlawful retaliation against their members' asserted First Amendment activity. As the district court observed, "[w]hat they have not done is offered any evidence that they face a 'credible threat of prosecution' *for their speech* 'under a statute that appears to render [their] arguably protected speech illegal.'" *Coal. for Humane Immigrant Rights*, 780 F. Supp. 3d at 95 (emphasis in original) (quoting *Am. Library Assn. v. Barr*, 956 F.2d 1178, 1194 (D.C. Cir. 1992)).

In sum, enjoining the IFR would not only disregard the congressional intent behind alien registration and undermine DHS's ability to carry out its statutory mandate, but would actually make it more difficult for many aliens themselves to comply with their existing statutory registration obligations. The public interest is not served by making compliance more difficult or by preventing DHS from introducing more modern registration methods. Like any lawbreakers, immigration lawbreakers cannot claim that more efficient law enforcement measures harm them. The balance of equities clearly weighs in favor of the IFR, because it both facilitates compliance for certain aliens and strengthens the government's ability to maintain public safety through accurate registration records. The district court recognized all of this in properly denying Plaintiffs the extraordinary relief they requested, and Plaintiffs have not shown that the district court abused its discretion in doing so.

# CONCLUSION

For the foregoing reasons the judgment of the district court should be affirmed.

Date: November 3, 2025

Respectfully submitted,

/s/ Christopher J. Hajec
CHRISTOPHER J. HAJEC
D.C. Bar No. 492551
*Counsel of Record*
MATT A. CRAPO
D.C. Bar No. 473355
DAVID L. JAROSLAV
D.C. Bar No. 90021286
*On the Brief*
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Ste. 33
Washington, DC 20001
(202) 232-5590
chajec@fairus.org
mcrapo@fairus.org
djaroslav@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

# CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 27(d)(2) because it contains 2,699 words, as measured by Microsoft Word software. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

Dated: November 3, 2025                     Respectfully submitted,

                                                              /s/ Christopher J. Hajec

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November 2025, I electronically filed the foregoing *amicus* brief with the Clerk of the Court using the CM/ECF system, which I understand to have caused service of the parties' counsel.

<u>s/ Christopher Hajec</u>